## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALLEGRA D. HEMPHILL,           *

                         *

          Plaintiff,      *

                         *

vs.                      *     Civil Action No. 1:07cv1236

                         *     Assigned to:  Judge John D. Bates

KIMBERLY- CLARK CORPORATION*

and                      *

PROCTER & GAMBLE COMPANY   *

                         *

          Defendant(s). *

*********************************************************************

### PLAINTIFF'S MOTION FOR A HEARING

The Plaintiff, Allegra Hemphill,  moves this Court for a hearing in the above captioned case **for patent infringement**.   The Plaintiff's Motion for a Hearing and the Plaintiff's Appendix are included herewith. The Plaintiff's motion for a hearing should be granted for the reasons, <u>and</u> points of  authorities that follow:


**INTRODUCTION**

The Complaint and Summons were filed on July 10, 2007.  It was assigned to Judge John D. Bates, United States District Court Judge, for the District of Columbia. In her Complaint,  Ms. Hemphill asserts an independent claim 2,  because the applicable law in the **independent** claim 2 is not found in the **independent** claim 1.

The patent infringement lawsuit against the above- named defendants,  reads in pertinent part, at paragraph 12:

12.     "Always", "Kotex" and "Poise" brand feminine care products each incorporate elements which were previously adjudicated in United States



RECEIVED

OCT 2 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

District Court, for the District of Maryland as part of the Hemphill Patent's claim construction [in an independent claim 1]. Specifically, each of these products incorporate:

a. A core member that is fairly rigid, having an annular base that can fit into an annular band of outer housing; and

b. An outer housing which serves as a handle structure for the use of the [vaginal] swab, and is not designed to be removed and thrown away.

"Claim construction is an issue of law." *Markman v. Westview Instruments, Inc.* 52 F3d. 967,970-971. (Fed. Cir. 1996) whereas, determination of infringement whether literal or under doctrine of equivalents is a question of fact." *SRI Int'l v. Mutsushita Elec. Corp. of A.*, 775 F2d. 1107, 1125 (Fed. Cir. 1985) en banc. "By reading the specification as a whole, the specification and prosecution history clearly define the scope of the invention [for an independent claim 2] **so that defendants must yield to doctrine of claim differentiation**" see *Fantasy Sports Properties v. Sportsline Com* 287 F3d. 1108, 1114 (Fed. Cir. 2002), which also asserted only one independent claim.[1] Here, "the doctrine of claim differentiation creates the presumption that each claim in a patent has a different scope that cannot broaden claims beyond their correct scope." *Fantasy Sports Properties v. Sportsline Com* 287 F3d. 1108, 1114 (Fed. Cir. 2002).

---

[1] In the Hemphill '720 Patent, the claims were written <u>and</u> filed in the United States Patent and Trademark Office by the Law Offices of Cushman, Darby, Cushman, 1801 K. Street, NW Washington, DC 20231. **There were no amendments made to the '720 patent.** See <u>Reexamination Certificate</u> in the Appendix, at 359A-360A.

2

It should be well understood, the United States Letters Patent 4,557,720 (hereinafter "the '720 patent"), correctly issued under mandatory patent laws of these United States. The ***means plus function* language** in claim 2, and not found in claim 1, **is relevant** because the **federal law is relevant**. Unlike claim 1, claim 2 is governed by Title 35 U.S.C. §112, ¶6 *means plus function* language. Thus, **the law** in the independent claim 2 **is <u>mandatory.</u>** SEE **35 U.S.C. §112, ¶6:**

> "An element in a claim for combination may be expressed as a ***means*** or step for performing a specified function without the recital of structure, material, or acts in support thereof, and **such claim *shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.*"**

It should also be noted that no judge in any court ever "sat", or held any hearings with respect to these defendants, --which is most "unusual". Therefore, this request for a hearing, is 'fair <u>and</u> balanced' for the patentee to demonstrate that the above accused devices **infringe** claim 2 in her '720 Patent.

3

## *I. MEANS PLUS FUNCTION* LANGUAGE IN CLAIM 2 IS RELEVANT

Undeniably, claim 2 is governed by Title 35 U.S.C. §112, ¶6 *means plus function language.* To identify structure as housing means, Claim 2 reads:

2. A vaginal swab comprising an outer housing including an inner case member and an outer case member at least part of which is connected to and overlies said inner case member;

a core member, at least one layer of a porous material secured to said core member, and **housing means** *for supporting and enclosing* said core member, **said core member being secured to said housing means,** having at least two portions movable relative to one another between first and second positions *for enclosing said core member when in said first position* and *for both exposing* said core member and the said porous padding secured thereto and *for forming a* handle *for said swab* when in said second position.

See Hemphill United States Letters Patent 4, 557,720 in the Appendix at 107A -114A. See Claim 2 in the Hemphill '720 Patent at App. 114A.

"Once the court concludes the above claim limitation is a means-plus-function limitation, **two steps of claim construction remain 1) the court must first identify the function of the limitation and 2) the court must then look to the specification and identify the corresponding structure for that function**" See *Biomedino LLC v. Waters Techonologies Corp.* 490 F3d. 946, 947 (Fed. Cir. 2007).

4

## II. PRIOR ART IN CLAIM 2 IS RELEVANT

2. "The Supreme Court in *Festo VIII* noted that "the patentee, as the author of the claim language may be expected to draft claims encompassing readily known equivalents." 122 S. Ct. 1831. "The theory of the doctrine of equivalents is that an applicant through the doctrine of equivalents should only be able to protect the scope of [her] invention." [2] [3] *Festo Corporation v. Shoketsu Kinzoku Kabushiki Co. LTD* 493 F3d. 1368, 1379-1380 (Fed. Cir. 2007).

Once *means plus function language* has been identified in the independent claim 2, it is equally important to determine the **definiteness** of a vaginal swab and thus, clarify how rigid is fairly rigid for a core member in claim 2. Here, we simply clarify, to understand the terms for a fairly rigid core member and vaginal swab to achieve definiteness in claim 2.

---

[2] See *materials used* **for a core member:**
The PTO confirmed that prior art Srininvasanet al. 3,973,567 patent had structure readable in claim 2. App. 306A. See the flat flexible sheet as a core member ("...may comprise **a fluid impermeable sheet material such as polyethylene or polypropylene cellophane or other similar films**"), Col. 4, ll.5-12 at App. 331A.

See ("...a **string or cord**") for core member in prior art Fielding 3,731,682 patent, Col. 4, ll.35-40 at App. 169A.

[3] See *materials used* **for an outer housing**
in prior art Bower 4,159,718 patent in Col. 1, ll. 29-31. ("...comprising two **rectangular** sheets ...") in Col. 1, ll. 57-58 at App. 197A.

See a cover in prior art Johansson 4,165,942 patent: ("...protective cover which can be opened up at one end ...and folded back to expose..") in Col. 1, ll. 48-55. App. 201A.

See a sheath in Schuster 4,157,709: "comprises an outer sheath, an intermediate tube slidable there within...."). Col. 2, ll. 60-66. App. 190A.

## ARGUMENT

### *MEANS PLUS FUNCTION* LANGUAGE IN CLAIM 2 <u>IS</u> RELEVANT

"When a claim uses the term "means" to describe a limitation, a presumption inheres that the inventor used the term to invoke §112, ¶6.  In the independent claim 2, *housing means*  is structure or material capable of performing the specified function. This Court begins its construction of the term "housing means" in the independent claim 2 with the observation that if a claim element contains the term "means" and recites a function there is a presumption that §112, ¶6 applies.

 Claim 2 in the Hemphill '720 Patent reads:

> " ...*core member being secured to said **housing means** ...*
>
> ***housing means*** for supporting and enclosing core member
>
> ...and for both exposing ...and for forming a handle for said swab ..."

"[A]ll one needs to do in order to obtain the benefit of §112, ¶6 is to recite some structure corresponding to the means in the specification as the statute states so that one can readily ascertain what the claim means <u>and</u> <u>comply</u> <u>with</u> the particularity requirement of §112, ¶2," "Thus, in order for a means plus function claim to be valid under 112, the corresponding structure of the limitation "must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation." *Default Proof Card Sys. Inc, v. Home Depot USA Inc*. 412 F3d. 1291, 1302 (Fed. Cir. 2005). In *Vermont Industries, Inc v. Reinke Manufacturing Co.* 983 F2d. 1039, 1043 Fed. Cir. 1993), it was explained that §112, ¶6

6

permitted "broad means plus function language, but provided a standard to make the broad claim language more definite[:]...[t]he applicant must describe in the patent specification some structure which performs the specified function." "Permitting an applicant to use a broad means expression for claiming a functional limitation provided that the specification indicates what structure constitutes the means for performing the claimed function is often referred to as the "quid pro quo" for the convenience of employing §112, ¶6. *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F3d. 1372, 1378 (Fed. Cir. 1999). Therefore, in the Hemphill '720 patent, the portion of the written description that pertains to the structure component of the means plus function limitation is the following:

> In the specification, <u>Summary of the Present Invention</u>" recites:
> "the outer container is essentially peeled away from an enclosing protecting
> relationship   about the swab itself *with at least part of the outer container*
> *forming the handle structure at the base of the thus exposed "swab"*..[4] Col. 2, ll.

---

[4] First, we review structure as "the swab" . The '720 Patent teaches:
"**the swab** 100 is comprised of a core 102 covered by a gauze layer 104" Col. 5,ll. 29-31.

"[A]bsorbent gauze material 104 is secured about the exterior surface of core 102 but not about annular band 106" '720 Patent Col. 5, ll. 36-38.

"[C]ore 102 is separately formed [from 110 outer container] so as to have a base formed as an annular band or ring 106." '720 Patent  Col. 5, ll. 32-33.

In Col. 5, ll.41 see "[t]he cover or *outer case 110*" is the outer case member of outer housing. Thus,
 "the annular band or ring 106 of core member 102 has an outer diameter which is at least equal to the inner diameter of band 112 so that the two can fit " in Col. 5, ll. 44-45 is an inner case which  is consistent with Claim 2 requiring *an outer case member and inner case member* which forms an outer housing.

 [B]and 106 and band 112 are  secured **until** 110 [outer container] is pulled and the opening is initiated  in '720 Patent Col. 6, ll. 44-48.

19-22.

More importantly, see:

> "My device, as set forth herein, is comprised of an outer container, the various
> embodiments which allow that container, or at least a part thereof, to form the
> handle structure for "the swab", with that handle providing the protection for "the
> swab" while packaged and a handle during use to provide better control over "the
> swab" during such use" in Col 1, ll. 66 through Col. 2, ll. 4.

Hence, unlike claim 1, claim 2 clearly recites the handle structure as *housing means.*

A proper indefiniteness analysis "asks first whether structure is described in the
specification, and, if so, whether one skilled in the art would identify the structure from
the description." *Biodmedino, at 952.* Clearly, "[s]tructure supporting a means plus
function claim under §112, ¶6 appears in the specification. Moreover, Hemphill points
to reexamination to demonstrate that one skilled in the art *actually* identified structure
from the description in the written description. During reexamination, the patent
examiner in the PTO correctly recognized sufficient structure recited and reviewed the
*materials used.* As proof, the patent examiner stated the prior art

> "Srininvasan has structure that reads on claim 2 such as core member surrounded
> by a layer of porous material..." See App. 306A.

The patent examiner in the PTO also stated and confirmed that

> "Claim 2 of Hemphill is patentable over Srininvasan because Srininvasan
> 3973567 does not disclose the housing means of Hemphill". See App. 310

> "While it is true that the patentee need not disclose details of structures well
> known in the art, the specification must nonetheless disclose some structure." *Default*

8

*Proof*, 412 F3d. At 1302. And see *Atmel* 198 F3d. At 1382   In *Biomedino LLC v. Waters Techonologies Corp*. 490 F3d. 946, 952-953 (Fed. Cir. 2007: "If one employs means plus function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language.  To conclude otherwise would vitiate the language of the statute requiring "corresponding structure, material, or acts described in the specification." 35 U.S.C. §112, ¶6.

## PRIOR ART IS RELEVANT

This Court is not expected to ignore the Examiners in the United States Patent and Trademark Office who conducted <u>Reexamination.</u> In *Dickinson v. Zurko,* 119 S. Ct. 1816 (1999): "This court was reminded of its obligation to give appropriate deference to agency expertise." Statements made by expert opinions of the PTO  <u>cannot</u> <u>be</u> <u>dismissed</u> in the independent claim 2.  Patent examiners in the United States Patent Trademark Office  made a number of comments relevant to this case.  First the examiner in the PTO stated:

> the  (sanitary napkin) in prior art Rosa McNair Patent 4,285,343 is neither relevant under 35 U.S.C. 102 nor 35 U.S.C. 103.  App. 291.

The sanitary napkin has a wooded stick or cudgel that is short and heavy.
The patent examiner also stated and confirmed prior art

> "Srininvasan has structure that reads on claim 2 such as core member surrounded by a layer of porous material..." App. 306.

Finally, and most significant to the present case, the patent examiner in the PTO confirmed that

"Claim 2 of Hemphill is patentable over Srininvasan because Srininvasan 3973567 does not disclose the **housing means** of Hemphill". App. 310.

It should be well understood, **"there were no amendments made to the Hemphill '720 patent"** which is made clear in the REEXAMINATION CERTIFICATE at App. 359-360. In the PTO, Ms. Allegra Hemphill distinguished each of the prior art references on the ground that they did not disclose the protection nor disclose safety features in which the Hemphill '720 Patent accomplished. The patent examiners in the PTO found her observations understandable about both sanitary napkins in Rosa McNair Patent and the sanitary napkin in Srininvasan's Patent which proved that neither sanitary napkin has the first, enclosed protecting relationship as found in the Hemphill '720 Patent. These sanitary napkins are structurally incapable of being in a first, enclosed position and they have no means of supporting or enclosing the core member as the independent claim 2 requires. Such sanitary napkins are exposed at all times, in every way. Defendant- corporations merely recognize such problems exist which is far easier than finding and demonstrating solutions, *paraphrasing Pharmstem Therapeutics, Inc. v. Viacell, Inc.* F3d. 1342, 1368 (Fed. Cir. 2007). "[S]econdary considerations such as commercial success, long felt but unsolved needs, failures of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *quoting KSR International Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734 2007. In this way, *the court can rely on the fact Ms. Hemphill stated to the PTO that her **vaginal swab** does not resemble, behave or function like a sanitary napkin.*

10

The defendants, Kimberly-Clark Corporation and Procter & Gamble,

**have no patent of their own** so they make every effort to preclude "due process".

At no time have the defendants or their attorneys shown any error for the reasons for

patentability in the PTO. Instead, their approach reflects how masterful they can

manipulate the court's system along with their mis-perception of the scientific process,

as well as, the patent process", In *Pharmstem Therapeutics, Inc. v. Viacell, Inc.* F3d.

1342, 1361, 1378 (Fed. Cir. 2007). "Scientific methodology starts with hypothesis based

on what is already known----**invention is about achieving a long-sought goal *which is***

***taken to an entirely new level unlike ever before*.**"

In this instance, it is important to point out that even the defendants do not refer to

the accused devices as "sanitary napkins" in Rosa McNair's Patent or Srininvasan's

Patent. The devices accused of infringing are known as feminine products and they are

marketed as "NEW". They are called '*maxi*-pads', '*mini*-pads', 'ultra-thins' etc., so as

to 'skirt the real issue' that they are vaginal swabs as claimed in the Hemphill '720

Patent.

11

## A. IT IS REASONABLE TO CLARIFY TERMS FOR DEFINITENESS

## CLARIFY A "FAIRLY RIGID CORE MEMBER"

The question before this Court is whether claim 2 reads to a fairly rigid core member or does claim 2 read to a core member <u>without</u> "reading into" the claim limitations from the specification? In the case of *Acumed LLC v. Stryker Corp.* 483 F3d. 800, 808 (Fed. Cir. 2007), **this Court will be reminded that the Federal Circuit cautions with "our repeated statements that limitations from the specification are not to be read into the claims."** We know, the above claim 2 <u>does</u> <u>not</u> read 'a fairly rigid core member' yet, supportive evidence for understanding 'fairly rigid' should be directed to *materials used* in both Hemphill and Srininvasan Patents which have similar structure for a core member.

In *Acumed* at 806: "the trial court's exclusion of "sharp corners" or "sharp angles" renders the construction insufficiently definite since the court did not specify precisely how "sharp" is too sharp." Likewise, so as not to parallel the same argument in *Acumed,* --here, it is reasonable that this Court must specify how rigid is "fairly rigid" to describe a core member in the independent claim 2.


## B. CLARIFY DEFINITENESS FOR "SWAB"

In claim 1, a vaginal swab was defined by a 1994 dictionary which was dated ten years after the patent issued. See *Acumed LLC v. Stryker Corp.* 483 F3d. 800, 807, 812 (Fed. Cir. 2007):

> "At the outset, [Federal Circuit Judges will be ] troubled by a district court's clear reliance on a common English language dictionary which was published ten years

12

after the '444 patent issued to construe a term....During claim construction hearing, the court explained that the dictionary would be an aid to our work. The court not only used the dictionary as an aid but actually utilized the dictionary definition as the starting point when defining each of the disputed claim terms. It should be noted that the claim construction hearing occurred before this court en banc decision in *Phillips v. AWH Corp.* 415 F3d. 1303, 1313 (Fed. Cir. 2005). Thus, the district court may have been following the methodology in *Texas Digital Systems Inc. v. Telegenix Inc* 308 F3d. 1193, 1201-1202 (Fed. Cir. 2002) which relied heavily on the use of dictionaries to ascertain the plain meaning of a claim term. **Our *Phillips* decision, clarified that the *Texas Digital* approach was <u>not</u> appropriate."**

In claim 1, the district court followed the same methodology above. By relying solely on a dictionary, the district court judge actually  widened the scope *to include an additional* range of equivalents, such as a stick or wire in claim 1 by defining a vaginal swab as:

> a small piece of absorbent material attached to the end of a stick or wire and used for cleansing or applying medicine within the vaginal canal

We learned from *Acumed LLC v. Stryker Corp.* 483 F3d. 800, 812, 814  (Fed. Cir. 2007):

> "The district court's methodology led it astray from determining the "the meaning that the term would have to a person of ordinary skill in the art...in the context of the entire patent. *Phillips* at 1313. Since *Phillips*, we have repeatedly rejected the concept of construing claim terms to have meanings broader than the meaning derived from the intrinsic evidence." However, "in such circumstances where reference to dictionaries is appropriate, the [court's] task is to scrutinize the

13

intrinsic evidence in order to determine the most appropriate definition"

Conclusively, this Court must fulfill its first obligation to be true to the '720 Patent *itself* and identify 'corresponding structure and/or materials used' *as the statute requires* in claim 2 under 35 U.S.C. §112,¶ 6. The defendants and their attorneys can offer no reason and no explanation as to why they failed to review 'corresponding structure and materials used' in the independent claim 2, *as required by law.*

**CONCLUSION**: A hearing on patent infringement should be granted.  It is necessary.


Respectfully submitted,

*Allegra Hemphill*

Allegra Hemphill, Pro Se
4902 3rd Street NW
Washington, DC 20011
(240) 361 - 8699
(202) 271- 6209

14

**Certificate of Service:**
**By US Mail (Postage Paid), to:**

Kimberly Clark Corporation
Kramon & Graham, PA
One South Street, Suite 2600
Baltimore, Maryland 21202
attn. James Ulwick,
    Aaron Raskas

Procter & Gamble Corporation
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001
attn.: Blaney Harper

I hereby certify that on October 22, 2007,
this document was caused to be served upon the parties named on this page at the
addresses listed and by the means stated.

*Allegra Hemphill*

Allegra Hemphill

15

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLEGRA D. HEMPHILL, | * |
| | * |
| *Plaintiff,* | * |
| | * |
| vs. | *  Civil Action No. 1:07cv1236 |
| | * Assigned to: Judge John D. Bates |
| KIMBERLY- CLARK CORPORATION | * |
| | * |
| and | * |
| PROCTER & GAMBLE COMPANY | * |
| | * |
| *Defendant(s).* | * |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# PLAINTIFF'S APPENDIX

# TABLE OF CONTENTS

Page

HEMPHILL UNITED STATES LETTERS PATENT 4,557,720....................................107
    United States Department of Commerce
    Patents and Trademark Office
    Patent Application Number 619,684 June 1984
    Hemphill United States Letters Patent #4,557,720 December 10, 1985
    CERTIFIED FILE WRAPPER CASE ...................................................................115
        Hemphill US Patent No, 4, 557,720.............................................................119
        Patent Application 434,828 filed by Cushman Darby Cushman...............127
            See original claims 5 and 6..........................................................142
        USPTO Paper No. 4...................................................................................150
        Information Disclosure Statement ............................................................153
        Information cited by applicant ..................................................................154
        Fielding US Patent 3,731,682....................................................................166
        Schuster US Patent 4,157,709...................................................................189
        Bower US Patent 4,159,718.......................................................................195
        Johansson US Patent 4,165,942.................................................................199
        Attorney Correspondence, species election #1.........................................206
        USPTO Paper No. 7....................................................................................207
            Notice of references cited including Kenner, Gelardin 2,393,677,
            Alvarez 4,177,811, Barlow, Jeffreys Gaskell .................................210
        Revocation of Power of Attorney ..............................................................211
        Applicant's Remarks...................................................................................222
        USPTO Paper No. 10 .................................................................................223
        Applicant's correspondence , species election # 4....................................228
        USPTO Communication and Notice of Allowability..................................240
        USPTO Paper No. 3, claims 5 and 6 are allowable....................................241
        Notice of Allowance and issue fee due......................................................243

**TABLE OF CONTENTS** **- Continued**

                                                                                    **Page**
American Heritage College Dictionary (3rd ed. 1993).....................................362-363
American Heritage College Dictionary, 1369 (3rd ed. 1993 "Swab"............................364
American Heritage College Dictionary, 1405(3rd ed. 1993)   "Theca"........................366
American Heritage College Dictionary1488 3rd ed. 1993) "Vaginal............................367
Webster's New Collegiate Dictionary (A Merriam-Webster 1979)...............................368
Webster's New Collegiate Dictionary 1166 (1979) "Swab" .....................................369
Webster's New Collegiate Dictionary 1199 (1979) "Theca"......................................370
Webster's New Collegiate Dictionary 1281(1979) "Vaginal".....................................371

**EXHIBITS**

Show Accused Devices have structural components ↔  or, ↕  .....................373

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ALLEGRA D. HEMPHILL,       *

          *

       Plaintiff     *

          *

vs.          *    Civil Action No. 1:07cv1236

          *    Assigned to:  Judge John D. Bates

KIMBERLY- CLARK CORPORATION*

and          *

PROCTER & GAMBLE COMPANY   *

          *

       Defendant(s).*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## [PROPOSED] ORDER

Upon consideration of the Plaintiff's Motion for a Hearing and the

Plaintiff's Appendix, it is hereby, this _____ day of _____, 2007.

**IT IS ORDERED,** that all parties and any counsel shall appear for a

hearing on the _____, day of _____2007 at _____a.m./p.m.

_____

UNITED STATES DISTRICT COURT JUDGE

# United States Patent [19]

**Hemphill**

[11] **Patent Number:** **4,557,720**

[45] **Date of Patent:** **Dec. 10, 1985**

[54] **VAGINAL APPLICATOR**

[76] Inventor: Allegra D. Hemphill, 6217 Charnwood Dr., Rockville, Md. 20852

[21] Appl. No.: **619,684**

[22] Filed: **Jun. 11, 1984**

### Related U.S. Application Data

[63] Continuation of Ser. No. 434,828, Oct. 18, 1982, abandoned.

[51] Int. Cl.⁴ ............................................. A61B 10/00
[52] U.S. Cl. ............................................ 604/1; 401/77; 401/78
[58] Field of Search ................... 604/1, 2; 401/77, 78, 401/196, 202, 207, 116

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 251,502 | 4/1879 | Bridle . |
| 493,591 | 3/1893 | Kenner ..................................... 604/2 |
| 685,088 | 10/1901 | Barlow ..................................... 604/1 |
| 1,711,352 | 4/1929 | Jeffreys ..................................... 604/1 |
| 2,344,060 | 3/1944 | Ray . |
| 2,393,677 | 1/1946 | Gelardin ........................... 401/77 X |
| 3,586,452 | 6/1971 | Mason . |
| 3,731,682 | 5/1973 | Fielding . |
| 4,023,559 | 5/1977 | Gaskell .................................. 604/1 X |
| 4,155,991 | 5/1979 | Schopflin et al. . |
| 4,157,709 | 6/1979 | Schuster et al. . |
| 4,159,718 | 7/1979 | Bower . |
| 4,165,942 | 8/1979 | Johansson . |
| 4,175,439 | 11/1979 | Laker . |
| 4,177,811 | 12/1979 | Alvarez .................................... 604/1 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 114619 | 10/1929 | Austria ..................................... 604/1 |

*Primary Examiner*—John D. Yasko
*Assistant Examiner*—Christa K. Scott
*Attorney, Agent, or Firm*—Allegra D. Hemphill; F. Erich Hemphill; Gardner, Vivian C.

[57] **ABSTRACT**

A disposable vaginal refreshener or swab comprised of an outer container for enclosing an inner, fairly rigid core member about which an absorbent layer is secured. The outer container when removed, exposes the adsorbent covered member or allows that member to be moved out of the container into an operable position. The outer container also forms the handle for the disposable swab element.

**2 Claims, 11 Drawing Figures**



# 107(A)



FIGURE 1

FIGURE 2

FIGURE 2a.

FIGURE 3

FIGURE 4

FIGURE 4a.

**108(A)**

**U.S. Patent**    Dec. 10, 1985    Sheet 2 of 3    **4,557,720**

FIGURE 5



FIGURE 6



FIGURE 7



**109(A)**

FIGURE 8

FIGURE 9





**110(A)**

4,557,720

| 1 | 2 |

## VAGINAL APPLICATOR

This application is a continuation of Ser. No. 434,828 filed Oct. 18, 1982 now abandoned.

### FIELD OF THE PRESENT INVENTION

The present invention relates to vaginal swabs and refreshners.

### BACKGROUND OF THE PRESENT INVENTION

It is well known that the vagina is a relatively long, hollow, tube like structure that extends from the cervix or the outer end of the uterus down to the labia minora. The interior of the vagina is composed of a mucous membrane and an outer, smooth muscle closely attached to it. While glands are present in the vaginal lining itself, vaginal secretions can arise from the glands in the cervical canal of the uterus such as bartholin's and skene's glands. The lining of the vaginal cavity also responds to stimulation from various ovarian hormones either by building up new cell layers or by shedding old ones. Likewise, mucous is developed in the cervical canal of the uterus at other times, such as in the proliferative phase of the menstrual cycle where the endometrium thickens and its glands begin their secretion of mucous. Thus, it is well known that a variety of secretions develop varying amounts of mucous and other material as the result of a variety of factors and conditions.

Normally, such secretions are clean but occassionally debris in the form of blood or from the deposition of seminal fluid can accumulate. Accordingly, it is desirable at times to be able to have a convenient disposable swab or refreshner available for purposes of cleansing the vaginal area or for purposes of adding or treating the vaginal area with fragrances, medications, germicides or deodorants.

Many types of vaginal devices have been suggested including plunger type devices as in Rogers, U.S. Pat. No. 1,256,831, swabs as in U.S. Pat. No. 3,228,393, or foam type devices directly formed in their outer container as in Ravel, U.S. Pat. No. 4,260,570.

### SUMMARY OF THE PRESENT INVENTION

I have found that a truly portable, convenient and disposable internal vaginal cleaning device or refreshner is not available, especially one that is small, compact, easily usable and very simply constructed. The devices such as disclosed in the Rogers patent are cumbersome and not easily disposable. I have found that a device such as disclosed by Ravel is not convenient to use as the device does not provide a sufficiently long handle structure in order to manipulate the swab itself to produce appropriate and needed cleaning. Further, the foam or sponge-like exteriors from which some vaginal swabs or applicators are comprised as in Ravel are not sufficiently absorbent to produce the necessary and appropriate cleaning required. Rather, such devices tend to collect mucous and other vaginal fluids only on their outer surfaces as they do not have the absorbency needed to provide the amount of fluid collection and removal or to hold and apply the proper amount of material that should be used for proper treatment, as is actually desired or necessary.

My device, as set forth herein, is comprised of an outer container, the various embodiments of which allow that container, or at least a part thereof, to form the handle structure for the swab, with that handle providing both the protection for the swab while packaged and a handle during use to provide better control over swab during such use.

The swab portion is preferably comprised of fairly rigid inner core member, constructed either in segments or as a one piece unit, over which a thick, gauze type absorbent pad or layer is secured. In one embodiment, the rigid structure on which the pad is secured is retractable into and extendable from an outer container in which it is held by means of twisting a rotatable bottom thereof in a manner similar to raising and lowering a lipstick. In a second embodiment, the outer container is held together by means of a flexible strap or lever-type handle with that strap or handle serving to provide means for extending the swab from its retracted to its raised operative position. In another embodiment, the outer container is essentially peeled away from its enclosing or protecting relationship about the swab itself with at least part of the outer container forming the handle structure at the base of the thus exposed swab.

Other objects, features, and characteristics of the present invention, as well as the methods and operation and functions of the related elements of the structure, and to the combination of parts and economies of manufacture, will become more apparent upon consideration of the following detailed description and the appended claims with reference to the accompanying drawings, all of which form a part of this specification, wherein like reference numerals designate corresponding parts in the various figures.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a view of a first embodiment of the present invention showing the device in its covered, closed and unextended condition;

FIG. 2 is a view of the device as in FIG. 1 in its extended, operating condition;

FIG. 2a is a diagrammatic cross-sectional view of a portion of the device shown in FIG. 2;

FIG. 3 is a side, elevational view of a second embodiment of the present invention in its closed condition;

FIG. 4 is a side, elevational view of device shown in FIG. 3 with the top having been removed, prior to the swab being raised to its operative position;

FIG. 4a is a diagrammatic cross-sectional view of a portion of the bottom of the device shown in FIG. 4;

FIG. 5 is a side, elevational view of the device shown in FIGS. 3 and 4 in its raised operative condition with portions having been cut away or omitted for clarity;

FIG. 6 is a side, elevational view of still another embodiment of the present invention showing an additional handle structure that can be located on the exterior case;

FIG. 7 is diagrammatic, cross-sectional view of the female reproductive system showing the area in which the present device is used;

FIG. 8 is a diagrammatic, perspective view of still another embodiment of the present invention in its closed and sealed condition; and

FIG. 9 is diagrammatic, perspective view of the device shown in FIG. 8 in its opened and ready to use condition.

3

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS OF THE PRESENT INVENTION

As explained above, the present invention is designed to dry or absorb material in the internal vaginal area when one observes a discharge or lubrication building up to the point that cleansing is either desired or required. Alternatively, the swab can be used as an applicator for a variety of products or medicants and it can either be pre-impregnated therewith or such materials could be applied once the swab was unpackaged. It should be understood that the adsorbent gauze material and the swab element is contemplated as being sterile when packaged. Likewise, it is important that the device be extremely compact and easily manufactured so as to be both portable and disposable rendering it easily carriable and usable.

Turning first to FIGS. 1, 2 and 2a, the device is comprised of an outer housing, generally indicated at 10, with that outer housing being comprised of an exterior cover 12, an internal tubular member 14 and rotatable base 16. The swab itself is comprised of an internal and preferably hollow core member 18 which as shown in FIG. 2a preferably has a flange 20 integrally formed therewith and extending about its base. Flange 20 cooperates with a radially inwardly extending flange 22 at the top of tube 14 so that when core member 18 is in its fully extended position, as shown in FIG. 2, flanges 20 and 22 will abut one another and prevent further movement as shown in FIG. 2a.

An outer gauze adsorbent layer 24 is secured to core 18 by any convenient means, preferably by a medically inert adhesive. It is also preferred that gauze 24 extend over or around flange 20 at the base of core member 18. Accordingly, when core 18 is in its fully raised condition, gauze 24 will be effectively clamped between flanges 20 and 22.

The operation of this structure, in order to raise core 18 from the position shown in FIG. 1 to the erected or extended position shown in FIG. 2, is accomplished by a conventional helical cam and guide slot arrangement, generally indicated at 26 in FIG. 2a. Such mechanisms, for example, are shown in Coryel, U.S. Pat. No. 1,504,216, or Davis, U.S. Pat. No. 3,677,654, both of which are exemplary of conventional well known mechanisms for raising and lowering lipsticks. Thus, by rotating base 16 it is possible to raise and lower core 18 and the attached gauze material 24.

With reference to FIG. 7, the average vaginal cavity is approximately 9 cm (3.5 inches) long. Accordingly, I prefer to have the swab, gauze material 24 and likewise core 18 be approximately 4 inches long. Container 14 accordingly must be approximately 4 inches in length in order to effectively receive core 18 and the gauze material 24 therein when core 18 is retracted, as shown in FIG. 1. I have found that a cover having a total length of approximately 4 inches is sufficient to completely encase container 14 above base 16.

The container is preferably made from a moldable plastic material, such as polyethylene or any one of the other polyolefins or from thermoplastics. Core 18 can be made from the same material. I prefer to have the adsorbent material 24 be comprised of a cotton or cotton/polyester gauze. However, it is important to employ a highly absorbent material and, accordingly, any such materials could be used as the absorbant material 24.

4

As an alternative method of raising and lowering swab 24, the interior of core 18 can be provided with suitable threads and a suitably corresponding threaded rod (not shown) could be attached to the rotatable base 16. As base 16 was rotated it would likewise rotate the threaded rod which would in turn, rotate inside core member 18 causing that core member to be raised or lowered depending upon the position of the core member relative to that threaded rod and the direction in which base 16 was rotated.

Turning now to FIGS. 3–5, the second embodiment of the present invention is comprised of an outer container, generally indicated at 30, which is comprised of a hollow base container 32, an exterior upper cover 34, a flexible retaining clamp member 36 and a swab member, generally indicated at 38. A flanged joint 40 is provided between base 32 and cover 34 in order to assure that the joint area is securely formed and to likewise assure their correct and desired relative positioning. If desired, a snap-type interconnection could be employed between cover 34 and base 32 as an added measure to work along with clamp member 36 to hold cover 34 in place. As shown in FIG. 3, the device is in its closed position and retaining clamp 36 is in place extending over cover 34.

Turning next to FIGS. 4a and 5a portion of the internal structure at the bottom of the device is set forth diagrammatically in cross-section in FIG. 4a where as the device in its extended condition ready for use is shown in FIG. 5. As shown in FIG. 5, the outer container 32 is provided along its upper periphery with an inwardly extending annular flange 42. Swab member 38 is respectively comprised of an internal core member 44 which is preferably formed in a one piece manner from a moldable plastic material such as, for example, polyethylene, and is formed with a bottom flange 46 as shown in both FIGS. 4a and 5. Affixed thereto is an outer sheath 48 of absorbable material and as shown, this sheath 48 preferably extends around and is affixed to core 44 adjacent the base thereof. As was true with the first embodiment, I prefer to use a medically inert adhesive for this purpose although other methods could be used to securely attach the gauze sheath 48 to core 44 in a manner that it extends over or around flange. Clamp 36 is preferably integrally formed with core 44 and is integrally hinged at a predetermined point along the bottom peripheral edge of that core member. The location where clamp member 36 is hinged to core 44 is predetermined so that when core 44 is retracted within the hollow container 32, clamp 36 can be pivoted up to its closed position extending about cover 34 as shown in FIG. 3, thereby securing core 44 within container 32 with the upper loop portion of clamp member 36 serving to hold cover 34 in place.

With reference specifically to FIG. 4, retaining member 36 has been rotated to its full pivoted unlocked condition and cover 34 has been removed thereby exposing the upper portion of swab 38. By pushing upward on member 36, the inner core 44 will be moved upwardly within container 32 thereby fully exposing swab member 38 as shown in FIG. 5. In the condition shown in FIG. 5, both the container 32 and the remaining portion of member 36 extending therebelow will act as a handle for the user to grasp onto when using the device.

In order to securely close the container to keep swab 38 sterile is to provide a bottom 50 on the lower container 32 in which a suitable passageway or opening 52

4,557,720

5

is provided through which member 36 can pass. It may be otherwise desirable to close or seal the opening 52 of container 32. This can be accomplished by a variety of sealing methods once the assembly is connected together. Preferably, a bottom member 50 is separately formed with a suitable cutout forming opening 52 with bottom member 50 snapping into place within the bottom confines of container 32 following insertion of swab 38 and member 36 into container 32.

In FIG. 6, another embodiment of the present invention is shown. The cover 34' extends along the full length of the internal core supporting the gauze or adsorbent pad assembly which can be similar to the structure set forth in FIGS. 3–5 without member 36 attached thereto. In this instance, the cover itself 34' can itself snap in place with respect to the lower container 32' so that a retaining clip or other retaining device would not be required. However, in order to provide sufficient leverage for handling the device when in use and to aid in securing cover 34' to base 32', one or two handles, as indicated at 60 and 62, could be provided on the sides of outer container formed from cover 34' and lower container 32'. These handles can be integrally molded together with lower container 32' and initially held in an upright condition by means of breakable bands indicated at 64.

Turning now to the last embodiment, as shown in FIGS. 8 and 9, the swab is generally indicated at 100 in FIG. 9 and is comprised of a core 102 covered by a gauze layer 104. An outer container is generally indicated at 110. Core 102 is separately formed so as to have a base formed as an annular band or ring 106. Core member 102 can be formed either as a solid structure or preferably with a hollow interior. As in the other embodiments, absorbent gauze material 104 is secured about the exterior surface of core 102 but not about annular band 106. In FIG. 9, the device is shown in its open, ready-to-use position whereas in FIG. 8, the device is shown in its closed and sealed condition. The cover or outer case 110 is comprised of an annular band or ring 112 at the base thereof together with an upper, portion generally indicated at 114. It should be understood that the annular band or ring 106 of core member 102 has an outer diameter which is at least equal to the inner diameter of band 112 so that the two can fit thereby allowing core 102 to be secured within band 112 by a suitable adhesive following their formation and the application of gauze 104. Outer container 110 is formed in its closed condition so that following insertion of core 102 therein the swab will be completely formed. However, the bottom of the resulting structure could be closed by a separate member (not shown) that would likewise fit within or over the base of band 112.

In FIG. 8, the outer container 110 is shown in its closed condition and it should be noted that container 110 is comprised of a plurality of segments defined by a plurality of sets of frangible seams. The first set of frangible seams 116 extend axially along the side walls of the container thereby defining two opposed vertically extending strips 121 and 123 of the side wall therebetween. They also define part of container segments 126 and 128 as will become clear below. A second set of frangible seams 118 extend across the top of container 110 and connect opposing pairs of seams 116 together. An additional seam 124 extends perpendicularly between the center of seams 118 on the very top of the container. Tabs 120 and 122 are provided adjacent each

6

side of seam 124 and will be used to pull open seam 124 and to thereby open container 110.

Another frangible seam 134 is provided between band 112 and the upper portion 114 with seam 134 defining the upper edge of band 112 and the bottom edge of upper portion 114. Two portions of that seam are thickened and, therefore, are non-frangible so that they respectively form hinges 130 and 132. The remaining portions of seam 134 are frangible and subject to being severed or broken when container 110 is opened. Seams 116, 118, 124 and 134 together serve to define sections 121, 123, 126 and 128 as well as the size of band 112. Sections 121 and 123 will be peeled away and discarded after tabs 120 and 122 are pulled up and away from each other thereby breaking seam 124 which is followed by the severing of seams 118 and 116 and a portion of seam 134 at the juncture between sections 121 and 123 and band 112. Once sections 121 and 123 have been removed, sections 126 and 128 will remain. These sections can then be rotated, respectively, about hinges 130 and 132 thus breaking the remaining portions of frangible seam 134 which had previously joined them to band 112. This open condition of segments 126 and 128 is shown in FIG. 9 with those segments being bent so that they engage one another, as shown in phantom. This opening procedure exposes swab member 100, with segments 126 and 128 serving to provide the handle structure required for using the swab. While segments 126 and 128 have been shown as comprising cylindrical type segments, the actual design of sections 121 and 123 can be modified as desired so that the resulting shape of segments 126 and 128 can be varied. In addition, it would be possible to reinforce segments 126 and 128 in an axial direction or to provide them with another internal shape that would not interfere with the dimensions and sides of swab 100 so that when sections 126 and 128 are folded down as shown in FIG. 9 a variety of handle structures could be formed.

The core member 102 and its band 106 are preferably molded as a one-piece unit. Likewise, the cover section 110, would also be integrally molded as a one-piece unit. Once these two molded portions are obtained, the gauze material 104 can be secured to core 102 with that structure then being placed into cover 110 with band 106 being permanently secured within band 112. It is believed that the resulting structure will maintain the sterile condition of gauze 104 until tabs 120 and 122 are pulled and the opening of the container 110 is initiated.

While the invention has been described in connection with what is presently considered to be the most practical and preferred embodiment, it is to be understood that the invention is not to be limited to the disclosed embodiment, but on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims, which scope is to be accorded the broadest interpretation so as to encompass all such modifications and equivalent structures.

What I claim is:

1. A vaginal swab comprised of an outer housing having a closed and open end on opposing ends thereof, said housing including an annular band defining said open end and a plurality of frangible seams that together define a pair of removable members and a pair of housing segments hingably secured to said annular band following removal of said removable members, a swab core member having a predetermined exterior shape, said core member having an annular base with an outer

**113(A)**

4,557,720

7

diameter equal to the inner diameter of said annular band and an adsorbent member secured to said core member, said core member being secured within said housing so that said adsorbent member is enclosed therein.

2. A vaginal swab comprising an outer housing including an inner case member and an outer case member at least part of which is connected to and overlies said inner case member;

a core member, at least one layer of a porous material secured to said core member, and housing means

8

for supporting and enclosing said core member, said core member being secured to said housing means, having at least two portions movable relative to one another between first and second positions for enclosing said core member when in said first position and for both exposing said core member and the said porous padding secured thereto and for forming a handle for said swab when in said second position.

* * * * *

114(A)

IW 505697

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE

**United States Patent and Trademark Office**

**March 29, 2002**

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

**APPLICATION NUMBER:** *06/619,684*
**FILING DATE:** *June 11, 1984*
**PATENT NUMBER:** *4,557,720*
**ISSUE DATE:** *December 10, 1985*

By Authority of the
**COMMISSIONER OF PATENTS AND TRADEMARKS**



*L. Edelen*

**L. EDELEN**
**Certifying Officer**

# 115(A)

# PETITIONER'S LODGING

## FILE WRAPPER CASE  619, 684 June 1984
## United States Department of Commerce
## United States Patents and Trademarks Office
## ("the USPTO")

# JUMBO UTILITY

Form PTO-436A
(Rev. 8/78)

4557720

.4557720.

| SERIAL NUMBER 619684 series of 1979 | PATENT DEC 10 1985 | PATENT NUMBER | GROUP ART UNIT 336 | EXAMINER YASKO |
|---|---|---|---|---|

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | | |
|---|---|---|---|---|---|
| 06/619,684 | 06/11/84 | 604 | 1 | | |

241-97-314
14
07-69-05-43

ALLEGRA D. HEMPHILL, JOHNSON CITY, TN.

**CONTINUING DATA*********************
VERIFIED          THIS APPLN IS A CON OF  06/434,828 10/18/82 abandoned

Yes A.S

7/911-484-3

**FOREIGN/PCT APPLICATIONS************
VERIFIED

None A.S

FOREIGN FILING LICENSE GRANTED 10/17/84          ***** SMALL ENTITY *****

| Foreign priority claimed 35 USC 119 conditions met | ☐ yes ☒ no ☐ yes ☒ no | AS FILED → | STATE OR COUNTRY TN | SHEETS DRWGS. 3 | TOTAL CLAIMS 20 | INDEP. CLAIMS 3 | FILING FEE RECEIVED $200.00 | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| Verified and Acknowledged | Examiner's Initials | | | | | | | |

ADDRESS ALLEGRA HEMPHILL
1507 LINDEN ST., #13
JOHNSON CITY, TN 37601

Allegra D. Hemphill
6217 Charnwood Drive
#7 Rockville, MD 20852

TITLE  VAGINAL APPLICATOR

U.S. DEPT. of COMM.-Pat. & TM Office — PTO-436L (rev. 10-78)

| PARTS OF APPLICATION FILED SEPARATELY | 12-14 PREPARED FOR ISSUE 1-8-86 |
|---|---|
| | CHRISTA K. SCOTT (Assistant Examiner) / (Docket Clerk) |

AT ALLOWANCE

EXAMINED AND PASSED FOR ISSUE

John D. Yasko
(Primary Examiner)      336

| SHEETS DRWGS. 3 | FIGURES DRWGS. 11 | CLAIMS 2 | CLASS 604 | SUBCLASS 1 | (Group) |
|---|---|---|---|---|---|

Estimate of printed pages

| Drawing(s) | Spec(s) | Issue fee due (est.) $250.00 |
|---|---|---|

Notice of allowance and issue fee due (est.)

| Date mailed 1-7-85 | Date paid 4-8-85 |
|---|---|

E 66

117(A)

RETENTION LABEL

# REGULAR UTILITY

Form PTO-436
(Rev. 8/78)

| SERIAL NUMBER 434828 | PATENT DATE | PATENT NUMBER |
|---|---|---|

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 6/434,828 | 10/18/82 | 128 | 1 | 339 | |

ALLEGRA D. HEMPHILL, ROCKVILLE, MD.

**CONTINUING DATA***********************
VERIFIED

**FOREIGN/PCT APPLICATIONS************
VERIFIED

***** SMALL ENTITY *****

| Foreign priority claimed ☐ yes ☒ no<br>35 USC 119 conditions met ☐ yes ☐ no<br>Verified and Acknowledged _____ Examiner's Initials | AS FILED → | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| | | MD | 3 | 6 | 3 | $ 150.00 | |

CUSHMAN, DARBY & CUSHMAN
1801 K ST., N. W., 8TH FLR.
WASHINGTON, DC 20006

Allegra D. Hemphill
1507 Linden St #13
Johnson City, Tennessee, 37601

VAGINAL APPLICATOR

U.S. DEPT. of COMM.-Pat. & TM Office  —  PTO-436L (rev. 10-78)

| PARTS OF APPLICATION FILED SEPARATELY | PREPARED FOR ISSUE |
|---|---|
| | |
| | (Assistant Examiner)          (Docket Clerk) |

| AT ALLOWANCE | | | | | EXAMINED AND PASSED FOR ISSUE |
|---|---|---|---|---|---|
| SHEETS DRWGS. | FIGURES DRWGS. | CLAIMS | CLASS | SUBCLASS | |
| | | | | | (Primary Examiner)          (Art Unit) |

| | Estimate of printed pages | | Issue fee due (est.) |
|---|---|---|---|
| | Drawing(s) | Spec(s) | |
| | Notice of allowance and issue fee due (est.) | | |
| | Date mailed | Date paid | |

**118(A)**

RETENTION LABEL

# United States Patent [19]

## Hemphill

[11] **Patent Number:** **4,557,720**

[45] **Date of Patent:** **Dec. 10, 1985**

[54] **VAGINAL APPLICATOR**

[76] Inventor: **Allegra D. Hemphill**, 6217 Charnwood Dr., Rockville, Md. 20852

[21] Appl. No.: **619,684**

[22] Filed: **Jun. 11, 1984**

### Related U.S. Application Data

[63] Continuation of Ser. No. 434,828, Oct. 18, 1982, abandoned.

[51] Int. Cl.⁴ .................................................. A61B 10/00

[52] U.S. Cl. ...................................... 604/1; 401/77; 401/78

[58] Field of Search ................... 604/1, 2; 401/77, 78, 401/196, 202, 207, 116

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 251,502 | 4/1879 | Bridle . |
| 493,591 | 3/1893 | Kenner .......................................... 604/2 |
| 685,088 | 10/1901 | Barlow ........................................... 604/1 |
| 1,711,352 | 4/1929 | Jeffreys ......................................... 604/1 |
| 2,344,060 | 3/1944 | Ray . |
| 2,393,677 | 1/1946 | Gelardin .......................... 401/77 X |
| 3,586,452 | 6/1971 | Mason . |
| 3,731,682 | 5/1973 | Fielding . |
| 4,023,559 | 5/1977 | Gaskell ................................. 604/1 X |
| 4,155,991 | 5/1979 | Schopflin et al. . |
| 4,157,709 | 6/1979 | Schuster et al. . |
| 4,159,718 | 7/1979 | Bower . |
| 4,165,942 | 8/1979 | Johansson . |
| 4,175,439 | 11/1979 | Laker . . |
| 4,177,811 | 12/1979 | Alvarez ..................................... 604/1 |

#### FOREIGN PATENT DOCUMENTS

114619 10/1929 Austria ....................................... 604/1 .

*Primary Examiner*—John D. Yasko
*Assistant Examiner*—Christa K. Scott
*Attorney, Agent, or Firm*—Allegra D. Hemphill; F. Erich Hemphill; Gardner, Vivian C.

[57] **ABSTRACT**

A disposable vaginal refreshener or swab comprised of an outer container for enclosing an inner, fairly rigid core member about which an absorbent layer is secured. The outer container when removed, exposes the adsorbent covered member or allows that member to be moved out of the container into an operable position. The outer container also forms the handle for the disposable swab element.

**2 Claims, 11 Drawing Figures**



**119(A)**



FIGURE 1

FIGURE 2

FIGURE 2a.

FIGURE 3

FIGURE 4

FIGURE 4a.

**120(A)**

FIGURE 5



FIGURE 6



FIGURE 7



**121(A)**

FIGURE 9

FIGURE 8





**122(A)**

4,557,720

1

## VAGINAL APPLICATOR

This application is a continuation of Ser. No. 434,828 filed Oct. 18, 1982 now abandoned.

### FIELD OF THE PRESENT INVENTION

The present invention relates to vaginal swabs and refreshers.

### BACKGROUND OF THE PRESENT INVENTION

It is well known that the vagina is a relatively long, hollow, tube like structure that extends from the cervix or the outer end of the uterus down to the labia minora. The interior of the vagina is composed of a mucous membrane and an outer, smooth muscle closely attached to it. While glands are present in the vaginal lining itself, vaginal secretions can arise from the glands in the cervical canal of the uterus such as bartholin's and skene's glands. The lining of the vaginal cavity also responds to stimulation from various ovarian hormones either by building up new cell layers or by shedding old ones. Likewise, mucous is developed in the cervical canal of the uterus at other times, such as in the proliferative phase of the menstrual cycle where the endometrium thickens and its glands begin their secretion of mucous. Thus, it is well known that a variety of secretions develop varying amounts of mucous and other material as the result of a variety of factors and conditions.

Normally, such secretions are clean but occassionally debris in the form of blood or from the deposition of seminal fluid can accumulate. Accordingly, it is desirable at times to be able to have a convenient disposable swab or refreshner available for purposes of cleansing the vaginal area or for purposes of adding or treating the vaginal area with fragrances, medications, germicides or deodorants.

Many types of vaginal devices have been suggested including plunger type devices as in Rogers, U.S. Pat. No. 1,256,831, swabs as in U.S. Pat. No. 3,228,393, or foam type devices directly formed in their outer container as in Ravel, U.S. Pat. No. 4,260,570.

### SUMMARY OF THE PRESENT INVENTION

I have found that a truly portable, convenient and disposable internal vaginal cleaning device or refreshner is not available, especially one that is small, compact, easily usable and very simply constructed. The devices such as disclosed in the Rogers patent are cumbersome and not easily disposable. I have found that a device such as disclosed by Ravel is not convenient to use as the device does not provide a sufficiently long handle structure in order to manipulate the swab itself to produce appropriate and needed cleaning. Further, the foam or sponge-like exteriors from which some vaginal swabs or applicators are comprised as in Ravel are not sufficiently adsorbent to provide the necessary and appropriate cleaning required. Rather, such devices tend to collect mucous and other vaginal fluids only on their outer surfaces as they do not have the absorbency needed to provide the amount of fluid collection and removal or to hold and apply the proper amount of material that should be used for proper treatment, as is actually desired or necessary.

My device, as set forth herein, is comprised of an outer container, the various embodiments of which allow that container, or at least a part thereof, to form

2

the handle structure for the swab, with that handle providing both the protection for the swab while packaged and a handle during use to provide better control over swab during such use.

The swab portion is preferably comprised of fairly rigid inner core member, constructed either in segments or as a one piece unit, over which a thick, gauze type adsorbent pad or layer is secured. In one embodiment, the rigid structure on which the pad is secured is retractable into and extendable from an outer container in which it is held by means of twisting a rotatable bottom thereof in a manner similar to raising and lowering a lipstick. In a second embodiment, the outer container is held together by means of a flexible strap or lever-type handle with that strap or handle serving to provide means for extending the swab from its retracted to its raised operative position. In another embodiment, the outer container is essentially peeled away from its enclosing or protecting relationship about the swab itself with at least part of the outer container forming the handle structure at the base of the thus exposed swab.

Other objects, features, and characteristics of the present invention, as well as the methods and operation and functions of the related elements of the structure, and to the combination of parts and economies of manufacture, will become more apparent upon consideration of the following detailed description and the appended claims with reference to the accompanying drawings, all of which form a part of this specification, wherein like reference numerals designate corresponding parts in the various figures.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a view of a first embodiment of the present invention showing the device in its covered, closed and unextended condition;

FIG. 2 is a view of the device as in FIG. 1 in its extended, operating condition;

FIG. 2a is a diagrammatic cross-sectional view of a portion of the device shown in FIG. 2;

FIG. 3 is a side, elevational view of a second embodiment of the present invention in its closed condition;

FIG. 4 is a side, elevational view of device shown in FIG. 3 with the top having been removed, prior to the swab being raised to its operative position;

FIG. 4a is a diagrammatic cross-sectional view of a portion of the bottom of the device shown in FIG. 4;

FIG. 5 is a side, elevational view of the device shown in FIGS. 3 and 4 in its raised operative condition with portions having been cut away or omitted for clarity;

FIG. 6 is a side, elevational view of still another embodiment of the present invention showing an additional handle structure that can be located on the exterior case;

FIG. 7 is diagrammatic, cross-sectional view of the female reproductive system showing the area in which the present device is used;

FIG. 8 is a diagrammatic, perspective view of still another embodiment of the present invention in its closed and sealed condition; and

FIG. 9 is diagrammatic, perspective view of the device shown in FIG. 8 in its opened and ready to use condition.

4,557,720

3

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS OF THE PRESENT INVENTION

As explained above, the present invention is designed to dry or absorb material in the internal vaginal area when one observes a discharge or lubrication building up to the point that cleansing is either desired or required. Alternatively, the swab can be used as an applicator for a variety of products or medicants and it can either be pre-impregnated therewith or such materials could be applied once the swab was unpackaged. It should be understood that the adsorbent gauze material and the swab element is contemplated as being sterile when packaged. Likewise, it is important that the device be extremely compact and easily manufactured so as to be both portable and disposable rendering it easily carriable and usable.

Turning first to FIGS. 1, 2 and 2a, the device is comprised of an outer housing, generally indicated at 10, with that outer housing being comprised of an exterior cover 12, an internal tubular member 14 and rotatable base 16. The swab member is comprised of an internal and preferably hollow core member 18 which as shown in FIG. 2a preferably has a flange 20 integrally formed therewith and extending about its base. Flange 20 cooperates with a radially inwardly extending flange 22 at the top of tube 14 so that when core member 18 is in its fully extended position, as shown in FIG. 2, flanges 20 and 22 will abut one another and prevent further movement as shown in FIG. 2a.

An outer gauze adsorbent layer 24 is secured to core 18 by any convenient means, preferably by a medically inert adhesive. It is also preferred that gauze 24 extend over or around flange 20 at the base of core member 18. Accordingly, when core 18 is in its fully raised condition, gauze 24 will be effectively clamped between flanges 20 and 22.

The operation of this structure, in order to raise core 18 from the position shown in FIG. 1 to the erected or extended position shown in FIG. 2, is accomplished by a conventional helical cam and guide slot arrangement, generally indicated at 26 in FIG. 2a. Such mechanisms, for example, are shown in Coryel, U.S. Pat. No. 1,504,216, or Davis, U.S. Pat. No. 3,677,654, both of which are exemplary of conventional well known mechanisms for raising and lowering lipsticks. Thus, by rotating base 16 it is possible to raise and lower core 18 and the attached gauze material 24.

With reference to FIG. 7, the average vaginal cavity is approximately 9 cm (3.5 inches) long. Accordingly, I prefer to have the swab, gauze material 24 and likewise core 18 be approximately 4 inches long. Container 14 accordingly must be approximately 4 inches in length in order to effectively receive core 18 and the gauze material 24 therein when core 18 is retracted, as shown in FIG. 1. I have found that a cover having a total length of approximately 4 inches is sufficient to completely encase container 14 above base 16.

The container is preferably made from a moldable plastic material, such as polyethylene or any one of the other polyolefins or from thermoplastics. Core 18 can be made from the same material. I prefer to have the adsorbent material 24 be comprised of a cotton or cotton/polyester gauze. However, it is important to employ a highly absorbant material and, accordingly, any such materials could be used as the absorbant material 24.

4

As an alternative method of raising and lowering swab 24, the interior of core 18 can be provided with suitable threads and a suitably corresponding threaded rod (not shown) could be attached to the rotatable base 16. As base 16 was rotated it would likewise rotate the threaded rod which would in turn, rotate inside core member 18 causing that core member to be raised or lowered depending upon the position of the core member relative to that threaded rod and the direction in which base 16 was rotated.

Turning now to FIGS. 3–5, the second embodiment of the present invention is comprised of an outer container, generally indicated at 30, which is comprised of a hollow base container 32, an exterior upper cover 34, a flexible retaining clamp member 36 and a swab member, generally indicated at 38. A flanged joint 40 is provided between base 32 and cover 34 in order to assure that the joint area is securely formed and to likewise assure their correct and desired relative positioning. If desired, a snap-type interconnection could be employed between cover 34 and base 32 as an added measure to work along with clamp member 36 to hold cover 34 in place. As shown in FIG. 3, the device is in its closed position and retaining clamp 36 is in place extending over cover 34.

Turning next to FIGS. 4a and 5a portion of the internal structure at the bottom of the device is set forth diagrammatically in cross-section in FIG. 4a where as the device in its extended condition ready for use is shown in FIG. 5. As shown in FIG. 5, the outer container 32 is provided along its upper periphery with an inwardly extending annular flange 42. Swab member 38 is respectively comprised of an internal core member 44 which is preferably formed in a one piece manner from a moldable plastic material such as, for example, polyethylene, and is formed with a bottom flange 46 as shown in both FIGS. 4a and 5. Affixed thereto is an outer sheath 48 of absorbable material and as shown, this sheath 48 preferably extends around and is affixed to core 44 adjacent the base thereof. As was true with the first embodiment, I prefer to use a medically inert adhesive for this purpose although other methods could be used to securely attach the gauze sheath 48 to core 44 in a manner that it extends over or around flange. Clamp 36 is preferably integrally formed with core 44 and is integrally hinged at a predetermined point along the bottom peripheral edge of that core member. The location where clamp member 36 is hinged to core 44 is predetermined so that when core 44 is retracted within the hollow container 32, clamp 36 can be pivoted up to its closed position extending about cover 34 as shown in FIG. 3, thereby securing core 44 within container 32 with the upper loop portion of clamp member 36 serving to hold cover 34 in place.

With reference specifically to FIG. 4, retaining member 36 has been rotated to its full pivoted unlocked condition and cover 34 has been removed thereby exposing the upper portion of swab 38. By pushing upward on member 36, the inner core 44 will be moved upwardly within container 32 thereby fully exposing swab member 38 as shown in FIG. 5. In the condition shown in FIG. 5, both the container 32 and the remaining portion of member 36 extending therebelow will act as a handle for the user to grasp onto when using the device.

In order to securely close the container to keep swab 38 sterile is to provide a bottom 50 on the lower container 32 in which a suitable passageway or opening 52

4,557,720

5

is provided through which member 36 can pass. It may be otherwise desirable to close or seal the opening 52 of container 32. This can be accomplished by a variety of sealing methods once the assembly is connected together. Preferably, a bottom member 50 is separately formed with a suitable cutout forming opening 52 with bottom member 50 snapping into place within the bottom confines of container 32 following insertion of swab 38 and member 36 into container 32.

In FIG. 6, another embodiment of the present invention is shown. The cover 34' extends along the full length of the internal core supporting the gauze or adsorbent pad assembly which can be similar to the structure set forth in FIGS. 3–5 without member 36 attached thereto. In this instance, the cover itself 34' can itself snap in place with respect to the lower container 32' so that a retaining clip or other retaining device would not be required. However, in order to provide sufficient leverage for handling the device when in use and to aid in securing cover 34' to base 32', one or two handles, as indicated at 60 and 62, could be provided on the sides of outer container formed from cover 34' and lower container 32'. These handles can be integrally molded together with lower container 32' and initially held in an upright condition by means of breakable bands indicated at 64.

Turning now to the last embodiment, as shown in FIGS. 8 and 9, the swab is generally indicated at 100 in FIG. 9 and is comprised of a core 102 covered by a gauze layer 104. An outer container is generally indicated at 110. Core 102 is separately formed so as to have a base formed as an annular band or ring 106. Core member 102 can be formed either as a solid structure or preferably with a hollow interior. As in the other embodiments, absorbant gauze material 104 is secured about the exterior surface of core 102 but not about annular band 106. In FIG. 9, the device is shown in its open, ready-to-use position whereas in FIG. 8, the device is shown in its closed and sealed condition. The cover or outer case 110 is comprised of an annular band or ring 112 at the base thereof together with an upper, portion generally indicated at 114. It should be understood that the annular band or ring 106 of core member 102 has an outer diameter which is at least equal to the inner diameter of band 112 so that the two can fit thereby allowing core 102 to be secured within band 112 by a suitable adhesive following their formation and the application of gauze 104. Outer container 110 is formed in its closed condition so that following insertion of core 102 therein the swab will be completely formed. However, the bottom of the resulting container could be closed by a separate member (not shown) that would likewise fit within or over the base of band 112.

In FIG. 8, the outer container 110 is shown in its closed condition and it should be noted that container 110 is comprised of a plurality of segments defined by a plurality of sets of frangible seams. The first set of four frangible seams 116 extend axially along the side walls of the container thereby defining two opposed vertically extending strips 121 and 123 of the side wall therebetween. They also define part of container segments 126 and 128 as will become clear below. A second set of frangible seams 118 extend across the top of container 110 and connect opposing pairs of seams 116 together. An additional seam 124 extends perpendicularly between the center of seams 118 on the very top of the container. Tabs 120 and 122 are provided adjacent each

6

side of seam 124 and will be used to pull open seam 124 and to thereby open container 110.

Another frangible seam 134 is provided between band 112 and the upper portion 114 with seam 134 defining the upper edge of band 112 and the bottom edge of upper portion 114. Two portions of that seam are thickened and, therefore, are non-frangible so that they respectively form hinges 130 and 132. The remaining portions of seam 134 are frangible and subject to being severed or broken when container 110 is opened. Seams 116, 118, 124 and 134 together serve to define sections 121, 123, 126 and 128 as well as the size of band 112. Sections 121 and 123 will be peeled away and discarded after tabs 120 and 122 are pulled up and away from each other thereby breaking seam 124 which is followed by the severing of seams 118 and 116 and a portion of seam 134 at the juncture between sections 121 and 123 and band 112. Once sections 121 and 123 have been removed, sections 126 and 128 will remain. These sections can then be rotated, respectively, about hinges 130 and 132 thus breaking the remaining portions of frangible seam 134 which had previously joined them to band 112. This open condition of segments 126 and 128 is shown in FIG. 9 with those segments being bent so that they engage one another, as shown in phantom. This opening procedure exposes swab member 100, with segments 126 and 128 serving to provide the handle structure required for using the swab. While segments 126 and 128 have been shown as comprising cylindrical type segments, the actual design of sections 121 and 123 can be modified as desired so that the resulting shape of segments 126 and 128 can be varied. In addition, it would be possible to reinforce segments 126 and 128 in an axial direction or to provide them with another internal shape that would not interfere with the dimensions and sides of swab 100 so that when sections 126 and 128 are folded down as shown in FIG. 9 a variety of handle structures could be formed.

The core member 102 and its band 106 are preferably molded as a one-piece unit. Likewise, the cover section 110, would also be integrally molded as a one-piece unit. Once these two molded portions are obtained, the gauze material 104 can be secured to core 102 with that structure then being placed into cover 110 with band 106 being permanently secured within band 112. It is believed that the resulting structure will maintain the sterile condition of gauze 104 until tabs 120 and 122 are pulled and the opening of the container 110 is initiated.

While the invention has been described in connection with what is presently considered to be the most practical and preferred embodiment, it is to be understood that the invention is not to be limited to the disclosed embodiment, but on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims, which scope is to be accorded the broadest interpretation so as to encompass all such modifications and equivalent structures.

What I claim is:

1. A vaginal swab comprised of an outer housing having a closed and open end on opposing ends thereof, said housing including an annular band defining said open end and a plurality of frangible seams that together define a pair of removable members and a pair of housing segments hingably secured to said annular band following removal of said removable members, a swab core member having a predetermined exterior shape, said core member having an annular base with an outer

4,557,720

7

diameter equal to the inner diameter of said annular band and an adsorbent member secured to said core member, said core member being secured within said housing so that said adsorbent member is enclosed therein.

2. A vaginal swab comprising an outer housing including an inner case member and an outer case member at least part of which is connected to and overlies said inner case member;

a core member, at least one layer of a porous material secured to said core member, and housing means

8

for supporting and enclosing said core member, said core member being secured to said housing means, having at least two portions movable relative to one another between first and second positions for enclosing said core member when in said first position and for both exposing said core member and the said porous padding secured thereto and for forming a handle for said swab when in said second position.

* * * * *

# APPLICATION FOR UNITED STATES PATENT

**Inventor(s):**  Allegra D. Hemphill

**Invention:**  Vaginal Applicator

**Cushman, Darby & Cushman**
1801 K Street, N. W.
Washington, D. C.  20006
**Attorneys**
**Telephone:** (202) 861-3000

# SPECIFICATION

# 127(A)

1

## FIELD OF THE PRESENT INVENTION

The present invention relates to vaginal swabs and refreshners.

## BACKGROUND OF THE PRESENT INVENTION

5

It is well known that the vagina is a relatively long, hollow, tube like structure that extends from the cervix or the outer end of the uterus down to the labia minora. The interior of the vagina is composed of a mucous membrane and an

10

outer, smooth muscle closely attached to it. While glands are present in the vaginal lining itself, vaginal secretions can arise from the glands in the cervical canal of the uterus such as bartholin's and skene's glands. The lining of the

15

vaginal cavity also responds to stimulation from various ovarian hormones either by building up new cell layers or by shedding old ones. Likewise, mucous is developed in the cervical canal of the uterus at other times, such as in the prolifera-

20

tive phase of the menstrual cycle where the endometrium thickens and its glands begin their secretion of mucous. Thus, it is well known that a variety of secretions develop varying amounts of mucous and other material as the result of a

25

variety of factors and conditions.

Normally, such secretions are clean but occassionally debris in the form of blood or from the deposition of seminal fluid can accumulate. Accordingly, it is desirable at times to be able

30

to have a convenient disposable swab or refreshner available for purposes of cleansing the vaginal area or for purposes of adding or treating the

10/22/82 434828        3 101      150.00 CK

**128(A)**

2

vaginal area with fragrances, medications, germicides or deodorants.

Many types of vaginal devices have been suggested including plunger type devices as in Rogers, U.S. Patent 1,256,831, swabs as in U.S. Patent 3,228,393, or foam type devices directly formed in their outer container as in Ravel, U.S. patent 4,260,570.

### SUMMARY OF THE PRESENT INVENTION

I have found that a truly portable, convenient and disposable internal vaginal cleaning device or refreshner is not available, especially one that is small, compact, easily usable and very simply constructed. The devices such as disclosed in the Rogers patent are cumbersome and not easily disposable. I have found that a device such as disclosed by Ravel is not convenient to use as the device does not provide a sufficiently long handle structure in order to manipulate the swab itself to produce appropriate and needed cleaning. Further, the foam or sponge-like exteriors from which some vaginal swabs or applicators are comprised as in Ravel are not sufficiently adsorbent to produce the necessary and appropriate cleaning required. Rather, such devices tend to collect mucous and other vaginal fluids only on their outer surfaces as they do not have the absorbency needed to provide the amount of fluid collection and removal or to hold and apply the proper amount of material that should be used for proper treatment, as is actually desired or necessary.

**129 (A)**

3

My device, as set forth herein, is comprised of an outer container, the various embodiments of which allow that container, or at least a part thereof, to form the handle structure for the swab, with that handle providing both the protection for the swab while packaged and a handle during use to provide better control over swab during such use.

The swab portion is preferably comprised of fairly rigid inner core member, constructed either in segments or as a one piece unit, over which a thick, gauze type adsorbent pad or layer is secured. In one embodiment, the rigid structure on which the pad is secured is retractable into and extendable from an outer container in which it is held by means of twisting a rotatable bottom thereof in a manner similar to raising and lowering a lipstick. In a second embodiment, the outer container is held together by means of a flexible strap or lever-type handle with that strap or handle serving to provide means for extending the swab from its retracted to its raised operative position. In another embodiment, the outer container is essentially peeled away from its enclosing or protecting relationship about the swab itself with at least part of the outer container forming the handle structure at the base of the thus exposed swab.

Other objects, features, and characteristics of the present invention, as well as the methods and operation and functions of the related elements of the structure, and to the combination of parts and economies of manufacture, will become more apparent upon consideration of the following detailed description and the appended claims with

**130 (A)**

4

reference to the accompanying drawings, all of
which form a part of this specification, wherein
like reference numerals designate corresponding
parts in the various figures.

5

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGURE 1 is a view of a first embodiment
of the present invention showing the device in its
covered, closed and unextended condition;

FIGURE 2 is a view of the device as in
10   Figure 1 in its extended, operating condition;

FIGURE 2a is a diagrammatic cross-
sectional view of a portion of the device shown in
FIGURE 2;

FIGURE 3 is a side, elevational view of a
15   second embodiment of the present invention in its
closed condition;

FIGURE 4 is a side, elevational view of
device shown in Figure 3 with the top having been
removed, prior to the swab being raised to its
20   operative position;

FIGURE 4a is a diagrammatic cross-
sectional view of a portion of the bottom of the
device shown in FIGURE 4;

FIGURE 5 is a side, elevational view of
25   the device shown in Figures 3 and 4 in its raised
operative condition with portions having been cut
away or omitted for clarity;

FIGURE 6 is a side, elevational view of
still another embodiment of the present invention
30   showing an additional handle structure that can be
located on the exterior case;

# 131 (A)

5

FIGURE 7 is diagrammatic, cross-sectional view of the female reproductive system showing the area in which the present device is used;

FIGURE 8 is a diagrammatic, perspective view of still another embodiment of the present invention in its closed and sealed condition; and

FIGURE 9 is diagrammatic, perspective view of the device shown in Figure 8 in its opened and ready to use condition.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS OF THE PRESENT INVENTION

As explained above, the present invention is designed to dry or absorb material in the internal vaginal area when one observes a discharge or lubrication building up to the point that cleansing is either desired or required. Alternatively, the swab can be used as an applicator for a variety of products or medicants and it can either be pre-impregnated therewith or such materials could be applied once the swab was unpackaged. It should be understood that the adsorbent gauze material and the swab element is contemplated as being sterile when packaged. Likewise, it is important that the device be extremely compact and easily manufactured so as to be both portable and disposable rendering it easily carriable and usable.

Turning first to Figures 1, 2 and 2a, the device is comprised of an outer housing, generally indicated at 10, with that outer housing being comprised of an exterior cover 12, an internal tubular member 14 and rotatable base 16. The swab

**132 (A)**

6

itself is comprised of an internal and preferably
hollow core member 18 which as shown in Figure 2a
preferably has a flange 20 integrally formed
therewith and extending about its base.  Flange 20
5    cooperates with a radially inwardly extending
flange 22 at the top of tube 14 so that when core
member 18 is in its fully extended position, as
shown in FIGURE 2, flanges 20 and 22 will abut one
another and prevent further movement as shown in
10   Figure 2a.

An outer gauze adsorbent layer 24 is
secured to core 18 by any convenient means,
preferably by a medically inert adhesive.  It is
also preferred that gauze 24 extend over or around
15   flange 20 at the base of core member 18.  Accord-
ingly, when core 18 is in its fully raised
condition, gauze 24 will be effectively clamped
between flanges 20 and 22.

The operation of this structure, in order
20   to raise core 18 from the position shown in Figure
1 to the erected or extended position shown in
Figure 2, is accomplished by a conventional
helical cam and guide slot arrangement, generally
indicated at 26 in FIGURE 2a.  Such mechanisms,
25   for example, are shown in Coryel, U.S. Patent
1,504,216, or Davis, U.S. Patent 3,677,654, both
of which are exemplary of conventional well known
mechanisms for raising and lowering lipsticks.
Thus, by rotating base 16 it is possible to raise
30   and lower core 18 and the attached gauze material
24.

With reference to Figure 7, the average
vaginal cavity is approximately 9 cm (3.5 inches)
long.  Accordingly, I prefer to have the swab,
35   gauze material 24 and likewise core 18 be

**133(A)**

7

approximately 4 inches long. Container 14 accordingly must be approximately 4 inches in length in order to effectively receive core 18 and the gauze material 24 therein when core 18 is retracted, as shown in Figure 1. I have found that a cover having a total length of approximately 4 inches is sufficient to completely encase container 14 above base 16.

The container is preferably made from a moldable plastic material, such as polyethylene or any one of the other polyolefins or from thermo-plastics. Core 18 can be made from the same material. I prefer to have the adsorbent material 24 be comprised of a cotton or cotton/polyester gauze. However, it is important to employ a highly absorbent material and, accordingly, any such materials could be used as the absorbent material 24.

As an alternative method of raising and lowering swab 24, the interior of core 18 can be provided with suitable threads and a suitably corresponding threaded rod (not shown) could be attached to the rotatable base 16. As base 16 was rotated it would likewise rotate the threaded rod which would in turn, rotate inside core member 18 causing that core member to be raised or lowered depending upon the position of the core member relative to that threaded rod and the direction in which base 16 was rotated.

Turning now to Figures 3-5, the second embodiment of the present invention is comprised of an outer container, generally indicated at 30, which is comprised of a hollow base container 32, an exterior upper cover 34, a flexible retaining clamp member 36 and a swab member, generally

**134(A)**

8

indicated at 38.  A flanged joint 40 is provided
between base 32 and cover 34 in order to assure
that the joint area is securely formed and to
likewise assure their correct and desired relative
5  positioning.  If desired, a snap-type interconnec-
tion could be employed between cover 34 and base
32 as an added measure to work along with clamp
member 36 to hold cover 34 in place.  As shown in
Figure 3, the device is in its closed position and
10  retaining clamp 36 is in place extending over
cover 34.

Turning next to Figures 4a and 5a portion
of the internal structure at the bottom of the
device is set forth diagrammatically in cross-
15  section in Figure 4a where as the device in its
extended condition ready for use is shown in
Figure 5.  As shown in Figure 5, the outer
container 32 is provided along its upper periphery
with an inwardly extending annular flange 42.
20  Swab member 38 is respectively comprised of an
internal core member 44 which is preferably formed
in a one piece manner from a moldable plastic
material such as, for example, polyethylene, and
is formed with a bottom flange 46 as shown in both
25  Figures 4a and 5.  Affixed thereto is an outer
sheath 48 of absorbable material and as shown,
this sheath 48 preferably extends around and is
affixed to core 44 adjacent the base thereof.  As
was true with the first embodiment, I prefer to
30  use a medically inert adhesive for this purpose
although other methods could be used to securely
attach the gauze sheath 48 to core 44 in a manner
that it extends over or around flange.  Clamp 36
is preferably integrally formed with core 44 and
35  is integrally hinged at a predetermined point

**135 (A)**

9

along the bottom peripheral edge of that core
member. The location where clamp member 36 is
hinged to core 44 is predetermined so that when
core 44 is retracted within the hollow container

5    32, clamp 36 can be pivoted up to its closed
position extending about cover 34 as shown in
Figure 3, thereby securing core 44 within
container 32 with the upper loop portion of clamp
member 36 serving to hold cover 34 in place.

10    With reference specifically to Figure 4,
retaining member 36 has been rotated to its full
pivoted unlocked condition and cover 34 has been
removed thereby exposing the upper portion of swab
38. By pushing upward on member 36, the inner

15    core 44 will be moved upwardly within container 32
thereby fully exposing swab member 38 as shown in
Figure 5. In the condition shown in Figure 5,
both the container 32 and the remaining portion of
member 36 extending therebelow will act as a

20    handle for the user to grasp onto when using the
device.

In order to securely close the container
to keep swab 38 sterile is to provide a bottom 50
on the lower container 32 in which a suitable

25    passageway or opening 52 is provided through which
member 36 can pass. It may be otherwise desirable
to close or seal the opening 52 of container 32.
This can be accomplished by a variety of sealing
methods once the assembly is connected together.

30    Preferably, a bottom member 50 is separately
formed with a suitable cutout forming opening 52
with bottom member 50 snapping into place within
the bottom confines of container 32 following
insertion of swab 38 and member 36 into container

35    32.

**136 (A)**

10

In Figure 6, another embodiment of the present invention is shown. The cover 34' extends along the full length of the internal core supporting the gauze or adsorbent pad assembly which can be similar to the structure set forth in Figures 3 - 5 without member 36 attached thereto. In this instance, the cover itself 34' can itself snap in place with respect to the lower container 32' so that a retaining clip or other retaining device would not be required. However, in order to provide sufficient leverage for handling the device when in use and to aid in securing cover 34' to base 32', one or two handles, as indicated at 60 and 62, could be provided on the sides of outer container formed from cover 34' and lower container 32'. These handles can be integrally molded together with lower container 32' and initially held in an upright condition by means of breakable bands indicated at 64.

Turning now to the last embodiment, as shown in Figures 8 and 9, the swab is generally indicated at 100 in Figure 9 and is comprised of a core 102 covered by a gauze layer 104. An outer container is generally indicated at 110. Core 102 is separately formed so as to have a base formed as an annular band or ring 106. Core member 102 can be formed either as a solid structure or preferably with a hollow interior. As in the other embodiments, absorbant gauze material 104 is secured about the exterior surface of core 102 but not about annular band 106. In Figure 9, the device is shown in its open, ready-to-use position whereas in Figure 8, the device is shown in its closed and sealed condition. The cover or outer case 110 is comprised of an annular

**137 (A)**

11

band or ring 112 at the base thereof together with
an upper, portion generally indicated at 114.  It
should be understood that the annular band or ring
106 of core member 102 has an outer diameter which
5   is at least equal to the inner diameter of band
112 so that the two can fit thereby allowing core
102 to be secured within band 112 by a suitable
adhesive following their formation and the
application of gauze 104.  Outer container 110 is
10   formed in its closed condition so that following
insertion of core 102 therein the swab will be
completely formed.  However, the bottom of the
resulting structure could be closed by a separate
member (not shown) that would likewise fit within
15   or over the base of band 112.

In Figure 8, the outer container 110 is
shown in its closed condition and it should be
noted that container 110 is comprised of a
plurality of segments defined by a plurality of
20   sets of frangible seams.  The first set of four
frangible seams 116 extend axially along the side
walls of the container thereby defining two
opposed vertically extending strips 121 and 123 of
the side wall therebetween.  They also define
25   part of container segments 126 and 128 as will
become clear below.  A second set of frangible
seams 118 extend across the top of container 110
and connect opposing pairs of seams 116 together.
An additional seam 124 extends perpendicularly
30   between the center of seams 118 on the very top of
the container.  Tabs 120 and 122 are provided
adjacent each side of seam 124 and will be used to
pull open seam 124 and to thereby open container
110.

**138 (A)**

12

Another frangible seam 134 is provided
between band 112 and the upper portion 114 with
seam 134 defining the upper edge of band 112 and
the bottom edge of upper portion 114. Two
5   portions of that seam are thickened and, there-
fore, are non-frangible so that they respectively
form hinges 130 and 132. The remaining portions
of seam 134 are frangible and subject to being
severed or broken when container 110 is opened.
10  Seams 116, 118, 124 and 134 together serve to
define sections 121, 123, 126 and 128 as well as
the size of band 112. Sections 121 and 123 will
be peeled away and discarded after tabs 120 and
122 are pulled up and away from each other thereby
15  breaking seam 124 which is followed by the
severing of seams 118 and 116 and a portion of
seam 134 at the juncture between sections 121 and
123 and band 112. Once sections 121 and 123 have
been removed, sections 126 and 128 will remain.
20  These sections can then be rotated, respectively,
about hinges 130 and 132 thus breaking the
remaining portions of frangible seam 134 which had
previously joined them to band 112. This open
condition of segments 126 and 128 is shown in
25  Figure 9 with those segments being bent so that
they engage one another, as shown in phantom.
This opening procedure exposes swab member 100,
with segments 126 and 128 serving to provide the
handle structure required for using the swab.
30  While segments 126 and 128 have been shown as
comprising cylindrical type segments, the actual
design of sections 121 and 123 can be modified as
desired so that the resulting shape of segments
126 and 128 can be varied. In addition, it would
35  be possible to reinforce segments 126 and 128 in

**139 (A)**

13

an axial direction or to provide them with another internal shape that would not interfere with the dimensions and sides of swab 100 so that when sections 126 and 128 are folded down as shown in
5   Figure 9 a variety of handle structures could be formed.

The core member 102 and its band 106 are preferably molded as a one-piece unit. Likewise, the cover section 110, would also be integrally
10   molded as a one-piece unit. Once these two molded portions are obtained, the gauze material 104 can be secured to core 102 with that structure then being placed into cover 110 with band 106 being permanently secured within band 112. It is
15   believed that the resulting structure will maintain the sterile condition of gauze 104 until tabs 120 and 122 are pulled and the opening of the container 110 is initiated.

While the invention has been described in
20   connection with what is presently considered to be the most practical and preferred embodiment, it is to be understood that the invention is not to be limited to the disclosed embodiment, but on the contrary, is intended to cover various modifica-
25   tions and equivalent arrangements included within the spirit and scope of the appended claims, which scope is to be accorded the broadest interpreta- tion so as to encompass all such modifications and equivalent structures.

**140(A)**

14

WHAT I CLAIM IS:

1      1. A disposable vaginal swab comprised
2 of a housing surrounding a swab member comprised
3 of a stiff core member and an absorbant outer
4 covering secured thereto, at least a portion of
5 said housing comprising a removable cover to close
6 said housing and protect said swab member within
7 said housing, said core member being <u>movably</u>
8 <u>retained</u> within said housing so as to be <u>movable</u>
9 <u>between</u> a first retracted position and a second
10 extended position relative to said housing when
11 said cover has been removed and means for moving
12 said core member between said first retracted and
13 said second extended positions.

1      2. A swab as in claim 1, wherein said
2 adsorbent cover is comprised of a textile gauze-
3 like fabric.

1      3. A swab as in claim 1, wherein said
2 moving means includes a rotatable member rotatably
3 secured to said housing and cam means operatively
4 connecting at least a portion of said core member
5 and the interior of said housing together so that
6 said core member will move vertically within said
7 housing as said rotatable member is rotated.

1      4. A swab as in claim 3, wherein said
2 core means comprises a cam member fixed to the
3 core member and a tube rotatably retained within
4 said housing and about said core member, said tube
5 member including means defining at least one

**141(A)**

15

6   helical slot extending along the length thereof
7   with said core member being operatively associated
8   with said helical slot.

1       5. A vaginal swab comprised of an outer
2   housing having a closed and open end on opposing
3   ends thereof, said housing including an annular
4   band defining said open end and a plurality of
5   frangible seams that together define a pair of
6   removable members and a pair of housing segments
7   hingably secured to said annular band following
8   removal of said removable members, a swab core
9   member having a predetermined exterior shape, said
10  core member having an annular base with an outer
11  diameter equal to the inner diameter of said
12  annular band and an adsorbent member secured to
13  said core member, said core member being secured
14  within said housing so that said adsorbent member
15  is enclosed therein.

1       8. A vaginal swab comprising an outer
2   housing including an inner case member and an
3   outer case member at least part of which is
4   connected to and overlies said inner case member;
5       a core member, at least one layer of a
6   porous material secured to said core member, and
7   housing means for supporting and enclosing said
8   core member, said core member being secured to
9   said housing means, having at least two portions
10  movable relative to one another between first and
11  second positions for enclosing said core member
12  when in said first position and for both exposing
13  said core member and the said porous padding
14  secured thereto and for forming a handle for said
15  swab when in said second position.

**142(A)**

15

6  helical slot extending along the length thereof
7  with said core member being operatively associated
8  with said helical slot.

1      7. A vaginal swab comprised of an outer
2  housing having a closed and open end on opposing
3  ends thereof, said housing including an annular
4  band defining said open end and a plurality of
5  frangible seams that together define a pair of
6  removable members and a pair of housing segments
7  hingably secured to said annular band following
8  removal of said removable members, a swab core
9  member having a predetermined exterior shape, said
10  core member having an annular base with an outer
11  diameter equal to the inner diameter of said
12  annular band and an adsorbent member secured to
13  said core member, said core member being secured
14  within said housing so that said adsorbent member
15  is enclosed therein.

1      8. A vaginal swab comprising an outer
2  housing including an inner case member and an
3  outer case member at least part of which is
4  connected to and overlies said inner case member;
5      a core member, at least one layer of a
6  porous material secured to said core member, and
7  housing means for supporting and enclosing said
8  core member, said core member being secured to
9  said housing means, having at least two portions
10  movable relative to one another between first and
11  second positions for enclosing said core member
12  when in said first position and for both exposing
13  said core member and the said porous padding
14  secured thereto and for forming a handle for said
15  swab when in said second position.

**142(A)**

14

### WHAT I CLAIM IS:

1       1.  A disposable vaginal swab comprised
2    of a housing surrounding a swab member comprised
3    of a stiff core member and an absorbant outer
4    covering secured thereto, at least a portion of
5    said housing comprising a removable cover to close
6    said housing and protect said swab member within
7    said housing, said core member being <u>movably</u>
8    <u>retained</u> within said housing so as to be <u>movable</u>
9    <u>between</u> a first retracted position and a second
10   extended position relative to said housing when
11   said cover has been removed and means for moving
12   said core member between said first retracted and
13   said second extended positions.

1       2.  A swab as in claim 1, wherein said
2    adsorbent cover is comprised of a textile gauze-
3    like fabric.

1       3.  A swab as in claim 1, wherein said
2    moving means includes a rotatable member rotatably
3    secured to said housing and cam means operatively
4    connecting at least a portion of said core member
5    and the interior of said housing together so that
6    said core member will move vertically within said
7    housing as said rotatable member is rotated.

1       4.  A swab as in claim 3, wherein said
2    core means comprises a cam member fixed to the
3    core member and a tube rotatably retained within
4    said housing and about said core member, said tube
5    member including means defining at least one

**141(A)**

16

## ABSTRACT OF THE PRESENT INVENTION

A disposable vaginal refreshner or swab comprised of an outer container for enclosing an inner, fairly rigid core member about which an
5    adsorbent layer is secured.  The outer container when removed, exposes the adsorbent covered member or allows that member to be moved out of the container into an operable position.  The outer container also forms the handle for the disposable
10    swab element.

**143(A)**

**ORIGINAL**

**DECLARATION AND POWER OF ATTORNEY**

**FOR ORIGINAL U.S. APPLICATIONS**
**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**                    **SOLE/JOINT**

*(NOTE: This form may be executed only when attached to the specification (including-claims) as the last page thereof.)

As a below named inventor, I hereby declare: THAT my residence, post office address and citizenship are as stated below next to my name; THAT I verily believe I am the original, first and sole (if only one name is listed below) or a joint inventor (if plural inventors are named below) of the invention in

## Vaginal Applicator

(insert Title of invention)

described and claimed in the attached specification; that I do not know and do not believe that this invention was ever known or used in the United States of America before my or our invention or discovery thereof, or patented or described in any printed publication in any country before my or our invention or discovery thereof, or more than one year prior to this application; that this invention was not in public use or on sale in the United States of America for more than one year prior to this application; that this invention has not been patented or made the subject of an inventor's certificate issued before the date of this application in any country foreign to the United States of America on an application filed by me or my legal representatives or assigns more than twelve months before this application; that I acknowledge my duty to disclose information of which I am aware which is material to the examination of this application, and that applications for patent or inventor's certificate on this invention or discovery which have been filed by me or my legal representatives or assigns in any country foreign to the United States of America are as follows:

fill in if applicable

(a) none filed more than 12 months prior hereto, unless named below:

state NONE if none were filed

(b) earliest filed less than 12 months prior hereto (the priority of which is hereby claimed under 35 U.S.C. 119):

**None**

(and possibly others on subsequent dates).

And I hereby appoint Cushman, Darby & Cushman, Eighth Floor, 1801 K Street, N.W., Washington, D.C. 20006, telephone number 861-3000 (to whom all communications about this application are to be directed), and each partner thereof (named below with Registration Nos. and of the same address); individually and collectively my attorneys to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith and with the resulting patent.

| | | | | |
|---|---|---|---|---|
| John W. Malley | 13821 | Raymond F. Lippitt | 17519 | Edward M. Prince | 22429 | Arthur R. Crawford | 25327 |
| Paul N. Kokulis | 16773 | G. Lloyd Knight | 17598 | Donald B. Deaver | 23048 | W. Warren Taltavull | 25647 |
| Allen Kirkpatrick | 16749 | Carl G. Love | 18781 | David W. Brinkman | 20817 | Michael L. Keller | 26751 |
| David E. Varner | 15665 | Lawrence A. Hymo | 19057 | George M. Sirilla | 18221 | Charles R. Donohoe | 24546 |
| Lloyd J. Street | 17223 | Akin T. Davis | 19923 | William T. Bullinger | 25503 | Sherman O. Parrett | 25905 |
| George T. Mobille | 17353 | Edgar H. Martin | 20534 | Donald J. Bird | 25323 | Robert A. Vanderhye | 27076 |
| James L. Dooley | 17710 | William K. West, Jr. | 22037 | Larry S. Nixon | 25640 | Watson T. Scott | 26581 |
| Alvin Guttag | 17511 | Kevin R. Joyce | 20508 | James R. Longacre | 24427 | Peter W. Gowdey | 25872 |

I declare further that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

COMPLETE all lines SIGN DATE

*(1) Inventor's Signature _Allegra D. Hemphill_    Date _Oct. 15, 1982_

Inventor's Name (typed) _Allegra    D.    Hemphill_
First    Middle Initial    Family Name    Citizenship

Residence _6217 Charnwood Drive, Rockville, Maryland_

Post Office Address

(Include Zip Code) _20852_

COMPLETE all lines SIGN DATE

*(2) Inventor's Signature _____    Date _____

Inventor's Name (typed) _____
First    Middle Initial    Family Name    Citizenship

Residence _____

Post Office Address _____

(Include Zip Code) _____

COMPLETE all lines SIGN DATE

*(3) Inventor's Signature _____    Date _____

Inventor's Name (typed) _____
First    Middle Initial    Family Name    Citizenship

Residence _____

Post Office Address _____

(Include Zip Code) _____

COMPLETE all lines SIGN DATE

*(4) Inventor's Signature _____    Date _____

Inventor's Name (typed) _____
First    Middle Initial    Family Name    Citizenship

Residence _____

Post Office Address _____

(Include Zip Code) _____

COMPLETE all lines SIGN DATE

*(5) Inventor's Signature _____    Date _____

Inventor's Name (typed) _____
First    Middle Initial    Family Name    Citizenship

Residence _____

Post Office Address _____

(Include Zip Code) _____

COMPLETE all lines SIGN DATE

*(6) Inventor's Signature _____    Date _____

Inventor's Name (typed) _____
First    Family Name    Citizenship

**144(A)**

Residence _____

Post Office Address _____

(Include Zip Code) _____

NOTE:

**FOR ADDITIONAL INVENTORS, check box** ☐ **and attach sheet with same information and signature and date for e**



434828

Fig. 1

Fig. 2

Fig. 2a

Fig. 3

Fig. 4

145(A)

PRINT OF DRAWING AS
ORIGINALLY FILED

434828



*Fig. 4*

*Fig.5*

*Fig.6*

**146(A)**

PRINT OF DRAWING AS
ORIGINALLY FILED

434828



Fig. 7

Fig. 8

Fig. 9

Application or Patent No.: _____

Serial or Patent No.: _____  Docket No.: _____

Filed or Issued: __Herewith__

For:  VAGINAL APPLICATOR

VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY
STATUS (37 CFR 1.9(f) and 1.27(b)) – INDEPENDENT INVENTOR

*V. Barron
#3 Declarati
of small Entit
3-36-83*

As a below named inventor, I hereby declare that I qualify as an independent inventor
as defined in 37 CFR 1.9(c) for purposes of paying reduced fees under section 41(a)
and (b) of Title 35, United States Code, to the Patent and Trademark Office with
regard to the invention entitled ___Vaginal Applicator___
described in

    [x]  the specification filed herewith
    [ ]  application serial no. _____, filed _____
    [ ]  patent no. _____, issued _____.

I have not assigned, granted, conveyed or licensed and am under no obligation under
contract or law to assign, grant, convey or license, any rights in the invention to
any person who could not be classified as an independent inventor under 37 CFR 1.9(c)
if that person had made the invention, or to any concern which would not qualify as a
small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR
1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or
licensed or am under an obligation under contract or law to assign, grant, convey, or
license any rights in the invention is listed below:

    [x]  no such person, concern, or organization
    [ ]  persons, concerns or organizations listed below*

    *NOTE:  Separate verified statements are required from each named
    person, concern or organization having rights to the invention averring
    to their status as small entities. (37 CFR 1.27)

FULL NAME _____
ADDRESS _____
    [ ] INDIVIDUAL    [ ] SMALL BUSINESS CONCERN    [ ] NONPROFIT ORGANIZATION

FULL NAME _____
ADDRESS _____
    [ ] INDIVIDUAL    [ ] SMALL BUSINESS CONCERN    [ ] NONPROFIT ORGANIZATION

FULL NAME _____
ADDRESS _____
    [ ] INDIVIDUAL    [ ] SMALL BUSINESS CONCERN    [ ] NONPROFIT ORGANIZATION

I acknowledge the duty to file, in this application or patent, notification of any
change in status resulting in loss of entitlement to small entity status prior to
paying, or at the time of paying, the earliest of the issue fee or any maintenance fee
due after the date on which status as a small entity is no longer appropriate. (37 CFR
1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that
all statements made on information and belief are believed to be true; and further
that these statements were made with the knowledge that willful false statements and
the like so made are punishable by fine or imprisonment, or both, under section 1001
of Title 18 of the United States Code, and that such willful false statements may
jeopardize the validity of the application, any patent issuing thereon, or any patent
to which this verified statement is directed.

Allegra D. Hemphill
NAME OF INVENTOR    NAME OF INVENTOR    NAME OF INVENTOR

_____
Signature of Inventor    Signature of Inventor    Signature of Inventor

_Oct. 15, 1982_
Date    Date    Date

**148(A)**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

RECEIVED

JUN 11 1983

GROUP 630

In re Application of

Allegra G. Hemphill

Serial No. 434,828                    Group Art Unit 335

Filed: October 18, 1982

Title: VAGINAL APPLICATOR

* * * * * * * * * *

January 10, 1983

Honorable Commissioner of
 Patents and Trademarks
Washington, D.C. 20231

DEPOSIT ACCOUNT
CHARGE STATEMENT
REVOCATION AND RESTATEMENT

Honorable Commissioner of
Patents and Trademarks
Washington, D.C. 20231

Sir:

All prior statements in this case authorizing the Com-
missioner to make charges against our Account are hereby re-
voked.

Instead, the Commissioner is hereby authorized to charge
any fee specifically authorized hereafter, or any deficiency
in the fee(s) filed, or asserted to be filed, or which should
have been filed concerning any paper filed hereafter, and
which may be required under Rules 16-18 now or hereafter rela-
tive to this application and the resulting Official Document
under Rule 20, or credit any overpayment, to Account No. 03-
3975. This statements does not authorize charge of the issue
fee.

Respectfully submitted,

CUSHMAN, DARBY & CUSHMAN

By: _____
        Peter W. Gowdey
        Reg. No. 25,872

PWG:lsp
1801 K Street, N.W.
Washington, D.C. 20006
Tel:  861-3000

**149 (A)**

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

#34828

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/434,828 | 10/19/82 | HEMPHILL | A |

CUSHMAN, DARBY & CUSHMAN
1801 K ST., N. W., 8TH FLR.
WASHINGTON, DC 20006

| | EXAMINER |
|---|---|
| | YASKO, J |
| ART UNIT | PAPER NUMBER |
| 336 | 4 |

DATE MAILED: 02/28/84

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS

[ ] This application has been examined    [ ] Responsive to communication filed on _____    [ ] This action is made final.

A shortened statutory period for response to this action is set to expire ____ month(s), **30** days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I** THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. [ ] Notice of References Cited by Examiner, PTO-892.
2. [ ] Notice re Patent Drawing, PTO-948.
3. [ ] Notice of Art Cited by Applicant, PTO-1449
4. [ ] Notice of Informal Patent Application, Form PTO-152
5. [ ] Information on How to Effect Drawing Changes, PTO-1474
6. [ ] _____

**Part II** SUMMARY OF ACTION

1. [X] Claims _____ **1 — 6** _____ are pending in the application.

    Of the above, claims _____ are withdrawn from consideration.

2. [ ] Claims _____ have been cancelled.

3. [ ] Claims _____ are allowed.

4. [ ] Claims _____ are rejected.

5. [ ] Claims _____ are objected to.

6. [X] Claims _____ **1 — 6** _____ are subject to restriction or election requirement.

7. [ ] This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.

8. [ ] Allowable subject matter having been indicated, formal drawings are required in response to this Office action.

9. [ ] The corrected or substitute drawings have been received on _____. These drawings are [ ] acceptable; [ ] not acceptable (see explanation).

10. [ ] The [ ] proposed drawing correction and/or the [ ] proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been [ ] approved by the examiner. [ ] disapproved by the examiner (see explanation).

11. [ ] The proposed drawing correction, filed _____, has been [ ] approved. [ ] disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

12. [ ] Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [ ] been received [ ] not been received

    [ ] been filed in parent application, serial no. _____; filed on _____.

13. [ ] Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. [ ] Other

PTOL-326 (7 - 82)    EXAMINER'S ACTION    **150(A)**



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/434,828 | 10/19/82 | HEMPHILL | A |

*434828*

| | EXAMINER |
|---|---|
| CUSHMAN, DARBY & CUSHMAN | YASKO, J |
| 1801 K ST., N. W., 8TH FLR. | |
| WASHINGTON, DC 20006 | ART UNIT | PAPER NUMBER |
| | 336 | 4 |

DATE MAILED: 02/28/84

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS

This application has been examined  ☐ Responsive to communication filed on _____  ☐ This action is made final.

A shortened statutory period for response to this action is set to expire _____ month(s), **30** days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474
6. ☐ _____

**SUMMARY OF ACTION**

1. ☒ Claims _____ **1-6** _____ are pending in the application.

Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☐ Claims _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☒ Claims _____ **1-6** _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.

8. ☐ Allowable subject matter having been indicated, formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. These drawings are ☐ acceptable; ☐ not acceptable (see explanation).

10. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved. ☐ disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections **MUST** be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

12. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

PTOL-326 (7-82)                    **EXAMINER'S ACTION**                    **150(A)**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*#3*
*d. little*
*5-6-83*

In re Application of

Allegra G. Hemphill

Serial No. 434,828                    Group Art Unit 335

Filed:  October 18, 1982

Title:  VAGINAL APPLICATOR

* * * * * * * * * *

January 10, 1983

Honorable Commissioner of
 Patents and Trademarks
Washington, D.C. 20231

DEPOSIT ACCOUNT
CHARGE STATEMENT
REVOCATION AND RESTATEMENT

Honorable Commissioner of
Patents and Trademarks
Washington, D.C. 20231

Sir:

        All prior statements in this case authorizing the Com-

missioner to make charges against our Account are hereby re-

voked.

        Instead, the Commissioner is hereby authorized to charge

any fee specifically authorized hereafter, or any _deficiency_

in the fee(s) filed, or asserted to be filed, or which should

have been filed concerning any paper filed hereafter, and

which may be required under Rules 16-18 now or hereafter rela-

tive to this application and the resulting Official Document

under Rule 20, or credit any overpayment, to Account No. 03-

3975.  This statements does _not_ authorize charge of the issue

fee.

                    Respectfully submitted,

                    CUSHMAN, DARBY & CUSHMAN

                    By:

                                Peter W. Gowdey
                                Reg. No. 25,872

PWG:lsp
1801 K Street, N.W.
Washington, D.C. 20006
Tel:  861-3000

**149 (A)**

Serial No. 434,828                                    -2-

Art Unit 336

(1)    This application contains claims directed to the following patentably distinct species of the claimed invention: Figs. 1-2a; Figs. 3-4a; Fig. 6; Figs. 8,9 respectively.

Applicant is required under 35 U.S.C. 121 to elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable. Currently, claim 1 is generic.

Applicant is advised that a response to this requirement must include an identification of the species that is elected consonant with this requirement, and a listing of all claims readable thereon, including any claims subsequently added. An argument that a generic claim is allowable or that all claims are generic is considered nonresponsive unless accompanied by an election.

Upon the allowance of a generic claim, applicant will be entitled to consideration of claims to not more than a reasonable number of species in addition to the elected species, provided that all claims to each additional species are written in

**151(A)**

Serial No. 434,828                    -3-

Art Unit 336


dependent form or otherwise include all the limitations
of an allowed generic claim as provided by 37 CFR
1.141. If claims are added after the election,
applicant must indicate which are readable upon the
elected species. MPEP 809.02(a).

John D. Yasko
Examiner
Art Unit 336

J. Yasko:rk

703-557-3501

2/23/84


**152(A)**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of

Allegra HEMPHILL

Serial No. 434,838

Filed: October 18, 1982

For: VAGINAL APPLICATOR

RECEIVED

NOV 22 1983

GROUP 330

***** ***** ***** *****

November 18, 1983

Honorable Commissioner of
Patents and Trademarks
Washington, D.C. 20231

DEC 15 1983

INFORMATION DISCLOSURE STATEMENT

Sir:

Attached is form PTO-1499 listing additional U.S. Pat-
ents to be brought to the Examiner's attention for his review
and consideration.

Ray and Mason show retractable lipstick holders, but are
similar to Coryell and Davis cited in the specification.
Fielding and Johansson show devices through which water is
pumped and are used for douching purposes which is different
from the concepts of the present invention. Similarly, Bower
discloses a disposable douche and a tubular probe. Laker and
Schuster et al relate to devices for collecting vaginal speci-
mens for diagnostic testing and Bridle and Schopflin et al show
devices for applying medicines. None of these is felt to be
more relevant than the references already cited.

Respectfully submitted,

CUSHMAN, DARBY & CUSHMAN

By: _____
Peter W. Gowdey
Reg. No. 25,872

PWG:lsp
1801 K Street, N.W.
Washington, D.C. 20006
Tel: 861-3000

## 153(A)

| FORM PTO-1449 (REV. 7-80) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. 3801/22914 | SERIAL NO. ~~434,838~~ 619684 |
|---|---|---|---|

# INFORMATION CITED BY APPLICANT
*(Use several sheets if necessary)*

| APPLICANT | HEMPHILL, ALLEGRA | |
|---|---|---|
| FILING DATE Octo. 18, 1982 | GROUP 335 | |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | 2 3 4 40 60 | 3/1?/41 | RAY | — | | |
| | AB | 3 5 86 45 2 | 6/22/71 | MASON | — | | |
| | AC | 3 7 3 16 8 | 25/8/73 | FIELDING | — | | |
| | AD | 2 5 15 0 2 | 4/3/79 | BRIDLE | — | | |
| | AE | 4 1 5 59 9 1 | 5/22/79 | SCHOPFLIN ET AL | — | | |
| | AF | 4 1 5 77 0 9 | 6/12/79 | SCHUSTER ET AL | — | | |
| | AG | 4, 15 9 7 18 | 7/3/79 | BOWER | — | | |
| | AH | 4 1 6 59 4 2 | 8/28/79 | JOHANSSON | — | | |
| | AI | 4 1 7 5 43 9 | 11/27/79 | LAKER | — | | |
| | AJ | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

## Other Publications *(Including Author, Title, Date, Pertinent Pages, Etc.)*

| | |
|---|---|
| AR | |
| AS | |
| AT | |

| EXAMINER /s/ CHRISTA K. SCOTT | DATE CONSIDERED ~~4-3-84~~ 12-13-84 |
|---|---|

*Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not ... and not considered. Include copy of this form with next communication to applicant.*

USCOMM-DC 80-398 S

# 154(A)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of

Allegra HEMPHILL

Serial No. 434,038

Filed: October 18, 1982

VAGINAL APPLICATOR

RECEIVED
NOV 22 1983
GROUP 380

RECEIVED
NOV 25 1983
GROUP 330

Group:   335

***** ***** ***** *****

November 18, 1983

Honorable Commissioner of
 Patents and Trademarks
Washington, D.C. 20231                    DEC 15 1983

INFORMATION DISCLOSURE STATEMENT

Sir:

    Attached is form PTO-1499 listing additional U.S. Pat-
ents to be brought to the Examiner's attention for his review
and consideration.

    Ray and Mason show retractable lipstick holders, but are
similar to Coryell and Davis cited in the specification.
Fielding and Johansson show devices through which water is
pumped and are used for douching purposes which is different
from the concepts of the present invention. Similarly, Bower
discloses a disposable douche and a tubular probe. Laker and
Schuster et al relate to devices for collecting vaginal speci-
mens for diagnostic testing and Bridle and Schopflin et al show
devices for applying medicines. None of these is felt to be
more relevant than the references already cited.

                        Respectfully submitted,

                        CUSHMAN, DARBY & CUSHMAN

                        By: _____
                              Peter W. Gowdey
                              Reg. No. 25,872

PWG:lsp
1801 K Street, N.W.
Washington, D.C. 20006
Tel:  861-3000

153(A)

| FORM PTO-1449 (REV. 7-80) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. 3801/22914 | SERIAL NO. ~~434,038~~ 619684 |
|---|---|---|---|
| **INFORMATION** CITED BY APPLICANT (Use several sheets if necessary) | | APPLICANT HEMPHILL, ALLEGRA | |
| | | FILING DATE Octo. 18, 1982 | GROUP 335 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | 2 3 4 40 60 | 3/14/44 | RAY | | | |
| | AB | 3 5 86 45 2 | 6/22/71 | MASON | | | |
| | AC | 3 7 3 16 8 | 25/8/73 | FIELDING | | | |
| | AD | 2 5 15 02 | 4/3/79 | BRIDLE | | | |
| | AE | 4 1 5 59 9 | 15/22/79 | SCHOPFLIN ET AL | | | |
| | AF | 4 1 5 77 0 | 96/12/79 | SCHUSTER ET AL | | | |
| | AG | 4,15 9,7 18 | 7/3/79 | BOWER | | | |
| | AH | 4 1 6 59 42 | 8/28/79 | JOHANSSON | | | |
| | AI | 4 1 75 43 9 | 11/27/79 | LAKER | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

### Other Publications (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| AR | |
| AS | |
| AT | |

| EXAMINER CHRISTA K. SCOTT YASKO | DATE CONSIDERED ~~4-3-84~~ 12-13-84 |
|---|---|

Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

USCOMM-DC 80-3985

**154(A)**

| FORM PTO-1449 (REV. 7-80) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. 3801/22914 | SERIAL NO. ~~434,038~~ 619684 |
|---|---|---|---|

**INFORMATION CITED BY APPLICANT**
*(Use several sheets if necessary)*

| APPLICANT HEMPHILL, ALLEGRA | |
|---|---|
| FILING DATE Octo. 18, 1982 | GROUP 335 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | 2 3 4 40 60 | 3/14/44 | RAY | | | |
| | AB | 3 5 86 45 26 | 6/22/71 | MASON | | | |
| | AC | 3 7 3 16 8 25 | 5/8/73 | FIELDING | | | |
| | AD | 2 5 15 0 24 | 4/3/79 | BRIDLE | | | |
| | AE | 4 1 5 59 9 15 | 6/22/79 | SCHOPFLIN ET AL. | | | |
| | AF | 4 1 5 77 0 96 | 6/22/79 | SCHUSTER ET AL. | | | |
| | AG | 4, 15 9 7 18 | 7/3/79 | BOWER | | | |
| | AH | 4 1 6 59 42 | 8/28/79 | JOHANSSON | | | |
| | AI | 4 1 7 5 43 9 | 11/27/79 | LAKER | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | TRANSLATION NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

### Other Publications  *(Including Author, Title, Date, Pertinent Pages, Etc.)*

| | | |
|---|---|---|
| AR | | |
| AS | | |
| AT | | |

| EXAMINER YASKO CHRISTA K. SCOTT | DATE CONSIDERED 4-3-84  12-13-84 |
|---|---|

*Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not ~~used~~ and not considered. Include copy of this form with next communication to applicant.*

USCOMM-DC 80-3985

**154(A)**

Case 1:07-cv-01236-RMC    Document 9-11    Filed 10/22/2007    Page 8 of 14

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of

Allegra HEMPHILL

Serial No. 434,038

Filed: October 18, 1982

FOR: VAGINAL APPLICATOR

RECEIVED
NOV 22 1983
GROUP 330

***** ***** ***** *****

November 18, 1983

Honorable Commissioner of
Patents and Trademarks
Washington, D.C. 20231

DEC 1 5 1983

INFORMATION DISCLOSURE STATEMENT

Sir:

Attached is form PTO-1499 listing additional U.S. Pat-
ents to be brought to the Examiner's attention for his review
and consideration.

Ray and Mason show retractable lipstick holders, but are
similar to Coryell and Davis cited in the specification.
Fielding and Johansson show devices through which water is
pumped and are used for douching purposes which is different
from the concepts of the present invention. Similarly, Bower
discloses a disposable douche and a tubular probe. Laker and
Schuster et al relate to devices for collecting vaginal speci-
mens for diagnostic testing and Bridle and Schopflin et al show
devices for applying medicines. None of these is felt to be
more relevant than the references already cited.

Respectfully submitted,

CUSHMAN, DARBY & CUSHMAN

By: _____
Peter W. Gowdey
Reg. No. 25,872

PWG:lsp
1801 K Street, N.W.
Washington, D.C. 20006
Tel: 861-3000

153(A)

March 14, 1944.                H. S. RAY                 2,344,060

COSMETIC HOLDER

Filed June 28, 1941                2 Sheets—Sheet 1



Fig. 1



Fig. 2



Fig. 3



Fig. 4



Fig. 5



Fig. 6

INVENTOR.

Harry S. Ray

BY Moses r Blum

ATTORNEYS

155(A)

March 14, 1944.    H. S. RAY    2,344,060

COSMETIC HOLDER

Filed June 28, 1941    2 Sheets-Sheet 2



Fig. 7

Fig. 8

Fig. 9

Fig. 11

Fig. 10



Fig. 12

INVENTOR.

Harry S. Ray

BY

Mock & Blum

ATTORNEYS

156(A)

Patented Mar. 14, 1944

2,344,060

# UNITED STATES PATENT OFFICE

2,344,060

## COSMETIC HOLDER

Harry S. Bay, New York, N. Y., assignor to Ray-
noldy Corporation, New York, N. Y., a corpora-
tion of New York

Application June 28, 1941, Serial No. 400,260

3 Claims.   (Cl. 15—137)

My invention relates to a new and improved cosmetic holder, and to a new and improved method of applying a lipstick or other toilet preparation or cosmetic.

While the invention relates particularly to an improved lipstick holder and to an improved method of applying a lipstick or lipstick material, it is not limited to applying any particular type of toilet preparation or cosmetic.

One of the objects of the invention is to provide a holder from which the material of the lipstick or the like can be extruded in the form of a mass of continuous cross-section.

Another object of the invention is to provide a lipstick holder whose mouth is sufficiently large to permit part of the lip of the user to be pressed into said mouth, so that the lipstick can be applied without protruding the lipstick from the holder.

Another object of the invention is to provide a holder whose mouth has a rim or edge which is shaped and dimensioned so that said rim can be used as a wiper for removing excess cosmetic, and for spreading the applied cosmetic in the form of a thin layer of uniform thickness.

Another object of the invention is to provide a holder which can be readily manufactured and assembled and into which the cosmetic material can be directly filled, thus eliminating the necessity of first molding the cosmetic material into stick form or the like, and then inserting the sticks or the like into the holder.

Another object of the invention is to provide a holder in which the lipstick can be shaped and extruded by means of the holder, said lipstick preferably, but not necessarily, having sufficient inherent rigidity so that it will stand up under the pressure of application, independently of the support which is provided by the rigid wall of the holder, so that said lipstick has the same formula and rigidity as any conventional lipstick.

Another object of the invention is to provide a holder which will extrude the material of the cosmetic so that the exposed face will have a continuous sharp edge.

Other objects of the invention will be set forth in the annexed description and drawings, which illustrate preferred embodiments thereof.

Fig. 1 is a front elevation of the improved holder, with the cover in closing position.

Fig. 2 is a vertical central section of Fig. 1.

Fig. 3 is a detail vertical sectional view which illustrates another embodiment of the means for extruding the material of the lipstick or the like,

Fig. 4 is a horizontal sectional view of the body of the holder which is shown in Fig. 2.

Fig. 5 is a perspective view of the holder which is illustrated in Figs. 1 and 2, with the cover of the holder removed.

Fig. 6 is a detail perspective view which illustrates a different shape of the mouth of the body of the holder.

Fig. 7 generally corresponds to Fig. 2 and it illustrates another embodiment of the invention.

Fig. 8 is a perspective view of the body of the holder which is illustrated in Fig. 7.

Fig. 9 is an outline, in vertical elevation, of the inner wall of the holder which is shown in Figs. 7 and 8.

Fig. 10 is an end elevation of the mouth of the body of the holder, which is illustrated in Figs. 7–9, inclusive.

Fig. 11 is a vertical cross-section of the throat of the device which is shown in Figs. 7–10, with the plane of the mouth held vertical.

Fig. 12 is a diagrammatic view, partially in cross-section, illustrating how the lipstick material is applied to the lips.

In the embodiment of Figs. 1 and 2, the holder is provided with a body 1 which is made of any suitable plastic, such as cellulose acetate plastic, polystyrene, or any other thermoplastic molding material. The body 1 can also be made of any suitable metal. Said body is preferably made of translucent or transparent material.

The upper part of the body is provided with a shoulder, on which the cover 2 can be mounted. The outer end of the body 1 is provided with a converging extrusion nozzle 3. The mouth of the extrusion nozzle 3 is elliptical, in said embodiment of Figs. 1–5, and the plane of said ellipse makes an angle of approximately 40°–45° with a plane which is perpendicular to the vertical axis of the body 1. The body 1 is provided with a portion of uniform interior cross-section, in which a piston 4 is slidably located. This piston 4 is rigid and it can be made of any suitable thermoplastic molding material or metal or the like. The upper face of the piston 4 may be provided with a sealing washer 5 which is made of flexible material and which fits tightly but slidably against the inner wall of said portion of the body 1.

As shown in Fig. 4, the inner wall of the body 1 is shaped so as to prevent the piston 4 from turning relative to said inner wall. For example, the inner wall of the body 1 may be of general hexagonal shape and the piston 4 and the washer 5 have corresponding hexagonal shapes.

As shown in Fig. 4, the inner hexagonal wall

157(A)

2                                                    2,344,060

of the body 1 is provided with shallow vertical grooves 4b, of angular or other cross-section. These grooves will be filled with the colored cosmetic, and said filling will remain in said grooves as the piston 4 is raised, because the hexagonal piston 4 and its washer 5 have straight walls, which do not enter said grooves 4b. These grooves 4b are made sufficiently shallow, so that the lipstick material will be forced only upwardly, when the piston 4 is forced upwardly. If the body 1 is made of translucent or transparent material, the colored material in grooves 4b will form a continuous inner layer, which will conceal the piston 4 and the internal parts of the applicator. These grooves 4b may be omitted, and each internal face of the cylindrical part of the body 1 may have one or more of said grooves 4b. The lower end of the body 1 is provided with a rotatable head 6, which may have knurling 7. The piston 4 has an axial tapped bore, in which the threaded bore of a screw 8 is located. The body of said screw 8 is threaded up to the top thereof, as only a portion of said threading is shown in Fig. 2. At the bottom of its threaded portion, the screw 8 is provided with a collar or head 9 which may or may not be integral with the screw 8. This collar 9 rests upon a cup-shaped rigid washer 10, whose vertical wall is rigidly connected, by cement or the like, to the corresponding portion of the wall of the body 1. The reduced shank 11 of the screw 8 passes through a suitable bore in said cupped washer 10 and the lower end of the member 11 is enlarged to provide a rigid and rivet-like connection with the recessed central part of the head 6.

The screw 8 can therefore be freely turned but it is held against longitudinal movement. Upon turning the head 6 of the screw 8, the piston 4 is moved upwardly towards the mouth of the extrusion nozzle 3. The lipstick material L is of any suitable formula which can provide a spreadable but rigid lipstick of the well-known type, which has sufficient rigidity to enable the use of the lipstick without any additional support from the holder. Formulas for lipsticks of this type are well-known in the trade, so that no specific formula need be given. The lipstick may be an easily spreadable paste, instead of having such inherent rigidity.

When the piston 4 is in the bottom position illustrated in Fig. 2, and when the cover 2 is removed from the body 1, the material for making the lipstick L can be poured in a heated liquid or plastic condition directly into the body 1. Said lipstick material need not be heated above 50° C. in order to become conveniently fluid for pouring purposes. As the average thermoplastic material, out of which the body 1 is made, begins to be affected by heat at temperatures above 70°, there is a sufficiently safe margin for the protection of said body. This makes it unnecessary first to mold the lipstick and then to insert the same into the holder. The lipstick material L has a recess which is occupied by the threaded shank of the screw 8. However, the nozzle 3 is sufficiently reduced in cross-section towards its mouth M, so that when the piston 4 is forced upwardly, the material of the lipstick L converges anterior said mouth, to form a mass of solid cross-section.

In the embodiment illustrated in Fig. 3, the screw 8a passes through the tapped bore of a piston 4a. The lower end of the screw 8a is rigidly connected to a rigid disc 12 which is of polygonal or other non-circular shape. This disc 12 is lo-

cated in a cap 14 whose shape corresponds to that of the disc 12, so that the cap 14 and the screw 8a turn in unison. The cap 14 has a flange 15 which fits turnably on an external shoulder of the body 1.

The construction shown in Fig. 3 is specifically adapted for use in a construction in which the bottom parts of the device are made of metal, instead of being made of a plastic such as cellulose acetate or the like.

Although the ejector or piston 4 is moved in a direction which is inclined to the edge of the mouth M, the material L is extruded so that its exposed lateral face is substantially parallel to the rim of said mouth.

As shown in Fig. 5, any suitable part of the body, such as the outer wall of the extrusion nozzle 3, is provided with a lateral fin 16. When inserting the heated plastic or fluid material of the lipstick into the holder, this fin 16 can be used for holding the body of the holder in a suitable support, and with the plane of the mouth M in a horizontal position. For this purpose, the holder is provided with a bore which is suitably inclined to the horizontal plane, and said bore has a recess in which the fin 16 is then located, so that the body of the holder is held against turning, during the filling operation.

Fig. 5 clearly shows the rim 17 of the elliptical mouth M of the holder. The thickness of this rim 17 may be approximately 0.025 of an inch or less, as low as 0.015 of an inch. This rim 17 has its edges slightly rounded in order to avoid cutting the lips of the user, but due to its thinness, the wall 17 serves as a spreading and wiping device for wiping the lipstick material over the lips of the user, thus producing a clean and sharp and non-smudgy effect. The thickness of the rim 17 may exceed .025 of an inch, up to .04–.05 of an inch and even more. The inner edge of rim 17 can be fairly sharp and its outer edge may be rounded. If the rim is made too thick, the cosmetic which is taken up by the lip may be removed by said thick wall. Hence, the invention is not limited to any particular thickness of the wall of rim 17, save that said wall should act to spread the cosmetic evenly across the lip, but without wiping the cosmetic off the lip.

Excess material is removed from the lips and it remains adherent to the lipstick material, inwardly of the rim 17.

While the invention is not limited to the specific dimensions which are stated herein by way of example, the major axis of the elliptical mouth M may have a length of about ⅜ of an inch, and the minor axis may have a length of about $\frac{7}{32}$ of an inch. This may vary, because the device will be made in different sizes. However, the mouth preferably has a length which exceeds the width thereof. Therefore, as shown in Fig. 12, the holder may be passed against a lip La of the user, while the material L is flush or substantially flush with the edge of the mouth M, so that a part of said lip La of the user can be forced under slight pressure into the nozzle 3, to contact with the material L, as shown in Fig. 12. Preferably, the mouth M is shaped so as to accommodate only one lip at a time. By moving the holder relative to the lip, preferably, but not necessarily in the direction of the width or smaller dimension of the mouth, the lipstick material is then thinly spread and wiped by the wiping rim of the mouth over the surface of the lip while all the material of the lipstick L is lo-

cated in the extrusion nozzle 3, and any excess material is wiped off the lip and retained in said nozzle.

It is therefore unnecessary at any time to extrude the material of the lipstick beyond the mouth M, in order to apply the material to a lip or lips. This prevents smearing of the holder and produces an even and non-smudgy effect. Of course, as shown in Fig. 8, the material may be slightly extruded beyond the mouth M, if this is desired.

In order to enable the lip to be forced into the extrusion nozzle, in the manner shown in Fig. 12, the smallest dimension of the mouth M should not be less than about 0.375 of an inch.

In the embodiment of Fig. 6, the rim 18a of the mouth Ma, instead of being of annular planar shape, is slightly concave at the long sides of the ellipse, following the concave broken line 18 which is shown in Fig. 2, and the line 18a which is shown in Fig. 7, so as to fit the mouth more accurately to the shape of the average lip.

In the embodiment of Figs. 1–6, the entire body of the holder, including the extrusion nozzle, has a single straight longitudinal axis.

In the embodiment of Fig. 7, the mechanism for operating the piston 4 is substantially the same as that shown in Fig. 2. In the embodiment of Fig. 7, the rigid washer 18a is rigidly connected to the body 1 by cement, and said washer 18a has an annular rib 18b, which fits in an annular groove of the turnable head 8, so that the washer 18a serves as a bearing for the turnable head 8, which turns the screw 8.

The mouth-portion of the body of the holder which is shown in Figs. 7–11, has a longitudinal axis 17, which makes an angle of about 135°–140° with the straight axis 17a of the body 1. The plane of the mouth is perpendicular to axis 17. This provides better support for the extruded layer of the lipstick material, if the device is used in this manner. This embodiment is also preferably used in the manner shown in Fig. 12. The rim R of the portion 3a of this embodiment is shaped as shown in Fig. 10, so as to have a portion of partial circular shape which terminates in a pointed portion whose walls 28 are substantially straight. This is convenient for producing the "cupid's bow" effect. The holder may also be dimensioned so that cosmetic may be applied simultaneously to both lips, in the manner shown in Fig. 12. Hence, when I refer to applying cosmetic to a lip, in a claim or claims, I include the simultaneous application of the cosmetic to both lips. The material L need not necessarily be a cosmetic, as medicinal materials may be applied.

The shape of the holder which is illustrated in Fig. 10, makes it unnecessary to provide the fin 18.

I have described preferred embodiments of my invention, but it is clear that numerous changes and omissions can be made without departing from its spirit.

The device or applicator may be used for applying material of any kind, and which need not necessarily be a cosmetic or toilet preparation, to any part of the body.

For convenience, the vertical line of the holder at point V is designated as the rear line of the holder, and the vertical line which passes through the point P is designated as the front line of the holder. The inner wall which is shown at the right-hand side of Fig. 7, has a convex portion C, which merges vertically into a concave portion

Ca. The inner wall has a convex shape circumferentially to the points Pa, through an angle of about 90° on each side of the point P. The vertical convex curvature of said convex-wall portion diminishes gradually in both directions from point P, until said convex curvature is substantially zero at the points Pa.

The concave shape which is indicated by Ca, continues circumferentially about 135° from each side of point P, up to the points Pb, and said degree of concave curvature is equal between point P and the respective points Pb. This concave curvature gradually diminishes between points Pb and V, until it is zero at V.

It will be noted that the rim of the mouth of the extrusion nozzle is free and exposed and shaped so that said rim can be directly contacted with the lip of the user. As illustrated in Fig. 8, the extruded material has a sharp edge. By reason of the dimensions previously mentioned, the extruded material has sufficient cross-section and strength to withstand the pressure under which said extruded material is applied to the lip of the user, especially since the length of the extruded mass is very small. Therefore, the desired sharp edge is not lost when the extruded material is pressed against the lip of the user.

In the embodiment of Fig. 2, the inner wall of the holder, including the extrusion throat or nozzle 3 thereof, substantially up to the lower end of said nozzle 3, is a symmetrical surface of revolution, whose axis is the common vertical axis of the body 1 and the screw 8. Above the lower end of the mouth, the inner wall of the device is a partial cylindrical wall, whose axis coincides with said common vertical axis.

I claim:

1. A lipstick device comprising a body which has a longitudinal axis, said body having an extrusion nozzle at one end thereof, said extrusion nozzle having a longitudinal axis which is inclined to the longitudinal axis of the body, said extrusion nozzle having a mouth whose rim is located in a plane which is substantially perpendicular to the axis of said extrusion nozzle, said body having a piston located therein, means adapted to move said piston towards said extrusion nozzle, said body having an extrudible lipstick filling which has been solidified in situ, said rim having a major axis and a minor axis, the length of said minor axis being substantially 83% of the length of said major axis, the thickness of said rim being substantially between .015 inch–.05 inch, said rim being wholly free and wholly exposed and shaped for direct contact with the lip of the user, said piston extruding said filling out of said nozzle with the free face of said filling substantially parallel to said rim.

2. A lipstick device comprising a body which has a longitudinal axis, said body having an extrusion nozzle at one end thereof, said extrusion nozzle having a longitudinal axis which is inclined to the longitudinal axis of the body, said extrusion nozzle having a mouth whose rim is located in a plane which is substantially perpendicular to the axis of said extrusion nozzle, said body having a piston located therein, means adapted to move said piston towards said extrusion nozzle, said body having a lipstick filling which has been solidified in situ, said rim having a major axis and a minor axis, the length of said minor axis being substantially 83% of the length of said major axis, the thickness of said rim being substantially between .015 inch–.05 inch, said rim having an apex in its internal lat-

**4**

2,344,060

eral cross-section, having a rim which is located in a plane which is inclined to the direction of movement of said piston, said rim being wholly free and wholly exposed and shaped for direct contact with the lip of the user, said piston extruding said filling out of said nozzle with the free face of said filling substantially parallel to said rim.

3. A lipstick device comprising a body which has a longitudinal axis, said body having a solid and extrudible lipstick filling and also having an extrusion nozzle at one end thereof, said extrusion nozzle having a longitudinal axis which is inclined to the longitudinal axis of the body, said extrusion nozzle having a mouth whose rim is located in a plane which is substantially per-

pendicular to the axis of said extrusion nozzle, said body having a piston located therein, means adapted to move said piston in a direction parallel to the longitudinal axis of said body towards said extrusion nozzle to extrude said lipstick filling out of said nozzle, said rim being wholly free and wholly exposed and shaped for direct contact with the lip of the user, the internal wall of said rim having a tapered cross-section which consists of two substantially symmetrical halves which meet substantially in a point, said piston extruding said filling out of said nozzle with the free face of said filling substantially parallel to said rim.

HARRY S. RAY.

160(A)

# United States Patent

[11] 3,586,452

| | | |
|---|---|---|
| [72] | Inventor | Richard A. Mason<br>Orange, Conn. |
| [21] | Appl. No. | 836,290 |
| [22] | Filed | June 25, 1969 |
| [45] | Patented | June 22, 1971 |
| [73] | Assignee | Eyelet Specialty<br>Wallingford, Conn. |

[54] COSMETIC CONTAINER
9 Claims, 5 Drawing Figs.

[52] U.S. Cl. ....................................................... 401/78,
401/96

[51] Int. Cl. ....................................................... B43k 21/08,
A45d 40/06

[50] Field of Search ....................................... 401/78, 96,
75

[56]                References Cited
UNITED STATES PATENTS

| 2,609,092 | 9/1952 | Braselton | 401/75 |
| 2,612,991 | 10/1952 | Braselton | 401/75 |
| 2,720,966 | 10/1955 | Davis | 401/78 |
| 2,838,169 | 6/1958 | Grau | 401/78 |

Primary Examiner—Lawrence Charles
Attorney—Sandoe, Hopgood & Calimafde

ABSTRACT: The invention contemplates a container for the efficient containment and selective dispensing of chalk or talc in stick form, as for cosmetic use. The arrangement is such as to provide self-adaptation to changing stick size, as may be occasioned by erosion in use. The arrangement also provides the facility of use which characterizes a conventional rotary or swivel lipstick, and special provision is made to assure the accumulation and storage of chalk or the like dust, in a manner to avoid soiling the hands or contaminating the otherwise clean exterior of the container.



PATENTED JUN 22 1971                3,586,452



Fig.1.

Fig.2.

Fig.3.

Fig.4

Fig.5.

INVENTOR
RICHARD A. MASON
BY
Sandoe, Hopgood & Calimafde
ATTORNEYS

**162(A)**

3,586,452

1

## COSMETIC CONTAINER

This invention relates to an improved container construction particularly adapted to the selective dispensing of a fragile substance such as a stick of chalk, or a consolidated stick of cosmetic talc.

Fragile sticks of the character indicated are notoriously susceptible to breakage and, of course, for use, they must be readily subject to erosion upon friction contact with an application surface or object. These considerations have thus far substantially limited the convenience and flexibility of use of chalk and talc sticks, as for cosmetic purposes.

It is, accordingly, an object of the invention to provide an improved containing and dispensing device for fragile substances of the character indicated.

Another object is to provide a propulsion mechanism for selectively dispensing a chalk stick or the like, with maximum protection against breakage of the stick.

A further object is to meet the foregoing objects with a construction making maximum use of parts of standard containers such as swivel lipstick containers.

It is also an object to meet the above objects with a construction in which eroded chalk is dispensed at one location and is otherwise efficiently accumulated within the container in a clean and neat manner, so as not to soil the hands, pocketbook or the like of the user.

A specific object is to achieve the foregoing objects with a construction which is self-adapting to size variations in the chalk stick, as such variations may occur in use of a given stick.

A general object is to provide a construction which will make chalk or the like stick materials almost as conveniently and economically usable as the pomade stick materials of today.

Other objects and various further features of novelty and invention will be pointed out or will occur to those skilled in the art from a reading of the following specification in conjunction with the accompanying drawings. In said drawings, which show, for illustrative purposes only, a preferred form of the invention:

FIG. 1 is an enlarged view in side elevation, partly broken away and in longitudinal section, to show a container of the invention;

FIG. 2 is a side elevation of a sleeve in the construction of FIG. 1;

FIG. 3 is a side elevation of a tubular member to which the sleeve of FIG. 2 is to be assembled;

FIG. 4 is a perspective view of a propulsion member in the construction of FIG. 1; and

FIG. 5 is an enlarged top view of the parts of FIGS. 2 and 3 in their assembled relation.

Briefly stated, the invention contemplates a container for the efficient containment and selective dispensing of chalk or talc in stick form, as for cosmetic use. The arrangement is such as to provide self-adaptation to changing stick size, as may be occasioned by erosion in use. The arrangement also provides the facility of use which characterizes a conventional rotary or swivel lipstick, and special provision is made to assure the accumulation and storage of chalk or the like dust, in a manner to avoid soiling the hands or contaminating the otherwise clean exterior of the container.

Referring to the drawings, the invention is shown in application to mechanism incorporating a number of parts of a conventional lipstick or the like container, of the so-called rotary or swivel variety, in which cams on two relatively rotatable tubular members coact with the follower 10 of a carrier or propulsion member 11. In the form shown, the inner tubular member 12 has a straight cam slot 13, and the outer tubular member 14 has a spiral cam slot 15, both slots being engaged by follower 10. An upper bead formation 16 and an enlarged base end 17 on the inner tubular member 12 define spaced shoulders for the axial location of outer tubular member 14. The outer tubular member 14 may be unitary and of molded

2

plastic, with an internal helical groove to determine the spiral cam 15, but in the form shown an outer sleeve 18 is lined with member 14, as by press-fitted assembly thereto, so that parts 14—18 are united as a single outer tubular member with the internal helical cam 15. Access for actuation may be by grasping the enlarged base 17 with one hand, and the outer shell 18 with the other hand; in the form shown, more convenient actuating access to base 17 is afforded by a large decorative base extension member or manipulating handle 19, which is generally cup-shaped and has a neck 20 press fitted and thus permanently united to the base 17. Angularly spaced local nibs, as at 21, may provide friction retention of a closure cap 22 which encloses the operating mechanism and the open end of the container, when not in use.

The chalk or talc stick to be accommodated and dispensed in accordance with the invention is shown by heavy phantom outline 25 in FIG. 1; in the form shown, the stick 25 is cylindrical. This stick is too brittle and is too easily eroded to be accommodated by conventional structure which has thus far been described. However, I have found that a resilient wrap of a suitable cylindrical sleeve 26 will properly support the stick 25, even as its cylindrical wall may erode in the process of use.

Preferably, the sleeve 26 is of a plastic having self-lubricating properties, so that it will give rise to minimum sidewall erosion of the stick 25 as it is progressively dispensed and consumed. The sleeve 26 is shown in full in FIG. 2 and is seen as a thin-walled, smooth-bore part which may be injection molded, of polyethylene or other suitable material. Sleeve 26 is longitudinally slitted and is formed with an unstressed diameter which is just less than the minimum tolerance of chalk stick diameter to be accommodated. Thus, stick 25 is accommodated in sleeve 26 as a slight interference fit, assuring lightly resilient wrapping pressure for substantially complete circumferential support of the stick 25; and, should there be any circumferential erosion of stick 25 as it is dispensed, the resilient sleeve deflection is available, as a preload, to accommodate the sleeve at all times to the stick 25.

Preferably, the sleeve 26 is a liner for the inner tubular member 12; it therefore performs substantially all the functions of tubular member 12 and may in certain container sized take the place of tubular member 12. As shown, however, sleeve liner 26 is a separate part, axially and angularly locked to inner tubular member 12, in such relation as to project its dispensing open end 27 slightly beyond the open end of the outer shell or casing 18. For convenience of stick application to the face, the open end 27 is formed as a truncation inclined from a right-cylindrical cut of the sleeve end. In FIG. 1, this truncation is sloped about 70° from the axis, and will be seen as important in providing relatively extensive and predominant support at 28, directly behind the chalk end as it is rubbed in use (in the right-to-left direction, in the sense of FIG. 2).

Since sleeve 26 is a liner for inner tubular member 12, it must have an opening in register with the cam slot 13, in order to permit cam follower action as described. The longitudinal slit of sleeve 26 is therefore widened at walls 29 defining such registration, but the slit is substantially narrowed at 30 near the dispensing end 27 in order to assure maximum circumferential support of stick 25 where stick application thrusts are predominantly generated.

Axial and angular location of sleeve 26 to inner member 12 is achieved by an integral bead 31 of sufficient arcuate extent to locate in the limited circumferential concavity 32 of the upper bead 16 of member 12. This relationship is best seen in FIG. 5, wherein bead 31 is shown with slight angular and radial clearance within concavity 32. This relationship assures no bind on the chalk stick due to the liner-locking relation, near the upper or stick-supporting end. If desired, more positive angular drive action between member 12 and liner 26 may be achieved by forming a local integral rib 33 on the periphery of sleeve 26, to engage between the narrowed slit walls 34 at the open end of member 12.

**163(A)**

3,586,452

3

Rattle-free support of the liner 26 and stick 25 is achieved by providing an integral circumferential bearing 35 near the lower end of the sleeve 26. Preferably, the unstressed diameter of the cylindrical band or bead which defines bearing 35 substantially matches the minimum tolerance diameter for the bore of inner tubular member 12, and it is located substantially at the lower end of cam follower action, thus assuring firmly piloted support for the liner in the immediate vicinity of cam action at the time when the longest unused length of stick 25 must be propelled or driven. Moreover, the stated diameter relationships at the bearing 35 assure one-sixteenth stick one-eighth slight expansion of sleeve 26 at its upper end, there will be a corresponding slight expansion of the diameter at bearing 35, the latter serving as a light dragging resilient preload at the bearing. For the preferred use of self-lubricating plastic, such preload assures smooth propulsion action and adequate resistance for purposes of holding a given propulsion advance during use, e.g., on the user's face, in the case of a cosmetic application.

In use, the fully loaded container will have a stick 25 of such length as to extend from the dispensing end 27 and back into contact with the relatively smooth upper face 36 of the carrier 11, the carrier 11 being in its most retracted position with follower 10 at the base end of cam action, substantially at the plane of bearing 35. For use, cap 22 is removed, and base 19 is slightly rotated with respect to outer shell 18, thus projecting one-sixteenth to one-eighth inch of stick 25 beyond the open end 27; this extent of projection will be found most convenient for facial application, and has been found to be well served by cosmetic chalk of 0.270-inch nominal diameter. If a given use does not consume all the projected chalk, then the propulsion mechanism should be retracted, and light finger pressure at the projecting end will effect the stick withdrawal.

It will be appreciated that throughout the described operation, and as stick 25 is progressively consumed, the sidewall or periphery of stick 25 will itself erode, to some degree, no matter how great the self-lubricating property of the bore of sleeve 26. At all times, the carrier 11, being elongated, will derive virtually purely axial orientation from its guided relation in the bore of sleeve 26, and eroded chalk or talc dust could cause a contaminating effect on the smoothness of carrier propulsion. To minimize such deleterious results, I provide one or more elongated passages, grooves or flutings 37 in the otherwise elongated periphery of carrier 11. These passages freely allow stick dust within the container to pass into the closed end 19, for accumulation without soiling the hands, pocket or pocketbook of the user. If desired, a suitable gum coat may be applied to the interior of base member 19, so that its natural tackiness may more assuredly entrap such dust accumulations as develop by way of passages 37.

Preferably, the plurality of passages 37 is located over the angular span α, in the vicinity of follower 11, and over the corresponding span α' on the diametrically opposite side. This arrangement leaves arcuately extensive cylindrical bearing spans or regions β–β' substantially at right angles to the region of cam action, for smoothest possible cam thrust reaction in the guidance of carrier 11 within sleeve 26.

It will be seen that I have provided an improved container construction which makes possible the safe, economical and convenient storage, handling and dispensing of chalk stick materials, as for cosmetic purposes. The mechanism provides smooth action in spite of chalk stick size variations as occur from one stick to another or in use. The mechanism also provides for clean accumulation of dust erosion within the container. Moreover, the mechanism may also make use of a substantial number of standard parts and thus be economically fabricated.

Although the invention has been described in detail for the preferred form shown, it will be appreciated that modifications may be made without departing from the invention as defined in the claims.

What I claim is:

4

1. A container for the holding and selective dispensing of a preformed stick of chalk or the like substance, comprising relatively rotatable inner and outer elongated tubular members, an elongated auxiliary sleeve supported within and by said inner tubular member and having a dispensing end projecting beyond the corresponding ends of both said tubular members, means angularly and axially locking said sleeve and inner tubular member to each other, a carrier slidably guided within said sleeve and having a substantially continuous chalk-engaging end, a radially outwardly projecting cam follower on said carrier, said inner tubular member and sleeve having cam means coacting with said cam follower to selectively displace said carrier upon relative rotation of said tubular members, said sleeve being longitudinally slitted and of resiliently deformable material, and a stick of chalk supported by and in slightly interfering relation within said sleeve between said dispensing end and said carrier; whereby, for such size variation of the chalk stick as may occur from one stick to the next or by reason of peripheral erosion in the course of use, said sleeve will continuously and substantially uniformly and extensively support the chalk stick, in readiness for such slight dispensing projection as may be needed for use.

2. The container of claim 1, in which said carrier is of elongated generally cylindrical plastic construction, with said cam follower integrally formed therewith.

3. The container of claim 2, in which said carrier has an elongated groove along its outer cylindrical surface, for accommodation and downward flow of dust erosion of the chalk stick.

4. The container of claim 1, in which said angular and axial locking means is located near the dispensing end of said sleeve, whereby, upon carrier propulsion, torque reaction to the friction of chalk engagement is sustained primarily at the region of angular and axial interlock.

5. The container of claim 1, in which said sleeve includes a radially outwardly projecting circumferential bearing portion in radially piloted relation with the bore of said inner tubular member, said bearing portion being at the end of said dispensing end, whereby as the dispensing end of said sleeve adapts itself as necessary to varying chalk size the reaction of such adaptation will produce minimal variation in the nature of piloting engagement at said bearings.

6. A container for the holding and selective dispensing of a preformed stick of chalk or the like, comprising relatively rotatable inner and outer elongated tubular members open at the open end of said container, said inner member including a thin-walled sleeve of self-lubricating and resiliently deformable plastic and having a dispensing end projecting beyond all other elements of said container at the open end thereof, said sleeve being longitudinally slitted, a stick of chalk supported by and in slightly interfering relation within said sleeve near the dispensing end thereof, a carrier guided within said sleeve and including a radially outwardly projecting cam follower, and cam means on said tubular members and coacting with said cam follower to selectively displace said carrier upon relative rotation of said tubular members.

7. The container of claim 6, in which the cam means on said sleeve is a portion of the longitudinal slit of said sleeve.

8. A container for the holding and selective dispensing of a preformed stick of chalk or the like, comprising relatively rotatable inner and outer elongated tubular members, the inner of said members being a thin-walled sleeve of self-lubricating and resiliently deformable plastic and having a dispensing end projecting beyond the corresponding end of said outer tubular member, said sleeve being longitudinally slitted, a stick of chalk supported by and in slightly interfering relation within said sleeve near the dispensing end thereof, a carrier guided within said sleeve and including a radially outwardly projecting cam follower, cam means on said tubular members and coacting with said cam follower to selectively displace said carrier upon relative rotation of said tubular members, said carrier being elongated and generally cylindrical for axially stabilized orientation within said sleeve, the

**164(A)**

3,586,452

5

periphery of said follower having a continuous elongated groove for downward reception of dust eroded from the chalk, and a full closure over the other axial end of one of said tubular members, whereby chalk dust passed by said carrier will be accumulated within said closure.

9. The container of claim 8, in which said carrier is elongated and generally cylindrical for axially stabilized orientation within said sleeve, the periphery of said follower having a

6

continuous elongated groove for downward reception of dust eroded from the chalk, said cam follower being at essentially one angular location on said carrier, and the periphery of said carrier being smoothly cylindrically arcuate at two opposed angular locations substantially 90° offset from said angular location.

165(A)

# United States Patent [19]

**Fielding**

[11] **3,731,682**

[45] **May 8, 1973**

[54] **VAGINAL TREATMENT ASSEMBLY**

[76] Inventor: **Sol B. Fielding,** 11930 Kearsarge Street, Los Angeles, Calif. 90049

[22] Filed: **Aug. 9, 1971**

[21] Appl. No.: **170,218**

[52] U.S. Cl. ...................128/239, 128/227, 128/247, 128/251, 128/269

[51] Int. Cl......A61b 19/00, A61m 3/00, A61m 7/02

[58] Field of Search.......................128/227, 239, 247, 128/251, 269

[56]                    **References Cited**

### UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 1,959,411 | 5/1934 | Dolmatch | 128/244 |
| 2,610,627 | 9/1952 | Watt et al | 128/239 |
| 2,631,333 | 3/1953 | Brown | 128/239 X |
| 3,062,211 | 11/1962 | Walden et al | 128/251 X |
| 3,486,503 | 12/1969 | Porter et al | 128/239 |
| 3,512,526 | 5/1970 | Fielding | 128/239 |

*Primary Examiner*—Aldrich F. Medbery
*Attorney*—William P. Green

[57]                    **ABSTRACT**

A vaginal treatment assembly including an outer cushion body dimensioned for reception within the human vaginal cavity, and containing an essentially tubular liner which projects into a passage in the cushion body and is withdrawable therefrom, together with an elongated member which projects into one end of the liner and extends through the interior of the liner and then through an opening at its opposite end, to engage an end wall of the cushion body in a relation retaining the latter against unwanted removal from the vaginal cavity while the liner is being withdrawn.

**20 Claims, 7 Drawing Figures**



# United States Patent [19]

**Fielding**

[11] **3,731,682**

[45] **May 8, 1973**

[54] **VAGINAL TREATMENT ASSEMBLY**

[76] Inventor: **Sol B. Fielding,** 11930 Kearsarge Street, Los Angeles, Calif. 90049

[22] Filed: **Aug. 9, 1971**

[21] Appl. No.: **170,218**

[52] U.S. Cl. .................128/239, 128/227, 128/247, 128/251, 128/269

[51] Int. Cl. .....A61b 19/00, A61m 3/00, A61m 7/02

[58] Field of Search.......................128/227, 239, 247, 128/251, 269

[56] **References Cited**

### UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 1,959,411 | 5/1934 | Dolmatch | 128/244 |
| 2,610,627 | 9/1952 | Watt et al | 128/239 |
| 2,631,333 | 3/1953 | Brown | 128/239 X |
| 3,062,211 | 11/1962 | Walden et al | 128/251 X |
| 3,486,503 | 12/1969 | Porter et al | 128/239 |
| 3,512,526 | 5/1970 | Fielding | 128/239 |

*Primary Examiner*—Aldrich F. Medbery
*Attorney*—William P. Green

[57] **ABSTRACT**

A vaginal treatment assembly including an outer cushion body dimensioned for reception within the human vaginal cavity, and containing an essentially tubular liner which projects into a passage in the cushion body and is withdrawable therefrom, together with an elongated member which projects into one end of the liner and extends through the interior of the liner and then through an opening at its opposite end, to engage an end wall of the cushion body in a relation retaining the latter against unwanted removal from the vaginal cavity while the liner is being withdrawn.

**20 Claims, 7 Drawing Figures**



3,586,452

5

periphery of said follower having a continuous elongated groove for downward reception of dust eroded from the chalk, and a full closure over the other axial end of one of said tubular members, whereby chalk dust passed by said carrier will be accumulated within said closure.

9. The container of claim 8, in which said carrier is elongated and generally cylindrical for axially stabilized orientation within said sleeve, the periphery of said follower having a

6

continuous elongated groove for downward reception of dust eroded from the chalk, said cam follower being at essentially one angular location on said carrier, and the periphery of said carrier being smoothly cylindrically arcuate at two opposed angular locations substantially 90° offset from said angular location.

10

15

20

25

30

35

40

45

50

55

60

65

70

75

**165(A)**

PATENTED MAY 8 1973                    3,731,682



INVENTOR
SOL B. FIELDING

BY
William F. Green
ATTORNEY

167(A)

3,731,682

| 1 | 2 |

# VAGINAL TREATMENT ASSEMBLY

## CROSS REFERENCE TO RELATED APPLICATION

Certain features of the assembly disclosed in the present application have been shown and claimed in my U.S. Pat. No. 3,512,526 issued May 5, 1970 and in my copending application Ser. No. 35,682 filed May 8, 1970 on "Sheath Assembly for Douche Nozzle."

## BACKGROUND OF THE INVENTION

This invention relates to improved devices for treating the vaginal tract, as for instance for applying medication to or cleaning the vaginal tissues.

In my above identified patent and application, I have disclosed a unique type of vaginal treating device which includes a cushion body or sheath adapted to be received about a douche nozzle in a relation preventing direct contact of that nozzle with the vaginal tissues. The cushion body is liquid permeable and adapted to pass fluids outwardly therethrough from the nozzle for treating the vaginal tissues, and is soft enough to be rubbed against the tissues without damaging them. The assembly also includes an essentially tubular liner which extends into the interior of the cushion body, and is received about the douche nozzle, and is apertured to pass the fluids outwardly from the nozzle.

## SUMMARY OF THE INVENTION

The present invention provides a treating assembly having an outer cushion body and tubular liner of the above discussed general type, and which is especially constructed to facilitate withdrawal of the liner from within the cushion body or outer sheath while the latter is contained within the vaginal tract, so that the cushion body may be left within the tract for medication or other purposes separately from the liner. For this purpose, I provide in conjunction with the cushion body and liner an elongated element which extends into the liner and through its interior to an inner end of the assembly, and which at that inner end passes through an opening in the end of the liner to a position of engagement with an end wall of the cushion body, so that the elongated member can be utilized to exert force against and hold the cushion body within the tract during withdrawal of the liner. Preferably, the liner even when inserted into the cushion body as far as possible has an outer end portion projecting beyond the corresponding extremity of the cushion body to allow grasping of that end portion as a handle for manipulating the assembly. The elongated removal element is desirably long enough to project substantially beyond even this end portion of the liner, so that the ends of the removal element and the liner can be grasped by different hands and moved in opposite directions during withdrawal of the liner. For best results, the portion of the elongated member which is small enough to move into the liner should be of a length at least as great as or preferably greater than the combined length of the liner and the passage within which it is contained in the cushion body.

Certain particular features of the invention relate to various ways in which the elongated removal element can be constructed in a manner enabling its reduction in length when not in use. More particularly, this element may be formed of two or more sections which are connectible together in an essentially end to end elongated relation, but are relatively movable, telescopically or otherwise, to an overall reduced length condition when not in use.

## BRIEF DESCRIPTION OF THE DRAWING

The above and other features and objects of the invention will be better understood from the following detailed description of the typical embodiments illustrated in the accompanying drawing, in which:

FIG. 1 is primarily an axial section through a first form of vaginal treatment assembly constructed in accordance with the invention;

FIG. 2 is a reduced scale showing of the manner in which the liner of the FIG. 1 assembly is withdrawn from the outer cushion or sheath body;

FIG. 3 shows the liner and cushion body with a douche nozzle received therein;

FIGS. 4, 5, and 6 show three variational types of liner removal elements; and

FIG. 7 shows the element of FIG. 6 in its reduced length condition.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

With reference first to FIG. 1, I have illustrated at 10 an assembly embodying the invention, and including an outer cushion or sheath body 11, a liner 12, and an elongated liner removal element 13. The cushion body 11 is formed of a material which is very soft and pliable, at least when wet, to avoid damage to the vaginal tissues when contacted by this body. The cushion body has an essentially tubular side wall portion 14, centered about a main axis 15 of the device, and which is open at its lower end for reception of liner 12, removal element 13, and a douche nozzle 16 (see FIG. 3). At its upper end, the cushion or sheath body 11 is closed by an upper or axially inner end wall 17. Internally, the tubular side wall 14 of body 11 may have a normally straight cylindrical internal surface 18, extending upwardly from bottom end 19 to a location 20 at which the inner surface may curve inwardly and hemispherically at 21 across the inner end of liner 12. Externally, the body 11 preferably has an outer surface 22 which tapers gradually and progressively and desirably frustoconically from lower end surface 19 to a location 23 at which the outer surface curves or is rounded inwardly and essentially hemispherically as shown to provide a narrowed and rounded leading end of the cushion body.

The material forming cushion or sheath body 11 is of a type containing a large number of passages or pores which communicate with one another through the entire radial thickness of the side wall of the body, between surfaces 18 and 22, and also through the entire thickness of end wall 17, in a manner enabling water or another fluid from nozzle 16 to pass freely and rapidly through the material to the outside of body 11. As an example, body 11 may be formed of an appropriate resiliently deformable open pored sponge material, such as polyurethane sponge (which is soft both when wet and dry), any other suitable synthetic sponge material, rubber sponge, regenerated cellulose sponge material (soft only when wet), or the like. Alternatively, body 11 may be formed of any other soft

3,731,682

3

fluid permeable cushioning substance, such as for example cotton or other massed natural or synthetic fibers, an appropriate knitted or woven cushioning material formed of a suitable yarn or threads of cotton or other material, a mass or series of layers of paper or paper-like material, et cetera. The cushioning substance may also be of a type adapted to expand to an increased thickness or external size when wet. One desirable expansible substance of this type is a highly compressed cotton-like mass of natural and/or synthetic fibers, typically including for example mixed cellulose, rayon and polyurethane fibers, with the fibers being adapted to be automatically released from their compressed condition when they become wet.

The tubular liner 12 within outer body 11 is formed of a material which is substantially stiffer, harder and more rigid than the very soft porous body 11, but which itself preferably has substantial resilient deformability, and is desirably more flexible than nozzle 16. For best results, liner 12 is formed of a resiliently deformable or flexible resinous plastic material which is substantially impermeable to water, other douche liquids, medicinal substances, et cetera. As an example, the liner may be formed of polyvinylchloride, or any other appropriate substance which can be safely received within the body cavity. The liner 12 has a tubular side wall 24, which projects axially outwardly or downwardly beyond the lower extremity of porous cushion body 11 to a location 25, to provide a handle portion of liner 12 beyond body 11 by which a user may hold and manipulate the device without grasping the sponge body. The tubular side wall 24 extends upwardly into the interior of body 11 to the upper end of the passage formed by inner surface 18 of body 11. At its upper end, liner 12 curves gradually and annularly inwardly toward axis 15, in correspondence with the curvature of the inner surface of body 11 and to the location of a circular edge 27 defining an opening centered about axis 15 at the upper end of the liner. The liner thus has a wall extending partially across its upper end and defining an annular shoulder 27' against which nozzle 16 is engageable upwardly as will appear at a later point in connection with the mentioned opening 27. Near its upper end, the tubular side wall 24 of liner 12 contains a number of apertures 28, through which liquids from the nozzle 16 may flow laterally into the porous material of cushion body 11, for discharge therefrom, when the nozzle is in the FIG. 3 position of insertion within the liner.

The tubular side wall 24 of liner 12 may have an outer surface 29 which may be of straight cylindrical configuration along the entire axial distance from a location 30 to a location 31, except as the diameter is reduced at a location 32 just beneath apertures 28. At the region 32, the entire thickness of the side wall is deformed radially inwardly, and annularly about axis 15, to provide an annular inner shoulder 33 of a diameter slightly less than the diameter of the internal surface 34 above and beneath that location. Both the upper and lower sides of this annular reduced diameter shoulder 33 may curve gradually radially inwardly to provide tapering upper and lower surfaces 35 and 36 on the shoulder. The internal and external straight cylindrical surfaces of tubular side wall 24 continue downwardly to the location of a bottom downwardly tapering shoulder or flange 37 formed by providing an

4

inturned reduced diameter annular portion of the material of liner 12 as shown in FIG. 1. The two annular shoulders 33 and 37 may extend inwardly to approximately the same diameter, and are both resiliently deformable and resiliently expansible by virtue of the resilient characteristics of the material of which liner 12 is formed, to engage nozzle 16 in fluid sealing fashion when in the FIG. 3 position.

The diameter of external surface 29 of liner 12 may be very slightly greater than the normal internal diameter of outer porous body 11, to be a sufficiently tight frictional fit within body 11 to retain the two elements 11 and 12 in assembled positions as shown in FIG. 1 during handling. However, this light friction fit enables easy withdrawal of liner 12 from within body 11 when desired.

For assisting in withdrawing cushion body 11 from the vaginal tract, this body 11 may carry one or more pull tabs 38, extending downwardly beyond the lower end 19 of body 11 to a location at which they may be grasped by a user. In FIG. 1, two such tabs are formed at diametrically opposite locations as opposite ends of an elongated narrow flexible ribbon or tape 39, which extends upwardly along internal surface 18 of body 11 at one side of the body, then curves along the underside of the rounded top wall of body 11, and extends downwardly again adjacent a diametrically opposite portion of wall 18. This ribbon may be suitably secured permanently to body 11, as by an appropriate cement or adhesive, stitching, clipping, or by otherwise attaching it to any convenient portion of the body. The currently preferred attachment is by cementing at the upper end 40 of the ribbon. In lieu of a ribbon, an appropriate string or cord may be employed for forming the pull tabs, or if the body 10 is formed of a knitted or woven material the pull tabs may be formed merely as extended ends of the yarn, thread, string or cord of which the material is formed.

Element 13 has a lower handle portion 41, and extends upwardly from that handle portion into and through liner 12 to a position of engagement with the underside of top wall 17 of body 11. The upper end surface 42 of element 13 may be rounded hemispherically in correspondence with the curvature of the under or inner surface of top wall 17 of body 11, to exert upward force against body 11 over a substantial area. Between the location of its lower handle 41 and its upper end surface 42, element 13 may be of straight cylindrical external configuration, and of a diameter just slightly less than the internal diameters of shoulders 33 and 37, and the internal diameter of opening 27 at the top of the liner.

As seen in FIG. 2, the overall length $l$ of element 13 should be greater than the total of length $t$ of liner 12 and length $s$ of the liner receiving passage within body 11, so that the handle portion 41 of element 13 can project downwardly beyond liner 12 and at the same time engage the upper end of body 11 during the entire downward removal of liner 12 from body 11. It may also be noted that the length $l'$ of the portion of element 13 which can be received within liner 12 and body 11 should be at least as great as the total of the dimensions $s$ and $t$, again to assure effective removal of the liner from body 11.

**169 (A)**

3,731,682

5

The douche nozzle 16 may be of completely conventional construction, and when in use may be connected to the usual flexible hose 43 which receives water or douche fluid from an elevated gravity bag 44 or other fluid source capable of producing a flow of liquid from that source through hose 43 and into nozzle 16. Alternatively the nozzle may be of the type carried by a hand-held syringe bulb. The nozzle is essentially rigid or stiff, and may typically be formed of an appropriate resinous plastic material of suitable rigidity. The nozzle is illustrated in FIG. 3 as it appears when inserted within liner 12 and sheath body 11, and in that position is centered about the previously mentioned axis 15 and elongated in the direction of that axis. The nozzle contains a passage 45 whose lower end receives fluid from hose 43, and whose upper end communicates with a number of apertures 46 in the side wall 47 of the nozzle for passing fluid outwardly to the exterior of the nozzle. Externally, the nozzle has an outer surface 48 which along most of its length is essentially cylindrical, and which beneath the location 39 flares gradually and essentially conically to a location 51 beyond which the nozzle may have an externally hexagonal portion 52 for engagement with a tool if necessary in screwing the nozzle into a hose fitting 53. At its upper end, upwardly beyond the location 50, the outer surface of the nozzle may flare gradually and essentially conically at 54, to form an enlarged head 55 containing the side wall apertures 46. At the upper extremity of enlarged head 55, the nozzle may have a closed generally transverse end wall 56. If desired, the nozzle may have a slight longitudinal curvature, in a manner well known in the art, instead of extending straight along the axis 15 in the manner illustrated, and the external configuration of the nozzle may of course vary in different respects in accordance with known prior teachings.

The shoulder 33 of liner 12 is dimensioned to annularly engage the outer surface 54 of the nozzle in its installed FIG. 3 position, beneath apertures 46, to form an annular seal at that location preventing flow of water downwardly beyond that point within the liner. Shoulder 37 at the bottom of the liner similarly engages the tapered outer surface 51' of the nozzle annularly near its lower or axially outer end, to form another annular seal against fluid leakage or loss downwardly between the nozzle and liner, and past the two shoulders.

To now describe the manner of use of the device, assume first of all that the assembly is to be employed in the manner illustrated in FIG. 1, say for example to apply medication to the inner wall surfaces of the vaginal tract. The medication may be appropriately applied to cushion body 11, as by dipping that body into the desired medicating liquid and causing it to be absorbed into the pores of body 11. A user may then grasp the lower handle portion of liner 12, and insert and manipulate the liner and body into the vaginal tract while holding the liner at its lower end. The soft cushion body can be rubbed against the tissues without danger of harm to apply the medication in a very thorough manner. If it is desired to leave the medicating element within the tract, the user merely inserts element 13 upwardly through liner 12 and to the FIG. 1 position of engagement with the underside of the top wall of body 11, and holds element 13 in that position

6

while pulling downwardly on the lower handle end of liner 12. The medicated cushion body 11 may thus be left precisely in any predetermined position in the vaginal tract, and the entire liner can be completely withdrawn from the body 11 while still exerting upward holding force on body 11 in the manner illustrated in FIG. 2. When it is finally desired to remove the body 11 itself, this may be done by pulling downwardly on tabs 38 which are secured to the body.

When it is desired to utilize the device for douche purposes, the douche nozzle 16 is inserted into liner 12 to the position illustrated in FIG. 3, and is yieldingly held in that position by confinement of the upper enlarged head 55 of the nozzle between the upper end of the liner and shoulder 33. Water or another douche fluid may then be forced through the nozzle and from its upper apertures, to discharge through apertures 28 of the liner into porous body 11, and to flow outwardly through the pores of that body to the vaginal tissues. If, after the douche procedure is completed, it is desired to leave sheath body 11 within the vaginal tract, the user may first hold liner 12 and body 11 in the tract while pulling nozzle 16 downwardly out of the liner, and then may insert element 13 into the liner for use in the manner discussed in connection with FIG. 1 in removing the liner while leaving body 11 in position. If it is preferred to remove outer body 11 along with liner 12, this may be accomplished by merely grasping the lower end of liner 12 with the two pull tabs held between the fingers and the user's liner, so that the tabs cause body 11 to move downwardly with the liner.

FIG. 4 shows at 13a a variational form of removal element which may be utilized in lieu of the element 13 of FIG. 1. In FIG. 4, the element 13a is formed of two rigid sections 113 and 213, which are connected together in an essentially end to end relation to form an assembly having a total length corresponding to the length of element 13 in FIG. 1, and having a small enough transverse dimension to be insertible upwardly into the liner and utilized in the manner illustrated in FIG. 2. The sections 113 and 213 may be pivotally hinged together at 313, so that section 213 may swing relative to section 113 to the broken line position 213' of FIG. 4, in which the two sections are received in adjacent side by side parallel relation and the overall length of the assembly is thus reduced. In the extended full line position of FIG. 4, the section 213 may be engaged by a pair of detent lugs or shoulders 413 at its opposite sides, acting to yieldingly hold the two sections in their extended position of use. As in the first form of the invention, a handle 41a may be provided at one end of the unit, and a rounded surface 40a curving in correspondence with the inner surface of the end wall of body 11 may be provided at the opposite end for exerting the holding force against body 11. The capacity of the holding element 13a of FIG. 4 for such reduction in length facilitates its handling when not in use and during shipping.

FIG. 5 shows another removal or holding element 13b which may be utilized in lieu of the element 13 in FIG. 1, and which is formed of two sections 113b and 213b. The latter section contains an elongated passage 313b which telescopically receives section 113b. Section 113b has detent shoulders 413b projecting laterally therefrom and which are receivable in engagement

3,731,682

7

with detenting notches 513b at one end of body 213b and 613b at the opposite end of element 213b. When the sections are in the position illustrated in FIG. 5, engagement of detent lugs or shoulders 413b with the left end shoulders 513b on section 213b yieldingly retains the two sections in their relatively extended maximum overall length positions, in which the overall length of the assembly 13b is great enough to enable it to function in the manner of element 13 in FIG. 2. When not in use, section 113b is forced rightwardly within and relative to section 213b to a position in which shoulders 413b engage the second set of notches or shoulders 613b at the right end of section 213b, to yieldingly retain the sections in a minimum overall length telescopically collapsed condition. The section 113b (or the corresponding part of any of the other forms of pusher) may typically have a ball tip 123b for pushing against the end of the cushion body without damage thereto, but with the tip having a transverse dimension small enough to pass entirely through liner 12 and its end opening 27.

FIGS. 6 and 7 show still another two section device 13c capable of being utilized in place of the element 13 of FIG. 1, and in this instance including a section 113c which is telescopically receivable within a tubular section 213c and has threads 313c engageable with either of two sets of threads 413c or 513c formed internally within opposite ends of element 213c. When threads 313c and 413c are in engagement as illustrated in FIG. 6, the two sections are in their extended full length positions in which they can be utilized in a manner illustrated in connection with element 13 in FIG. 2. To shorten the overall length of the assembly 13c, part 113c is merely turned relative to section 213c far enough to move the threads 313c and 413c out of engagement, to thus enable axial sliding movement of section 113c farther into section 213c in telescoping relation until threads 313c can engage and are screwed into the second set of threads 513c at the right end of section 213c, to retain the assembly 13c in the reduced length condition of FIG. 7 for ease in handling and shipping.

While certain specific embodiments of the present invention have been disclosed as typical, the invention is of course not limited to these particular forms, but rather is applicable broadly to all such variations as fall within the scope of the appended claims.

I claim:

1. A vaginal treatment assembly comprising an elongated cushion body formed of deformable material dimensioned to be inserted into the vaginal tract and having a passage extending therein from its outer end and an end wall at the inner end of said passage, an essentially tubular liner formed of a material stiffer than said cushion body and projecting into and lining said passage for insertion into the vaginal tract therewith, said liner being free for withdrawal from said passage to enable removal of the liner from the vaginal tract separately from said cushion body, said liner having an outer end portion which is accessible to a user and having an opening at the inner end of the liner opposite said end wall of the cushion body, and an elongated member having a portion sized to project into said outer end of the liner and through the interior thereof to its inner end and then through said opening into en-

8

gagement with said end wall of the cushion body and adapted to be held against said end wall by a user as said liner is withdrawn along said member and from said cushion body to retain the latter in the vaginal tract.

2. A vaginal treatment assembly as recited in claim 1, in which said outer end portion of the liner projects outwardly beyond said cushion body to form a handle portion by which the liner and cushion body are inserted and by which the liner is withdrawn.

3. A vaginal treatment assembly as recited in claim 1, in which said elongated member is of a length substantially greater than the length of said liner.

4. A vaginal treatment assembly as recited in claim 1, in which said elongated member has a length greater than the combined length of said liner and said passage in the cushion body.

5. A vaginal treatment assembly as recited in claim 1, in which said elongated member is formed of two sections connected together in generally end to end relation giving the member a length greater than that of either of its sections, said sections being relatively movable to a reduced overall length condition.

6. A vaginal treatment assembly as recited in claim 1, in which said elongated member is formed of two sections connected together in generally end to end relation giving the member a length greater than that of either of its sections, and a connection between said two sections interconnecting adjacent ends thereof for relative folding movement to positions adjacent one another in which the member has a reduced overall length.

7. A vaginal treatment assembly as recited in claim 1, in which said elongated member includes two essentially telescopically interfitting sections relatively movable between extended length and reduced length conditions, and a connection between said sections for releasably retaining them in said extended length condition.

8. A vaginal treatment assembly as recited in claim 1, in which said elongated member includes two essentially telescopically interfitting sections relatively movable between extended length and reduced length conditions, and connector means for releasably retaining said sections selectively in either said extended length condition or said reduced length condition.

9. A vaginal treatment assembly as recited in claim 1, in which said elongated member includes two essentially telescopically interfitting sections relatively movable between extended length and reduced length conditions, and interfitting threads on said sections for releasably securing the sections in their extended length condition.

10. A vaginal treatment assembly as recited in claim 1, in which said elongated member includes two essentially telescopically interfitting sections relatively movable between extended length and reduced length conditions, external threads formed on one of said sections at a location within the other section, and two sets of threads formed internally within said other section and selectively engageable with said first mentioned threads in a relation releasably retaining said sections selectively in either said extended length condition or said reduced length condition.

**171(A)**

3,731,682

9

10

**11.** A vaginal treatment assembly as recited in claim 1, in which said elongated member includes two essentially telescopically interfitting sections relatively movable between extended length and reduced length conditions, a snap detent head formed on one of said sections at a location within the other section, and two snap detent shoulders formed in said other section near opposite ends thereof and releasably engageable in detenting relation with said head on said one section in a relation selectively retaining said sections in either said extended length condition or said reduced length condition.

**12.** A vaginal treatment assembly as recited in claim 1, in which said cushion body is formed of a liquid permeable material through which fluids may pass from the interior of said liner to the outside of the cushion body.

**13.** A vaginal treatment assembly as recited in claim 1, in which said cushion body is formed of a liquid permeable sponge material through which fluids may pass from the interior of said liner to the outside of the cushion body.

**14.** A vaginal treatment assembly as recited in claim 1, in which said liner has apertures in its side wall.

**15.** A vaginal treatment assembly as recited in claim 1, including a pull tab extending outwardly from the outer end of said cushion body and accessible for pulling the cushion body from the vaginal tract.

**16.** A vaginal treatment assembly as recited in claim 1, in which said liner is adapted to removably receive a douche nozzle and is constructed to pass fluid from the nozzle through the liner to said cushion body, said cushion body being porous and adapted to pass said fluid outwardly therethrough to the exterior of the cushion body.

**17.** A vaginal treatment assembly as recited in claim 1, in which said liner is adapted to removably receive a douche nozzle and is constructed to pass fluid from the nozzle through the liner to said cushion body, said cushion body being liquid permeable and adapted to pass said fluid outwardly therethrough to the exterior of the cushion body, said liner having shoulder means engageable with a douche nozzle to releasably retain it in fixed position on the nozzle.

**18.** A vaginal treatment assembly as recited in claim 1, in which said liner is adapted to removably receive a douche nozzle and is constructed to pass fluid from the nozzle through the liner to said cushion body, said cushion body being liquid permeable and adapted to pass said fluid outwardly therethrough to the exterior of the cushion body, said liner being formed of a deformable resinous plastic material having a side wall which is apertured to pass said fluid, said side wall having a reduced dimension shoulder portion engageable with an enlarged end of the nozzle to retain the nozzle releasably within the liner.

**19.** A vaginal treatment assembly as recited in claim 18, in which said outer end portion of the liner projects beyond the outer end of said cushion body to provide a handle and has a reduced diameter resilient shoulder at its outer end engageable with the nozzle.

**20.** A vaginal treatment assembly as recited in claim 19, including a pull string connected to said cushion body and extending outwardly therefrom adjacent said outer end portion of the liner.

* * * * *

172 (A)

# United States Patent [19]

**Bridle**

[11] **Des. 251,502**

[45] ** **Apr. 3, 1979**

[54] **MEDICANT TRANSFER DEVICE**

[75] Inventor: **Mark M. Bridle**, Newport Beach, Calif.

[73] Assignee: **American Hospital Supply Corporation**, Evanston, Ill.

[**] Term: **14 Years**

[21] Appl. No.: **758,970**

[22] Filed: **Jan. 13, 1977**

[51] Int. Cl. ..................................................... **D24—04**
[52] U.S. Cl. ................................. **D24/24; 128/272.1; 128/272.3; D24/52; D24/63**
[58] Field of Search ........................ D24/24, 63, 25, 52; 128/272.3, 272.1, 231; D9/216, 10; 206/222

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 198,964 | 8/1964 | Dash et al. | D24/63 X |
| D. 246,321 | 11/1977 | Löfman | D24/24 |
| 3,788,369 | 1/1974 | Killinger | 128/272.3 |
| 3,938,520 | 2/1976 | Scislowicz et al. | 128/272.3 |
| 3,941,171 | 3/1976 | Ogle | 128/272.3 |
| 3,987,791 | 10/1976 | Chittenden et al. | 128/272.3 |

*Primary Examiner*—Bernard Ansher
*Attorney, Agent, or Firm*—Robert E. Hartenberger

[57] **CLAIM**

The ornamental design for a medicant transfer device, as shown and described.

### DESCRIPTION

FIG. 1 is a perspective view of the medicant transfer device showing my new design;

FIG. 2 is a side elevational view thereof;

FIG. 3 is a top plan view of the medicant transfer device; and

FIG. 4 is a bottom plan view of the medicant transfer device.




**173 (A)**

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : Des. 251,502

DATED       : April 3, 1979

INVENTOR(S) : Mark M. Bridle et al.

It is certified that error appears in the above—identified patent and that said Letters Patent are hereby corrected as shown below:

On the cover sheet  Item (75) inventors' should read

-- Mark M. Bridle, Newport Beach,        and John F. Cromelin,

Yorba Linda, both of Calif. --.

Signed and Sealed this

Twenty-first Day of August 1979

[SEAL]

Attest:

LUTRELLE F. PARKER

Attesting Officer    Acting Commissioner of Patents and Trademarks

**174 (A)**

U.S. Patent          Apr. 3, 1979          Des. 251,502

FIG. 3



FIG.1



FIG. 2



FIG.4



**175(A)**

# United States Patent [19]

## Schopflin et al.

[11] **4,155,991**

[45] * **May 22, 1979**

[54] VAGINAL RING

[75] Inventors: Gisela Schopflin; Gerhard Landahn; Barbara Muhe; Heidemarie Hartmann; Fred Windt, all of Berlin, Fed. Rep. of Germany

[73] Assignee: Schering Aktiengesellschaft, Berlin and Bergkamen, Fed. Rep. of Germany

[ * ] Notice: The portion of the term of this patent subsequent to Mar. 15, 1994, has been disclaimed.

[21] Appl. No.: 774,170

[22] Filed: Mar. 3, 1977

### Related U.S. Application Data

[62] Division of Ser. No. 623,487, Oct. 17, 1975, Pat. No. 4,012,496.

[30] Foreign Application Priority Data

Oct. 18, 1974 [DE] Fed. Rep. of Germany ....... 2450107
Aug. 21, 1975 [DE] Fed. Rep. of Germany ....... 2537585

[51] Int. Cl.² ........................ A61K 9/00; A61K 31/74
[52] U.S. Cl. ...................................... 424/15; 128/130; 128/260
[58] Field of Search ................ 128/260, 130; 424/15, 424/19–22, 28

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,527,210 | 9/1970 | Towns | 128/130 |
| 3,545,439 | 12/1970 | Duncan | 128/130 |
| 3,659,997 | 5/1972 | Wolfors | 128/130 |
| 3,744,489 | 7/1973 | Mauro | 128/130 |
| 3,908,646 | 9/1975 | Assari | 128/130 |
| 3,911,911 | 10/1975 | Scommegna | 128/130 |
| 3,920,805 | 11/1975 | Roseman | 424/15 |
| 4,012,496 | 3/1977 | Schopflin et al. | 424/15 |
| 4,012,497 | 3/1977 | Schopflin | 424/22 |
| 4,034,749 | 7/1977 | Von Kemera et al. | 128/130 |
| 4,043,339 | 8/1977 | Roseman | 128/260 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2158226 | 5/1973 | Fed. Rep. of Germany | 424/22 |
| 2445971 | 4/1976 | Fed. Rep. of Germany | 128/260 |
| 2450107 | 4/1976 | Fed. Rep. of Germany | 128/130 |
| 7415908 | 6/1975 | Netherlands | 128/130 |
| 7512254 | 4/1976 | Netherlands | 128/130 |
| 1412970 | 11/1975 | United Kingdom | 128/130 |

### OTHER PUBLICATIONS

Chem. Abstr. 79 #45823t (1973) of Schopflin et al., Ger. Off. 2,158,226, May 24, 1973.
Chem. Abstr. 84 #79719g (1976) of Schopflin et al., Brit. 1,412,970, Nov. 5, 1975.
Chem. Abstr. 85 #37243a (1976) of Schopflin, Ger. Off. 2,445,971, Apr. 8, 1976.
Chem. Abstr. 84 #95619e (1976) of Schering A/G, Neth. Appl. 74 15,908, Jan. 10, 1975.
Chem. Abstr. 85 #182419d (1976) of Schering A/G, Neth. Appl. 75 12,254, Apr. 21, 1976.

Primary Examiner—Shep K. Rose
Attorney, Agent, or Firm—Millen & White

[57] **ABSTRACT**

A composite vaginal ring containing a safe and effective amount of a pharmaceutically active medicament, which comprises:
(a) a major supporting vaginal ring consisting essentially of a physiologically acceptable synthetic resin and having at least a portion of the annular surface thereof adapted to mate with corresponding minor, medicament-containing vaginal ring segment; and
(b) at least one minor, medicament-containing vaginal ring segment adapted to mate with the modified annular surface of said major supporting vaginal ring and consisting essentially of a safe and effective amount of a pharmaceutically active amount of a nonionic, lipophilic drug dissolved or uniformly suspended in an elastomeric, cross-linked LTV linear dimethylpolysiloxane resin.

19 Claims, 16 Drawing Figures



Fig.1

Fig.2

Fig.3

Fig.4

Fig.4a

Fig.5

Fig.5a

Fig.6

Fig.6a

Fig.7

Fig.7a



Fig. 8a

Fig. 8



Fig. 9



Fig. 10



Fig. 11

4,155,991

1

# VAGINAL RING

This is a division of application Ser. No. 623,487 filed Oct. 17, 1975, now U.S. Pat. No. 4,012,496.

## CROSS-REFERENCE TO RELATED APPLICATIONS

Details regarding the preparation of LTV elastomer drug excipients can be found in copending, commonly assigned U.S. patent application Ser. No. 444,886 filed Feb. 22, 1974, now abandoned the contents of which are incorporated by reference herein.

## BACKGROUND OF THE INVENTION

This invention relates to a vaginal ring containing active medicinal agents, especially estrogens or progestogens alone or in combination.

Vaginal rings containing progestationally active steroid hormones or a combination of progestationally and estrogenically effective medicinal agents for preventing conception with or without antiovulatory activity are advantageous whenever formulations of drugs for peroral administration, which contain these active agents, are contraindicated. Vaginal rings furthermore have the advantage of liberating women from a compulsory daily ingestion of tablets. These rings constitute annularly shaped articles which can be introduced into the vagina in a simple manner and which are well tolerated by female patients. As compared to conventional intrauterine pessaries and subdermally administered capsules, these rings have the further advantage that they can be removed and reinserted by the female patient herself at any time.

Vaginal rings made of a synthetic resin, especially silicone elastomers obtained from RTV (room temperature vulcanizing) silicone rubber two-component compositions, e.g. as described in Contraception 8:651 (1973) or from hot-vulcanized silicone rubber products as described in Steroids 21:325 (1973) and which contain active medicinal agents such as steroid hormones, are known per se, e.g. see Fertil. Steril. 21:99 (1970); Amer. J. Obstet. Gynecol. 113:927 (1972); Contraception 8:561 (1973); DOS [German Laid-Open Application] 1,900,196; etc. The active medicinal agent is released from the synthetic resin carrier over a prolonged period of time and is resorbed by the vaginal mucosa.

The steroid hormones contained in the conventional vaginal rings are exclusively those having a progestational effect. Depending on the release rate and amount of progestationally active agent, protection against conception is attained by the use of these rings either with or without attendant antiovulatory activity.

Heretofore known contraceptives in the form of vaginal rings, however, exhibit many known disadvantages. They are produced, inter alia, from RTV silicone rubber two-component compositions, the poor mechanical properties of which are notorious and must first be improved by the addition of fillers. These fillers, however, can disadvantageously influence the release of the medicinally active agent from the vaginal ring. Several conventional vaginal rings are manufactured by vulcanizing suspensions of the medicinal agent in RTV silicone rubber two-component compositions in appropriate molds. The active medicinal agents are released from this type of vaginal ring during the period of application in quantities which are greatly reduced in the

2

course of time as has been reported in Contraception 8:561 (1973).

Considerable differences in the dosage of the active medicinal agents result perforce in qualitative and quantitative differences in the biological and/or contraceptive effect, as well as in the type and extent of undesired side effects during the period of application of the vaginal rings. Known vaginal rings which contain the medicinal agent as a homogeneous suspension in the synthetic resin base have a total weight of about 6.0–15.0 g. If the active medicinal agent is to be released from these vaginal rings in an adequate amount throughout the period of administration, they must contain about 5–30% by weight of the active medicinal agent. This content of effective agent in the drug formulation is uneconomically high as related to the amount of active medicinal agent which is actually released during the period of use. Heretofore, no suitable process has been known for adjusting the rate of the desired active drug release rate for a certain active medicinal agent from vaginal rings made of silicone elastomers.

Previously known vaginal rings have been manufactured in part on the basis of synthetic resins which are not entirely physiologically harmless. Thus, RTV silicone rubber two-component compositions containing tin compounds as vulcanization accelerators are utilized for the manufacture of vaginal rings, but such vulcanization accelerators have a toxic effect on the living organism as has been reported in Amer. J. Obstet. Gynecol. 113:927 (1972).

Also known are relatively stiff vaginal rings provided with a metallic spring, similar to a pessary used for the treatment of a prolapse. During their use, erosion of the mucosa can occur in the zone of the posterolateral vaginal vault; see J.A.M.A. 208:949 (1969). British Pat. No. 1,264,732 describes devices consisting of a capsule containing the active medicinal agent on a plastic ring of silicone rubber. However, such devices are poorly suited for mass production due to their construction. Also, these rings lack practicality in their usage because the inward capsule containing the active medicinal agent hinders that the inner ring lies close to the cervix wall and this implies the risk of its dammage, what can be the cause of an increased expulsion rate.

Accordingly, there is still need to solve the problem of providing vaginal rings containing an active medicinal agent which release the active agents over a prolonged period of time, e.g. at least several weeks, regularly and in a uniform quantity required for attaining the desired biological effect, and to overcome the aforedescribed disadvantages inherent in conventional vaginal rings. The present invention fills such needs.

## OBJECTS OF THE INVENTION

Accordingly, it is a general object of this invention to provide sustained release pharmaceutical compositions in the form of a vaginal ring.

Another object of this invention is to provide a convenient and highly adaptable drug implant for use in female animals which exhibits a uniform rate of drug release over a prolonged period of time.

A further object of this invention is to provide a vaginal ring adapted to receive an optionally detachable sustained release pharmaceutical composition.

An additional object of this invention is to provide a vaginal ring having sustained release of estrogen or progesterone hormonal activity.

179(A)

4,155,991

3

A more particular object of this invention is to provide contraceptive and/or antiprotozoal vaginal rings which exhibit a sustained release of effective medicaments over a prolonged period of time.

Yet another object of this invention is to provide a medicated pessary.

Upon study of the specification and appended claims, further objects and advantages of this invention will become apparent to those skilled in the art.

## SUMMARY OF THE INVENTION

Briefly, the above and other objects, features and advantages of the present invention are attained in one aspect thereof by providing a composite vaginal ring containing a safe and effective amount of a pharmaceutically active medicament, which comprises:

(a) a major supporting vaginal ring consisting essentially of a physiologically acceptable synthetic resin and having at least a portion of the annular surface thereof adapted to mate with corresponding minor, medicament-containing vaginal ring segment; and

(b) at least one minor, medicament-containing vaginal ring segment adapted to mate with the modified annular surface of said major supporting vaginal ring and consisting essentially of a safe and effective amount of a pharmaceutically active amount of a nonionic, lipophilic drug dissolved or uniformly suspended in an elastomeric, cross-linked LTV linear dimethylpolysiloxane resin.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above features will become more fully apparent to those skilled in the art to which this invention pertains from the following Detailed Description, taken in conjunction with the annexed Drawings wherein:

FIGS. 1–3 show top views of vaginal rings according to this invention;

FIG. 4 shows a cross section through the vaginal ring having an inner ring and an outer ring both of circular cross section inserted therein;

FIG. 4a shows an enlarged partial cross section of the supporting ring shown in FIG. 4;

FIG. 5 shows a cross section through a vaginal ring with an inner ring having a circular cross section and an outer ring having a circular-segment-shaped cross section;

FIG. 5a shows an enlarged partial cross section of the supporting ring of FIG. 5;

FIG. 6 shows a cross section through a vaginal ring having an outer ring with a cross section in the shape of a circular segment;

FIG. 6a shows an enlarged partial cross section of the supporting ring of FIG. 6;

FIG. 7 shows a cross section through a vaginal ring with an inner ring having a circular cross section;

FIG. 7a shows an enlarged partial cross section of the supporting ring of FIG. 7;

FIG. 8 shows a schematic top view of a vaginal ring with a drug-containing layer continuously applied on the inside and outside;

FIG. 8a, as a supplement, shows an enlarged partial cross section of the vaginal ring of FIG. 8;

FIG. 9 shows a schematic top view of a vaginal ring having a drug-containing layer extending along the outer perimeter;

FIG. 10 is a schematic top view of a vaginal ring wherein two drug-containing layers are applied in succession in a section-wise manner along the outer perimeter; and

FIG. 11 shows a schematic top view of a vaginal ring wherein the drug-containing layer is applied to only a portion of the outer edge of the supporting ring.

## DETAILED DISCUSSION

The above and other problems of the prior art are solved in accordance with the present invention by mounting on a supporting ring made of a synthetic resin one or two rings or ring sections which contain an active medicinal agent and are made of a silicone elastomer synthetic resin.

A preferred embodiment of the vaginal ring of this invention consists of a supporting ring having one or two annular continuous, pocket-like indentations adapted to receive rings which fit into these recesses, these rings containing an active medicinal agent and being made of an LTV silicone elastomer.

This vaginal ring according to the invention is composed of the actual synthetic-resin supporting ring with one or two recesses and an inner and/or outer ring containing an active medicinal agent which is fitted into the pocket-like recesses of the supporting ring.

The drug-containing rings preferably have a circular cross section. The cross section, however, can also be of the shape of a circular segment. The dimensions of the supporting ring and of the drug-containing rings are selected so that the contact points of the outer edge and the inner edge, respectively, of the supporting ring with the drug-containing ring lie above the center line of the drug-containing ring in case of a circular cross section or above the center line of the circle forming the segment in case of a cross section shaped like a circular segment. Thus, a favorable fixation of the drug-containing rings in the pocket-like recesses of the supporting ring is attained.

One additional embodiment is a vaginal ring having an outer ring which has a circular cross section, e.g. as shown in the right hand side of FIG. 4a.

The supporting ring, in this embodiment, can consist of any kind of physiologically acceptable synthetic resin, as long as it possesses sufficient strength and elasticity. Suitable such synthetic resins are well known in the art and include but are not limited to organopolysiloxane elastomers, e.g. LTV dimethylpolysiloxane elastomer, hot-vulcanized dimethylpolysiloxane elastomers, polyamides, natural and synthetic rubber, polyesters, polytetrafluoroethylene and polyethylenes which are molded to the shaped article in a conventional manner, e.g. by injection-molding or casting.

Another preferred embodiment resides in applying rings which contain the active medicinal agent and are made on the basis of LTV silicone elastomer to a supporting ring made of LTV silicone elastomer by vulcanizing. This vaginal ring according to the present invention is composed of the following parts:

(a) The actual supporting ring with one or two drug-containing layers applied by vulcanization to the inside edge and/or to the outside edge of the supporting ring; and

(b) The layers containing the active medicinal agent having a cross section in the shape of a circular segment. The dimensions of the supporting ring and of the drug-containing rings vulcanized thereon are preferably chosen so that the vulcanized-on layers are not in contact on the outer and/or inner edge of the supporting ring. The drug-containing layers can surround and-

## 180 (A)

4,155,991

5

/or encompass the entire supporting ring or can be vulcanized thereon in partial sections.

The vaginal rings of the present invention have an average size of 0.5–20 cm., the particular size being dependent on the species for utilization of the ring, e.g. for smaller mammals, such as dogs, the ring size will be smaller than in the case of larger mammals such as horses and cows. In vaginal rings for use in women, the outer diameter is about 5–10 cm., and in the case of Rhesus monkeys, for example, about 2–3 cm. The diameter of such ring cross sections is generally 5–15 mm., preferably 7–10 mm.

The supporting ring and the drug-containing rings and/or the layers vulcanized thereon are produced on the basis of conventional LTV silicone elastomers. Organopolysiloxane two-component molding compositions of the LTV type (low temperature vulcanizing type) and components of these compositions are known, for example, from DAS's (German Published Applications) Nos. 1,171,641 and 1,900,969; DOS (German Unexamined Laid-Open Application) No. 1,940,124; U.S. Pat. Nos. 2,823,218, 3,159,601, 3,159,662 and 3,220,972.

The following LTV silicone elastomer compositions, described in detail in copending, commonly assigned U.S. patent applications Ser. No. 444,886 filed Feb. 22, 1974 now abandoned and Ser. No. 616,001 filed Sept. 23, 1975, now U.S. Pat. No. 4,012,497 the contents of which are incorporated by reference herein, are especially preferred for at least the medicament-containing vaginal ring segment in accordance with the present invention:

## LTV SILICONE ELASTOMER A

A nontoxic pharmaceutical composition adapted for implantation into a human or animal body to provide a constant, uniform drug release rate over a time interval of several months or years, being substantially free of peroxide, acetic acid and metal salts of carboxylic acids and consisting essentially of a homogeneous mixture of:

(a) 85–95, preferably 89–91, parts by weight of an LTV linear dimethylpolysiloxane resin containing 0.05–0.5 molar percent of methylvinylsiloxane units, having a molecular weight of 20,000–50,000 and containing an average of 1.58–2.02 monovalent hydrocarbon residues per silicone atom;

(b) correspondingly 15–5, preferably 11–9, parts by weight of a cross-linking composition consisting essentially of a dimethylpolysiloxane cross-linking agent substantially free of methylvinylsiloxane units, having a molecular weight of 500–1000 and containing 1–3 Si-H bonds per molecule;

(c) a catalytic amount of a noble-metal based cross-linking catalyst; and

(d) a pharmaceutically active amount of a nonionic, lipophilic drug dissolved or uniformly suspended in said composition.

## LTV SILICONE ELASTOMER B

This composition is similar to LTV Silicone Elastomer A but contains preferably 83–89 parts by weight of component (a); preferably 5–6 parts by weight of component (b); together with 5–10 parts by weight of a dimethylpolysiloxane resin having a molecular weight of 10,000–40,000 and having 0.2–1.5 molar percent methylvinylsiloxane units as an auxiliary cross-linking agent.

6

## LTV SILICONE ELASTOMER C

This composition is preferably used with medicaments having an unsaturated structure in the molecule, and comprises:

(a) 20–100 parts by weight of an organopolysiloxane having a viscosity of 500–200,000 centistokes (at 25° C.) and having the general formula

$$CH_2=CHSiO\left[\begin{array}{c}R\\|\\SiO\\|\\R\end{array}\right]\left[\begin{array}{c}R\\|\\SiO\\|\\R\end{array}\right]\begin{array}{c}R\\|\\Si-CH=CH_2\\|\\R\end{array}$$

wherein

R is lower alkyl (preferably methyl) and/or aryl of up to 10 carbon atoms, and

n is an integer from 200–1600;

(b) 0–50 parts by weight of an organopolysiloxane copolymer consisting essentially of:

(i) $(R')_3SiO_{0.5}$ units,

(ii) $(R')_2(Vi)SiO_{0.5}$ units, and

(iii) $SiO_2$ units, wherein

Vi is a vinyl group and R' is a monovalent organic residue which does not contain any unsaturated groups, and at least 50% of R' is methyl, and

wherein the ratio of a+b/c is 0.4–1.5 (preferably 0.6–1.0) and the ratio of b/c is 0.02–0.5 (preferably 0.05–0.15);

(c) 5–15 parts by weight of an organohydrogen polysiloxane of the general formula

$$R''_aH_bSiO_{(4-a-b/2)}$$

wherein

R'' is a monovalent organic residue which has no unsaturated groups; a and b are each positive numbers; the ratio of a:b is 0.5–10 (preferably 1.0–5); the sum of a+b is 1–2.5; and wherein at least three hydrogen atoms bound to different Si atoms are present per molecule; which component contains 50–900 molar percent, based on the unsaturated end groups in components (a) and (b) of vinyl groups attached to SiH; and

(d) a catalytic amount of platinum or a platinum compound.

The alkyl and/or aryl residues R contained in component (a) are of up to 10 carbon atoms. Examples in this connection include but are not limited to methyl, ethyl, propyl, isopropyl, butyl, octyl, tert.-amyl, cyclopentyl, cyclohexyl, phenyl, naphthyl, tolyl, xylyl, benzyl, chlorophenyl, cyanomethyl and 3,3,3-trifluoropropyl residues.

The residues R' and R'' contained in components (a) and (b) are each independently alkyl residues of up to 8 carbon atoms, preferably of up to 3 carbon atoms, e.g. methyl, ethyl and n-propyl.

Components (a), (b), and (d) constitute one component of the LTV organopolysiloxane two-component molding composition, while component (c) constitutes the second component having a cross-linking effect.

Component (a) and/or the mixture of components (a), (b) and (c) or of (a), (b), (c) and (d) can contain metallic ions, e.g. copper (II) ions for delayed curing at room temperature in an amount of 2.61 to 75 parts by weight of metallic ions per part by weight of platinum.

Although the vulcanization of the organopolysiloxane molding compositions in the presence of the noble

## 181 (A)

4,155,991

7

metal catalyst can take place at room temperature, vulcanization at a slightly elevated temperature is especially advantageous. The vulcanizing period of the catalyzed mixture is 1–6 hours at 60°–120° C. To initiate the vulcanization, the mixture can also be heated for a short time to a higher temperature, e.g. to 150° C. for a period of 1–10 minutes, but maximally 15 minutes.

The platinum component (d) of the molding composition can actually be used in one of the conventional forms catalyzing the reaction between silicon-linked hydrogen residues and silicon-linked vinyl residues. Examples in this connection are metallic platinum per se; platinum on support materials, e.g. silica gel or carbon powder; hexachloroplatinic acid and platinum salts, such as platinum carbonyl dichloride PtCOCl₂ and platinum dicarbonyl dichloride Pt(CO)₂Cl₂; etc. All of these platinum compounds are usable as catalysts. However, pure hexachloroplatinic acid has the disadvantage that it shows a relatively sparse solubility in organosilicon compounds containing silane groupings. Platinum compounds used in the solid form as catalysts cause the cross-linking reaction to take place very slowly and with poor controllability, just as the reaction as such can also be interrupted more readily than can be expected with the use of comparable catalysts in solution. Therefore, hexachloroplatinic acid is preferably used as the catalyst while dissolved in isopropanol, and PtCOCl₂ and Pt(CO)₂Cl₂ are used as the catalyst while dissolved in a diorganopolysiloxane containing 10–15 molar percent of vinyl groups. In this connection, at least 0.1 part by weight of platinum must be used per 1 p.p.m. of (a) and (b). Since impurities in the molding compositions can poison such small amounts of catalyst, 10–40 p.p.m. of platinum is preferably employed, although larger quantities of platinum do not impair the reaction.

A special embodiment of the vaginal ring according to this invention resides in that the same LTV silicone elastomer is employed for the supporting ring as well as for the drug-containing ring of synthetic resin.

In one embodiment of the supporting ring utilized for the vaginal ring of this invention, the supporting ring consists of a foamed silicone elastomer with closed cell pores. For this purpose, volatile agents such as, for example, hydrocarbons such as pentane or heptane and halogenated hydrocarbons, such as methylene chloride, monofluorodichloromethane, trichlorofluoromethane and trichlorofluoroethane, etc. are introduced in finely dispersed form into the mixture to be vulcanized and evaporated during the vulcanization.

The vulcanizates obtained from these organopolysiloxane two-component molding compositions are inactive with respect to nonionic, lipophilic active medicinal agents, nonpoisonous for the living organism, compatible, and are not absorbed by the living organism.

The effective agents contained in the drug-containing rings are preferably effective agents having a hormonal activity, e.g. estrogens and progestogens. Such compounds are well known in the art and include but are not limited to 3-methoxy-17α-ethynyl-1,3,5(10)-estratrien-17-ol (mestranol); 3-hydroxy-1,3,5(10)-estratrien-17-one (estrone); 17β-estradiol; estriol; ethynylestradiol; 4-pregnene-3,20-dione (progesterone); d-13-ethyl-17α-ethynyl-17β-hydroxy-4-gonen-3-one (d-norgestrel) and the esters thereof; 17α-ethynyl-19-nortestosterone (norethisterone) and the esters thereof; 6-chloro-17-hydroxy-1α,2α-methylenepregna-4,6-diene-3,20-dione (cyproterone) and the esters thereof; 19-norhydroxy-

8

progesterone and the esters thereof; 6-chloro-17-acetoxy-pregna-4,6-diene-3,20-dione (chlormadinone acetate); 15,16α-methylene- and 15,16β-methylene-17β-hydroxy-18-methyl-17α-ethynyl-4-estren-3-one; 17α-acetoxy-6α-methylprogesterone (medroxy-progesterone acetate); 9β,10α-pregna-4,6-diene-3,20-dione (dydrogesterone); etc.

As active medicinal agents, all those can actually be used which are nonionic and lipophilic. Accordingly, neuroleptics, such as butyrophenone derivatives, e.g. haloperidol, or bacteriostatics and/or fungistats, such as nystatin or metronidazole, are suitable for incorporation into the silicone elastomer.

The amount of active agent incorporated into the LTV silicone elastomer is generally 10–60% by weight, based on the total composition, and is dependent in individual cases on the specific active agent or active agent combination. Examples are the following total doses in milligrams:

|  | Useful | Preferred |
|---|---|---|
| Cyproterone acetate | 200–1000 | 250–750 |
| d-norgestrel | 100–500 | 200–400 |
| Ethynylestradiol | 20–100 | 25–50 |
| Estradiol | 20–90 | 25–50 |
| Mestranol | 50–100 |  |
| Ethynylnortestosterone acetate | 150–950 | 200–800 |
| Estrone | 10–80 |  |
| Estriol | 15–70 |  |
| Progesterone | 250–900 |  |
| Norethisterone | 100–600 | 200–500 |
| Cyproterone | 100–900 | 200–700 |
| Norhydroxyprogesterone | 250–950 |  |
| Chlormadinone acetate | 170–850 |  |
| 15,16α-Methylene- and 15,16β-methylene-17β-hydroxy-18-methyl-17α-ethynyl-4-estren-3-one | 50–750 | 100–500 |
| Dydrogesterone | 100–550 |  |
| Metronidazole | 300–950 |  |

Thus, it is readily possible for the outer ring to contain only a progestogen, whereas the inner ring contains an estrogen, or conversely. Progestogens or estrogens can be applied, for example, in combination with bactericides.

The total quantity of active agent in the LTV silicone elastomer is dimensioned so that a specific, constant amount per day is released over the desired time period. In detail, these amounts are, for example, in case of:

| | | |
|---|---|---|
| Cyproterone acetate | 300–1000 | μg./d. |
| d-Norgestrel | 30–250 | μg./d. |
| Ethynylestradiol | 30–60 | μg./d. |
| Estradiol | 20–150 | μg./d. |
| Mestranol | 20–100 | μg./d. |
| Ethynylnortestosterone acetate | 300–1000 | μg./d. |

One embodiment of the vaginal ring according to this invention resides in using same for the prevention of conception. A contraceptive effect on the basis of ovulation inhibition is attained over the period of application of the vaginal ring according to this invention if this ring releases, e.g. daily amounts of 130–250 μg. of ethynylestradiol or 800–1000 μg. of cyproterone acetate and 30–50 μg. of ethynylestradiol. Vaginal rings containing antiprotozoal agents in the drug-comprising inner or outer rings, e.g. metronidazole, and optionally estrogens are suitable in particular for the treatment of trichomoniasis. The active medicinal agent is incorporated into the LTV silicone elastomer base for produc-

**182 (A)**

**4,155,991**

9

ing the drug-containing ring. For this purpose, the active agent is comminuted and/or finely ground, optionally micronized; mixed with an LTV silicone elastomer two-component composition to form a suspension free of air bubbles; shaped into rings; and vulcanized by heating, preferably at 40°–120° C.

The drug-containing rings have, in the case of the outer ring, a diameter of 0.5–8.0 mm., preferably 1.5–5.0 mm., and in the case of the inner ring, a diameter of 0.3–2.0 mm., preferably 0.4–1.6 mm.

The drug-containing rings are built up entirely or partially according to the matrix principle. The drug-containing rings, however, can also consist of a core containing the active agent and an outer silicone elastomer shell of any desired layer thickness, low in active agent content; conversely, these rings can consist of a core element low in active agent content and surrounded by an elastomer layer containing the active medicinal agent. Such an envelope low in active medicinal agent over a core enriched in the active agent with a predominantly suspended active agent is obtained, for example by short-term extraction of the suspension vulcanizates containing the active medicinal agent with a suitable solvent, e.g. ethanol/water 1:1 (vol./vol.).

The rings containing the active medicinal agent are inserted in the pocket-like recesses of the supporting ring; glued optionally with the aid of catalyzed LTV silicone elastomer two-component composition and subsequently vulcanized to half the side of the recesses of the supporting ring, or they are molded onto the initially vulcanized supporting rings and the vulcanized completely together with the supporting ring.

The supporting ring, the drug-containing outer and-/or inner ring constitute, either put together and/or glued together, the actual vaginal ring.

To produce the drug-containing coating on the supporting ring, the active agent is likewise incorporated into the LTV silicone elastomer base. For this purpose, the active agent is finely ground, optionally micronized; mixed into a suspension with an LTV silicon elastomer two-component composition; applied in the form of a layer to the initially vulcanized supporting ring with the use of the multicomponent injection molding technique; and vulcanized by heating, preferably at 40°–120° C.

It can also be advantageous to combine the synthetic resin-active agent suspension with an auxiliary substance, such as, for example, a tenside, a defrother, a solubilizer, and/or a resorption-delaying agent in order to impart to the molded article any desired physical properties. Furthermore, however, inert auxiliary agents can also be used, such as highly disperse silicone dioxide, which impart to the ring the desired mechanical characteristics.

The drug-containing coatings, when they are vulcanized onto the outer edge of the supporting ring, have a layer thickness of 0.1–5.0 mm., preferably 0.5–3.0 mm. When they are vulcanized onto the inner edge of the supporting ring, the drug-containing coatings have a layer thickness of 0.1–3.0 mm., preferably 0.5–2.0 mm.

The drug-containing coatings are built up entirely or partially in accordance with the matrix principle.

Since no by-products are formed during the vulcanization of the LTV silicone elastomer two-component composition, a subsequent heat treatment of the cured product is superfluous.

The vaginal rings of this invention have the advantage that the active medicinal agents are released therefrom over a longer time period regularly and uniformly

10

within the limits of the dosage required for the desired biological effect, e.g. for the inhibition of ovulation. Moreover, these vaginal rings have the advantage that the amount of active agent which must be incorporated into a single such contraceptive can be much lower than in the case of the conventional vaginal rings, since the medicament-containing surface thereof is in direct contact with the vaginal wall.

The vaginal rings of the present invention on the basis of LTV silicone elastomer do not crumble under mechanical stress. They cannot be damaged as readily during their introduction into the body as vaginal rings on the basis of RTV elastomers containing more or less defined mixtures of active fillers with the notorious, disadvantageous characteristics which they exert on the medicinal agent, which fillers must be incorporated to improve the mechanical properties.

With the aid of the vaginal ring according to this invention, many active medicinal agents can be successfully utilized which could not be used with the heretofore known and customary carrier materials in the conventional vaginal rings.

The vaginal rings producible in accordance with this invention can be sterilized in saturated, pressurized steam at 120° C. without incurring undesired changes during this step.

The following examples are to explain the present invention.

Without further elaboration, it is believed that one skilled in the art can, using the preceding description, utilize the present invention to its fullest extent. The following preferred specific embodiments are, therefore, to be construed as merely illustrative and not limitative of the remainder of the disclosure in any way whatsoever. In the following examples, the temperatures are set forth uncorrected in degrees Celsius; unless otherwise indicated, all parts and percentages are by weight.

**EXAMPLE 1**

A supporting ring intended for receiving two drug-containing rings is injection-molded from a polyethylene-vinyl acetate copolymer ("ALATHON" E/VA 3170, DuPont & de Nemours) with the following dimensions: outer diameter of the supporting ring, 6 cm.; inner diameter of the supporting ring, 4.2 cm.; and spacing between the pocket-like recess for the outer ring and the pocket-like recess for the inner ring, 5.5 mm. The drug-containing outer ring has a diameter of 4 mm.; the drug-containing inner ring has a diameter of 0.5 mm. The vaginal ring has a ring cross section diameter of 10.1 mm.

The drug-containing outer ring with a diameter of 4 mm. is molded from a homogeneous suspension of 15.0 g. of d-norgestrel in 85.0 g. of the LTV organopolysiloxane two-component molding composition I and vulcanized by heating for two hours at 110° C. The LTV organopolysiloxane two-component molding composition $C_1$ comprises 75 parts by weight of a polydimethylsiloxane having bilateral vinyl end groups and a viscosity of 50,000 centistokes at 25° C.; 25 parts by weight of a copolymer composed of 40 molar percent $SiO_2$ units, 45 molar percent $(CH_3)_3SiO_{0.5}$ units and 15 molar percent $Vi(CH_3)_2SiO_{0.5}$ units; 8 parts by weight of an Si—H component comprising 16.6 molar percent $(CH_3)_3SiO_{0.5}$ units, 33.4 molar percent $(CH_3)_2SiO$ units and 50 molar percent $CH_3HSiO$ units; and 10 p.p.m. of platinum (based on the total mixture) in the form of a

**183 (A)**

4,155,991

**11**

2% solution of $H_2PtCl_4$ in isopropanol. The drug-containing inner ring is produced from a homogeneous suspension of 58.0 g. of ethynylestradiol in 42.0 g. of the LTV organopolysiloxane two-component molding composition $C_2$ by molding and two hours of vulcanizing at 105° C. The LTV organopolysiloxane two-component molding composition $C_2$ is composed of 85 parts by weight of a bilaterally vinyl-terminated polydimethylsiloxane having a viscosity of 1000 centistokes at 25° C.; 15 parts by weight of a copolymer having the composition of 40 molar percent $SiO_2$ units, 45 molar percent $(CH_3)_3SiO_{0.5}$ units and 15 molar percent $Vi(CH_3)_2SiO_{0.5}$ units; 4.5 parts by weight of an Si—H component containing 38 molar percent $SiO_2$ units, 29 molar percent $(CH_3)_3SiO_{0.5}$ units and 33 molar percent $(CH_3)_2HSiO_{0.5}$ units; and 10 p.p.m. of platinum (based on the total mixture) in the form of a 2% solution of $H_2PtCl_4$ in isopropanol.

**EXAMPLE 2**

A supporting ring is produced from dimethylpolysiloxane molding composition ("SILASTIC" 4600, Dow Corning) by molding, followed by 5 minutes of initial vulcanization at 150° C. and one hour of vulcanization at 120° C.; this supporting ring has the following dimensions: outer diameter, 6 cm.; inner diameter, 4.2 cm.; and spacing between the pocket-like recess for the outer ring and the pocket-like recess for the inner ring, 5.3 mm.

In this supporting ring are inserted a d-norgestrel-containing outer ring having a diameter of 4 mm. and a mestranol-containing inner ring having a diameter of 1 mm. The d-norgestrel-containing outer ring is prepared from a suspension of 20.0 g. of d-norgestrel and 18.0 g. of highly disperse silicon dioxide in 62.0 g. of the LTV organopolysiloxane two-component molding composition $C_3$ by molding and vulcanizing for two hours at 100° C. The LTV organopolysiloxane two-component molding composition $C_3$ is composed of: 75 parts by weight of a bilaterally vinyl-terminated polydimethylsiloxane having a viscosity of 1000 centistokes at 25° C.; 25 parts by weight of a copolymer comprised of 40 molar percent $SiO_2$ units, 45 molar percent $(CH_3)_3SiO_{0.5}$ units and 15 molar percent $Vi(CH_3)_2SiO_{0.5}$ units; 8 parts by weight of an Si—H component comprising 16.6 molar percent $(CH_3)_3SiO_{0.5}$ units, 33.4 molar percent $(CH_3)_2SiO$ units and 50.0 molar percent $CH_3HSiO$ units; 30 p.p.m. of platinum (based on the total mixture) in the form of a 1% solution of $Pt(CO)_2Cl_2$ in an open-chain dimethylpolysiloxane containing 12 molar percent vinyl groups; and 5 parts by weight, based on the platinum, of Cu(II) ions.

The mestranol-containing inner ring is prepared from a homogeneous suspension of 60.0 g. of mestranol in 40.0 g. of the LTV organopolysiloxane two-component molding composition $C_4$ by molding and vulcanizing for 40 minutes at 110° C. The LTV organopolysiloxane two-component molding composition $C_4$ comprises 75 parts by weight of a bilaterally vinyl-terminated polydimethylsiloxane having a viscosity of 1000 centistokes at 25° C.; 25 parts by weight of a copolymer composed of 40 molar percent $SiO_2$ units, 45 molar percent $(CH_3)_3SiO_{0.5}$ units and 15 molar percent $Vi(CH_3)_2SiO_{0.5}$ units; 8 parts by weight of an Si-H component comprising 16.6 molar percent $(CH_3)_3SiO_{0.5}$ units, 33.4 molar percent $(CH_3)_2SiO$ units and 50.0 molar percent $CH_3HSiO$ units; and 10 p.p.m. of platinum (based on the

**12**

total mixture) in the form of a 2% solution of $H_2PtCl_4$ in isopropanol.

**EXAMPLE 3**

Supporting rings having the dimensions indicated in Example 2 are produced, according to the procedure described therein, from a homogeneous mixture of 35.0 g. of highly disperse silicon dioxide and 65.0 g. of resin-reinforced dimethylpolysiloxane molding composition ("SIL GEL" 2001, Wacker Chemie).

Vaginal rings are prepared with the use of these supporting rings by inserting and gluing drug-containing inner and outer rings having the dimensions described in Example 2.

The above-indicated catalyzed two-component composition is employed for gluing. The drug-containing outer ring is made from a suspension of 25.0 g. of micronized cyproterone acetate and 15.0 g. of highly disperse silicon dioxide in 60.0 g. of the LTV organopolysiloxane two-component molding composition $C_5$ by molding and vulcanizing for two hours at 115° C. The LTV organopolysiloxane two-component molding composition $C_5$ comprises 75 parts by weight of a bilaterally vinyl-terminated polydimethylsiloxane having a viscosity of 50,000 centistokes at 25° C.; 25 parts by weight of a copolymer composed of 40 molar percent $SiO_2$ units, 45 molar percent $(CH_3)_3SiO_{0.5}$ units and 15 molar percent $Vi(CH_3)_2SiO_{0.5}$ units; 8 parts by weight of an Si-H component containing 16.6 molar percent $(CH_3)_3SiO_{0.5}$ units, 33.4 molar percent $(CH_3)_2SiO$ units and 50 molar percent $CH_3HSiO$ units; and 35 p.p.m. of platinum (based on the total mixture) in the form of a 1.5% solution of $Pt(CO)_2Cl_2$ in a dimethylpolysiloxane containing 15 molar percent vinyl groups.

The drug-containing inner ring is made from a suspension of 20.0 g. of estradiol in the LTV organopolysiloxane two-component molding composition $C_6$ by molding and vulcanizing for two hours at 110° C.

The LTV organopolysiloxane two-component molding composition $C_6$ contains the following ingredients: 75 parts by weight of bilaterally vinyl-terminated polydimethylsiloxane having a viscosity of 50,000 centistokes at 25° C.; 25 parts by weight of a copolymer composed of 40 molar percent $SiO_2$ units, 45 molar percent $(CH_3)_3SiO_{0.5}$ units and 15 molar percent $Vi(CH_3)_2SiO_{0.5}$ units; 8 parts by weight of an Si-H component containing 16.6 molar percent $(CH_3)_3SiO_{0.5}$ units, 33.4 molar percent $(CH_3)_2SiO$ units and 50 molar percent $CH_3HSiO$ units; and 25 p.p.m. of platinum (based on the total mixture) in the form of a 2% solution of $Pt(CO)_2Cl_2$ in a dimethylpolysiloxane containing 10 molar percent vinyl groups.

**EXAMPLE 4**

Supporting rings having a diameter of 9 mm. with a spacing between the pocket-like recess for receiving the drug-containing outer ring and the pocket-like recess for the drug-containing inner ring of 5.3 mm. are manufactured from a homogeneous mixture of 30.0 g. of highly disperse silicon dioxide in a catalyzed LTV silicone elastomer base as a dimethylpolysiloxane casting composition ("SILOPREN" 0228, Bayer) by molding, initially vulcanizing for 5 minutes at 140° C. and completing the vulcanization at 120° C. for 120 minutes. These supporting rings are designed for receiving a d-norgestrel-containing outer ring having a diameter of 3.0 mm. and an estradiol-containing inner ring having a diameter of 1.0 mm. The vaginal ring has a diameter of

**184 (A)**

13

4,155,991

14

its ring cross section of 10.3 mm. The d-norgestrel-containing outer ring is prepared from a suspension of 15.0 g. of micronized d-norgestrel and 20.0 g. of highly disperse silicon dioxide in 65.0 g. of the LTV organopolysiloxane two-component molding composition $C_4$ described in Example 2 by molding and vulcanizing for 2 hours at 110° C. The vulcanizates are extracted successively for 90 minutes with 96% ethanol, again for 30 minutes with 96% ethanol, for 60 minutes with 70% ethanol, and for 30 minutes with 50% ethanol at room temperature and are then air-dried. In this way, d-norgestrel-containing rings are obtained having an envelope of low d-norgestrel content surrounding a core enriched in d-norgestrel. The estradiol-containing inner ring is molded from a suspension of 35.0 g. of micronized estradiol in 65.0 g. of the LTV organopolysiloxane two-component molding composition $C_3$ described in Example 2 and vulcanized by heating for two hours at 100° C.

### EXAMPLE 5

Supporting rings having the dimensions of Example 1 are produced from dimethylpolysiloxane molding composition (Dow Corning "SILASTIC" 4600) as indicated in Example 2. Vaginal rings are prepared by inserting the drug-containing outer and inner rings of Example 1 into these supporting rings.

### EXAMPLE 6

Supporting rings having the dimensions set forth in Example 1 are injection-molded from a terephthalate basis thermoplastic polyether ester elastomer.

These supporting rings are designed for receiving a d-norgestrel-containing outer ring, as described in Example 2, and an ethynylestradiol-containing inner ring, as described in Example 1, which are inserted in the supporting ring.

### EXAMPLE 7

Supporting rings having the dimensions described in Example 4 are made from a suspension of 32.0 g. of highly disperse silicon dioxide in the LTV organopolysiloxane two-component molding composition $C_4$ described in detail in Example 3, following the method indicated in Example 4.

The drug-containing outer rings are produced from a suspension of 35.0 g. of micronized ethynylnortestosterone acetate and 15.0 g. of highly disperse hydrophobic silicon dioxide in 50.0 g. of LTV organopolysiloxane two-component molding composition $C_3$ as described in Example 2 by molding and two hours of vulcanizing at 100° C. The drug-containing inner rings have the composition of the inner rings according to Example 3 and are manufactured analogously. The supporting ring, the drug-containing outer ring and the drug-containing inner ring are combined into a vaginal ring.

### EXAMPLE 8

Supporting rings having a cross section diameter of 9 mm. with a spacing between the pocket-like recesses for receiving drug-containing outer and inner rings of 6.2 mm. are produced according to the method disclosed in Example 4 from a suspension of 28.0 g. of highly disperse silicon dioxide and 5.0 g. of barium sulfate in 67.0 g. of catalyzed LTV silicone elastomer two-component composition ("SILOPREN" 0839, Bayer). The supporting rings are designed to receive a d-norgestrel-containing outer ring having a cross section shaped like a circular segment and having a diameter of 2.5 mm. and to receive an ethynylestradiol-containing inner ring having a diameter of 0.5 mm.

The d-norgestrel-containing outer ring is prepared from a suspension of 40.0 g. of d-norgestrel in 60.0 g. of the LTV organopolysiloxane two-component molding composition $C_1$ as described in Example 1, by molding and vulcanizing for 90 minutes at 110° C.

The ethynylestradiol-containing inner rings are obtained from 55.0 g. of ethynyestradiol and 45.0 g. of the LTV organopolysiloxane two-component molding composition $C_3$ as described in Example 2, after preparing a suspension free of air bubbles, by molding and vulcanizing for three hours at 90° C.

### EXAMPLE 9

Supporting rings having the dimensions of Example 8 are injection-molded from a terephthalate basis thermoplastic polyether ester elastomer.

These supporting rings are combined to form vaginal rings having a ring cross section diameter of 10.2 mm. by inserting the drug-containing inner and outer rings described in Example 8.

### EXAMPLE 10

A supporting ring designed for receiving two drug-containing rings having an outer diameter of 3 cm. and an inner diameter of 2 cm. is produced, as indicated in Example 2, from a dimethylpolysiloxane molding composition ("SILASTIC" 4600, Dow Corning). The spacing between the pocket-like recesses of this supporting ring from the outer to the inner ring is 3.1 mm. The drug-containing outer ring has a diameter of 2 mm. and is prepared as indicated in Example 1 from a d-norgestrel suspension in the LTV organopolysiloxane two-component molding composition $C_1$. The drug-containing inner ring has a diameter of 0.5 mm. and is prepared as described in Example 9 from an ethynylestradiol suspension in the LTV organopolysiloxane two-component molding composition $C_3$ as disclosed in Example 2. The drug-containing rings are inserted in the supporting ring; all three rings together form a vaginal ring for use in animals.

### EXAMPLE 11

Supporting rings having an outer diameter of 4.2 cm. and an inner diameter of 3.0 cm. are formed with two pocket-like recesses for receiving the outer and inner rings containing the active agent. The outer ring has a diameter of 2.5 mm. and the inner ring has a diameter of 0.5 mm., with a spacing between the pocket-like recesses of 3.8 mm. The supporting rings are prepared from a homogeneous mixture of 31.0 g. of highly disperse silicon dioxide in the catalyzed LTV silicone elastomer basse A and initially vulcanized by heating for 5 minutes to 130° C. The drug-containing vaginal ring is manufactured by molding, in a second process step, onto the initially vulcanized supporting ring. The outer molded ring contains d-norgestrel in the LTV organopolysiloxane two-component molding composition $C_1$ (as described in Example 1) and the inner molded ring contains ethynylestradiol in the LTV organopolysiloxane two-component molding composition $C_2$ (also described in Example 1). This composite is initially vulcanized for 5 minutes by heating to 120° C. and then heated for two hours at 110° C. The vulcanizate is sterilized by heating for 30 minutes in pressurized steam and is then packaged under sterile conditions.

**185 (A)**

4,155,991

15

## EXAMPLE 12

A supporting ring is produced from a dimethylpolysiloxane molding composition ("SILASTIC" 4600, Dow Corning) by molding, 5 minutes of initial vulcanization at 150° C. and 1.5 hours of vulcanizing at 120° C., this supporting ring having the following dimensions: outer diameter, 6 cm.; inner diameter, 4.2 cm.; and spacing between the pocket-like recesses for receiving the drug-containing outer and inner rings, 5.3 mm.

Into this supporting ring are inserted an outer ring having a diameter of 4 mm., containing metronidazole and nystatin and an inner ring having a diameter of 1 mm. and containing estriol. The outer ring can readily be separated by the female patient from the application unit after using the vaginal ring for 1 week. The remaining, estriol-containing vaginal ring is intended for usage over a period of several weeks.

The drug-containing outer ring, 4 mm. in diameter, is molded from a homogeneous mixture of 30.0 g. of micronized 1β-(hydroxyethyl)-2-methyl-5-nitroimidazole (metronidazole), 30.0 g. of micronized nystatin, 2.0 g. of highly disperse hydrophobic silicon dioxide and 38.0 g. of the LTV organopolysiloxane two-component molding composition C₄ described in Example 2. This ring is initially vulcanized for a period of 5 minutes at 100° C. and then for 4 hours at 80° C.

The drug-containing inner ring, having a diameter of 1 mm., is formed from a suspension of 55.0 g. of micronized estriol in 45.0 g. of LTV organopolysiloxane two-component molding composition C₃ disclosed in Example 2 and vulcanized by three hours of heating at 95° C.

This vaginal ring is intended for the treatment of trichomoniasis.

## EXAMPLE 13

A supporting ring is prepared from dimethylpolysiloxane molding composition ("SILASTIC" 4600, Dow Corning) by molding, 5 minutes of initial vulcanizing at 150° C., and 1.5 hours of vulcanizing at 120° C., this supporting ring having the following dimensions: outer diameter, 6 cm.; inner diameter, 4.2 cm.; and spacing between the pocket-like recesses for receiving the d-norgestrel-containing outer and inner rings, 5.6 mm.

d-Norgestrel-containing rings having a diameter of 4 mm. (outer ring) and a diameter of 1 mm. (inner ring) are made from a suspension of 25.0 g. of micronized d-norgestrel, 12.0 g. of highly disperse silicon dioxide in 63.0 g. of the LTV organopolysiloxane two-component molding composition C₄ described in Example 2, initially vulcanized by heating for 10 minutes to 115° C. and subsequently completely vulcanized by heating for three hours at 100° C. The vulcanizates are extracted successively for 90 minutes with 96% ethanol, then again for 30 minutes with 96% ethanol, 60 minutes with 70% ethanol and 30 minutes with 50% ethanol at room temperature, and are thereafter air-dried. The d-norgestrel-containing rings, consisting of an envelope with a low d-norgestrel content on a d-norgestrel-enriched core, are formed into a vaginal ring by insertion into the supporting ring.

## EXAMPLE 14

A supporting ring is prepared from dimethylpolysiloxane molding composition ("SILASTIC" 4600, Dow Corning) as described in Example 13, with the dimensions set forth therein. Estriol-containing outer and inner rings are made from a suspension of 20.0 g. of

16

micronized estriol and 15.0 g. of highly disperse silicon dioxide in the LTV organopolysiloxane two-component molding composition C₄ described in Example 2, following the method indicated in Example 13; the rings are partially extracted with ethanol as likewise described therein. The estriol-containing outer ring and the inner ring are inserted in the supporting ring, forming a vaginal ring having a ring cross section diameter of 10.3 mm.

## EXAMPLE 15

A supporting ring is prepared from dimethylpolysiloxane molding composition ("SILASTIC" 4600, Dow Corning) by molding, 5 minutes of initial vulcanizing at 150° C., and 1 hour of vulcanizing at 120° C., this supporting ring having the following dimensions: outer diameter, 6 cm.; inner diameter, 4.2 cm.; and spacing between the pocket-like recess for receiving the outer ring and the inner edge of the supporting ring, 6.5 mm.

A d-norgestrel-containing outer ring having a cross section in the shape of a circular segment and a diameter of 2.5 mm. is inserted in this supporting ring. The d-norgestrel-containing outer ring is prepared from a suspension of 20.0 g. of d-norgestrel and 18.0 g. of highly disperse silicon dioxide in 62.0 g. of the LTV organopolysiloxane two-component molding composition C₃ by molding and two hours of vulcanizing at 100° C. The composition of the LTV organopolysiloxane two-component molding composition C₃ is that of Example 2.

## EXAMPLE 16

A supporting ring is prepared from a dimethylpolysiloxane molding composition ("SILASTIC" 4600, Dow Corning) by molding, 5 minutes of initial vulcanization at 150° C. and 1.5 hours of vulcanization at 120° C., this supporting ring having the following dimensions: outer diameter, 6 cm.; inner diameter, 4.2 cm.; and spacing between the pocket-like recess for receiving the drug-containing inner ring and the outer edge of the supporting ring, 8.1 mm.

An estriol-containing inner ring of a diameter of 1.5 mm. is inserted in this supporting ring. This drug-containing inner ring is molded from a suspension of 55.0 g. of micronized estriol in 45.0 g. of the LTV organopolysiloxane two-component molding composition C₃ described in Example 2 and vulcanized by heating for three hours to 95° C.

## EXAMPLE 17

A vaginal ring containing d-norgestrel and ethynylestradiol having an outer diameter of 60 mm. and an inner diameter of 42 mm. is produced with the use of the multicomponent injection-molding technique from three components as a composite vulcanizate which is vulcanized at 100° C. for one hour. Component 1 is a homogeneous mixture of 26 parts by weight of highly disperse silicon dioxide, 3 parts by weight of highly disperse magnesium oxide and 71 parts by weight of catalyzed LTV silicone elastomer base ("SILOPREN" 3008, Bayer).

Component 2 consists of a mixture of 24 parts by weight of highly disperse silicon dioxide, 8 parts by weight of micronized d-norgestrel and 68 parts by weight of catalyzed LTV silicone elastomer base ("SILOPREN" 3008, Bayer).

Component 3 contains, in 100 parts by weight, 10 parts by weight of micronized ethynylestradiol, 21 parts

**186 (A)**

4,155,991

**17**

by weight of an LTV organopolysiloxane molding composition comprising 75 parts by weight of a bilaterally vinyl-terminated polydimethylsiloxane having a viscosity of 100 centistokes at 25° C.; 25 parts by weight of a copolymer composed of 40 molar percent $SiO_2$ units, 45 molar percent $(CH_3)_2SiO_{0.5}$ units and 15 molar percent $Vi(CH_3)_2SiO_{0.5}$ units; 8 parts by weight of an Si—H component consisting of 16.6 molar percent $(CH_3)_3SiO_{0.5}$ units, 33.4 molar percent $(CH_3)_2SiO$ units and 50.0 molar percent $CH_3HSiO$ units; and 10 p.p.m. of platinum (based on the total mixture) in the form of a 2% solution of $H_2PtCl_6$ in isopropanol.

Within the composite vulcanizate, component 1 forms a ring having an ellipsoidal cross section wherein, on the outer and inner edges, the drug-containing components 2 and 3 are vulcanized so that the vaginal ring in total has a circular cross section with a radius of curvature of 4.5 mm. on the outer edge. Component 2 has a maximum layer thickness of 2 mm. and is vulcanized along a circular arc section of 2.5 mm., encompassing the ring. Component 3 is vulcanized in a maximum layer thickness of 1.5 mm. with an expansion of 1.5 mm., surrounding the ring on all sides.

**EXAMPLE 18**

A vaginal ring is produced from the three components 1–3 described in Example 17 as a composite vulcanizate with the same dimensions, but wherein the drug-free component 1 is combined with methylene chloride so that component 1 evaporates during the injection-molding step and/or during the vulcanizing process and forms a closed-cell foam.

**EXAMPLE 19**

A vaginal ring is prepared with the dimensions disclosed in Example 17 from three components in the form of a composite vulcanizate with the use of the multicomponent injection-molding technique. Component 1 is a mixture of 24 parts by weight of highly disperse silicon dioxide and 73 parts by weight of LTV silicone elastomer composition ("SILOPREN" 0028, Bayer).

Component 2 is a mixture of 4.8 parts by weight of micronized d-norgestrel, 22.4 parts by weight of highly disperse silicon dioxide and 72.8 parts by weight of the organopolysiloxane two-component molding composition described in Example 17.

Component 3 contains 10 parts by weight of micronized ethynylestradiol and 22 parts by weight of highly disperse silicon dioxide in 68 parts by weight of an LTV organopolysiloxane two-component molding composition containing 75 parts by weight of a bilaterally vinyl-terminated polydimethylsiloxane having a viscosity of 1000 centistokes at 25° C.; 25 parts by weight of a copolymer composed of 40 molar percent $SiO_2$ units, 45 molar percent $(CH_3)_2SiO_{0.5}$ units and 15 molar percent $Vi(CH_3)_2SiO_{0.5}$ units; 8 parts by weight of an Si-H component consisting of 16.6 molar percent $(CH_3)_3SiO_{0.5}$ units, 33.4 molar percent $(CH_3)_2SiO$ units and 50.0 molar percent $CH_3HSiO$ units; 30 p.p.m. of platinum (based on the total mixture) in the form of a 1% solution of $Pt(CO)_2Cl_2$ in an open-chain dimethylpolysiloxane containing 12 molar percent vinyl groups; and 5 parts by weight, based on the parts by weight of platinum, of Cu(II) ions.

From the three aforementioned components, a composite vulcanizate is produced in the form of superimposed rings by 75 minutes of vulcanizing at 120° C. In

**18**

this composite vulcanizate, component 1 determines the configuration and has an almost circular cross section. On the flattened outer edge of the ring, consisting of drug-free component 1, component 2 is vulcanized in a width of 3 mm. with a maximum layer thickness of 2.0 mm. over 120 mm. of the outer edge of the ring, and component 3 is vulcanized in a width of 2 mm. with a maximum layer thickness of 2.5 mm. over the remaining length of the outer edge.

**EXAMPLE 20**

A vaginal ring is prepared as a composite vulcanizate by analogy to Example 19. Component 2, containing d-norgestrel, is applied in a width of 2.5 mm. with a layer thickness of maximally 3 mm. continuously along the outer edge of component 1.

**EXAMPLE 21**

A vaginal ring containing ethynylestradiol and d-norgestrel is produced by the multicomponent injection-molding method from components 1–3 described in detail in Example 19 by composite vulcanization at 120° C. The resultant composite vulcanizate has a circular cross section, carrying along the outer edge component 2 containing d-norgestrel, extending continuously with a maximum layer thickness of 2.0 mm and a width of 2.5 mm. On the inner side of the ring, component 3 containing ethynylestradiol is affixed over a length of 30 mm. with a width of 2.0 mm. and a thickness of about 2.5 mm.

What is claimed is:

1. A composite vaginal ring containing a safe and effective amount of a pharmaceutically active medicament, consisting essentially of:

(a) a supporting, medicament-free vaginal ring consisting essentially of a physiologically acceptable synthetic resin and having a continuous encircling pocket-like indentation along the inner edge of the annular surface along the central plane thereof adapted to mate with a corresponding smaller, medicament-containing inner encircling annular minor vaginal ring segment; and

(b) a smaller, vaginal medicament-containing inner encircling annular minor vaginal ring adapted to mate with the continuous encircling pocket-like indentation in the modified annular surface of said supporting, medicament-free vaginal ring along the central plane thereof and consisting essentially of a safe and effective amount of a pharmaceutically active nonionic, lipophilic vaginal drug dissolved or uniformly suspended in an elastomeric, cross-linked LTV linear dimethylpolysiloxane resin.

2. A vaginal ring according to claim 1, wherein said minor ring segment is vulcanized onto said major supporting ring.

3. A vaginal ring according to claim 1, wherein said LTV resin component consists essentially of a nontoxic pharmaceutical composition adapted for implantation into a human or animal body to provide a constant, uniform drug release rate over a time interval of several months or years, being substantially free of peroxide, acetic acid and metal salts of carboxylic acids and consisting essentially of a homogeneous mixture of:

(a) 85–95, preferably 89–91, parts by weight of an LTV linear dimethylpolysiloxane resin containing 0.05–0.5 molar percent of methylvinylsiloxane units, having a molecular weight of 20,000–50,000

**187(A)**

4,155,991

| 19 | 20 |

and containing an average of 1.58–2.02 monovalent hydrocarbon residues per silicone atom;

(b) correspondingly 15–5, preferably 11–9, parts by weight of a cross-linking component consisting essentially of a dimethylpolysiloxane cross-linking agent substantially free of methylvinylsiloxane units, having a molecular weight of 500–1000 and containing 1–3 Si—H bonds per molecule;

(c) a catalytic amount of a noble-metal based cross-linking catalyst; and

(d) a pharmaceutically active amount of a nonionic, lipophilic drug dissolved or uniformly suspended in said composition.

4. A vaginal ring according to claim 1, wherein said LTV resin component consists essentially of preferably 85–89 parts by weight of component (a) preferably 5–6 parts by weight of component (b); together with 5–10 parts by weight of a dimethylpolysiloxane resin having a molecular weight of 10,000–40,000 and having 0.2–1.5 molar percent methylvinylsiloxane units as an auxiliary cross-linking agent.

5. A vaginal ring according to claim 1, wherein said LTV resin component consists essentially of

(a) 20–100 parts by weight of an organopolysiloxane having a viscosity of 500–200,000 centistokes (at 25° C.) and having the general formula

$$CH_2=CHSiO \left[ \begin{array}{c} R \\ | \\ SiO \\ | \\ R \end{array} \right]_n \left[ \begin{array}{c} R \\ | \\ Si \\ | \\ R \end{array} \right] —CH=CH_2$$

wherein

R is lower alkyl (preferably methyl) and/or aryl of up to 10 carbon atoms, and

n is an integer from 200–1600;

(b) 0–50 parts by weight of an organopolysiloxane copolymer consisting essentially of:

(i) $(R')_3SiO_{0.5}$ units,

(ii) $(R')_2(Vi)SiO_{0.5}$ units, and

(iii) $SiO_2$ units, wherein

Vi is a vinyl group and R' is a monovalent organic residue which does not contain any unsaturated groups, and at least 50% of R' is methyl, and

wherein the ratio of $a+b/c$ is 0.4–1.5 (preferably 0.6–1.0) and the ratio of $b/c$ is 0.02–0.5 (preferably 0.05–0.15);

(c) 5–15 parts by weight of an organohydrogen polysiloxane of the general formula

$$R''_aH_bSiO_{(4-a-b/2)}$$

wherein

R'' is a monovalent organic residue which has no unsaturated groups, a and b are each positive numbers; the ratio of a:b is 0.5–10 (preferably 1.0–5); the sum of $a+b$ is 1–2.5; and wherein at least three hydrogen atoms bound to different Si atoms are present per molecule; which component contain 50–500 molar percent, based on the unsaturated

end groups in components (a) and (b) of vinyl groups attached to SiH; and

(d) a catalytic amount of platinum or a platinum compound.

6. A vaginal ring according to claim 1, wherein said major supporting ring is composed of an elastomeric, cross-linked LTV linear dimethylpolysiloxane resin.

7. A vaginal ring according to claim 1, wherein said drug is a steroid hormone.

8. A vaginal ring according to claim 8, wherein said drug is at least one steroid hormone having progestational or estrogenic activity.

9. A vaginal ring according to claim 1, wherein the major supporting ring is a closed-cell foam.

10. A vaginal ring according to claim 10, wherein said major supporting ring is composed of an elastomeric, cross-linked LTV linear dimethylpolysiloxane resin.

11. A vaginal ring according to claim 1, wherein said drug is an antiprotozoal medicament.

12. A vaginal ring according to claim 1, wherein the exposed portion of said minor ring segment is circular in cross-section.

13. A vaginal ring according to claim 12, wherein the entire minor ring segment is circular in cross-section.

14. A vaginal ring according to claim 1, wherein supporting, medicament-free ring (a) also has a continuous encircling pocket-like indentation along the outer edge of the annular surface along the central plane thereof adapted to mate with a corresponding smaller, medicament-containing outer encircling annular minor vaginal ring segment; and which also contains

(c) a smaller, vaginal medicament-containing outer encircling annular minor vaginal ring adapted to mate with the continuous encircling pocket-like indentation in the modified outer annular surface of said supporting, medicament-free vaginal ring along the central plane thereof and consisting essentially of a safe and effective amount of a pharmaceutically active nonionic, lipophilic vaginal drug dissolved or uniformly suspended in an elastomeric, crosslinked LTV linear dimethylpolysiloxane resin;

whereby the composite ring contains both inner and outer minor ring segments along the central plane of said major supporting ring.

15. A vaginal ring according to claim 14, wherein one of said minor ring segments contains a progestationally active steroid drug and the other of said ring segments contains an estrogenically active steroid drug.

16. A vaginal ring according to claim 15, wherein the major supporting ring is a closed-cell foam composed of an elastomeric, cross-linked LTV linear dimethylpolysiloxane resin.

17. A vaginal ring according to claim 16 dimensioned for insertion into a human female vagina.

18. A vaginal ring according to claim 17 further comprising an antiprotozoal drug in a portion of at least one of said minor rings.

19. A vaginal ring according to claim 18, wherein the exposed portion of said minor ring segments are circular in cross-section.

* * * * *

# United States Patent [19]

## Schuster et al.

[11] **4,157,709**

[45] **Jun. 12, 1979**

[54] **PROBE FOR OBTAINING CERVICAL MUCUS AND PROCESS THEREOF**

[75] Inventors: **Samuel R. Schuster,** Wellesley; **Louis Kopito; Harold Kosasky,** both of Brookline, all of Mass.

[73] Assignee: **Ovatime, Inc.,** Brookline, Mass.

[21] Appl. No.: **795,097**

[22] Filed: **May 9, 1977**

[51] Int. Cl.² .......................................... A61B 10/00
[52] U.S. Cl. .............................. 128/759; 128/269
[58] Field of Search ............. 128/2 B, 2 W, 263, 4–8, 128/127, 130, 131, 269, 304; 73/53

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,703,216 | 2/1929 | Wappler | 128/6 |
| 2,022,065 | 11/1935 | Wappler | 128/6 |
| 2,184,642 | 12/1939 | Glass | 128/303.12 |
| 2,579,849 | 12/1951 | Newman | 128/3 |
| 3,877,464 | 4/1975 | Vermes | 128/2 W X |
| 3,924,608 | 12/1975 | Mitsui | 128/2 B |
| 3,960,143 | 6/1976 | Terada | 128/4 |
| 4,013,066 | 3/1977 | Schuster | 73/53 X |
| 4,023,559 | 5/1977 | Gaskell | 128/2 W |

### OTHER PUBLICATIONS

Medical Surgical Review, p. 35, (Advertisement), Feb. 1970.

*Primary Examiner*—Robert W. Michell
*Assistant Examiner*—Francis J. Jaworski
*Attorney, Agent, or Firm*—Morse, Altman, Oates & Bello

[57] **ABSTRACT**

A probe is provided for inserting a test element into the vaginal cavity while shielding it from intermediate vaginal contact, for positioning the test element precisely in contact with the cervical os in order to collect a specimen of cervical material therefrom, and for retrieving the test element and the specimen from the vaginal cavity while shielding them from intermediate vaginal contact. Processes are provided for retrieving specimens in the form of tissue or mucus.

**14 Claims, 13 Drawing Figures**





FIG. 1

FIG. 2

FIG. 8

FIG. 3

FIG. 4

**190 (A)**

# United States Patent [19]

## Schuster et al.

[11] **4,157,709**

[45] **Jun. 12, 1979**

[54] **PROBE FOR OBTAINING CERVICAL MUCUS AND PROCESS THEREOF**

[75] Inventors: **Samuel R. Schuster,** Wellesley; **Louis Kopito; Harold Kosasky,** both of Brookline, all of Mass.

[73] Assignee: **Ovutime, Inc.,** Brookline, Mass.

[21] Appl. No.: **795,097**

[22] Filed: **May 9, 1977**

[51] Int. Cl.² .............................................. A61B 10/00
[52] U.S. Cl. .................................... 128/759; 128/269
[58] Field of Search ............. 128/2 B, 2 W, 263, 4–8, 128/127, 130, 131, 269, 304; 73/53

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,703,216 | 2/1929 | Wappler | 128/6 |
| 2,022,065 | 11/1935 | Wappler | 128/6 |
| 2,184,642 | 12/1939 | Glass | 128/303.12 |
| 2,579,849 | 12/1951 | Newman | 128/3 |
| 3,877,464 | 4/1975 | Vermes | 128/2 W X |
| 3,924,608 | 12/1975 | Mitsui | 128/2 B |
| 3,960,143 | 6/1976 | Terada | 128/4 |

| | | | |
|---|---|---|---|
| 4,013,066 | 3/1977 | Schuster | 73/53 X |
| 4,023,559 | 5/1977 | Gaskell | 128/2 W |

### OTHER PUBLICATIONS

Medical Surgical Review, p. 35, (Advertisement), Feb. 1970.

*Primary Examiner*—Robert W. Michell
*Assistant Examiner*—Francis J. Jaworski
*Attorney, Agent, or Firm*—Morse, Altman, Oates & Bello

[57] **ABSTRACT**

A probe is provided for inserting a test element into the vaginal cavity while shielding it from intermediate vaginal contact, for positioning the test element precisely in contact with the cervical os in order to collect a specimen of cervical material therefrom, and for retrieving the test element and the specimen from the vaginal cavity while shielding them from intermediate vaginal contact. Processes are provided for retrieving specimens in the form of tissue or mucus.

**14 Claims, 13 Drawing Figures**



**189(A)**



FIG. 1

FIG. 2

FIG. 8

FIG. 3

FIG. 4

**190 (A)**



FIG. 5

FIG. 6

FIG. 7

FIG. 9

FIG. 10

FIG. II

FIG. 12

FIG. 13

**191 (A)**

4,157,709

**1**

## PROBE FOR OBTAINING CERVICAL MUCUS AND PROCESS THEREOF

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the medical testing of cervical material, i.e. tissue and/or mucus, and more particularly to the routine collection of cervical material via the vaginal cavity in such a way that the cervical specimen is unaffected by contact with the vaginal wall.

2. The Prior Art

In the past, it usually has required skilled medical personnel to obtain useful samples of cervical material. In one form, such cervical material is tissue from the cervical os, which is tested for malignancy in the form of a pap smear. In another form, such cervical material is mucus from the cervical os, which indicates ovulation when of predeterminedly low viscosity and the absence of ovulation when of predeterminedly high viscosity, for fertility control. Previously proposed probes, by which cervical material may be collected, examined and tested, generally have not been for self-use by women wishing to retrieve cervical specimens. It is desired to retrieve such cervical specimens by a reliable probe, which does not require a skilled medical operator but rather which can be operated by the subject woman herself. The probe of the present invention thus enables any woman to submit self-obtained cervical tissue specimens to the laboratory for microscopic examination or to subject self-obtained cervical mucus to rheological testing in simple equipment available in the home for fertility control.

### BRIEF DESCRIPTION OF THE INVENTION

The primary object of the present invention is to provide a probe for inserting a test element into the vaginal cavity while shielding it from intermediate vaginal contact, for positioning the test element precisely in contact with the cervical os in order to collect a specimen of cervical material, and for retrieving the test element and the specimen from the vaginal cavity while shielding them from intermediate vaginal contact. The design of this probe is based in part upon two considerations. The first consideration is that, in most women, the distance between the cervical os and posterior fornix is approximately the same, viz. 1 to 5 centimeters. The second consideration is that, in order to achieve the most accurate test results, it is often desirable that the cervical material be undisturbed by transfer from one mechanical device to another, for example from a first test support to a second test support. It is desirable particularly that the collection of cervical mucus, which at times other than during mid-cycle is very sparse, may be made directly on the final test support. In accordance with the present invention, the probe preferably comprises a test element for collecting a specimen by direct contact with the cervical os, a sheath within which the test element is confined during insertion into the vaginal cavity, a foot at the forward extremity of the sheath, which enables repeated positioning of the sheath predeterminedly within the vaginal cavity, and a manual control for directing the test support from within the sheath into contact with the cervical os and from contact with the cervical os back into the sheath. Thus, removal of the instrument from the vaginal cavity achieves isolation of the test support

**2**

within the sheath during removal of the sheath from the vaginal cavity.

Other objects of the present inventions will in part be obvious and will in part appear hereinafter.

The invention accordingly comprises the devices and processes herein disclosed, together with their parts, steps and interrelationships, the scope of which will be indicated in the appended claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

For a fuller understanding of the nature and objects of the present invention, reference is made to the following detailed description, which is to be taken in connection with the accompanying drawings, wherein:

FIG. 1 is a sagittal view of the human female anatomy in the vicinity of the cervix;

FIG. 2 is a perspective view of a device embodying the present invention in a first operative condition;

FIG. 3 is a perspective view of the device of FIG. 2 in a second operating condition;

FIG. 4 is a perspective view of the device of FIG. 2 in a third operating condition;

FIG. 5 is a longitudinal, cross sectional view of the device as shown in FIG. 2;

FIG. 6 is a longitudinal, cross sectional view of the device as shown in FIG. 3;

FIG. 7 is a longitudinal, cross sectional view of the device as shown in FIG. 4;

FIG. 8 is a front view of the device as shown in FIGS. 2 and 5;

FIG. 9 is a perspective view of a component of the device of FIGS. 2 to 7, in operative relation to a component of a test apparatus;

FIG. 10 is a side view of a modification of a component of the device of FIGS. 2 to 7, in a first operating condition;

FIG. 11 is a side view of a component of FIG. 9, in a second operating condition;

FIG. 12 is a side view of another modification of a component of the device of FIGS. 2 to 7, in a first operating condition; and

FIG. 13 is a side view of the component of FIG. 12, in a second operating condition.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 anatomically illustrates details of the uterus 20 and the vaginal wall 22. Uterus 20 includes the uterine fundus 24, the cervix 26, the portio vaginalis 28 and the cervical os 30. The posterior fornix 32 between the most distal portion of the portio vaginalis and the posterior vaginal wall is of particular interest in accordance with the present invention. It has been found that the geometrical distance, between a plane 34 containing the end of the posterior fornix and a plane 36 containing the cervical os, ranges from 1 to 5 centimeters in almost all normal women. The test probe now to be described relies upon that anatomical fact.

With reference now to FIGS. 2 and 5, the illustrated probe, shown generally at 40, comprises an outer sheath 42, an intermediate tube 44 slidable therewithin and an inner shaft 46 slidable therewithin. Sheath 42, tube 44 and shaft 46, in effect, are outer, intermediate and inner telescoping members, all of which are predeterminedly shaped to serve interrelated functions. The purpose of these interrelated functions is to collect mucus from the cervical os on a test support 76, which, as shown in FIG. 9, is in the from of a ridged element 79 that is

4,157,709

3

adapted for contact by a cross-ridged element 81 in such a way that the pulling force necessary to cause separation of the ridged elements is a function of rheological properties. Such a system is described in detail in U.S. Pat. No. 3,926,037, issued Dec. 16, 1976 and U.S. Pat. No. 4,002,056, issued Jan. 11, 1977.

Sheath 42, which is composed of a thin semi-rigid polymer, such as polyethylene or polyethylene terephthalate, includes a forwardly projecting reference foot portion 48, a transversely shaped intermediate mouth portion 50, a rearwardly extending tubular body portion 52, and a rearward flange poriton 54.

In accordance with the present invention, reference foot portion 48 ranges in length from 1 to 5 centimeters so that, when the instrument is inserted into the vagina, the reference foot portion moves along the inferior vaginal wall until seated in the posterior fornix, which serves as a reference point that limits further insertion. Reference foot portion 48 has a narrow forward extremity 56 that is shaped to contact the end 32 of the posterior fornix, a convex under surface 58 that is shaped to rest against the posterior vaginal wall and a concave upper surface 60 that is shaped to rest beneath the most distal portion of the portio vaginalis. Intermediate mouth portion 50 includes an upwardly directed surface that is severed into sections by intersecting slits 61, 62, 63, 64, which extend longitudinally along body portion 42 and meet in the vicinity of the center of mouth portion 50. These severed sections constitute a mouth with flexible flaps that tend to remain closed normally but that can be opened from inside the sheath in a manner to be described below.

Intermediate tube 44 has an outside diameter that is slightly less than the inside diameter of body portion 52 of sheath 42 so as to be slidable within body portion 52. Tube 44 has an open forward end 66, an intermediate inwardly directed annular rib 68, an outwardly directed stop flange 70 and an outwardly directed manual flange 72. As shown in FIGS. 3 and 6, when flange 70 of tube 44 is in abutment against flange 54 of sheath 42, forward extremity 66 of tube 44 projects through mouth portion 50 to expose the front end of inner shaft 46. It will be observed that, when in the condition shown in FIGS. 2 and 5, sheath 40 is capable of being inserted through the vaginal cavity so that extremity 48 seats against end 32 of the posterior fornix and so that mouth portion 50 is adjacent to cervical os 30. Preferably tube 44 is composed of a semi-rigid material such as polyethylene or polyethylene terephthalate.

Shaft 46 includes: a forward portion 74, which is recessed to seat a test element 76; a body portion 78, which slides within annular rib 68; and a rearward handle portion 80 that slides within tube 44. The outside diameter of body portion 78 is slightly less than the inside diameter of annular rib 68. The outside diameter of rearward handle 80 is slightly less than the inside diameter of tube 44. The forward portion of shaft 78 has a natural curve which causes it to bend upwardly when it is not confined within tube 44. When rearward portion 80 of shaft 46 is pressed inwardly against the bias of compression spring 82, the forward face of test support 76 is pressed against cervical os 30. Preferably shaft 46 is composed of a semi-rigid material such as polyethylene or polyethylene terephthalate.

OPERATION

In operation, first device 40, as shown in FIG. 2, is inserted into the vaginal cavity in such a way the refer-

4

ence foot portion 48 moves continuously along the inferior vaginal wall until the instrument can be inserted no farther. At this point, forward extremity 56 is seated at the end 32 of the posterior fornix, which is the reference point for operation of the instrument. Next, manual pressure is exerted between fingers against flange 54 and thumb against flange 72 to cause flange 70 to abut against flange 54 and forward extremity 66 of tube 44 to project through mouth 50. Next, manual pressure on rearward portion 80 of shaft 46 against the bias of spring 82 causes the forward portion of shaft 46 to project from tube 44 and a forward surface of test support 76 to abut against cervical os 30. Next, the pressure on rearward portion 80 of shaft 46 is released to permit spring 82 to retract forward portion 74 and test support 76 into tube 44. Then, tube 44 is retracted so that its forward portion recedes through mouth 50 of sheath 52. Finally, the entire device is removed from the vaginal cavity. The arrangement is such that test support 76 now can be removed from within the device in such a way as to permit cervical mucus thereon to be tested.

A modification of a component of the device of FIGS. 3 to 7 is shown in FIGS. 10 and 11. FIGS. 10 and 11 show the forward extremity of a shaft 82 which can be substituted for shaft 46, of the above described embodiment. Here shaft 82, which does not have a natural curved forward portion, is straight and has at its forward extremity a test element 84. Test element 84 is pivoted to shaft 82 at 86. Test element 84 is of sufficiently small cross sectional dimension to slide with the end of shaft 82 into and out of tube 44. When test element 84 is projected forwardly into contact with the anterior lip 90 of the portio vaginalis, it pivots in a clockwise direction in such a way that its test surface 92 contacts cervical os 30. When in this operative condition, test surface 92 collects cervical mucus or tissue from the cervical os. The operation of the illustrated device with the modification shown in FIGS. 10 and 11 is substantially the same as the operation of the embodiment of FIGS. 2 to 7 described above.

In another modification, shown in FIGS. 12 and 13, test element 76 is replaced by a sponge 94 that is composed of a resilient polymeric foam. The sponge is sufficiently resilient to expand when protruded from tube 44 and to contract when retracted into tube 44. Sponge 94 is designed to abrade the cervix in the vicinity of the os in such as way that, when rotated as in FIG. 13, its serrated surface scrapes and collects tissue for later microscopic examination. The operation of this modification is otherwise substantially the same as the operation of the embodiment of FIGS. 2 to 7 described above.

Since certain changes may be made in the foregoing disclosure without departing from scope of the invention hereof, it is intended that all matter described in the foregoing specification or shown in the accompanying drawings be interpreted in an illustrative and not in a limited sense.

What is claimed is:

1. A vaginal probe comprising:

(a) sheath means characterized substantially by an original shape extending substantially along an axis of elongation for insertion into the vaginal cavity, said sheath means including forward extremity means connected thereto and intermediate mouth means, said sheath means being sufficiently rigid to substantially maintain said original shape during said insertion;

193 (A)

4,157,709

5

(b) control means causing closing of said mouth means when in one condition and causing opening of said mouth means when in another condition;

(c) specimen sampling means for confinement within said sheath means when in one condition and for protrusion through said mouth means when in another condition; said specimen sampling means extending through a curvature when in said other condition, from said mouth means to the cervical os

(d) said specimen sampling means being confined within said sheath means when said sheath means is inserted into and is withdrawn from the vaginal cavity;

(e) said specimen means being in contact with the cervical os when said extremity means is seated in the posterior fornix, said control means is in said one condition so that said mouth means is open, and said specimen means is in said one condition so that it protrudes through said mouth means;

(f) said forward extremity means having a configuration for seating in the posterior fornix and being a mechanical reference ranging in length along said axis from 1 to 5 centimeters and maintaining said length along said axis during said insertion.

2. The probe of claim 1 wherein said mouth means is provided by transverse portion that is integral with portions of said sheath means and that is defined by slits in said transverse portion.

3. The probe of claim 1 wherein said control means includes a tube slidable in said sheath means between an inoperative position at which it is confined within said sheath means and an operative position at which it protrudes through said mouth means.

4. The probe of claim 1 wherein said specimen means includes a rod having a test element at its forward extremity, said forward extremity having an inoperative position at which it is confined within said control means and an operative position at which it projects from said control means.

5. The probe of claim 1 wherein said specimen means includes an element with a ridged face for contacting the cervical os.

6. The probe of claim 1 wherein said specimen means includes a shaft and a pivoted element thereon, said pivoted element having a surface for contact with the cervical os.

7. The probe of claim 1 wherein said specimen means includes a sponge.

8. A vaginal probe comprising:

(a) a sheath and a forward extremity connected thereto for insertion into the vaginal cavity, said sheath including an intermediate mouth, said sheath and said extremity being composed of a

6

resilient polymer and being developed along an axis, said mouth being generally transverse with respect to said axis, said sheath and said extremity being characterized by an original shape extending substantially along an axis of elongation and being sufficiently rigid to maintain said original shape during said insertion;

(b) a movable control within said sheath, said control causing closing of said mouth when in one condition and causing opening of said mouth when in another condition;

(c) a shaft having a test element at an end, said shaft being reciprocable with respect to said sheath, said test element being confined within said sheath when in one condition and being protruded through said mouth when in another condition; said shaft extending through a curvature when in said other condition from said mouth to the cervical os;

(d) said test element being confined within said sheath when said sheath is inserted into and is withdrawn from the vaginal cavity;

(e) said test element being in contact with the cervical os when said extremity is seated in the posterior fornix, said control is in said one condition so that said mouth means is open, and said test element is in said one condition so that it protrudes through said mouth;

(f) said extremity having a configuration for seating in the posterior fornix and being a mechanical reference ranging in length along said axis from 1 to 5 centimeters.

9. The probe of claim 8 wherein said mouth is provided by transverse portion that is integral with portions of said sheath and that is defined by slits in said transverse portion.

10. The probe of claim 8 wherein said tube is slidable in said sheath between an inoperative position at which it is confined within said sheath and an operative position at which it protrudes through said mouth.

11. The probe of claim 8 wherein said test element includes a rod, said forward extremity having an inoperative position at which it is confined within said tube and an operative position at which it projects from said tube.

12. The probe of claim 8 wherein said test element includes a ridged face for contacting the cervical os.

13. The probe of claim 8 wherein said test element includes a shaft and a pivoted element thereon, said pivoted element having a surface for contact with the cervical os.

14. The probe of claim 8 wherein said test element includes a sponge.

* * * * *

194 (A)

# United States Patent [19]

**Bower**

[11] **4,159,718**

[45] **Jul. 3, 1979**

[54] **DISPOSABLE DOUCHE**

[76] Inventor: **Earle S. Bower,** 633 Third Ave., New York, N.Y. 10017

[21] Appl. No.: **817,049**

[22] Filed: **Jul. 19, 1977**

[51] Int. Cl.² .................................................. A61M 7/00
[52] U.S. Cl. .......................................... 128/248; 128/251
[58] Field of Search ............... 128/248, 251, 232, 231, 128/233, 239, 247; 229/3.1; 222/107

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 2,568,915 | 9/1951 | Friedman | 128/251 |
| 2,661,741 | 12/1953 | Puckman | 128/232 |
| 3,144,866 | 8/1964 | Elles | 128/232 |
| 3,371,665 | 3/1968 | Druckenmiller et al. | 128/239 |
| 3,530,858 | 9/1970 | Edwards | 128/232 |
| 3,559,872 | 2/1971 | Riboud | 229/3.1 |
| 3,844,284 | 10/1974 | Schornfeld et al. | 128/232 |

*Primary Examiner*—Lawrence W. Trapp
*Attorney, Agent, or Firm*—Pennie & Edmonds

[57] **ABSTRACT**

A disposable douche made up of two sheets of a thin plastic material sealed together along their edges to form a bag having a closed end. A treated paper tubular joiner section extends into the bag opposite the closed end with the sheets being sealed to the joiner section along a portion of its length. A treated paper tubular probe section is adapted to slidably and sealingly engage the interior of the joiner section. The bag may be filled with a liquid when the probe is removed from the joiner section.

7 Claims, 3 Drawing Figures



**195(A)**



FIG. 1

FIG. 2

FIG. 3

196(A)

# United States Patent [19]

## Bower

[11]  **4,159,718**

[45]  **Jul. 3, 1979**

[54]  **DISPOSABLE DOUCHE**

[76]  Inventor:  **Earle S. Bower**, 633 Third Ave., New York, N.Y. 10017

[21]  Appl. No.:  **817,049**

[22]  Filed:  **Jul. 19, 1977**

[51]  Int. Cl.² ............................................ A61M 7/00
[52]  U.S. Cl. ............................................ 128/248; 128/251
[58]  Field of Search ............... 128/248, 251, 232, 231, 128/233, 239, 247; 229/3.1; 222/107

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,568,915 | 9/1951 | Friedman | 128/251 |
| 2,661,741 | 12/1953 | Puckman | 128/232 |
| 3,144,866 | 8/1964 | Elles | 128/232 |
| 3,371,665 | 3/1968 | Druckenmiller et al. | 128/239 |
| 3,530,858 | 9/1970 | Edwards | 128/232 |
| 3,559,872 | 2/1971 | Riboud | 229/3.1 |
| 3,844,284 | 10/1974 | Schornfeld et al. | 128/232 |

*Primary Examiner*—Lawrence W. Trapp
*Attorney, Agent, or Firm*—Pennie & Edmonds

[57]  **ABSTRACT**

A disposable douche made up of two sheets of a thin plastic material sealed together along their edges to form a bag having a closed end. A treated paper tubular joiner section extends into the bag opposite the closed end with the sheets being sealed to the joiner section along a portion of its length. A treated paper tubular probe section is adapted to slidably and sealingly engage the interior of the joiner section. The bag may be filled with a liquid when the probe is removed from the joiner section.

7 Claims, 3 Drawing Figures



**195(A)**



FIG. 1

FIG. 2

FIG. 3

**196(A)**

4,159,718

1

# DISPOSABLE DOUCHE

## DESCRIPTION OF THE PRIOR ART

Disposable douches have been proposed which incorporate relatively expensive molded plastic parts which increase the cost of the item. For example see the disposable douche disclosed in U.S. Pat. No. 3,144,866. It is an object of my invention to provide for a disposable douche which will incorporate a minimum of easily formed parts where the parts are formed of inexpensive materials such as paper and thin plastic sheeting.

Prior art disposable douches of which I am aware are of relatively small volume, on the order of 6 liquid ounces, whereas the user often desires a greater amount on the order of 12–16 liquid ounces. A problem associated with use of large volume douches is that the packages in which the douches are sold are necessarily large. It is therefore a further object of my invention to provide for a disposable douche which may be packaged for sale to a consumer in an unfilled state such that it may be packaged in a small unobtrusive manner. The douche bag when sold may contain a medicinal product and the bag is designed to be easily filled by the consumer with a liquid prior to use.

## GENERAL DESCRIPTION OF THE INVENTION

A disposable douche according to the invention broadly comprises two sheets of a thin plastic material which are sealed together along a major portion of their peripheries to form a bag having a closed end. A treated paper tubular section extends into a filler end of the bag opposite the sealed end and has the plastic sheeting sealed onto a portion of the length of the tubular section. A separate treated paper tubular probe section is adapted to sealingly and slidably engage the interior of the joiner section when the disposable douche is assembled for use. The bag is adapted to be filled with a liquid through the joiner section after which the probe is inserted.

Preferably the joiner section is precoated with a thin plastic material which is the same as the plastic material comprising the sheets in order to facilitate sealing of the sheets onto the exterior of the joiner section.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a broken plan view of a disposable douche constructed according to the invention;

FIG. 2 is a sectional view of FIG. 1 taken along lines 2—2; and

FIG. 3 is an enlarged sectional view of FIG. 1 taken along lines 3—3.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings and in particular to FIG. 1, there is disclosed a disposable douche 1 comprising two rectangular sheets 2 and 3 which are heat sealed together along their long edges 4 and 5 as well as at the short edge end 6 to form a bag 7 having a closed end. A joiner section 8 comprising a spiral wound treated paper tube is inserted into the bag 7. The sheets 2 and 3 are sealed to the joiner section 8 along a portion of its length 9 as well as to each other along seams 10 in order to form the filler end of the bag 7.

A probe 11 comprising a spiral wound treated paper tubular section is adapted to slidably and sealingly engage the interior of the joiner section 8. The probe

2

section has orifices 12 positioned near the outer end thereof. Preferably there are two rows each having three orifices 12 positioned circumferentially 120° apart. The rows are positioned about ⅞″ and 1″ respectively from the end of the probe.

The bag 7 may contain a medicinal product 13 which is adapted to mix with liquid when the bag 7 is filled by the user through the joiner section 8. The douche when sold may have the probe 11 positioned in the joiner section to keep the powder within the bag. In this event the probe 11 is moved from the joiner section prior to filling. After the bag is filled the probe 11 is inserted into the joiner section after which the disposable douche 1 is ready for use.

Preferably the sheets 2 and 3 each comprise a 50 gauge polyester material adhesively laminated to a low density polyethylene material of approximately 1½ mils thickness.

The joiner section 8 is a spiral wound hollow white sulfite paper tube coated with a 1 mil polyethylene coating on the outside surface to facilitate the joining with the polyethylene material comprising the sheets 2 and 3.

The probe section 11 is a spiral wound tube flat rolled at one end and sealed with an approved adhesive. The tube itself may comprise two layers of a white sulfite paper, one layer of a white kraft paper and one layer of a white flint paper.

The joiner section 8 is heat sealed to the plastic sheets by utilizing a contoured die which is formed around and heat sealed to the joiner section. A locating pin positions the joiner tube to the contoured die after which the die parts are closed to heat seal the sheets to the joiner section. The die parts are then opened to release the complete bag 7.

It is seen that a disposable douche constructed according to the invention has a minimum of parts, utilizes inexpensively formed parts made of inexpensive materials and at the same time provides an assembly which will be of a minimum size for convenient packaging.

While I have described the structure of a disposable douche, it is apparent that it could also have application as a large volume enema for hospital use. In this event the probe structure would be modified slightly to provide a soft molded plastic tip and a compatible joiner tube.

I claim:

1. A disposable douche comprising two sheets of a thin plastic material sealed together along a major portion of their edges to form a bag having a closed end, a tubular joiner section extending into an end of the bag opposite said closed end with said sheets being heat sealed to the outer surface of said joiner section along a portion of its length to form a permanent seal and to each other to form a filler end of the bag, and an axially slidable tubular probe section sealingly engaging the interior of said tubular joiner section whereby when said probe is axially slid from said joiner section the bag may be filled with a liquid through said joiner section and whereby when said probe is axially slid into said joiner section said douche is ready for use.

2. A disposable douche according to claim 1 wherein said tubular joiner section and said tubular probe section each comprise a treated paper.

3. A disposable douche according to claim 2 wherein said joiner section and said probe section each comprise a spiral wound tube.

197(A)

4,159,718

**3**

4. A disposable douche according to claim 2 wherein the exterior of the paper joiner section is coated with a thin coating of the same plastic material comprising the sheets to facilitate sealing of the sheets to the joiner section.

5. A disposable douche according to claim 2 wherein the interior surface of the tubular probe has thin wax film impregnated thereon.

6. A disposable douche according to claim 1 wherein said sheets are substantially rectangular in shape with the closed end and filling end of said bag being formed by the short edges of the sheets.

7. A disposable douche comprising two substantially rectangular sheets of a thin plastic material sealed together along their long edges and along one of their

**4**

short edges to form a substantially rectangular shaped bag having a closed end, a treated paper spiral wound tubular joiner section having a thin plastic coating on the exterior thereof of the same plastic material comprising the sheets with said joiner section extending into the end of the bag opposite said closed end and with said sheets being heat sealed to the outer surface of said joiner section along a portion of its length and to each other to form a filler end of the bag, and an axially slidable treated paper spiral wound tubular probe section having a thin coating of wax impregnated on the interior surface thereof sealingly engaging the interior of said tubular section and adapted to be moved axially with respect to said tubular section.

* * * * *

20

25

30

35

40

45

50

55

60

65

**198(A)**

# United States Patent [19]

**Johansson**

[11]    **4,165,942**

[45]    **Aug. 28, 1979**

[54]    **DISPOSABLE WASHING IMPLEMENT FOR PERSONAL BODY CARE**

[76]    Inventor:    **Hans A. V. Johansson,** Trehäradsvägen 36, Eslöv, Sweden, 241 00

[21]    Appl. No.:    **815,155**

[22]    Filed:    **Jul. 13, 1977**

[51]    Int. Cl.³ .............................................. B05C 1/00
[52]    U.S. Cl. .................................. 401/132; 401/203; 128/269
[58]    Field of Search .................. 401/7, 196, 203, 204, 401/202, 132–135; 128/269, 263, 239, 266; 206/374, 375; 222/80

[56]    **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 1,487,167 | 3/1924 | Kamagawa | 401/203 |
| 2,519,555 | 8/1950 | Fields | 128/266 |
| 2,642,065 | 6/1953 | Negri | 128/272 X |
| 3,063,084 | 11/1962 | Marinus | 401/203 |
| 3,135,262 | 6/1964 | Kobler et al. | 128/263 X |
| 3,922,099 | 11/1975 | Christine et al. | 401/134 |

*Primary Examiner*—Clifford D. Crowder
*Attorney, Agent, or Firm*—William F. Frank

[57]    **ABSTRACT**

A washing implement for personal body care comprises an elongated washing rod provided with a hand grip. The washing rod has a protective cover which is secured at the inner end of the washing rod to the hand grip. The protective cover opens at the top and is designed to be slipped down along the washing rod and over the hand grip to form a protective sleeve for the hand of the person using the washing rod.

**2 Claims, 3 Drawing Figures**



**U.S. Patent**          Aug. 28, 1979          4,165,942



Fig 1

Fig. 2

Fig 3

200(A)

# United States Patent [19]

## Johansson

[11]  4,165,942

[45]  Aug. 28, 1979

[54] **DISPOSABLE WASHING IMPLEMENT FOR PERSONAL BODY CARE**

[76] Inventor:  Hans A. V. Johansson, Trehäradsvägen 36, Eslöv, Sweden, 241 00

[21] Appl. No.: 815,155

[22] Filed:  Jul. 13, 1977

[51] Int. Cl.²  ......................................  B05C 1/00
[52] U.S. Cl.  ...............................  401/132; 401/203; 128/269
[58] Field of Search  ..................  401/7, 196, 203, 204, 401/202, 132–135; 128/269, 263, 239, 266; 206/374, 375; 222/80

[56]                **References Cited**

### U.S. PATENT DOCUMENTS

| 1,487,167 | 3/1924 | Kamagawa | 401/203 |
|---|---|---|---|

| 2,519,555 | 8/1950 | Fields | 128/266 |
| 2,642,065 | 6/1953 | Negri | 128/272 X |
| 3,063,084 | 11/1962 | Marinus | 401/203 |
| 3,135,262 | 6/1964 | Kobler et al. | 128/263 X |
| 3,922,099 | 11/1975 | Christine et al. | 401/134 |

*Primary Examiner*—Clifford D. Crowder
*Attorney, Agent, or Firm*—William F. Frank

[57]                **ABSTRACT**

A washing implement for personal body care comprises an elongated washing rod provided with a hand grip. The washing rod has a protective cover which is secured at the inner end of the washing rod to the hand grip. The protective cover opens at the top and is designed to be slipped down along the washing rod and over the hand grip to form a protective sleeve for the hand of the person using the washing rod.

2 Claims, 3 Drawing Figures



U.S. Patent          Aug. 28, 1979          4,165,942



Fig 1

Fig. 2

Fig. 3

4,165,942

1

## DISPOSABLE WASHING IMPLEMENT FOR PERSONAL BODY CARE

The present invention relates to an improved washing implement for personal body care of the type which comprises at least one elongated rod-like washing element interconnected with a handle. In prior art implements of this type it was not taken into consideration that the portions thereof which come into contact with the body should be adequately protected before use. In addition, it has often been necessary for reasons of hygiene to use protective gloves.

It is an object of the present invention to provide in a washing implement of the above-mentioned type an extremely simple arrangement adapted to protect the rod-like element before the implement is put to use, and which can also be used instead of a protective glove. This object is attained according to the invention essentially by the fact that the washing rod includes at least one protective cover which, upon being opened at one end to uncover the rod, can be converted so as to provide a protection which completely or partly encloses the hand grasping the handle to hold the implement.

The invention will be explained in greater detail hereinafter with reference to the accompanying drawing, in which:

FIG. 1 is a side view of a washing rod provided with a protective cover;

FIG. 2 is a sectional view of the connecting portion of the washing rod and a handle; and

FIG. 3 illustrates the washing implement with its protective cover converted into a hand protection.

The washing implement according to the invention comprises a handle 1 having connected thereto a washing rod 2 which after use can be released from the handle 1 and discarded. The handle 1 has a through-flow passage 1a, and one end portion 1b thereof can be connected to a water hose (not shown).

The washing rod 2 comprises at least one tubular manifold passage 2b and at least one series of discharge orifices 2c extending from this passage 2b. A sleeve 2d of a porous, water-pervious material is fixedly or detachably mounted on the manifold tube 2a, the sleeve 2d serving as a washing sponge which is supplied with water from inside.

In order to protect the sleeve-shaped cleaning sponge 2d of the washing rod 2 against contamination before taking the implement into use, and to eliminate any need of using gloves in the washing operation, the washing rod 2 is provided with at least one protective cover 3 which can be opened up at one end 2e of the rod 2 and folded back to expose the rod 2, at the same time forming a protective sleeve 3c adapted completely or partly to cover the hand 4 gripping the handle 1 for holding the implement in use.

For the purpose of also preventing any foreign matter from entering the manifold passage 2b before taking the implement into use, the protective cover 3 can also close off the connecting portion 2f of the rod 2. Quick coupling can be provided by making the portion 3b of the protective cover 3 which covers the connecting portion 2f, so as to open by means of the handle 1 to establish communication between the supply passage 1a and the manifold passage 2b.

In order to provide for an effective fixation of the protective cover 3, a portion 3c of the latter may be

2

clamped between cooperating opposed surfaces on the connecting portions 1c and 2f of the rod and handle, respectively. A particularly effective fixation of the protective cover 3 can be attained by providing the handle 1 with a flange portion 1d adjacent to its connecting portion 1c, a portion 3b of the protective cover 3 being clamped between this flange portion 1d and an opposite end-face 2g of the rod 2. The operation of cutting a hole in the protective cover 3 is facilitated by providing the connecting portion 1c of the handle with cutting elements, preferably in the form of teeth 1e projecting from the end face of the connecting portion 1c.

The fixation of the protective cover 3 can be secured by forming the cooperating connecting portions 1c, 2f with at least one snap-lock 1f, 2h, preferably in the form of at least one detent 2h and at least one mating recess 1f.

The construction of the implement thus described can be varied within the scope of the appended claims. Thus, for instance, a container for a detergent, such as soap, may be connected to the handle or to the supply hose. In addition, a joint (not shown) may be arranged between the handle and rod to enable the rod to be inclined relative to the handle.

The arrangement thus described provides extremely simple means for effectively protecting the rod before utilizing the implement and the implement holding hand when in use. Since the rod is readily detachable, it may be replaced by a new rod and be discarded after each use of the implement, if this is considered necessary for hygienical reasons, and a soiled protective cover can easily be removed from the handle and discarded.

What is claimed is:

1. A washing implement for personal body care comprising a handle and a disposable washing rod slidably connectable to one end of said handle, said washing rod having a protective cover which is formed into a hand protection after the interconnection of the rod and the handle, the washing rod including a connecting end which before its connection to a connecting portion of the handle is at least partially covered by one end portion of the protective cover, there being a separate but interconnectable water-supply passage extending through the handle and the washing rod respectively, the said connecting portion of the handle being conically tapering and slidably fitting into a corresponding conically tapering portion of said rod connecting end, the said connecting portion of the handle having means for puncturing said end portion of the protective cover when the washing rod and the handle are connected, the said punctured end of the protective cover being simultaneously tightly squeezed between the wall of the water-supply passage in the washing rod and said connecting portion of the handle slidingly projecting into said rod water-supply passage, the said wall of the rod water-supply passage and said connecting portion of the handle being each provided with means to interact to form a snap-fitting lock when the said rod and the said handle are slidingly interconnected.

2. The implement according to claim 1 wherein the other end of said protective cover is opened after said rod and said handle are slidingly interconnected and said other opened end is invertedly drawn down over said rod to cover said handle to form said hand protection.

* * * * *

# United States Patent [19]

**Laker**

[11] **4,175,439**

[45] **Nov. 27, 1979**

[54] **APPARATUS AND METHOD FOR COLLECTING, STORAGE AND TRANSPORTING LIQUID SAMPLES FOR DIAGNOSTIC EXAMINATION**

[76] Inventor: Thomas L. Laker, 760-A Green Hill Rd., Madison, Conn. 06443

[21] Appl. No.: 797,512

[22] Filed: May 13, 1977

[51] Int. Cl.² ............................................. G01N 1/12
[52] U.S. Cl. ............................... 73/425.4 R; 128/269
[58] Field of Search ............... 73/425, 425.4; 128/2 F, 128/2 W, 269; 150/3

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

2,591,927  4/1952  Gladstone ........................... 128/269

| | | | |
|---|---|---|---|
| 2,902,146 | 9/1959 | Doherty | 73/425 |
| 3,282,114 | 11/1966 | Pell | 73/425 |
| 3,395,788 | 8/1968 | Gill | 150/3 |

*Primary Examiner*—S. Clement Swisher
*Attorney, Agent, or Firm*—Roy L. Parsell

[57] **ABSTRACT**

Apparatus for collecting, storage and transporting liquid samples for industrial and diagnostic purposes consisting of a pliable liquid absorbent member manipulated by a handling stick for transferring the absorbent member containing the liquid sample into a sealable pouch having a flexible transparent wall and after removing the handling stick sealing the container for storage and transporting to a testing laboratory.

**3 Claims, 6 Drawing Figures**



U.S. Patent        Nov. 27, 1979        4,175,439



**203(A)**

4,175,439

**1**

## APPARATUS AND METHOD FOR COLLECTING, STORAGE AND TRANSPORTING LIQUID SAMPLES FOR DIAGNOSTIC EXAMINATION

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to new and useful improvements in apparatus and methods for collecting, containing, storage and transporting liquid samples for industrial and diagnostic examination.

2. Description of the Prior Art

In certain industrial processes and products fluids may be present in various degrees of concentration and requiring sampling for analysis to insure against damage during process and to maintain standards of quality of the product.

Samples of the liquids are taken from the process underway or in storage or as the case may be of the raw materials to be subsequently used in the final product as well as the final product. The usual procedure is to procure a sample in a container and transport it to the testing laboratory, taking necessary steps to protect the quality of the sample as procured.

In a similar manner certain body fluids require examination and fluid samples must be procured and transported to the appropriate laboratory and examination. The procedure as applied to human beings and animals presents additional special problems.

The apparatus and method of the present disclosure is especially useful in the case of veterinary medicine.

### SUMMARY

The invention comprises an improvement in procuring the samples of urine, storage and transporting to testing laboratories. The devices and procedure are particularly adaptable to veterinarians but obviously are also adaptable to human beings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the resilient absorbent member to hold the sample;

FIG. 2 is a perspective view of the absorbent member formed into position to be inserted in the handling block;

FIG. 3 is a perspective view of the handling stick.

FIG. 4 is a perspective view of the absorbent member mounted in the handling stick;

FIG. 5 is a vertical perspective side view of the container in a closed position; and

FIG. 6 is a vertical perspective view of the container with the handling stick removed from the absorbent member but still in the container.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

For purposes of best describing the device, its application to the veterinary profession is selected as an example but this device is in no way limited to such application.

The sample collecting member 11 is of resilient absorbent material having a capillary structure to absorb a desired portion of the liquid desired for sampling when placed in contact therewith. The resilience of the material of the member 11 combined with the fold help to hold the absorbent member 11 between the tines of the handling stick. The tines may also have resilience. The folding of the absorbent member 11 also enables more surface to be presented for collecting a urine sample.

**2**

With the absorbent member mounted into the handling stick 12, it is more convenient to obtain a specimen of urine directly from the discharge stream of the animal as compared to collection by means of an open dish or container.

The container 13 is preferably a flat flexible plastic pouch having clear side walls and open at one end which permits closing and sealing.

The preferred sealing means comprises a groove 15 in one half side of the container inner wall 16 and a companion bead (not shown) in the opposite half of the container inner wall 16 which when both are pressed together hold the sides tightly together so that no moisture can exit or enter through the thus sealed end of the container.

The empty container as received is flat and closed. One side is provided with a guideline 14 of distinguishing mark or color and the portion of the side opposite the guideline 14 is blank. The veterinarian or the client is thus assisted in grasping each respective side and pulling the sides apart to open the container. To seal the container pressure is applied to each side wall of the container to force the bead 15 into its companion groove (not shown) where it is held securely by the resilience of the container wall material.

After the specimen of urine has been absorbed from the stream into the absorbent material 11 by the veterinarian or person taking the sample, the handling stick 12 with the absorbent member 11 thereon are inserted into the container 13.

Then by holding the absorbent member 11 by pressing the walls of the container 13 against member 11 the handling stick may be withdrawn and the container 13 closed and sealed as previously described.

The sample is now ready to be transferred to the testing laboratory for examination.

While it is important to make examination as soon as possible, if it is not so convenient, the container may be stored in a refrigerator since it is not only sealed but there is very little free liquid since virtually all of it remains in the absorbent members 11 until expressed.

When the container 13 containing the sample is ready for examination, the container 13 may be opened as previously described and some of the sample forced out by squeezing the walls of the container against the absorbent member thereby forcing out some of the sample which can be then poured from the container.

Alternatively after opening the container 13 some of the sample may be squeezed from the absorbent member but still remaining in the container and a strip containing deposits of different reagents inserted into the container 13 and the reactions observed or prescribed by the manufacturers of such reagent containing strips.

Having described my invention, I claim:

1. A device for collecting, storage, transporting and discharging a liquid sample collected from a liquid supply desired to be examined for medical, industrial or diagnostic purposes comprising

(a) a resilient absorbent member having sufficient capillary structure to absorb a portion of the liquid to be sampled when the absorbent member is placed in contact with the liquid supply or when the member is removed from the liquid supply to discharge the absorbed liquid upon the application of compressive pressure to the absorbent member;

**4,175,439**

3

(b) a sealable container for receiving, containing, storage and transporting the absorbent member holding the liquid;

(c) a handling stick for removably attaching the absorbent member thereto for inserting and removing the absorbent member relative to the liquid supply and the container respectively;

(d) the handling stick is provided at one end with a fork portion having tines for holding the absorbent member.

2. The device according to claim 1 wherein one of the tines is provided with a barb for releasably gripping the absorbent member.

3. A device for collecting, storage, transporting and discharging a liquid sample collected from a liquid sup-

4

ply to be examined for medical, industrial or diagnostic purposes comprising

(a) a resilient absorbent member having sufficient capillary structure to absorb a portion of the liquid to be sampled when the absorbent member is placed in contact with the liquid supply or when the member is removed from the liquid supply to discharge the absorbed liquid upon application of compressive pressure to the absorbent member;

(b) a sealable container for receiving, containing, storage and transporting the absorbent member holding the liquid sample; and

(c) an elongated handling member having a slotted end to receive and removably hold the absorbent member for collecting the liquid sample and depositing the absorbent member containing the sample into the container.

* * * * *

**205(A)**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of

Allegra HEMPHILL

Serial No. 434,838

Filed: October 18, 1982

For:  VAGINAL APPLICATOR

RECEIVED

MAR 27 1984

GROUP 330

Group:  336

Examiner:  Yasko

\*\*\*\*\* \*\*\*\*\* \*\*\*\*\* \*\*\*\*\* \*\*\*\*\*

March 26, 1984

Honorable Commissioner of
 Patents and Trademarks
Washington, D.C. 20231

### LETTER

Sir:

In response to the Official Action dated February 28, 1984, please consider the following remarks.

### REMARKS

In response to the above identified action, the applicant hereby elects the species of Group I, comprised of Figures 1, 2 and 2a for purposes of further prosecution and subject to the allowability of one or more generic claims.  A review of the claims has been made and the claims 1, 2 and 3 read on the elected species.

An early and favorable action is respectfully requested.

Respectfully submitted,

CUSHMAN, DARBY & CUSHMAN

By: _____
Peter W. Gowdey
Reg. No. 25,877

PWG:lsp

1801 K Street, N.W.
Washington, D.C. 20231
Tel:  861-3078

**206(A)**

Case 1:07-cv-01236-RMC   Document 9-16   Filed 10/22/2008   Page 1 of 6

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of

Allegra HEMPHILL

Serial No. 434,838

Filed: October 18, 1982

For: VAGINAL APPLICATOR

RECEIVED

MAR 27 1984

GROUP 330

#6/Election
041

Group: 336

Examiner: Yasko

***** ***** ***** ***** *****

March 26, 1984

Honorable Commissioner of
 Patents and Trademarks
Washington, D.C. 20231

## LETTER

Sir:

In response to the Official Action dated February 28, 1984, please consider the following remarks.

## REMARKS

In response to the above identified action, the applicant hereby elects the species of Group I, comprised of Figures 1, 2 and 2a for purposes of further prosecution and subject to the allowability of one or more generic claims. A review of the claims has been made and the claims 1, 2 and 3 read on the elected species.

An early and favorable action is respectfully requested.

Respectfully submitted,

CUSHMAN, DARBY & CUSHMAN

By: _____
     Peter W. Gowdey
     Reg. No. 25,877

PWG:lsp

1801 K Street, N.W.
Washington, D.C. 20231
Tel: 861-3078

**206(A)**

**4,175,439**

3

(b) a sealable container for receiving, containing, storage and transporting the absorbent member holding the liquid;

(c) a handling stick for removably attaching the absorbent member thereto for inserting and removing the absorbent member relative to the liquid supply and the container respectively;

(d) the handling stick is provided at one end with a fork portion having tines for holding the absorbent member.

2. The device according to claim 1 wherein one of the tines is provided with a barb for releasably gripping the absorbent member.

3. A device for collecting, storage, transporting and discharging a liquid sample collected from a liquid sup-

4

ply to be examined for medical, industrial or diagnostic purposes comprising

(a) a resilient absorbent member having sufficient capillary structure to absorb a portion of the liquid to be sampled when the absorbent member is placed in contact with the liquid supply or when the member is removed from the liquid supply to discharge the absorbed liquid upon application of compressive pressure to the absorbent member;

(b) a sealable container for receiving, containing, storage and transporting the absorbent member holding the liquid sample; and

(c) an elongated handling member having a slotted end to receive and removably hold the absorbent member for collecting the liquid sample and depositing the absorbent member containing the sample into the container.

* * * * *

205(A)



UNITED STATES DEPARTMENT OF COMMERCE
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

4348 28

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/434,828 | 10/18/82 | HEMPHILL | A |

```
┌                                              ┐
  CUSHMAN, DARBY & CUSHMAN
  1801 K ST., N. W., 8TH FLR.
  WASHINGTON, DC 20006
└                                              ┘
```

| EXAMINER |  |
|---|---|
| YASKO,J |  |
| ART UNIT | PAPER NUMBER |
| 336 | 7 |

DATE MAILED: 04/12/84

This is a communication from the examiner in charge of your application.

**COMMISSIONER OF PATENTS AND TRADEMARKS**

[ ] This application has been examined [X] Responsive to communication filed on *3-26-84* [ ] This action is made final.

A shortened statutory period for response to this action is set to expire _____ *3* month(s), _____ days from the date of this letter. Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**PART I** THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. [X] Notice of References Cited by Examiner, PTO-892.     2. [ ] Notice re Patent Drawing, PTO-948.
3. [X] Notice of Art Cited by Applicant, PTO-1449.          4. [ ] Notice of informal Patent Application, Form PTO-152
5. [ ] Information on How to Effect Drawing Changes, PTO-1474.   6. [ ] _____

**PART II** SUMMARY OF ACTION

1. [X] Claims _____ *1 - 6* _____ are pending in the application.

    Of the above, claims _____ *4 - 6* _____ are withdrawn from consideration.

2. [ ] Claims _____ have been cancelled.

3. [ ] Claims _____ are allowed.

4. [X] Claims _____ *1 - 3* _____ are rejected.

5. [ ] Claims _____ are objected to.

6. [ ] Claims _____ are subject to restriction or election requirement.

7. [X] This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.

8. [ ] Allowable subject matter having been indicated, formal drawings are required in response to this Office action.

9. [ ] The corrected or substitute drawings have been received on _____. These drawings are [ ] acceptable; [ ] not acceptable (see explanation).

10. [ ] The [ ] proposed drawing correction and/or the [ ] proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been [ ] approved by the examiner. [ ] disapproved by the examiner (see explanation).

11. [ ] The proposed drawing correction, filed _____, has been [ ] approved. [ ] disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections **MUST** be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

12. [ ] Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [ ] been received [ ] not been received

    [ ] been filed in parent application, serial no. _____; filed on _____

[ ] Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

[ ] Other

PTO-326 (Rev. 7 - 82)          EXAMINER'S ACTION          **207(A)**

Serial Number 434,828                          -2-

Art Unit 336


1.      The following is a quotation of 35 U.S.C. 103
which forms the basis for all obviousness rejections
set forth in this Office action:

> A patent may not be obtained though
> the invention is not identically
> disclosed or described as set forth in
> section 102 of this title, if the
> differences between the subject matter
> sought to be patented and the prior art
> are such that the subject matter as a
> whole would have been obvious at the
> time the invention was made to a person
> having ordinary skill in the art to
> which said subject matter pertains.
> Patentability shall not be negatived by
> the manner in which the invention was
> made.

2.      Claims 1 and 3 are rejected under 35 U.S.C.
103 as being unpatentable over Kenner in view of
Gelardin.

        It is considered obvious and well within the
skill of the art to provide the device of Kenner with a
removable cover and rotatable moving means as taught by
Gelardin if so needed or desired.

3.      Claim 2 is rejected under 35 U.S.C. 103 as


**208(A)**

Serial Number 434,828                    -3-
Art Unit 336


being unpatentable over Kenner in view of Gelardin as applied to claim 1 above, and further in view of Alvarez.

Obvious selection of one well known absorbent means for another to select fabric as taught by Alvarez, column 4, lines 17-19 producing no new or unobvious results.

Art of interest:

Barlow, Jeffreys, Gashkell, Austrian patent cited to show swabs.


J. D. Yasko/mb
703-557-3501
4/5/84

John D. Yasko
Examiner
Art Unit 336


**209 (A)**

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | | SERIAL NO. 434828 | | GROUP ART UNIT 336 | | ATTACHMENT TO PAPER NUMBER | 7 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **NOTICE OF REFERENCES CITED** | | | APPLICANT(S) HEMPHILL | | | | | |

### U.S. PATENT DOCUMENTS

| • | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | A | 4 9 3 5 9 1 | 3-1893 | KENNER | 604 | 2 | |
| | B | 2 3 9 3 6 7 7 | 1-46 | GELARDIN | 401 | 77x | |
| | C | 4 1 7 7 8 1 1 | 12-29 | ALVAREZ | 604 | 7 | |
| | D | 6 8 5 0 8 8 | 10-01 | BARLOW | 604 | 1 | |
| | E | 1 7 1 1 3 5 2 | 4-29 | JEFFREYS | 604 | 1 | |
| | F | 4 0 2 3 5 5 9 | 5-77 | GASKELL | 604 | 1x | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

### FOREIGN PATENT DOCUMENTS

| • | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | L | 1 1 4 6 1 9 | 10-29 | AUSTRIA | | 604 | 1 | | |
| | M | | | ATx | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

### OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
| --- | --- |
| R | |
| S | |
| T | |
| U | |

| EXAMINER J. YASKO | DATE 4-3-84 |
| --- | --- |

\* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

**210 (A)**

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 434828 | GROUP ART UNIT 336 | ATTACHMENT TO PAPER NUMBER 7 |
|---|---|---|---|---|
| **NOTICE OF REFERENCES CITED** | | APPLICANT(S) HEMPHILL | | |

## U.S. PATENT DOCUMENTS

| | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | 4 9 3 5 9 1 | 3-1893 | KENNER | 604 | 2 | |
| | B | 2 3 9 3 6 7 7 | 1-46 | GELARDIN | 401 | 77x | |
| | C | 4 1 7 7 8 1 1 | 12-79 | ALVAREZ | 604 | 7 | |
| | D | 6 8 5 0 8 8 | 10-01 | BARLOW | 604 | 1 | |
| | E | 1 7 1 1 3 5 2 | 4-29 | JEFFREYS | 604 | 1 | |
| | F | 4 0 2 3 5 5 9 | 5-77 | GASKELL | 604 | 1x | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | 1 1 4 6 1 9 | 10-29 | AUSTRIA ATX | | 604 | 1 | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

## OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | |
| S | |
| T | |
| U | |

| EXAMINER J. YASKO | DATE 4-3-84 |
|---|---|

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

## 210 (A)



5-21-84

#8/Rev.4
P/atty

REVOCATION OF POWER OF ATTORNEY

I, ALLEGRA D. HEMPHILL, formerly of 6217 Charnwood Drive,

Rockville, Maryland, presently residing at 1507 Linden Street, #13, Johnson

City, Tennessee, 37601, having by instrument dated October 15, 1982, appointed

Cushman, Darby & Cushman power of attorney for original U. S. applications

in the United States Patent & Trademark Office, do hereby and the same is

hereby revoked.

It is my intention that any and all correspondence with the U. S.

Patent & Trademark Office be directly to my Johnson City, Tennessee address.

ALLEGRA D. HEMPHILL

Sworn to and subscribed before me this 9th day of May, 1984.

NOTARY PUBLIC

My commission expires:

Jan 27, 1988

PREPARED BY:
GUY S. WEEMS, JR.
ATTORNEY AT LAW
P. O. BOX 313
120 S. CHEROKEE
JONESBOROUGH, TN
37659

**211 (A)**

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

S.N. 434,828  10/18/82
Allegra D. Hemphill

Cushman, Darby and Cushman
1801 K St., N.W., 8th Flr.
Washington, D.C. 20006

Paper No._____

MAILED

MAY 22 1984

GROUP 330

This is in response to the communication re the Power of Attorney filed ____5-14-84____

1. ☒ The power of attorney to you in this application has been revoked by the applicant.

2. ☐ In view of the notice in this application of the death of _____
   his power of attorney is terminated.

3. ☒ The power of attorney to you in this application has been accepted by the Commissioner of Patents, & Trademarks.

_____
For Director, Operation

4. ☐ The assignee in this application has intervened and appointed an attorney of his own selection. Further correspondence
   will be held with said attorney. (Rule 36, Rules of Practice.)

5. ☐ The revocation of the power of attorney to _____ has been
   entered and said attorney has been notified. Further correspondence will be addressed to you.

   assignee
6. ☐ On_____, the applicant appointed_____
   as additional attorney in this application. Further correspondence will continue to be addressed to you as
   specified in the new power of attorney.

   assignee
7. ☐ On_____, the applicant appointed_____
   as additional attorney in this application. Further correspondence will be addressed to said attorney. MPEP 403.02

8. ☐ The associate power of attorney to you in this application has been revoked by the attorney of record.

Allegra D. Hemphill
1507 Linden St. No. 13
Johnson City, Tenn.  37601

A. Little
For Director, Operation

RETAIN THIS COPY IN THE APPLICATION FILE

Copy A

FORM PTOL-305 (REV.9/75)

212 (A)

# APPLICATION FOR UNITED STATES PATENT

#9/Sub
Spec.
N.E.

Inventor(s):   Allegra D. Hemphill

Invention:    Vaginal Applicator

do not enter
Q-S.

# SPECIFICATION

# 213 (A)

add page 2 line 8

patent 4,260,570. And a plunger type vaginal syringe as in Kenner U.S. patent 493,591, and swabbing elements as in Alvarez, U.S. patent 4,177,811.

add page 2 line14

usable and very simply constructed. The device such as disclosed in the Alvarez is detachable in layers and is exposed directly after unpackaging, allowing for the swab element to become immediately usable. The Alvarez device does not allow for an elongated structure for the swabbing element to be introduced into the vaginal cavity nor does it provide a sufficient handle structure.

add page 3 line 11

either in segments or as a one piece unit, or as a one piece unit of a porous condition  over which a ...

add page 3 line 13

is secured directly to the core member, and is protected by the outer housing allowing the swab member or gauze to become impregnated in a retracted and/or extended position. The swab member is impregnated through the base of the exterior cover as well as the top portion of the opening on the exterior cover. Unlike the Kenner device, which has one opening and the central perforated end receives a sliding syringe tube that terminates into a plunger head. Unlike the Alvarez device the outer or exterior cover  may act as a protective covering for the gauze.

add page 3 line 18

lowering a lipstick, or can be extendable from an outer container, in which it is pushed manually, by a finger to a point and received by pulling the swab member into extended position and secured in place by means of twisting or turning the core member with gauze, or the handle structure to the right or to the left, thus locking into place. The raising and lowering of a lip-

page 3 line 18 cont.

stick as in <u>Gelardin</u> is in a manner by means of twisting and rotating a
base member with inner sleeves that effect rotation of sleeves by way of a
travel carrier.



**215 (A)**

BRIEF DESCRIPTION OF THE ALTERNATIVE DRAWING

FIGURE I is a view of the alternative method of the present invention showing the device is its covered condition;

Figure Ia is a diagrammatic cross sectionional view of a portion of the device shown in Figure I;

Section A is a diagrammatic cross section of the portion of the device shown in Figure I;

Section A-A is the exterior cover which will house the device shown in Figure I;

Section B-B is a diagrammatic cross sectional view of the portion shown in Section A-A that connects the device as shown in Figure I and Section A.

**216 (A)**

<u>add page 5 line 21</u>

unpackaged. After unpackaged, the swab or gauze may be impregnated through the inner core member by way of the top portion of the opened exterior cover while still in the retracted position as well as the extended position, which can not be obtained like the swabbing elements in the <u>Alvarez</u> or the <u>Kenner</u> devices.

<u>add page 6 line 13</u>

preferably by a medically inert adhesive. <u>Kenner</u> suggests that the sponge be removably secured extending from an opened end tube with a central perforation at the other end which allows for a syringe tube to be received.

**217 (A)**

add page 7 line 1 - 2

approximately 3½-4 inches long. Container  14
accordingly must be approximately 4 - 4½ inches in

add page 7 line 6

a cover having a total length of approximately 4-4½

add page 7 line 5

retracted, as shown in Figure 1.  As seen in the alternative drawing, Fig.I
the exterior/outer housing completely encases the core member with the
swab/gauze member, thus allowing for protection not to allow swab to be
completely exposed , as is with the Alvarez device.

add page 7 line 12

plastics or a rigid material such as nylon.

delete page 7 line 20 - 29   (for reason to clarify)

the interior of core 18...........which base 16 was rotated.

**218 (A)**

add page 7 lines 19–

As an alternative method of raising and lowering swab 24, turning first
to the alternative drawing, Fig. I, Ia Section A, A–A, B–B, the device is
comprised of an outer housing, generally indicated at 10, with that
outer housing being comprised of an exterior cover, also known as a handle
structure 12, the swab member iself is comprised of an internal and preferably
hollow core member 18 which is shown in Fig. I , preferably has a flange 20
integrally formed therewith and extending about its base 16.
The flange cooperates with a radially inwardly extending that filters
into a track lug Fig. Ia, Section A at the top portion of the exterior cover
12, so that when core member 18 is in its fully extended position, as shown
in Fig. I, flange 20 of Section A and the track lugs in Fig. Ia will connect
to prevent further movement.
An outer gauze adsorbent layer 24 is directly secured to the core member 18.

The operation of this structure, in order to raise core member 18 from
the retracted position to an extended position is accomplished by a manual
push by the finger at the base of the core member 18 as shown in Section A,
then by a pull of the swab member '24, unlike that of the Kenner and of the
Gelardin, to position said device into place. Insert finger into base 16.
Thus, by rotating the core member 18 with the swab member attached 24 to it,
turning to the right or to the left, the core member and the attached
swab/gauze member is locked in place by way of a track lug connection as
shown in Section A and Section B–B.

**219 (A)**

WHAT I CLAIM IS :

CLAIM 1  same

CLAIM 2  A swab member as in claim 1, wherein said adsorbent cover is
comprised of a textile gauze-like fabric secured directly to
core member

2b) wherein said core member may be a one piece unit, segmented,
or of a porous condition

2c) underlying adsorbent layer may be moistened when still in
retracted position, as well as extended position by way of two
(2) openings of exterior cover

2d) plastic or nylon outer housing(handle) is not liquid impervious

2e) whereby said adsorbent layer is not liquid impervious between
two (2) forms of thermoplastics, nylon, or any other rigid material.

Claim 3  3b) A swab as in claim 1, wherein said moving means includes an
exterior housing is used as a handle structure

3c) said exterior housing or cover is rotated to the right or to
the left ,thus, locking swab member into place in the fully
extended position.

**220(A)**

Fig. I

24

18

20

16

Fig. Ia

Section A

Section B-B

Section A-A

12

**221(A)**



Allegra D. Hemphill
1507 Linden Street, Apt. #13
Johnson City, TN 37601
(615) 926-7568

May 10, 1984

Commissioner Of Patent And Trademarks
Washington, D.C. 20231

Commissioner of Patent and Trademarks:

I would like to amend the patent specification for the
applicant, Allegra D. Hemphill of Johnson City Tennessee.

The specification covers a small entity, Vaginal Applicator,
Serial Number 06/434,828, with the filing date of 10/18/82.

An alternative drawing has been provided herewith, and is
considered to be covered by the generic claim(s) to the
original operation.

A Revocation of Power of Attorney is also enclosed herewith.

Please submit the contents enclosed herewith, to the attention
of the United States Patent and Trademark Office
Examiner J. Yasko, Art Unit 336.

Sincerely,

Allegra D. Hemphill

RECEIVED

MAY 17 1984

GROUP 350

**222(A)**

Case 1:07-cv-01236-RMC    Document 9-9    Filed 10/22/2007    Page 1 of 6



UNITED STATES DEPARTMENT OF COMMERCE
**Patent and Trademark Office**

Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 434828 | | | |
| 06/434,828 | 10/18/82 | NEWPHILL | |

| EXAMINER |
|---|
| YERDS |

| ART UNIT | PAPER NUMBER |
|---|---|
| 334 | 10 |

ALLEGA B. NEWPHILL
2507 LINDEN ST #18
JOHNSON CITY, TENNESSEE, 37401

DATE MAILED: 03/25/84

This is a communication from the examiner in charge of your application.

**COMMISSIONER OF PATENTS AND TRADEMARKS**

☐ This application has been examined  ☒ Responsive to communication filed on _____  ☒ This action is made final.

A shortened statutory period for response to this action is set to expire __3__ month(s), ____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned.  35 U.S.C. 133

**Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ _____

**Part II    SUMMARY OF ACTION**

1. ☒ Claims _____ 1-6 _____ are pending in the application.

    Of the above, claims _____ 4-6 _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _____ 1-3 _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.

8. ☐ Allowable subject matter having been indicated, formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. These drawings are ☐ acceptable;
    ☐ not acceptable (see explanation).

10. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings, filed on _____.
    has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved. ☐ disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

12. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

PTOL-326 (Rev. 7 - 82)                    EXAMINER'S ACTION                    **223(A)**

Serial Number 434,828

Art Unit 336

-2-

1.      The amendment filed May 14, 1984 is objected to under 35 U.S.C. 132 because it introduces new matter into the specification.  35 U.S.C. 132 states that no amendment shall introduce new matter into the disclosure of the invention.  The added material which is not supported by the original disclosure is as follows:

additions to specification and proposed new drawing figures.

Applicant is required to cancel the new matter in the response to this Office action.

The amendment to claim 2, is not entered since it is directed to a non-elected species.  The species of Figures 1,2,2a was elected paper #6.

2.      The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the

**224(A)**

Serial Number 434,828                                    -3-

Art Unit 336

time the invention was made to a person
having ordinary skill in the art to
which said subject matter pertains.
Patentability shall not be negatived by
the manner in which the invention was
made.

3.      Claims 1 and 3 stand rejected under 35 U.S.C.
103 as being unpatentable over Kenner in view of
Gelardin.  It is considered obvious and well within the
skill of the art to provide the device of Kenner with a
removable cover and roatable moving means as taught by
Gelandin if so needed or desired.

4.      Claim 2 is rejected under 35 U.S.C. 103 as
being unpatentable over Kenner in view of Gelardin as
applied to claim 1 above, and further in view of
Alvarez.  Obvious selection of one well known absorbent
means for another to select fabric as taught by Alvarez
column 4, lines 17-19, producing no new or unobvious
results.  It is noted that in any future response to
the Office action applicant must submit an argument
under the heading "Remarks" pointing out disagreements
with the Examiner's contentious.  applicant must also
discuss the references applied against the claims,
explaining how the claims avoid the references or
distinguish from them.

**225(A)**

Serial Number 434,828                           -4-

Art Unit 336

5.        This action is a _final rejection_ and is intended to close the prosecution of this application. Applicant's response to this action is limited either to an appeal to the Board of Appeals or to an amendment complying with the requirements set forth below.

If applicant should desire to appeal any rejection made by the examiner, a Notice of Appeal must be filed within the period for response identifying the rejected claim or claims appealed. The Notice of Appeal must be accompanied by the required appeal fee of $57.50.

If applicant should desire to file an amendment, entry of a proposed amendment after final rejection cannot be made as a matter of right unless it merely cancels claims or complies with a formal requirement made earlier. Amendments touching the merits of the application which otherwise might not be proper may be admitted upon a showing of good and sufficient reasons why they are necessary and why they were not presented earlier.

The filing of an amendment after final rejection, whether or not it is entered, does not stop the running of the statutory period for response to the final rejection unless the examiner holds the claims to be in condition for allowance. Accordingly, if a

**226(A)**

Serial Number 434,828                    -5-

Art Unit 336


Notice of Appeal has not been filed properly within the
period for response or any extension of the period
obtained under either 37 CFR 1.136(a) or (b), the
application will become abandoned.


John D. Yasko
Examiner
Art Unit 336


J. Yasko:dg

703-557-3144

05-24-84


**227(A)**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of
Allegra HEMPHILL
Serial No. 434,828                          Group:  336
Filed:  October 18, 1982
For:  VAGINAL APPLICATOR

***** ***** ***** *****

June 6, 1984

Honorable Commissioner of
 Patents and Trademarks
Washington, D.C. 20231

Sir:

Attached is an application for a File Wrapper PTO-37CFR 1.62, in response
to the Examiner's Office action on 5/25/84.

This submission is to transfer the aforementioned Serial No. 434,828, abandoned
of Species #1, Figures 1, 2 and 2a to elect Speceis #4, Figures 8 and 9.

I have included REMARKS, as suggested by the Office action, to discuss
the references cited, applied against the claims; Alvarez, Kenner and
Gelardinby distinguishing the differences for all obviousness, as well as
supplying reasons for the claims that have been modified.

This material concerns the VAGINAL APPLICATOR DEVICE
                    Allegra HEMPHILL, Inventor
                    Serial No. 434,828
                    Filed:  October 18, 1982

I wish to elect Speceis #4, Figures 8 and 9, as the embodiment to be
brought to the Examiner's attention; Examiner John Yasko, Group 336
for his review and consideration.

Enclosed is the $150.00 fee for the File Wrapper process.

Respectively submitted:

By: _____
        Allegra D. Hemphill

ADH:tr
1507 Linden Street #13
Johnson City, Tennessee 37601
Tel:  (615) 926-7568

**228(A)**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of
Allegra HEMPHILL
Serial No. 434,828                    Group:  336
Filed:  October 18,1982
For:  VAGINAL APPLICATOR

***** ***** ***** *****

June 6,1984

Honorable Commissioner of
 Patents and Trademarks
Washington, D.C. 20231

Sir:

Attached is an application for a File Wrapper PTO-37CFR 1.62, in response
to the Examiner's Office action on 5/25/84.

This submission is to transfer the aforementioned Serial No. 434,828, abandoned
of Species #1, Figures 1, 2 and 2a to elect Speceis #4, Figures 8 and 9.

I have included REMARKS, as suggested by the Office action, to discuss
the references cited, applied against the claims; Alvarez, Kenner and
Gelardinby distinguishing the differences for all obviousness, as well as
supplying reasons for the claims that have been modified.

This material concerns the VAGINAL APPLICATOR DEVICE
                    Allegra HEMPHILL, Inventor
                    Serial No. 434,828
                    Filed:  October 18,1982

I wish to elect Speceis #4, Figures 8 and 9, as the embodiment to be
brought to the Examiner's attention; Examiner John Yasko, Group 336
for his review and consideration.

Enclosed is the $150.00 fee for the File Wrapper process.

                    Respectively submitted:

                    By: _Allegra D. Hemphill_
                        Allegra D. Hemphill

ADH:tr
1507 Linden Street #13
Johnson City, Tennessee 37601
 Tel:  (615) 926-7568

**228(A)**

Serial Number 434,828

Art Unit 336                                        -5-


Notice of Appeal has not been filed properly within the period for response or any extension of the period obtained under either 37 CFR 1.136(a) or (b), the application will become abandoned.


John D. Yasko
Examiner
Art Unit 336


J. Yasko:dg

703-557-3144

05-24-84


**227(A)**

10   The swab portion is preferably comprised
of fairly rigid inner core member, constructed
either in segments or as a one piece unit, over
which a thick, gauze type adsorbent pad or layer
13   is secured.


REMARKS

Alvarez teaches that a moisture absorbent layer is exposed
     after the protective covering is removed and the same
     has a liquid impervious layer underneath.

Telfa, is one of the dressings used that provides for a
protective covering, a thin plastic layer allowing the
gauze underneath to be absorbent and not the outer layer,
therefore the outer layer is moisture adsorbent.

There is  a distinct difference between ABsorbent and
ADsorbent, to ab as in Alvarez  absorb is to take in,
suck up, swallow, engross wholly,  to take up or receive
by chemical or molecular actions as of gases or liquids and
to ad as in Hemphill to adsorb is to take up and hold,
to gather gas or liquid or dissolved material on a surface.


**229(A)**

5

10

## DETAILED DESCRIPTION OF THE PREFERRED
## EMBODIMENTS OF THE PRESENT INVENTION

As explained above, the present invention is designed to dry or absorb material in the internal vaginal area when observes a discharge or lubrication building up to the point that cleansing is either desired or required. Alternatively, the swab can be used as an applicator for a variety of products or medicants and it can either be pre-impregnated therewith or such materials could be applied once the swab was unpackaged. It should be understood that the adsorbent gauze material and the swab element is contemplated as being sterile when packaged.

15

18

19

21

22

REMARKS

line 18 of adsorbant quality for a variety of products or medicants the applicator is to take up and hold so to apply unto vaginal area

line 19 such as a treated material of one of the polymers like that that of Telfa, a thin plastic coating so not to tear or cause irritation to the mucous membrane.

line 21 unpackaged such as Furacin, petrolatum, silver foil or the like. Furacin, petrolatum adaptic gauze all are moisture adsorbent, the layer that is underneath is what is moisture absorbing.

line 22 adsorbent gauze material
Once the protective covering is removed the adsorbent layer is exposed

**230(A)**

13       material.  I prefer to have the adsorbent material
          24 be comprised of a cotton or cotton/polyester
15       gauze.

<u>REMARKS</u>

line 13-15

the example of Telfa, once again is used here to show that
the thin plastic coating, of the polymer/polyester medical grade
causes the gauze like textile to become adsorbant. The
underlying nature of the material allows for the material to
absorb, unlike that of <u>Alvarez</u>.

**231 (A)**

10

25    102 is separately formed so as to have a base
      formed as an annular band or ring 106.  Core
      member 102 can be formed either as a solid
      structure or preferably with a hollow interior.
29    As in the other embodiments, absorbant gauze

REMARKS
line 29(absorbant gauze)
typing error  to adsorbant gauze

**232 (A)**

WHAT I CLAIM IS:

     1.  A disposable vaginal swab comprised
of a housing surrounding a swab member comprised
3    of a stiff core member and an (absorbant) adsorbant outer
covering secured thereto, at least a portion of
said housing comprising a removable cover to close
said housing and protect said swab member within
said housing,  said core member being movably
retained within said housing so as to be movable
9    between a first retracted/retained position and a second
10   extended/exposed position relative to said housing
when said cover has been removed and means for moving
12   said core member between first retracted or retained
13   and said extended or exposed positions.

REMARKS
line 3(absorbant) typing error to adsorbant
line 9  retained     (added)
line 10 exposed     (word exposed added)
line 12 retained     (words or retained added)
line 13 or exposed   (words or exposed added)

Claim  1 has been modified, by way of the elected Species #4, Figures 8 and 9.
The speceis #4 allows for the removable cover to form the handle structure
unlike  Kenner, and a rotatable means by a hinge when the handle structure
exposes the swab member, unlike Gelardin.
Kenner states that the device allows for the injection of fluid and a
protruding element.  The hollow plunger head is used to inject fluid
and the plunger fits snuggly into the speculum.
Kenner has an annular groove that receives an elastic band.

Hemphill suggests that there is no protruding element after insertion
and the handle structure once removed serves as a functional part of
the device.

**233 (A)**

14

WHAT I CLAIM IS:

      2.  A swab as in claim 1, wherein said adsorbent cover is comprised of a textile gauze-like fabric, or of polymer materials or the like being of medical grade.

REMARKS

line 3 or of polymer materials or the like being of medical grade. included because of line 13-15 page 7

   I prefer to have the adsorbent material

   24 be comprised of a cotton or cotton/polyester gauze.

and included because of line 19 page 5

   and it can either be pre-impregnated therewith or

Claim 2, is of adsorbent material unlike that of Alvarez column 4 lines 17-19

   The said layer may also comprise other absorbent materials such as fabric or the like.

Definitions for adsorbent and absorbent:

   adsorbent materials- having power, capacity to take up and hold

   absorbent materials-allow for the swallowing up, engulf

   to take in, suck up, swallow, engross wholly

Alvarez teaches that the absorbent (fabric or the like) layer is exposed after the protective covering is unpackaged and has a layer that is also detachable underneath that is liquid impervious.

Hemphill suggests that the swab element be of adsorbent material, that is textile gauze-like treatment to provide the adsorbent nature. An example of this would be that of Telfa, a thin plastic coating which is non-irritating to the mucous membrane and will not tear or stick to the tissue unlike an absorbent gauze, because of the polymer material. The gauze may be treated also with petrolatum, furacin, silver foil, adaptic gauze or the like (see line 21 page 5)

Hemphill also suggests the the adsorbent layer be directly secured to the device, unlike the detachable layers of Alvarez.

234 (A)

WHAT I CLAIM IS:

        3.  A swab as in claim 1, wherein said
moving means includes a rotatable member rotatably
secured to said housing and cam means operatively
connecting at least a portion of said core member
and the interior of said housing together so that
said core member will move vertically (within) when said
(housing as said rotatable member is rotated.)
rotatable member of said housing is rotated.

6

7

REMARKS

line 6 (within) changed to when
line 7 (housing as said rotatable member is rotated.)  changed to
rotatable member of said housing is rotated.

Claim 3 has been modified, for clarity for speceis #4.
The Hemphill device is to be peeled downward after a first position
to separate tabs, thus opening or exposing of the swab member causes a
vertical movement, unlike the twisting of a base rotatable knob as in the
Gelardin device.
The Hemphill device, after removing the outer housing serves as a handle
structure, and still serves as a function for the device, unlike Gelardin,
that states that the cover is completely removed.
Gelardin has a rotatable base by means of twisting a knob by the way of
a travel carrier in the inner sleeve to advance and retract . Gelardin
has an inner and outer sleeve that serve to advance and retract carrier.

**235 (A)**



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

ALLEGRA D. HEMPHILL
1507 LINDEN STREET #13
Johnson, city, TENN. 37601

Applicant(s): ALLEGRA HEMPHILL

Serial Number: 619- 684

Filing Date: 6-11-84

Title: VAGINAL APPLICATOR

## Notice to File Missing Parts of Application–
## Filing Date Granted

If all missing parts are filed within the period set below, the total amount owed by applicant as a ☒ large entity, ☐ small entity (verified statement filed), is $ 250.00

1. ☐ The statutory basic filing fee is: ☐ missing ☐ insufficient. Applicant as a ☒ large entity, ☐ small entity, must submit $ _____ to complete the basic filing fee and MUST ALSO SUBMIT THE SURCHARGE AS INDICATED BELOW.

2. ☐ Additional claim fees of $ _____ as a ☐ large entity, ☐ small entity, including any required multiple dependent claim fee, are required. Applicant must submit the additional claim fees or cancel the additional claims for which fees are due. NO SURCHARGE IS REQUIRED FOR THIS ITEM.

3. ☐ The oath or declaration is:
   ☐ missing.
   ☐ does not cover items omitted at the time of execution.
   An oath or declaration in compliance with 37 CFR 1.63, identifying the application by the above Serial Number and Filing Date is required. A SURCHARGE MUST ALSO BE SUBMITTED AS INDICATED BELOW.

4. ☐ The oath or declaration does not identify the application to which it applies. An oath or declaration in compliance with 37 CFR 1.63 identifying the application by the above Serial Number and Filing Date is required. A SURCHARGE MUST ALSO BE SUBMITTED AS INDICATED BELOW.

5. ☐ The signature to the oath or declaration is: ☐ missing; ☐ a reproduction; ☐ by a person other than the inventor or a person qualified under 37 CFR 1.42, 1.43, or 1.47. A properly signed oath or declaration in compliance with 37 CFR 1.63, identifying the application by the above Serial Number and Filing Date is required. A SURCHARGE MUST ALSO BE SUBMITTED AS INDICATED BELOW.

6. ☐ The signature of the following joint inventor(s) is missing from the oath or declaration: _____. Applicant(s) should provide, if possible, an oath or declaration signed by the omitted inventor(s), identifying this application by the above Serial Number and Filing Date. A SURCHARGE MUST ALSO BE SUBMITTED AS INDICATED BELOW.

7. ☐ The application was filed in a language other than English. Applicant must file a verified English translation of the application and a fee of $20.00 under 37 CFR 1.17(k), unless this fee has already been paid. NO SURCHARGE IS REQUIRED FOR THIS ITEM.

8. ☒ Other: $150.00 FOR FILING FEE & $100.00 SURCHARGE

A Serial Number and Filing Date have been assigned to this application. However, to avoid abandonment under 37 CFR 1.53(d), the missing parts and fees identified above in items 1 and 3–6 must be timely provided ALONG WITH THE PAYMENT OF A SURCHARGE OF $100.00 for large entities or $50.00 for small entities who have filed a verified statement claiming such status. The surcharge is set forth in 37 CFR 1.16(e). Applicant is given ONE MONTH FROM THE DATE OF THIS LETTER, OR TWO MONTHS FROM THE FILING DATE OF this application, WHICHEVER IS LATER, within which to file all missing parts and pay any fees. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

Direct the response to, and any questions about, this notice to the undersigned, Attention, Application Branch, and include the above Serial Number and Filing Date.

Mrs. M. a. Belpuis    703- 557 3254    **236 (A)**
or: _____, Application Branch



1507 Linden Street #13
Johnson City, Tennessee 37601
July 18, 1984

Ms. M. A. Baldwin
Application Branch
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D. C. 20231

Dear Ms. Baldwin:

This letter is with respect to your Notice to File Missing Parts of Application received July 16, 1984.

The Serial Number 619-684 with new Filing Date 6-11-84 for a Vaginal Applicator is a small entity.

A small entity statement is in the parent application Serial Number 06/434,828 for applicant Allegra Hemphill.

I called Monday, July 16, 1984 and spoke with Ms. Wilcox concerning this matter and am now following-up with this written statement.

Ms. Baldwin, thank you for all your help.

Sincerely,

Allegra Hemphill

237 (A)



1460 / 030    9/18/84

x

# 75.00 24

1507 Linden Street #13
Johnson City, Tennessee 37601
September 7, 1984

RECEIVED

SEP 2 0 14

OFFICE OF ASSISTANT
COMMISSIONER FOR PATENTS

Honorable Commissioner of
Patents and Trademarks
Washington, D.C. 20231

Sir:

This submission is to file a petition for request, concerning the
File Wrapper Case #619-684, filing date 6-11-84.

A small entity status is to be maintained and enclosed is the surcharge
for the amount of $50.00.

The request for the first extension fee for $25.00 for a small entity
is also enclosed.

Attached is the certificate of mailing dated September 7, 1984.

The  total amount for the extension and the small entity status is
$75.00 (see enclosed check).

                    Respectively submitted:

            By: _____
                   ATlegra Hemphill

ADH:wr
Serial Number 619-684
Filing Date 6-11-84
Vaginal Applicator

HEMPHILL, A L        3 216       75.00   CK

09/14/84 HEMPHILL F E        3 216       75.00 CK

10/17/84

10/17/84 619684
10/17/84 619684        3 215       25.00 CK
10/17/84 619684        3 204       50.00 CK

**238 (A)**

Certificate of Mailing

I hereby certify that this correspondence is being deposited with the
United States Postal Service as first class mail in an envelope
addressed to:  Commissioner of Patents and Trademarks
               Washington, D.C. 20231
on September 7,1984

_____Allegra HEMPHILL_____

_____ *[signature]* _____

_____September 7,1984_____

**239 (A)**

Serial Number 619,684                                    -2-

Art Unit 336

1.      Claims 1-4 are withdrawn from further con-
sideration by the examiner, 37 CFR 1.142(b) as being
drawn to a nonelected species.  Election was made
without traverse in Paper No. 1 as filed with con-
tinuation application papers.

        The papers filed with the request for File
Wrapper Continuation received June 11, 1984 and the
election of species #4, Figures 8 and 9 is noted.  The
claims readable on the elected species are 5 and 6.

2.      Accordingly, claims 1-4 have been cancelled.

3.      At page 1 of the specification the following
has been inserted,--This Application is a continuation
of Serial #434,828 filed October 18, 1982 now
abandoned--.

C. Scott/mb
703-557-3125
12/18/84

John D. Yasko
Examiner
Art Unit 336

**240 (A)**

619684



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| | | | |

┌                                                    ┐

└                                                    ┘

| EXAMINER |
|---|
| |
| ART UNIT | PAPER NUMBER |
| | 3 |

DATE MAILED:

JAN 7 - 1985

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS

1. ☒ THIS IS AN ATTACHMENT TO THE NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE, PTOL 85.

2. ☒ All the claims being allowable, PROSECUTION ON THE MERITS IS CLOSED in this application. If not attached hereto, a Notice of Allowance or other appropriate communication will be sent in due course.

    A. ☐ Note the attached PTO-152, Notice of Informality, which indicates that the declaration (or oath) is deficient and that a substitute is required. The substitute declaration (or oath) MUST BE SUBMITTED WITHIN THE THREE MONTH STATUTORY PERIOD SET FOR PAYMENT OF THE BASE ISSUE FEE IN THE "NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE" (PTOL-85), preferably with and attached to the base issue fee. Note that the statute does not permit extension of the three month period set for payment of the base issue fee. Failure to timely file the substitute declaration (or oath) will result in ABANDONMENT of the application. The transmittal letter accompanying the declaration (or oath) should indicate the following in the upper right hand corner:
        Issue Batch Number; Date of the Notice of Allowance, and Serial Number.

    B. ☒ Formal drawings are now required and MUST BE SUBMITTED WITHIN THE THREE MONTH STATUTORY PERIOD SET FOR PAYMENT OF THE BASE ISSUE FEE IN THE "NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE" (PTOL-85). Note that the statute does not permit extension of the three month period set to pay the base issue fee. Failure to timely submit the drawings will result in ABANDONMENT of the application. The drawings should be submitted as a separate paper with a transmittal letter which is addressed to the Official Draftsman and which indicates the following in the upper right hand corner:
        Issue Batch Number; Date of the Notice of Allowance, and Serial Number.

    C. ☒ The claims are allowed in view of:
      a. ☒ Applicant's communication filed _June 11, 1984_
      b. ☐ The interview summarized on the attached EXAMINER INTERVIEW SUMMARY RECORD, PTOL-413.
      c. ☒ The attached Examiner's Amendment.
      d. ☐ An Examiner's Amendment which will follow in due course.

    D. ☒ The allowed claims are _5 and 6_

3. ☐ Note the attached Examiner's Statement of Reasons for Allowance.

4. ☒ Note attached NOTICE OF REFERENCES CITED, PTO-892, which is part of this communication. The listed references are considered to be pertinent to the claimed invention, but the claims are deemed to be patentable thereover.

5. ☒ Note attached LIST OF ART CITED BY APPLICANT, PTO-1449.

6. ☐ The drawings filed on _____ ☐ are acceptable as filed. ☐ are acceptable subject to correction as indicated on the attached Notice re Drawings, PTO-948. In order to avoid ABANDONMENT of this application, correction is required. Corrections can only be made in accordance with the instructions set forth in the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

7. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings filed on _____ has (have) been approved by the examiner. Applicant is reminded that in order to avoid abandonment of this applicant, execution of the proposed changes or submission of additional or substitute drawings MUST be made in accordance with the instructions set forth in the letter, "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474, attached to Paper No. _____

8. ☐ The proposed drawing correction, filed _____, has been approved. However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections are required and MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

9. ☐ In order to avoid ABANDONMENT, the drawing informalities noted on the Notice re Drawing, PTO-948, attached to Paper No. __ must now be corrected. Applicant is reminded that the corrections can only be made in accordance with the instructions set forth in the letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474, attached to the PTO-948.

10. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has; ☐ been received. ☐ not been received.

    ☐ been filed in parent application, Serial No. _____ filed on _____

## 241 (A)

John D. Yasko
Examiner
Art Unit 335

PTOL - 37 (Rev. 8 - 82)

NOTICE OF ALLOW

619684



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| | | | |

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | 3 |

DATE MAILED:

JAN 7 - 1985

This is a communication from the examiner in charge of your application.

COMMISSIONER OF PATENTS AND TRADEMARKS

1. ☒ THIS IS AN ATTACHMENT TO THE NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE, PTOL 85.

2. ☒ All the claims being allowable, PROSECUTION ON THE MERITS IS CLOSED in this application. If not attached hereto, a Notice of Allowance or other appropriate communication will be sent in due course.

   A. ☐ Note the attached PTO-152, Notice of Informality, which indicates that the declaration (or oath) is deficient and that a substitute is required. The substitute declaration (or oath) MUST BE SUBMITTED WITHIN THE THREE MONTH STATUTORY PERIOD SET FOR PAYMENT OF THE BASE ISSUE FEE IN THE "NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE" (PTOL-85), preferably with and attached to the base issue fee. Note that the statute does not permit extension of the three month period set for payment of the base issue fee. Failure to timely file the substitute declaration (or oath) will result in ABANDONMENT of the application. The transmittal letter accompanying the declaration (or oath) should indicate the following in the upper right hand corner: Issue Batch Number; Date of the Notice of Allowance, and Serial Number.

   B. ☒ Formal drawings are now required and MUST BE SUBMITTED WITHIN THE THREE MONTH STATUTORY PERIOD SET FOR PAYMENT OF THE BASE ISSUE FEE IN THE "NOTICE OF ALLOWANCE AND BASE ISSUE FEE DUE" (PTOL-85). Note that the statute does not permit extension of the three month period set to pay the base issue fee. Failure to timely submit the drawings will result in ABANDONMENT of the application. The drawings should be submitted as a separate paper with a transmittal letter which is addressed to the Official Draftsman and which indicates the following in the upper right hand corner: Issue Batch Number; Date of the Notice of Allowance, and Serial Number.

   C. ☒ The claims are allowed in view of:
      a. ☒ Applicant's communication filed _June 11, 1984_ .
      b. ☐ The interview summarized on the attached EXAMINER INTERVIEW SUMMARY RECORD, PTOL-413.
      c. ☒ The attached Examiner's Amendment.
      d. ☐ An Examiner's Amendment which will follow in due course.

   D. ☒ The allowed claims are _5 and 6_

3. ☐ Note the attached Examiner's Statement of Reasons for Allowance.

4. ☒ Note attached NOTICE OF REFERENCES CITED, PTO-892, which is part of this communication. The listed references are considered to be pertinent to the claimed invention, but the claims are deemed to be patentable thereover.

5. ☒ Note attached LIST OF ART CITED BY APPLICANT, PTO-1449.

6. ☐ The drawings filed on _____ ☐ are acceptable as filed. ☐ are acceptable subject to correction as indicated on the attached Notice re Drawings, PTO-948. In order to avoid ABANDONMENT of this application, correction is required. Corrections can only be made in accordance with the instructions set forth in the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES". PTO-1474.

7. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings filed on _____ has (have) been approved by the examiner. Applicant is reminded that in order to avoid abandonment of this applicant, execution of the proposed changes or submission of additional or substitute drawings MUST be made in accordance with the instructions set forth in the letter, "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474, attached to Paper No. _____.

8. ☐ The proposed drawing correction, filed _____, has been approved. However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections are required and MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

9. ☐ In order to avoid ABANDONMENT, the drawing informalities noted on the Notice re Drawing, PTO-948, attached to Paper No. _____ must now be corrected. Applicant is reminded that the corrections can only be made in accordance with the instructions set forth in the letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474, attached to the PTO-948.

10. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has; ☐ been received. ☐ not been received.

    ☐ been filed in parent application, Serial No. _____ filed on _____

John D. Yasko
Examiner
Art Unit 335

PTOL - 37 (Rev. 8 - 82)

NOTICE OF ALLOWABILITY

242 (A)

PTOL-85 (Rev. 8-82)



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

# NOTICE OF ALLOWANCE
# AND ISSUE FEE DUE

**✕✕CORRECTED COPY✕✕**

ALLEGRA HEMPHILL
1507 LINDEN ST., #13
JOHNSON CITY, TN 37601

All communications regarding this application should give the serial number, date of filing, name of applicant, and batch number.

Please direct all communications to the Attention of "OFFICE OF PUBLICATIONS" unless advised to the contrary.

The application identified below has been examined and found allowable for issuance of Letters Patent. PROSECUTION ON THE MERITS IS CLOSED.

| | SC/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|---|
| | 06/619,684 | 06/11/84 | 002 | SCOTT, C | 336 | 01/07/85 |
| First Named Applicant | HEMPHILL, | | ALLEGRA D. | | | |

TITLE OF INVENTION  VAGINAL APPLICATOR

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| | 604-001.000 | E66 | UTILITY | YES | $250.00 | 04/08/85 |

The amount of the issue fee is specified by 37 C.F.R. 1.18 as follows: for an original or reissue patent, except for a design or plant patent, $500; for a design patent, $175; and for a plant patent, $250. If the applicant qualifies for and has filed a verified statement of small entity status in accordance with 37 C.F.R. 1.27, the issue fee is one-half the respective amount aforementioned. The issue fee due printed above reflects applicant's status as of the time of mailing this notice. A verified statement of small entity status may be filed prior to or with payment of the issue fee. However, in accordance with 37 C.F.R. 1.28, failure to establish status as a small entity prior to or with payment of the issue fee precludes payment of the issue fee in the amount so established for small entities and precludes a refund of any portion thereof paid prior to establishing status as a small entity.

THE ISSUE FEE MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE as indicated above. The application shall otherwise be regarded as ABANDONED. The issue fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office. Where an authorization to charge the issue fee to a deposit account has been filed before the mailing of the notice of allowance, the issue fee is charged to the deposit account at the time of mailing of this notice in accordance with 37 C.F.R. 1.311. If the issue fee has been so charged, it is indicated above.

In order to minimize delays in the issuance of a patent based on this application, this Notice may have been mailed prior to completion of final processing. The nature and/or extent of the remaining revision or processing requirements may cause slight delays of the patent. In addition, if prosecution is to be reopened, this Notice of Allowance will be vacated and the appropriate Office action will follow in due course. If the issue fee has already been paid and prosecution is reopened, the applicant may request a refund or request that the fee be credited to a Deposit Account. However, applicant may wait until the application is either found allowable or held abandoned. If allowed, upon receipt of a new Notice of Allowance, applicant may request that the previously submitted issue fee be applied. If abandoned, applicant may request refund or credit to a Deposit Account.

In the case of each patent issuing without an assignment, the complete post office address of the inventor(s) will be printed in the patent heading and in the Official Gazette. If the inventor's address is now different from the address which appears in the application, please fill in the information in the spaces provided on PTOL-85b enclosed. If there are address changes for more than two inventors, enter the additional addresses on the reverse side of the PTOL-85b.

The appropriate spaces in the ASSIGNMENT DATA section of PTOL-85b must be completed in all cases. If it is desired to have the patent issue to an assignee, an assignment must have been previously submitted to the Patent and Trademark Office or must be submitted no later than the date of payment of the issue fee as required by 37 C.F.R. 1.334. Where there is an assignment, the assignee's name and address must be provided on the PTOL-85b to ensure its inclusion in the printed patent.

Advance orders for 10 or more printed copies of the prospective patent can be made by completing the information in Section 4 of PTOL-85b and submitting payment therewith. If use of a Deposit Account is being authorized for payment, PTOL-85c should also be forwarded. The order must be for at least 10 copies and must accompany the issue fee. The copies ordered will be sent only to the address specified in section 1 or 1A of PTOL-85b.

[ ] Note attached communication from Examiner.

[ ] This notice is issued in view of
applicant's communication filed _____

**IMPORTANT**

ATTENTION IS DIRECTED TO 37 C.F.R. 1.334.

THE PATENT WILL ISSUE TO APPLICANT UNLESS AN ASSIGNEE IS SHOWN IN ITEM 3 ON FORM PTOL-85b, ATTACHED

**PATENT AND TRADEMARK OFFICE COPY**

PTOL-85b (Rev 8-82)

ISSUE FEE TRANSMITTAL

U.S. Department of Commerce
Patent and Trademark Office

This form is provided in lieu of a formal transmittal and should be used for transmitting the Issue Fee. Sections 1A through 4 must be completed as appropriate.

INVENTOR(S) ADDRESS CHANGE & SC/SERIAL NO. 06/619,684

**INVENTOR'S NAME**

HEMPHILL, ALLEGRA D.

Street Address

6217 CHARNWOOD DRIVE

City, State and Zip Code

ROCKVILLE, MARYLAND 20852

**CO-INVENTOR'S NAME**

Street Address

City, State and Zip Code

☐ Check if additional changes are on reverse side.

**MAILING INSTRUCTIONS**

All further correspondence including the Issue Fee Receipt, the Patent, and advanced orders will be mailed to the addressee entered in section 1 on PTOL-85c, unless you direct otherwise by specifying the appropriate name and address in 1A below.

**2A.** The COMMISSIONER OF PATENTS AND TRADE-MARKS is requested to apply the Issue Fee to the application identified below.

06/619,684

(Signature of party in interest of record)     (Date)

D. Hemphill     4/2/85

Note: The Issue Fee will not be accepted from anyone other than the applicant; a registered attorney or agent; the assignee or other party in interest as shown by the records of the Patent and Trademark Office.

| | SC/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|---|
| | 06/619,684 | 06/11/84 | 002 | SCOTT, C | 336 | 01/07/85 |
| First Named Applicant | HEMPHILL, | | | ALLEGRA D. | | |

TITLE OF INVENTION   VAGINAL APPLICATOR

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| | 604-001.000 | E66 | UTILITY | YES | $250.00 | 04/08/85 |

**1A.** Further correspondence to be mailed to the following:

HEMPHILL, ALLEGRA D.
1507 LINDEN STREET #13
JOHNSON CITY, TENNESSEE 37601

04/16/85 619684

**2B.** For printing on the patent front page, list the names of not more than 3 registered patent attorneys or agents OR, alternatively, the name of a firm having as a member a registered attorney or agent. If no name is listed, no name will be printed.

1 HEMPHILL, ALLEGRA D.

2 HEMPHILL, DR. F. ERICH

3 GARDNER, VIVIAN C.

DO NOT USE THIS SPACE

242    250.00 CK

**3.** ASSIGNMENT DATA (print or type)

(1) ☒ This application is NOT assigned.
(2) ☐ Assignment previously submitted to the Patent and Trademark Office.
(3) ☐ Assignment submitted herewith.

**For Printing On The Patent:** (Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data below is only appropriate when an assignment has been previously submitted to the PTO or is submitted herewith. Completion of this form is NOT a substitute for filing of an assignment as required by 37 C.F.R. 1.334).

(1) NAME OF ASSIGNEE:

(2) ADDRESS: (City & State or Country)

(3) STATE OF INCORPORATION, IF ASSIGNEE IS A CORPORATION:

**4.**

The following fees are enclose:

☒ Issue fee     ☐ Advanced order     ☐ Assignment recording

The following fees should be charged to deposit acc. no. _____

(PTOL-85c or additional copy of PTOL-85b must be enclosed)

☐ Issue fee
☐ Advanced order
☐ Assignment recording

Number of advanced order copies requested: _____
(must be for 10 or more copies)

**TRANSMIT THIS FORM WITH FEE**

WK

244 (A)

# 4

Issue Batch Number: E66
Date of Notice of Allowance: 01/07/85
Serial Number: 06/619,684

Official Draftsman
Commissioner of
Patents and Trademarks
Washington, D.C. 20231

Sir:

Attached are the Formal Drawings required for the application of

Allegra HEMPHILL
Serial No. 06/619,684
Filed: June 11,1984
For: Vaginal Applicator
Batch No. E66

*(FIG's 8 & 9 only)*
*8½ x 14' rec'd*
*PB, 7/5/85*

Attached is a certificate of mailing dated April 4,1985.

Respectively submitted:

By: *Allegra D. Hemphill*
Allegra D. Hemphill

ADH:tr
1507 Linden Street #13
Johnson City, Tennessee 37601
Tel: (615) 926-7568

## 245 (A)

Certificate of Mailing

I hereby certify that this correspondence is being deposited with the
United States Postal Service as first class mail in an  envelope
addressed to: Commissioner of Patents and Trademarks
                    Washington, D.C. 20231
                    attn: Official Draftsman
on April 4,1985.


        Allegra D. HEMPHILL
_____

        *d. Hemphill*
_____

        April 4,1985
_____


**246 (A)**



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:  COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 06/619,684 | 06/11/84 | HEMPHILL            A | |

```
┌                              ┐
 ALLEGRA HEMPHILL
 1507 LINDEN ST., #13
 JOHNSON CITY, TN 37601

└                              ┘
```

| EXAMINER | |
|---|---|
| SCOTT,C | |
| ART UNIT | PAPER NUMBER |
| 336 | 5 |

DATE MAILED: 7-9-85

07/09/85

## NOTICE OF UNACCEPTABLE DRAWING CHANGES

The corrected, and/or substitute drawings, received from applicant or applicant's bonded commercial draftsman on _10-18-82_, are not acceptable for the reasons checked below. APPLICANT IS GIVEN FIFTEEN (15) DAYS FROM THE DATE OF THIS LETTER, OR UNTIL THE EXPIRATION OF THE ORIGINAL PERIOD SET FOR CORRECTING THE DRAWINGS (WHICHEVER IS LONGER) WITHIN WHICH TO CORRECT BELOW NOTED DEFICIENCY. NO EXTENSION OF THIS TIME LIMIT MAY BE GRANTED UNDER EITHER 37 CFR 1.136(a) or (b).

Corrections must be made by a bonded commercial draftsman. However, in order for a bonded commercial draftsman to now borrow the drawings in this application, a copy of this letter must be presented.

☐ The drawings remain informal for the reasons set forth on the attached PTO-948.

☑ The new and/or substitute sheet(s) of drawings are informal for the reasons set forth on the attached PTO-948.

☐ The Examiner approved changes, Paper No(s) _____,
have not been (completely) made, as noted below.

☐ The Examiner approved changes, Paper No(s) _____,
were incorrectly made and/or are inaccurate, as noted below.

☑ Other: _Formal Dwg's of Fig's 1-7 are required, on 8½ X 14" size paper._

_P.O. Burgess_
Acting **Chief Draftsman,**
**Patent & Trademark Office**

**247 (A)**

Form PTOL—426 (Rev. 1-83)

PTO - 948
(Rev. 8 -82)

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

ATTACHMENT TO
PAPER NUMBER

GROUP 336

Abraham S.N. 434828
Continued to 619,684

## NOTICE OF PATENT DRAWINGS OBJECTION

Drawing Corrections and/or new drawings may only be
submitted in the manner set forth in the attached letter,
"Information on How to Effect Drawing Changes" PTO-1474.

A. ☒ The drawings, filed on __10/18/82__, are objected to as informal for reason(s)
checked below:

1. ☒ Lines Pale.

2. ☒ Paper Poor. *Too thin (Fig 1 - 7)*

3. ☐ Numerals Poor.

4. ☐ Lines Rough and Blurred.

5. ☒ Shade Lines Required. *Proper + Clear*

6. ☐ Figures Must be Numbered.

7. ☒ Heading Space Required. *2"*

8. ☐ Figures Must Not be Connected.

9. ☐ Criss-Cross Hatching Objectionable.

10. ☐ Double-Line Hatching Objectionable.

11. ☐ Parts in Section Must Be Hatched.

12. ☐ Solid Black Objectionable.

13. ☐ Figure Legends Placed Incorrectly.

14. ☐ Mounted Photographs.

15. ☐ Extraneous Matter Objectionable.
[37 CFR 1.84 (1)]

16. ☒ Paper Undersized; either 8½" x 14",
~~required.~~ required.

17. ☐ Proper A4 Margins Required:
☐ TOP 2.5 cm. ☐ RIGHT 1.5 cm.
☐ LEFT 2.5 cm. ☐ BOTTOM 1.0 cm.

18. ☒ Other:
*Papers must have same
sizes 8½" x 14".*

B. ☒ The drawings, submitted on __10/18/82__, are so informal they cannot be
corrected. New drawings are required. Submission of the new drawings MUST be
made in accordance with the attached letter.

## 248 (A)

Certificate of Mailing

I hereby certify that this correspondence is being deposited with the
United States Postal Service as first class mail in an envelope
addressed to:  Commissioner of Patents and Trademarks
                    Washington, D. C. 20231
                    attn:  Official Draftsman
on July 23,1985.

            Allegra D. Hemphill

_____

*[signature]*

_____

        July 23,1985

_____

**249 (A)**



#6

Issue Batch Number:  E66
Date of Notice:  07/09/85
Serial Number:  06/619,684

Official Draftsman
Commissioner of
Patents and Trademarks
Washington, D.C. 20231

Sir:

Attached are the Formal Drawings, Figures 1-7, required for the
application of:

Allegra HEMPHILL
Serial No. 06/619,684
Filed: June 11, 1984
For: Vaginal Applicator
Batch No. E66

Attached is a certificate of mailing dated July 23, 1985.

Respectively submitted:

By: _____
     Allegra D. Hemphill

ADH:tr
1507 Linden Street #13
Johnson City, Tennessee 37601
Tel: (615) 926-7568

**250 (A)**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of

Allegra HEMPHILL

Serial No. 06/619,684                    Group: 336

Filed: June 11,1984

For: Vaginal Applicator                  *SMALL ENTITY*


        ****    *****    *****    *****


"OFFICE OF PUBLICATIONS"

Honorable Commissioner of

  Patents and Trademarks

Washington, D.C. 20231


Sir:

This submission is for the Notice of Allowance and Issue Fee.

Enclosed is the $250.00 for the small entity status of Serial No. 06/619,684, Batch No. E66.

Attached is a certificate of mailing dated April 4,1985.

Also included in this submission is the Formal Drawing required, which is addressed to the Official Draftsman.


                         Respectively submitted:


                    By: _Allegra Hemphill_
                         Allegra D. Hemphill

ADH:tr
1507 Linden Street #13
Johnson City, Tennessee 37601
Tel: (615) 926-7568


# 251 (A)

Case 1:07-cv-01236-RMC    Document 9-2    Filed 10/22/2007    Page 104 of 36



FIGURE 1

FIGURE 2

FIGURE 2a.

FIGURE 3

FIGURE 4

FIGURE 4a.

252 (A)

Case 1:06-cv-01236-RMC     Document 22     Filed 10/22/2007     Page 7 of 13

FIGURE 5



FIGURE 6

FIGURE 7



253 (A)



FIGURE 8

FIGURE 9

254 (A)



Commissioner of Patents and Trademarks
Box M. Fee
Washington, D.C. 20231

Honorable Commissioner:

Enclosed is the payment due for the maintenance fee
with applicable surcharge. I was in receipt of your
reminder as of August 12,1989.

My address has changed to 6217 Charnwood Drive
                                        Rockville, Maryland 20852

Please accept this payment for   $305.00 for

Patent Number 4557720

Respectfully,

*Adhemphill*

Allegra D. Hemphill
6217 Charnwood Drive
Rockville, Maryland 20852

**255  (A)**



256 (A)

In the United States Patent and Trademark Office

In re Application of

Allegra HEMPHILL

Serial No. 434,828                          Group:  336

Filed:  October 18,1982

For:  VAGINAL APPLICATOR

***** ***** ***** *****

June 6,1984

Honorable Commissioner of
 Patents and Trademarks
Washington, D.C. 20231

Sir:

Attached is an application for a File Wrapper PTO-37CFR 1.62, in response
to the Examiner's Office action on 5/25/84.

This submission is to transfer the aforementioned Serial No. 434,828, abandoned
of Species #1, Figures 1, 2 and 2a to elect Speceis #4, Figures 8 and 9.

I have included REMARKS, as suggested by the Office action, to discuss
the references cited, applied against the claims; Alvarez, Kenner and
Gelardinby distinguishing the differences for all obviousness, as well as
supplying reasons for the claims that have been modified.

This material concerns the VAGINAL APPLICATOR DEVICE
                        Allegra HEMPHILL, Inventor
                        Serial No. 434,828
                        Filed:  October 18,1982

I wish to elect Speceis #4, Figures 8 and 9, as the embodiment to be
brought to the Examiner's attention; Examiner John Yasko, Group 336
for his review and consideration.

Enclosed is the $150.00 fee for the File Wrapper process.

06/19/84  619684

                               Respectively submitted:

3 201
By: _____ 150.00/CK
       Allegra D. Hemphill

ADH:tr
1507 Linden Street #13
Johnson City, Tennessee 37601
 Tel:  (615) 926-7568

# 257 (A)



10

13

*do not enter Q.S.*

The swab portion is preferably comprised
of fairly rigid inner core member, constructed
either in segments or as a one piece unit, over
which a thick, gauze type adsorbent pad or layer
is secured.


## REMARKS

Alvarez teaches that a moisture absorbent layer is exposed
    after the protective covering is removed and the same
    has a liquid impervious layer underneath.

Telfa, is one of the dressings used that provides for a
protective covering, a thin plastic layer allowing the
gauze underneath to be absorbent and not the outer layer,
therefore the outer layer is moisture adsorbent.

There is  a distinct difference between ABsorbent and
ADsorbent, to ab as in Alvarez  absorb is to take in,
suck up, swallow, engross wholly,  to take up or receive
by chemical or molecular actions as of gases or liquids and
to ad as in Hemphill to adsorb is to take up and hold,
to gather gas or liquid or dissolved material on a surface.


## 258 (A)

10          DETAILED DESCRIPTION OF THE PREFERRED
            EMBODIMENTS OF THE PRESENT INVENTION

                    As explained above, the present invention
            is designed to dry or absorb material in the
            internal vaginal area when observes a
15          discharge or lubrication building up to the point
            that cleansing is either desired or required.
            Alternatively, the swab can be used as an
18          applicator for a variety of products or medicants
19          and it can either be pre-impregnated therewith or
            such materials could be applied once the swab was
21          unpackaged.  It should be understood that the
22          adsorbent gauze material and the swab element is
            contemplated as being sterile when packaged.


REMARKS

line 18 of adsorbant quality for a variety of products or medicants
the applicator is to take up and hold so to apply unto vaginal area

line 19 such as a treated material of one of the polymers like that
        that of Telfa, a thin plastic coating so not to tear or
        cause irritation to the mucous membrane.

line 21 unpackaged such as Furacin, petrolatum, silver foil or the like
Furacin, petrolatum adaptic gauze all are moisture adsorbent, the
layer that is underneath is what is moisture absorbing.

line 22 adsorbent gauze material
Once the protective covering is removed the adsorbent layer is exposed


**259 (A)**

13      material. I prefer to have the adsorbent material
           24 be comprised of a cotton or cotton/polyester
.15     gauze.


REMARKS

line 13-15

the example of Telfa, once again is used here to show that
the thin plastic coating, of the polymer/polyester medical grade
causes the gauze like textile to become adsorbent. The
underlying nature of the material allows for the material to
absorb, unlike that of Alvarez.

## 260 (A)

10

25      102 is separately formed so as to have a base
        formed as an annular band or ring 106.  Core
        member 102 can be formed either as a solid
        structure or preferably with a hollow interior.
29      As in the other embodiments, absorbant gauze

REMARKS
line 29(absorbant gauze)
typing error  to adsorbant gauze

261 (A)

14

WHAT I CLAIM IS:

1.  A disposable vaginal swab comprised
of a housing surrounding a swab member comprised
3      of a stiff core member and an (absorbant) adsorbant outer
covering secured thereto, at least a portion of
said housing comprising a removable cover to close
said housing and protect said swab member within
said housing,   said core member being movably
retained within said housing so as to be movable
9      between a first retracted/retained position and a second
10     extended/exposed position relative to said housing
when said cover has been removed and means for moving
12     said core member between first retracted or retained
13     and said extended or exposed positions.

REMARKS
line 3(absorbant) typing error to adsorbant
line 9   retained    (added)
line 10 exposed     (word exposed added)
line 12 retained    (words or retained added)
line 13 or exposed   (words or exposed added)


Claim 1 has been modified, by way of the elected Species #4, Figures 8 and 9.
The specefs #4 allows for the removable cover to form the handle structure
unlike  Kenner, and a rotatable means by a hinge when the handle structure
exposes the swab member, unlike Gelardin.
Kenner states that the device allows for the injection of fluid and a
protruding element.  The hollow plunger head is used to inject fluid
and the plunger fits snuggly into the speculum.
Kenner has an annular groove that receives an elastic band.


Hemphill suggests that there is no protruding element after insertion
and the handle structure once removed serves as a functional part of
the device.

**262 (A)**

WHAT I CLAIM IS:

      2.  A swab as in claim 1, wherein said
adsorbent cover is comprised of a textile gauze-
3     like fabric, <u>or of polymer materials or the like</u>
4     <u>being of medical grade.</u>


REMARKS

line 3 <u>or of polymer materials or the like being of medical grade.</u>
included because of line 13-15 page 7
  I prefer to have the adsorbent material
  24 be comprised of a cotton or cotton/polyester
  gauze.

and included because of line 19 page 5
   and it can either be pre-impregnated therewith or

Claim 2, is of <u>adsorbent</u> material unlike that of <u>Alvarez</u> column 4 lines 17-19
  The said layer may also comprise other <u>absorbent</u> materials
  such as fabric or the like.
Definitions for adsorbent and absorbent:
  adsorbent materials- having power, capacity to take up and hold
  absorbent materials-allow for the swallowing up, engulf
    to take in, suck up, swallow, engross wholly

<u>Alvarez</u> teaches that the absorbent (fabric or the like) layer is
   exposed after the protective covering is unpackaged and has
   a layer that is also detachable underneath that is liquid impervious.

<u>Hemphill</u>  suggests that the swab element be of adsorbent material, that
   is textile gauze-like treatment to provide the adsorbent nature.
   An example of this would be that of Telfa, a thin plastic
   coating which is non-irritating to the mucous membrane and will
   not tear or stick to the tissue unlike an absorbent gauze, because
   of the polymer material.  The gauze may be treated also with
   petrolatum, furacin, silver foil, adaptic gauze or the like
   (see line 21 page 5)
<u>Hemphill</u> also suggests the the adsorbent layer be directly secured to the
device, unlike the detachable layers of <u>Alvarez</u>.

**263 (A)**

WHAT I CLAIM IS:

3. A swab as in claim 1, wherein said
moving means includes a rotatable member rotatably
secured to said housing and cam means operatively
connecting at least a portion of said core member
and the interior of said housing together so that
said core member will move vertically (within) when said
(housing as said rotatable member is rotated.)
rotatable member of said housing is rotated.

6
7

REMARKS

line 6 (within) changed to when
line 7 (housing as said rotatable member is rotated.)  changed to
rotatable member of said housing is rotated.

Claim 3 has been modified, for clarity for speceis #4.
The Hemphill device is to be peeled downward after a first position
to separate tabs, thus opening or exposing of the swab member causes a
vertical movement, unlike the twisting of a base rotatable knob as in the
Gelardin device.
The Hemphill device, after removing the outer housing serves as a handle
structure, and still serves as a function for the device, unlike Gelardin,
that states that the cover is completely removed.
Gelardin has a rotatable base by means of twisting a knob by the way of
a travel carrier in the inner sleeve to advance and retract . Gelardin
has an inner and outer sleeve that serve to advance and retract carrier.

**264 (A)**



S (rev, 1-79)

**FILING RECEIPT**



## UNITED STATES DEPARTMENT OF COMMERCE
### Patent and Trademark Office

Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington D.C. 20231

| SERIAL NUMBER | FILING DATE | GRP ART UNIT | FIL FEE REC'D | ATTORNEY DOCKET NO. | DRWGS | TOT CL | IND CL |
|---|---|---|---|---|---|---|---|
| 06/434,828 | 10/18/82 | 335 | $ 150.00 | | 3 | 8 | 3 |

CUSHMAN, DARBY & CUSHMAN
1801 K ST., N. W., 8TH FLR.
WASHINGTON, DC 20006

Receipt is acknowledged of the patent application identified herein. It will be considered in its order and you will be notified as to the examination thereof. Be sure to give the U.S. SERIAL NUMBER, DATE OF FILING, NAME OF APPLICANT, and TITLE OF INVENTION when inquiring about this application. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this transmittal.

Applicant(s)    ALLEGRA D. HEMPHILL, ROCKVILLE, MD.

★ SMALL ENTITY ★

TITLE
VAGINAL APPLICATOR

**265 (A)**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

The Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

Herewith is application of:

Applicant:   Allegra D. Hemphill

For: Vaginal Applicator

including:

Date:   October 18, 1982

Docket No.

[x] Declaration        [ ] Declaration is facsimile/copy of signed Declaration

[x] Abstract ___1___ page(s),

_15_ pages of Specification (only spec. and claims)   [ ] Specification in non-English language

_6_ numbered claim(s); and

_3_ sheet(s) of drawing:   [x] informal;   [ ] formal   size: [ ] A4   [x] 14"

[ ]   Attached is an assignment to _____

[ ]   Priority is hereby claimed under Rule 55 and 35 U.S.C. 119 based on prior foreign
application(s)

No(s). _____ filed in _____

on _____ , respectively.

a. [ ] Certified copy (copies) attached.

b. [ ] Certified copy (copies) already filed on _____

in U.S. Application, Serial No. _____ , filed _____

[x]   Attached is a verified statement establishing "small entity" status under Rules 9 & 27.

[ ]   Attached:

[ ]   Preliminary amendment:

## THE FOLLOWING FILING FEE IS BASED ON CLAIMS AS FILED LESS ANY ABOVE CANCELLED
### PER MPEP $506 AND $607

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  | Basic Fee | = | $ 300.00 |
| Total Effective Claims | 7 | - 20 = -- | x $10.00 | = | -0- |
| Independent Claims | 3 | - 3 = -- | x $30.00 | = | -0- |

If _any_ multiple dependent claim (proper or improper) is present, add $100.00

Subtotal          300.00

If "small entity" status box above is checked, enter half (1/2) of subtotal & _subtract_ -  150.00

**TOTAL FILING FEE ENCLOSED**  = $ 150.00

If "non-English" box above is checked, add Rule 17(k) processing fee ($20.00)

If "assignment" box above is checked, add recording fee ($20.00) - - - - - - $

**TOTAL FEE ENCLOSED** - - - $ 150.00

The Commissioner is hereby authorized to charge any _deficiency_ in the fee(s) filed, or asserted
to be filed, or which should have been filed herewith or concerning any paper filed hereafter,
and which may be required under Rules 16-18 now or hereafter relative to this application and
the resulting Official document under Rule 20, or _credit_ any overpayment, to Account No. 03-
3975 for which purpose a _duplicate_ copy of this sheet is attached.

1801 K Street, N.W.
Washington, D.C. 20006
Tel: 861-3000

Ref: PWG:1sp

CUSHMAN, DARBY & CUSHMAN

By _____
Name:   Peter W. Gowdey
Reg. No.   25,872

## 266 (A)

GUY S. WEEMS
ATTORNEY AT LAW
BOX 313
120 ½ SOUTH CHEROKEE
JONESBOROUGH, TN. 37659

**267 (A)**



AFTER FIVE DAYS RETURN TO

D. Houchill
1507 Linden Street #13
Johnson City, Tennessee 37601

ZIP-CODE

attn: APPLICATION BRANCH
MS. M. A. BALDWIN

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

**268 (A)**



PATENT NUMBER

APPLICATION SERIAL NUMBER
01 9 6 84

APPLICANT'S NAME (PLEASE PRINT)
A. Hemphill

IF REISSUE, ORIGINAL PATENT NUMBER

ORIGINAL CLASSIFICATION

| CLASS | SUBCLASS |
|---|---|
| 604 | 4 1 |

CROSS REFERENCE(S)

| CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) |
|---|---|
| 401 | 77 | 78 |

INTERNATIONAL CLASSIFICATION (INT. CL. 3)

| A 61 B | 10 | 00 |
|---|---|---|

| GROUP ART UNIT | 236 |
|---|---|

ASSISTANT EXAMINER (PLEASE STAMP OR PRINT FULL NAME)
CHRISTA K. SCOTT

PRIMARY EXAMINER (PLEASE STAMP OR PRINT FULL NAME)
JASKE

ISSUE CLASSIFICATION SLIP

PTO 270
(10/80)

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

FORM PTO-875
(Rev. 3-83)

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

**PATENT APPLICATION FEE DETERMINATION RECORD**

SERIAL NO. 619-684

FILING DATE 6-11-84

APPLICANT (FIRST NAMED) Allegra Hemphill

## CLAIMS AS FILED - PART I

| FOR: | NO. FILED | NO. EXTRA | | SMALL ENTITY | | OR | OTHER THAN A SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|
| | | | | RATE | FEE | OR | RATE | FEE |
| BASIC FEE | | | | | $150 | OR | | $300 |
| TOTAL CLAIMS | 20 | –20– | | ×5= | $ | OR | ×10= | $ |
| INDEP. CLAIMS | 3 | –3– | | ×15= | $ | OR | ×30= | $ |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT | | | | +50= | $ | OR | +100= | $ |
| * If the difference in col. 1 is less than zero, enter "0" in col. 2 | | | | TOTAL | $150 | OR | TOTAL | $ |

## CLAIMS AS AMENDED - PART II

### AMENDMENT A

| | (1) CLAIMS REMAINING AFTER AMENDMENT | (2) HIGHEST NO. PREVIOUSLY PAID FOR | (3) PRESENT EXTRA | | SMALL ENTITY | | OR | OTHER THAN A SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | RATE | ADDIT. FEE | OR | RATE | ADDIT. FEE |
| TOTAL | * | MINUS ** | – | | ×5= | $ | OR | ×10= | $ |
| INDEP. | * | MINUS *** | – | | ×15= | $ | OR | ×30= | $ |
| ☐ FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | | +50= | $ | OR | +100= | $ |
| | | | | | TOTAL ADDIT. FEE | $ | OR | TOTAL | $ |

### AMENDMENT B

| | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NO. PREVIOUSLY PAID FOR | PRESENT EXTRA | | RATE | ADDIT. FEE | OR | RATE | ADDIT. FEE |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL | * | MINUS ** | – | | ×5= | $ | OR | ×10= | $ |
| INDEP. | * | MINUS *** | – | | ×15= | $ | OR | ×30= | $ |
| ☐ FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | | +50= | $ | OR | +100= | $ |
| | | | | | TOTAL ADDIT. FEE | $ | OR | TOTAL | $ |

### AMENDMENT C

| | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NO. PREVIOUSLY PAID FOR | PRESENT EXTRA | | RATE | ADDIT. FEE | OR | RATE | ADDIT. FEE |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL | * | MINUS ** | – | | ×5= | $ | OR | ×10= | $ |
| INDEP. | * | MINUS *** | – | | ×15= | $ | OR | ×30= | $ |
| ☐ FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | | +50= | $ | OR | +100= | $ |
| | | | | | TOTAL ADDIT. FEE | $ | OR | TOTAL | $ |

* If the entry in Col. 1 is less than the entry in Col. 2, write "0" in Col. 3.

** If the "Highest No. Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest No. Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest No. Previously Paid For" (Total or Indep.) is the highest number found in the appropriate box in Col. 1.

**270 (A)**

## SEARCH NOTES

| | Date | Ex'r |
|---|---|---|
| | | |

MBO UTI

PTO-436A
(78)

819

### SEARCHED

| Class | Sub | Date | Exr |
|---|---|---|---|
| 604 | 1 | 12-11-84 | QG. |
| | 2 | | |
| 401 | 77 | | |
| | 78 | | |
| | 196 | | |
| | 202 | | |
| | 207 | | |
| | 116 | | |

### PRINT CLAIM(S):

1

### INDEX OF CLAIMS

| Final | Original | | | Date | | | | | | Claim | | Date | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | R-13 | | | | | | | | | 26 | | | | | | | |
| | | | | | | | | | | 27 | | | | | | | |
| | | | | | | | | | | 28 | | | | | | | |
| | | | | | | | | | | 29 | | | | | | | |
| 1 | 5 = | | | | | | | | | 30 | | | | | | | |
| 2 | 6 = | | | | | | | | | 31 | | | | | | | |
| | 7 | | | | | | | | | 32 | | | | | | | |
| | 8 | | | | | | | | | 33 | | | | | | | |
| | 9 | | | | | | | | | 34 | | | | | | | |
| | 10 | | | | | | | | | 35 | | | | | | | |
| | 11 | | | | | | | | | 36 | | | | | | | |
| | 12 | | | | | | | | | 37 | | | | | | | |
| | 13 | | | | | | | | | 38 | | | | | | | |
| | 14 | | | | | | | | | 39 | | | | | | | |
| | 15 | | | | | | | | | 40 | | | | | | | |
| | 16 | | | | | | | | | 41 | | | | | | | |
| | 17 | | | | | | | | | 42 | | | | | | | |
| | 18 | | | | | | | | | 43 | | | | | | | |
| | 19 | | | | | | | | | 44 | | | | | | | |
| | 20 | | | | | | | | | 45 | | | | | | | |
| | 21 | | | | | | | | | 46 | | | | | | | |
| | 22 | | | | | | | | | 47 | | | | | | | |
| | 23 | | | | | | | | | 48 | | | | | | | |
| | 24 | | | | | | | | | 49 | | | | | | | |
| | 25 | | | | | | | | | 50 | | | | | | | |

### INTERFERENCE SEARCHED

| Class | Sub | Date | Exr |
|---|---|---|---|
| 604 | 1 | 12-13-84 | QG.5 |
| | 2 | | |
| 401 | 77 | | |
| | 78 | | |
| | 196 | | |
| | 202 | | |
| | 207 | | |
| | 116 | | |

SYMBOLS                STATUS

✓ .................... Rejected
= .................... Allowed
–(Through numeral) Canceled
+ .................... Restriction requirement
N .................... Nonelected invention or species
I .................... Interference
A .................... Appeal
O .................... Objected

### 271 (A)

PTO-1130 (rev. 8-79)

**PALM III APPLICATION FILE DATA CODING SHEET**

U.S. DEPARTMENT of COMMERCE—Pat. & TM. Off.

FORMAT NO. 2 / SERIAL NO.: 06 696824   TYPE APPL: 2

FILING DATE — Month 06  Day 11  Year 84

ATTORNEY DOCKET NUMBER (12 places)

FORMAT NO. 3

SPECIAL HANDLING

GROUP ART UNIT: 336   CLASS: 604

SHEETS OF DRAWINGS: 3

TOTAL CLAIMS: 20

INDEPENDENT CLAIMS: 3

FILING FEE RECEIVED: 31 206

SECURITY CASE?: NO

PREPARED: [signature] 10-16-84

Att'y. Reg. Nos. — ☐ APPL. PAPERS ☐ CODING SHEET

FORMAT NO. 4 - Applicant's Name & Address: ☐ APPL. PAPERS ☐ CODING SHEET

FORMAT NO. 5 - Title of Invention: ☐ APPL. PAPERS ☐ CODING SHEET

FORMAT NO. 8 & 7 Correspondence Address: ☐ APPL. PAPERS ☐ CODING SHEET

**FORMAT NO. 8**

| | | CONTINUITY CODE | PARENT APPLICATION SERIAL NUMBER | PARENT FILING DATE Month / Day / Year | STATUS CODE | PARENT PATENT NUMBER |
|---|---|---|---|---|---|---|
| RECORD | 8 0 1 | 0 2 | 0 6 4 3 4 8 2 8 | 1 0 / 1 8 / 8 2 | 2 | |
| RECORD | 8 0 2 | | 0 | | | |
| RECORD | 8 0 3 | | 0 | | | |
| RECORD | 8 0 4 | | 0 | | | |
| RECORD | 8 0 5 | | 0 | | | |
| RECORD | 8 0 6 | | 0 | | | |
| RECORD | 8 0 7 | | 0 | | | |
| RECORD | 8 0 8 | | 0 | | | |
| RECORD | 8 0 9 | | 0 | | | |
| RECORD | 8 1 0 | | 0 | | | |

☐ MORE ON SUPPLEMENTAL CODING SHEET

**FORMAT NO. 9**

| | | COUNTRY CODE | PCT/FOREIGN APPLICATION SERIAL NUMBER | FILING DATE Month / Day / Year |
|---|---|---|---|---|
| RECORD | 9 0 1 | | | |
| RECORD | 9 0 2 | | | |
| RECORD | 9 0 3 | | | |
| RECORD | 9 0 4 | | | |
| RECORD | 9 0 5 | | | |
| RECORD | 9 0 6 | | | |
| RECORD | 9 0 7 | | | |
| RECORD | 9 0 8 | | | |
| RECORD | 9 0 9 | | | |
| RECORD | 9 1 0 | | | |

FOREIGN PRIORITY CLAIMED?  ☐ YES  ☐ NO

☐ APPLICATION PAPERS

☐ MORE ON SUPPLEMENTAL CODING SHEET

272 (A)

PTO-1130
(Rev. 4-81)

PALM III APPLICATION FILE DATA CODING SHEET

U.S. DEPARTMENT of COMMERCE-Pat. & TM OM.

PREPARED BY

FORMAT NO. 2 / SERIAL NO.

06  4348287

TYPE APPL

ATTORNEY DOCKET NUMBER (12 paces)

FILING DATE
Month  Day  Year

SPECIAL HANDLING

GROUP ART UNIT
3335

CLASS

SHEETS OF DRAWINGS

TOTAL CLAIMS

INDEPENDENT CLAIMS

FILING FEE RECEIVED

SECURITY CASE?

DATE

Atty. Reg. Nos.

FORMAT NO. 3

FORMAT NO. 4 - Applicant's Name & Address
□ APPL. PAPERS   □ CODING SHEET

FORMAT NO. 5 - Title of Invention
□ APPL. PAPERS   □ CODING SHEET

FORMAT NO. 6 & 7 Correspondence Address
□ APPL. PAPERS   □ CODING SHEET

**FORMAT NO. 8**

| | | CONTINUITY CODE | PARENT APPLICATION SERIAL NUMBER | STATUS CODE | PARENT FILING DATE Month Day Year | PARENT PATENT NUMBER |
|---|---|---|---|---|---|---|
| RECORD | 8 0 1 | | 0 | | | |
| RECORD | 8 0 2 | | 0 | | | |
| RECORD | 8 0 3 | | 0 | | | |
| RECORD | 8 0 4 | | 0 | | | |
| RECORD | 8 0 5 | | 0 | | | |
| RECORD | 8 0 6 | | 0 | | | |
| RECORD | 8 0 7 | | 0 | | | |
| RECORD | 8 0 8 | | 0 | | | |
| RECORD | 8 0 9 | | 0 | | | |
| RECORD | 8 1 0 | | 0 | | | |

□ MORE ON SUPPLEMENTAL CODING SHEET

**FORMAT NO. 9**

| | | COUNTRY CODE | PCT/FOREIGN APPLICATION SERIAL NUMBER | FILING DATE Month Day Year |
|---|---|---|---|---|
| RECORD | 9 0 1 | | | |
| RECORD | 9 0 2 | | | |
| RECORD | 9 0 3 | | | |
| RECORD | 9 0 4 | | | |
| RECORD | 9 0 5 | | | |
| RECORD | 9 0 6 | | | |
| RECORD | 9 0 7 | | | |
| RECORD | 9 0 8 | | | |
| RECORD | 9 0 9 | | | |
| RECORD | 9 1 0 | | | |

FOREIGN PRIORITY CLAIMED?
□ YES
□ NO

APPLICATION PAPERS

□ MORE ON SUPPLEMENTAL CODING SHEET

273 (A)

FORM PTO-875

| U.S. DEPARTMENT OF COMMERCE | SERIAL NO. | FILING DATE |
|---|---|---|
| PATENT AND TRADEMARK OFFICE | 434828 | 10-18-82 |
| PATENT APPLICATION FEE DETERMINATION RECORD | APPLICANT (FIRST NAMED) Hemphill | |

## CLAIMS AS FILED – PART I

| FOR: | (Col. 1) NO. FILED | (Col. 2) NO. EXTRA | | SMALL ENTITY RATE | FEE | OR | OTHER THAN A SMALL ENTITY RATE | FEE |
|---|---|---|---|---|---|---|---|---|
| BASIC FEE | | | | | $150 | OR | | $300 |
| TOTAL CLAIMS | 6 | -20= | * 0 | x5= | $ 0 | OR | x10= | $ |
| INDEP. CLAIMS | 3 | -3= | * 0 | x15= | $ 0 | OR | x30= | $ |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT | | | | +50= | $ 0 | OR | +100= | $ |
| | | | | TOTAL | $150 | OR | TOTAL | $ |

\* If the difference in col. 1 is less than zero, enter "0" in col. 2

## CLAIMS AS AMENDED – PART II

### AMENDMENT A

| | (Col. 1) CLAIMS REMAINING AFTER AMENDMENT | (Col. 2) HIGHEST NO. PREVIOUSLY PAID FOR | (Col. 3) PRESENT EXTRA | SMALL ENTITY RATE | ADDIT. FEE | OR | OTHER THAN A SMALL ENTITY RATE | ADDIT. FEE |
|---|---|---|---|---|---|---|---|---|
| TOTAL | * | MINUS ** | = | x5= | $ | | x10= | $ |
| INDEP. | * | MINUS *** | = | x15= | $ | | x30= | $ |
| ☐ FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | +50= | $ | | +100= | $ |
| | | | | TOTAL ADDIT. FEE | $ | OR | TOTAL | $ |

### AMENDMENT B

| | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NO. PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE | ADDIT. FEE | OR | RATE | ADDIT. FEE |
|---|---|---|---|---|---|---|---|---|
| TOTAL | * | MINUS ** | = | x5= | $ | | x10= | $ |
| INDEP. | * | MINUS *** | = | x15= | $ | | x30= | $ |
| ☐ FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | +50= | $ | | +100= | $ |
| | | | | TOTAL ADDIT. FEE | $ | OR | TOTAL | $ |

### AMENDMENT C

| | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NO. PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE | ADDIT. FEE | OR | RATE | ADDIT. FEE |
|---|---|---|---|---|---|---|---|---|
| TOTAL | * | MINUS ** | = | x5= | $ | | x10= | $ |
| INDEP. | * | MINUS *** | = | x15= | $ | | x30= | $ |
| ☐ FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | +50= | $ | | +100= | $ |
| | | | | TOTAL ADDIT. FEE | $ | OR | TOTAL | $ |

\* If the entry in Col. 1 is less than the entry in Col. 2, write "0" in Col. 3.
\*\* If the "Highest No. Previously Paid For" IN THIS SPACE is less than 20, enter "20".
\*\*\* If the "Highest No. Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest No. Previously Paid For" (Total or Indep.) is the highest number found in the appropriate box in Col. 1.

**274 (A)**

ABANDONED

## REGULAR UT

Form PTO-436
(Rev. 8/78)

SERIAL NUMBER (series of 1979) 4348

SERIAL • '6/4 ?

## SEARCH NOTES

| | Date | Ex'r |
|---|---|---|
| | | |

## SEARCHED

| Class | Sub | Date | Ex'r |
|---|---|---|---|
| 604 | 1 | 4. 8.1 | , / |
| | 2 | | |
| 401 | 77 | | |
| | 78 | | |
| | 196 | | |
| | 202 | | |
| | 207 | | |
| | 116 | | |

## INTERFERENCE SEARCHED

| Class | Sub | Date | Ex'r |
|---|---|---|---|
| | | | |

## PRINT CLAIM(S):

## INDEX OF CLAIMS

| Claim Final | Original | 2 1 8 | 4 2 8 8 | 5 5 8 8 | | | | | | | Date | | | | Claim Final | Original | | | | | | | | | | Date | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | ✓ | ✓ | | | | | | | | | | | 26 | | | | | | | | | | | | | | |
| 2 | | | ✓ | ✓ | | | | | | | | | | | 27 | | | | | | | | | | | | | | |
| 3 | | | ✓ | ✓ | | | | | | | | | | | 28 | | | | | | | | | | | | | | |
| 4 | | | N | N | | | | | | | | | | | 29 | | | | | | | | | | | | | | |
| 5 | | | N | ✓ | | | | | | | | | | | 30 | | | | | | | | | | | | | | |
| 6 | | ✓ | N | N | | | | | | | | | | | 31 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | 32 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | 33 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | 34 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | 35 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | 36 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | 37 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | 38 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | 39 | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | 40 | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | 41 | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | 42 | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | 43 | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | 44 | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | 45 | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | 46 | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | 47 | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | 48 | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | 49 | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | 50 | | | | | | | | | | | | | | |

SYMBOLS                     STATUS

✓ .................. Rejected
■ .................... Allowed
– (Through numeral) Canceled

## 275 (A)

ABANDONED



434828

## CONTENTS

Entered

1. *Applications* _____ papers. & pat

2. Declaration of Small Entity        Oct. 18, 1982

3. Pre. Authorization to Charge Jan. 10, 1983

4. Restriction (30 days)        Feb. 28, 1984     2-30

5. Prior Art        Nov. 18, 1983

6. Election        March 30, 1984

7. REJ (3 mos)        April 12, '84     4-3

8. Rev. And Plat.        May 14, 1984

9. Sub. Spec. N.E.        May 14, 1984

10. FINAL REJ (3 mos)        May 15, '84     5-24

11. _____

12. _____

13. _____

14. _____

15. _____

16. _____

17. _____

18. _____

19. _____

20. _____

21. _____

22. _____

23. _____

24. _____

25. _____

26. _____

27. _____

28. _____

29. _____

30. _____

31. _____

## 276 (A)

*Allegra D. Hemphill*
6217 Charnwood Drive
Rockville, Maryland 20852

VIA PRIORITY MAIL

Commissioner of Patents and Trademarks
Washington, District of Columbia 20231

February 2, 1998

RE:   RE-EXAMINATION PROCESS (35 USC 302): PRIOR ART

| UNITED STATES PATENT: | #4,557,720 | vs. | #4,285,343 |
|---|---|---|---|
| INVENTOR: | Allegra D. Hemphill | | Rosetta M. McNair |
| TITLE: | VAGINAL APPLICATOR | | SANITARY NAPKIN |
| PRIMARY EXAMINER: | John D. Yasko | | John D. Yasko |
| ASSISTANT EXAMINER: | Christa K. Scott | | |

Dear Madam or Sir:

Under the reexamination process (35 USC 302)
I respectfully appeal to the Patents and Trademarks Office to
please re-examine the Hemphill U.S. Patent #4,557,720 limited
to the embodiment, figures 8 & 9; patented claim #2.
The patent claim is structural with respect to a vaginal swab.
The vaginal swab is a "vaginal" swab because of a cover or sheath.
The vaginal swab will have many uses but the way the consumer
will make use of the device is entirely up to them.

The reason for the re-examination is due to the McNair
U.S. Patent #4,285,343 recently brought to my attention
(January 20, 1998).  Although the McNair patent is structurally
equivalent to a swab, it is more relevant to the Alvarez
U.S. Patent #4,177,811, which preceded McNair.

I appreciate the Patents and Trademark Office for citing
Alvarez as a swab, rather than McNair (structurally like a swab)
because Alvarez is the more equivalent structure to Hemphill;
having an outer housing which is safer and effective for
consumer health concerns.  I believe the improvements made by
Hemphill would have been patentable over this prior art by McNair.
To help simplify matters, I have included a structural
comparison and the prior art patent for your review.

Consumers deserve products that are safe and effective. Therefore,
Hemphill is understood to be in compliance with the rules and
regulations under the Patents and Trademarks Office and the
guidelines set forth by the Good Manufacturing Practices (GMP).

In closing, no other prior art patent, including McNair,
made the distinction in the way the vaginal swabs are
absorbing.  Hemphill was distinguished from Alvarez (McNair
is absorbing like Alvarez) and I believe the prior art by
McNair is relevant to Alvarez, but Hemphill was found patentable
over Alvarez and respectfully requests a certificate of patentability
with respect to the McNair prior art.

Enclosed, please find the Reexamination Fee in the amount of $2520.00

Respectfully submitted,

*Allegra Hemphill*
Allegra Hemphill

enclosures   STRUCTURAL COMPARISON
             Hemphill U.S. Patent #4,557,720
             McNair U.S. Patent #4,285,343 (prior art)
             Reexmination Fee

# 277 (A)

1. The Patent Trademark Offices, at first, rejected Hemphill because of Alvarez. The gauze-like material (104) is a topsheet or layering that has an adsorbency characteristic that is distinctive and is distinguished from Alvarez because it allows fluid to begin absorbing inside or underneath and not on the outer most surface first. This characteristic or trait completely changes the look and behavior to become a _vaginal swab_.

The adsorbency nature (Hemphill) has the power or capacity to provide protection or a shield to the consumer as it takes up and holds the fluid in and not on the outer most surface first; to improve absorbing. (The fluid is guided or directed inside or underneath and not on the outer most surface first).

Whereas, the absorbent nature (Alvarez) allows the swallowing up, engulf to take in, suck up, engross wholly on the outer most surface first which offers no protection to the consumer or shield to help them feel clean, dry or even comfortable.

2. The adsorbency characteristic is present to improve absorbing. The way an adsorbency characteristic is absorbing is distinctive because one can see and feel the difference (an example of a Telfa pad was given to the PTO) which is moisture-absorbent inside or underneath and not on the outer most surface first. Hemphill was first, to make this distinction for the _vaginal swab_.

3. There are many reasons why absorbing like Alavrez is unsafe for the consumer which is the purpose for the Hemphill technology. In my opinion, if McNair had referenced Alvarez as prior art, as its' structural equivalent, I believe Hemphill would still be patentable over both Alvarez and McNair. It is appreciated that the PTO cited Alvarez as the more relevant prior art to Hemphill because Alvarez is more complete, structurally.

4. The PTO would not allow Hemphill to be stiff or rigid; Hemphill is bendable.

A structural description for **HEMPHILL** U.S. Patent #4,557,720 _vaginal swab_ is

covered (104) material (102) on a
band, ring or the like (106)
which is or at least a part thereof
outer housing(110)

Fibers: liquid-pervious/liquid impervious



A structural description for **ALVAREZ** U.S. Patent #4,177,811 applicator is

absorbent material (102) on a
band, ring or the like (106)
having an outer housing (110)

Fibers: alternating liquid-pervious:liquid impervious



A structural description for **McNAIR** U.S. Patent #4,285,343 _sanitary napkin_ is

absorbent material (102 x 2) on
a band, ring or the like (106)

Fibers: (2) liquid-pervious:liquid impervious

* Although McNair is highly absorptive, McNair is absorbent, absorbing like Alvarez. The McNair cover sheet (13) on an absorbent bat (14) as the central absorbent pad (11) with a band or backing (12).

Hemphill improves absorbing on the McNair cover sheet (13) because of (104) adsorbency characteristic. Hemphill improves McNair band or backing (12) to protect and make safe the fibers in a first enclosed -to- second exposed position (106) via an outer housing (110) for safety and effectiveness. Although McNair is structurally more equivalent to Alvarez and is absorbing like Alvarez, Hemphill was found patentable over Alvarez.

*Allegra D. Hemphill*
6217 Charnwood Drive
Rockville, Maryland 20852

VIA PRIORITY MAIL

Commissioner of Patents and Trademarks
Washington, District of Columbia 20231                    February 2, 1998

RE:  RE-EXAMINATION PROCESS (35 USC 302): PRIOR ART

| UNITED STATES PATENT: | #4,557,720 | vs. | #4,285,343 |
|---|---|---|---|
| INVENTOR: | Allegra D. Hemphill | | Rosetta M. McNair |
| TITLE: | VAGINAL APPLICATOR | | SANITARY NAPKIN |
| PRIMARY EXAMINER: | John D. Yasko | | John D. Yasko |
| ASSISTANT EXAMINER: | Christa K. Scott | | |

Dear Madam or Sir:

Under the reexamination process (35 USC 302)
I respectfully appeal to the Patents and Trademarks Office to
please re-examine the Hemphill U.S. Patent #4,557,720 limited
to the embodiment, figures 8 & 9; patented claim #2.
The patent claim is structural with respect to a vaginal swab.
The vaginal swab is a "vaginal" swab because of a cover or sheath.
The vaginal swab will have many uses but the way the consumer
will make use of the device is entirely up to them.

The reason for the re-examination is due to the McNair
U.S. Patent #4,285,343 recently brought to my attention
(January 20, 1998).  Although the McNair patent is structurally
equivalent to a swab, it is more relevant to the Alvarez
U.S. Patent #4,177,811, which preceded McNair.

I appreciate the Patents and Trademark Office for citing
Alvarez as a swab, rather than McNair (structurally like a swab)
because Alvarez is the more equivalent structure to Hemphill;
having an outer housing which is safer and effective for
consumer health concerns.  I believe the improvements made by
Hemphill would have been patentable over this prior art by McNair.
To help simplify matters, I have included a structural
comparison and the prior art patent for your review.

Consumers deserve products that are safe and effective. Therefore,
Hemphill is understood to be in compliance with the rules and
regulations under the Patents and Trademarks Office and the
guidelines set forth by the Good Manufacturing Practices (GMP).

In closing, no other prior art patent, including McNair,
made the distinction in the way the vaginal swabs are
absorbing.  Hemphill was distinguished from Alvarez (McNair
is absorbing like Alvarez) and I believe the prior art by
McNair is relevant to Alvarez, but Hemphill was found patentable
over Alvarez and respectfully requests a certificate of patentability
with respect to the McNair prior art.

Enclosed, please find the Reexamination Fee in the amount of $2520.00

Respectfully submitted,

*Allegra Hemphill*
Allegra Hemphill

enclosures  STRUCTURAL COMPARISON
            Hemphill U.S. Patent #4,557,720
            McNair U.S. Patent #4,285,343 (prior art)
            Reexmination Fee

# 277 (A)

1. The Patent Trademark Offices, at first, rejected Hemphill because of Alvarez. The gauze-like material (104) is a topsheet or layering that has an adsorbency characteristic that is distinctive and is distinguished from Alvarez because it allows fluid to begin absorbing inside or underneath and not on the outer most surface first. This characteristic or trait completely changes the look and behavior to become a <u>vaginal swab</u>.

The <u>adsorbency nature</u> (Hemphill) has the power or capacity to provide protection or a shield to the consumer as it <u>takes up and holds</u> the fluid in and not on the outer most surface first; to improve absorbing. (The fluid is guided or directed inside or underneath and not on the outer most surface first.)

Whereas, the <u>absorbent nature</u> (Alvarez) allows the swallowing up, engulf to take in, suck up, engross wholly on the outer most surface first which offers no protection to the consumer or shield to help them feel clean, dry or even comfortable.

2. The adsorbency characteristic is present to improve absorbing. The way an adsorbency characteristic is absorbing is distinctive because one can see and feel the difference (an example of a Telfa pad was given to the PTO) which is moisture-absorbent inside or underneath and not on the outer most surface first. Hemphill was first, to make this distinction for the <u>vaginal swab</u>.

3. There are many reasons why absorbing like Alavrez is unsafe for the consumer which is the purpose for the Hemphill technology. In my opinion, if McNair had referenced Alvarez as prior art, as its' structural equivalent, I believe Hemphill would still be patentable over both Alvarez and McNair. It is appreciated that the PTO cited Alvarez as the more relevant prior art to Hemphill because Alvarez is more complete, structurally.

4. The PTO would not allow Hemphill to be stiff or rigid; Hemphill is bendable.

A structural description for **HEMPHILL** U.S. Patent #4,557,720 <u>vaginal swab</u> is

covered (104) material (102) on a
band, ring or the like (106)
which is or at least a part thereof
outer housing (110)

Fibers: liquid-pervious/liquid impervious



A structural description for **ALVAREZ** U.S. Patent #4,177,811 <u>applicator</u> is

absorbent material (102) on a
band, ring or the like (106)
having an outer housing (110)

Fibers: alternating liquid-pervious:liquid impervious



A structural description for **McNAIR** U.S. Patent #4,285,343 <u>sanitary napkin</u> is

absorbent material (102 x 2) on
a band, ring or the like (106)

Fibers: (2) liquid-pervious:liquid impervious

* Although McNair is highly absorptive, McNair is absorbent, absorbing like Alvarez. The McNair cover sheet (13) on an absorbent bat (14) as the central absorbent pad (11) with a band or backing (12).

Hemphill improves absorbing on the McNair cover sheet (13) because of (104) adsorbency characteristic. Hemphill improves McNair band or backing (12) to protect and make safe the fibers in a first enclosed -to- second exposed position (106) via an outer housing (110) for safety and effectiveness. Although McNair is structurally more equivalent to Alvarez and is absorbing like Alvarez, Hemphill was found patentable over Alvarez.

PRIOR ART: **SAFETY & EFFECTIVENESS**

I.  Improving the absorbing (adsorbency characteristic)
helps prevent and helps reduce many uncomfortable symptoms
and structurally, a "swab" has a band, ring or the like present
as a means to reduce touching or handling the fiber(s).
The band helps reduce soiling the fiber(s) with unclean hands.
The fiber(s) is placed in close proximity to the body where
there are openings (including pores on the skin, or vaginal and
anal openings).

Microbes and microorganisms are present on objects.
These germs of various unknown origins are transmitted by
unclean hands; that can be carried by the hands causing the
consumer to innocently infect themselves.  Responsible
parties should know to refrain from purposefully instructing the
consumer to deliberately touch the applicator tip without instructing
them to _first_ wash their unclean hands, thereby reducing the effects
of contagions and contaminating the fiber.

II.  Hemphill made improvements over Alvarez _and_ McNair.
Hemphill combines an adsorbency characteristic, a solid or
hollow core member that is bendable (as the PTO charged that
Hemphill is not stiff or rigid, but bendable) with an outer
housing.

The patent claim begins reading as follows:
<u>A VAGINAL SWAB COMPRISING AN OUTER HOUSING</u>

Hemphill and Alvarez are absorbing differently but
Hemphill and Alvarez make provisions for cleanliness during
the manufacturing process with an outer housing present.
Another purpose for an outer housing is to help to reduce
tampering or contaminating the fiber.  McNair has <u>no</u> outer housing.

Alvarz has an outer housing absorbing unlike Hemphill and
McNair has <u>no</u> outer housing absorbing unlike Hemphill.
**Alavrez was the more befitting patent to Hemphill; cited by the PTO.

**HEMPHILL** U.S. Patent #4,557,720        **ALVAREZ** U.S. Patent #4,177,811





**McNAIR** U.S. Patent #4,285,343



The McNair cover sheet (13) and **absorbent bat** (14)
is the central absorbent pad (11) with a band or backing (12).
McNair is absorbent; absorbing like Alvarez.

Hemphill improves absorbing on the McNair cover sheet (13)
because of an adsorbency characteristic.  Hemphill improves
McNair band or backing (12) to protect and make safe the fiber(s)
in a first enclosed or closed position -to- second exposed position (106)
via an outer housing (110) for safety and effectiveness.
Hemphill improves the McNair absorbent _bat_ as "bat" is defined as:
a **stout wooded stick**: cudgel.  Cudgel is a **short heavy stick**; club.
(_American Heritage Dictionary_ College, Third Edition, page 115).
Hemphill core 102 can be either solid or hollow; bendable.
(Core 102 and band 106 is the Hemphill core member. Band 106
is, or at least a part thereof outer housing 110).

Although McNair is structurally more equivalent to Alvarez
and is absorbing like Alvarez, Hemphill was found patentable over Alvarez.

**270 (A)**

*Allegra D. Hemphill*
6217 Charnwood Drive
Rockville, Maryland 20852

VIA PRIORITY MAIL

Commissioner of Patents and Trademarks
Washington, District of Columbia 20231                February 24, 1998

EXAMINING GROUP NO. 3308
REEXAM CONTROL NO: 90/004,908
FILING DATE : 02/03/98
PATENT NUMBER: 4,557,720
PAPER NO. 7

Dear Madam or Sir:

It is my understanding to disclose everything that is known
to the Patent Trademark Office.   In obedience, I include the
Srinivasan U.S. Patent No. 3,973,567 which displays a
sanitary napkin even though there is nothing remarkable
about Srinivasan as a <u>vaginal swab</u> to be relevant.
1.  A <u>vaginal swab</u> does not look or behave like a sanitary napkin.
A <u>vaginal swab</u> does not function or operate like a sanitary napkin.
**It is believed the sanitary napkin shifted, through McNair,
U.S. Patent No. 4,285,343 to become structurally like a swab.**
It is also believed that the improvements made by Hemphill is
safer and more effective to be patentable over this prior art.
2.  <u>All</u> the components or parts must be present to be a
<u>vaginal swab</u>.  To be a <u>vaginal swab</u>: a cover or layering is the
adsorbency characteristic (104) present to improve absorbing.
Srinivasan is absorbing like Alvarez with no (104)
adsorbency characteristic to improve absorbing.

The distinctive quality of a <u>vaginal swab</u> provides
comfortable protection.  The range of a vaginal swab
is not stiff or rigid so as to be harsh or abrasive that
would cause harmful irritations or complications and
it is not flimsy so as to crumble or fall apart in use.
As it is specified in the Hemphill U.S. Patent #4,557,720
**a vaginal swab is fairly rigid which is an honest description.**
Bendable is <u>undefined</u> in most dictionaries but bendable, to
my understanding, will be tractable because Hemphill is the
first.  Hemphill is the first <u>vaginal swab</u>.

At this time, I have concluded my submission for reexamination.
Please concentrate closely on the McNair U.S. Patent No. 4,285,343
sanitary napkin previously submitted because I must make certain
that the Hemphill U.S. Patent No. 4,557,720 vaginal swabs are
<u>honestly in compliance</u> with the Patent Trademark Office.
Respectfully submitted;

*Allega Hemphill*

Allegra Hemphill                         **280 (A)**

# United States Patent [19]

## McNair

[11]    **4,285,343**

[45]    **Aug. 25, 1981**

[54] **SANITARY NAPKIN**

[76] Inventor:  Rosetta M. McNair, 3013 Guinevere Dr., Chespeake, Va. 23323

[21] Appl. No.: **85,423**

[22] Filed:  Oct. 16, 1979

[51] Int. Cl.³ ................................................ A61F 13/16
[52] U.S. Cl. ............................................................ 128/287
[58] Field of Search ............... 128/287, 289, 284, 290 R

[56]                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,102,359 | 12/1937 | Friesman | 128/289 |
| 2,787,271 | 4/1957 | Clark | 128/290 R |
| 2,890,701 | 6/1959 | Weinman | 128/289 |
| 3,881,490 | 5/1975 | Whitehead et al. | 128/287 |

*Primary Examiner*—John D. Yasko
*Attorney, Agent, or Firm*—William F. Frank

[57]                **ABSTRACT**

The present invention provides a central elongate highly-absorptive pad element having side panels extending laterally therefrom. The side panels may be formed as an integral part of the invention or may be formed separately and secured to the longitudinal edges of the central element. The lines of common juncture between the central element and the side panels provides flexibility so that the side panels may be folded over the upper surface of the central element for packaging and may be folded toward the back side of the central element when the invention is used. The central element and the side elements have a fluid-impervious backing upon which is placed a thin layer of flexible adhesive which will not penetrate the absorbent materials placed thereon. The central element has a highly-absorptive pad means whereas the absorptive means on the side panels may be minimal. The backing element of the central portion of the invention contains a strip of adhesive covered by a protective tape until use. A similar arrangement is provided on each of the side panels. When used, the central element is placed on the inner side of the undergarment after the protective strip has been removed. The side panels are then folded over the outer surface of the undergarment, one side panel engaging the outer surface of the undergarment, the other side panel engaging the absorptive surface of the first fold of the pad. The side panels may be of a width such that when folded over the central panel they meet along a common line rather than overlap.

3 Claims, 7 Drawing Figures



**U.S. Patent**          Aug. 25, 1981          4,285,343



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7

**282  (A)**

4,285,343

| 1 | 2 |

# SANITARY NAPKIN

## FIELD OF THE INVENTION

The present invention is in the field of absorbent articles, and more particularly, is in the field of absorbent pads for use by women during periods of menstruation.

## BACKGROUND OF THE INVENTION AND PRIOR ART

Absorbent pads for use by women during menstrual periods have advanced over the years from the familiar Kotex type pad requiring the use of a special small belt through the Tampon development and into the present day flat, but highly-absorptive pads which generally are constructed so as to be removably attached, generally through an adhesive adhesion, to the undergarment. Throughout the evolution, emphasis has been placed upon a highly-absorptive article but one which was also less and less conspicuous, particularly when worn under outer-garments which, by design and fashion, may be close fitting. Currently, the elongated, flat pad having a maximum absorptive quality is available. The absorptive quality of available pads can be selected depending upon the requirement for absorption. The absorptive qualities appear to vary from that of minimal-absorptive needs designed for daily wear to the highly-absorptive pad required by women having a copious menstrual flow.

While the pads designed for maximum absorptive quality have been found generally acceptable, it has been also found that these pads provide less than the desired amount of protection. The maximum-absorptive pads do not always prevent the staining of the undergarments by the menstrual fluid and this is very difficult to remove. Additionally, the design of the pads does not maintain them in the desired position when worn and they tend to fold along their longitudinal axis which is also believed also tends toward aiding in the staining of undergarments.

## SUMMARY OF THE PRESENT INVENTION

The present invention is an improvement over the current art in that it provides an absorptive pad which will not fold or crumple laterally along the longitudinal axis but will remain substantially flat or slightly concave to conform to the body surface. It has also been found that this improvement presents staining of undergarments and has actually increased absorptive capacity.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will now be shown by way of illustrative embodiment only in the accompanying drawings wherein:

FIG. 1 is a plan view of the absorptive pad of the present invention;

FIG. 2 is a bottom plan view of the invention shown in FIG. 1 as the invention might be packaged or as it is arranged in the installation on an undergarment;

FIG. 3 is an elevation view in cross-section along the plane 3—3 of FIG. 1;

FIG. 4 is an elevation view in partial cross-section showing the present invention installed on an undergarment;

FIG. 5 is an elevation view in partial cross-section along lines 4—4 of FIG. 4;

FIG. 6 is a top plan view of another embodiment of the present invention; and

FIG. 7 is a top plan view of the embodiment shown in FIG. 6 with the side panels folded as in the embodiment shown in FIG. 2.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is indicated generally as 10 in FIG. 1. The invention comprises a central elongate absorbent element 10 with laterally extending side panels 20 and 21. On element 10 is an elongated absorbent pad 11. Pad 11 comprises a fluid impervious backing element 12 on which an absorbent means is secured thereto by a light overall layer of flexible adhesive which does not penetrate the absorbent means. The absorbent means, as perhaps better seen in FIG. 3 comprises a fluid pervious cover sheet 13 and a central absorbent bat 14, the cover sheet and absorbent bat being of conventional construction for this type of use. It will be noted in FIG. 1 that the absorbent means does not fully cover the backing element at the distal extremities thereof in order to provide a more tapered fit as is customary and desired in this art. Panels 20 and 20' extend laterally along respective longitudinal edges 17 and 18 of the absorbent pad 11 in centerized relationship therewith and are from one-half to three-quarters the length of element 11, preferably about two-thirds. These are identical and the description thereof will be confined to panel 20, it being understood that panel 20' is identical in construction. Panel 20 comprises a fluid-impervious backing element 21 as can be seen in FIGS. 2 and 3 to which there is secured, by a light overall layer of flexible adhesive, a thin pad 22 of soft absorbent material, the thin pad and backing element of the side panel being coextensive. The side panels 20 and 20' may be formed as an integral part of pad 11. If formed separately, each is secured or attached to the central absorbent pad 11 by adhesive or by sewing or other known means, along the respective edges 17 and 18. In either formation, the lines of common juncture of the side panels with the central element must be flexible so that each side panel may be folded about the respective lateral edge of the central element. As seen in FIG. 2, the side panels 20 and 20' have an elongate strip 28 and 28'. Referring to FIG. 3, the elongate strip 28 covers a thin strip of adhesive material 27 which is applied to the outer surface of the backing element 21. This is to protect the adhesive from drying out until such time as the device is used. As will also be seen in FIG. 3, on the outer surface of the backing element of the central absorbent pad 11 there is a strip 16 substantially identical to strip 28 on side panel 20 which covers and protects a thin strip of adhesive 15 thereon. As seen in FIG. 2, the backing element 21 of side panel 20 may contain perforated or roughened areas 23, 24, 25, and 26 which extend across the entire tip of the outer surface of the backing element, but are covered in FIG. 2 by the ends of the protective strip 28. The purpose of these roughened areas 23–26 is to provide some frictional engagement between the outer surface of an undergarment when the present invention is applied to the undergarment. These roughened areas may be omitted without in any way diminishing the effectiveness of the present invention.

Referring now to FIGS. 4 and 5, there is shown therein the present invention 10 after it has been applied to an undergarment 30. As can be seen, the undergar-

**283 (A)**

3
4,285,343
4

ment 30 comprises a body support section 31, a leg opening 33 and a crotch section 32. The invention has been applied to the undergarment 30 by removing the protective strip 16 from the outer surface of the backing element 12, thus exposing the adhesive strip 15. The outer surface of the backing element is then placed in contact with the inner surface of the crotch portion 32 of garment 30, the adhesive engaging the material sufficiently to prevent the central element 10 from sliding. The protective strips 28 and 28' are then removed from side panels 20 and 20' thus exposing the adhesive strip on the outer surface of the backing elements 21 and 21'. Depending upon which side element is first folded over the outer surface of the crotch section 32, the adhesive element 27 and 27' engages the outer surface of the crotch element 32 and the adhesive element 27' or 27 then engages the surface of absorbent pad 22 or 22'. As thus placed in the undergarment, the absorbent pad 11 is uppermost and the soft absorbent pads 22 and 22' are below the garment, thus avoiding any possibility of chafing the surfaces of the body in contact with the device.

Referring now to FIGS. 6 and 7, it will be noted that this embodiment of the invention differs from that shown in FIGS. 1 and 2 in that the side panels 20'' and 21'' are only of a width such that when folded over the central pad portion, the outer edges of the side panels meet along the general center line of the outer surface of the backing element of the central pad. This embodiment presents a less thick section in the crotch portion 30 of the undergarment, but it is no less effective.

It has been found that when the present device is placed on the garment in the manner described above, and the garment is worn, the central absorbent pad 11 is maintained in substantially full contact with the body and does not bunch up laterally, but remains in comfortable contact. The central absorbent pad 11 also does not tend to move longitudinally, thereby bringing some discomfort or unwanted attention to the wearer. It has also been found that when so emplaced, the present invention prevents staining of the crotch of the undergarment and more readily completely absorbs the menstrual fluid.

Those of skill in the art will recognize that the size and materials as illustratively disclosed in the above description may be varied according to needs without departing from the principle of the present invention as recited in the appended claims.

What is claimed is:

1. An improved sanitary napkin comprising an elongated central absorptive means with side panel means extending laterally from each longitudinal edge of said central means with a flexible line of juncture therebetween, each said side panel being of a width at least half the width of said central element, a fluid-impervious backing for said central means and for each of said side panels with means on each backing to secure said napkin to an undergarment, said central means being secured to the inner surface of the crotch portion of said undergarment, each side panel being folded over to encompass at least half of the outer surface of said crotch portion to which it is secured, the so-positioned napkin maintaining its longitudinal position and its lateral width as the crotch portion of the undergarment conforms to the body of the wearer.

2. The napkin according to claim 1 wherein said central absorptive means comprises a fluid-impervious backing, a thin layer of flexible adhesive on one surface, a highly-absorptive, fluid-pervious, absorbent material secured to said one surface by said adhesive, and a fluid-pervious cover for said absorptive material, said cover and said absorptive material not being co-extensive with said one surface at the distal ends thereof, the other surface of said backing element having a thin longitudinal strip of an adhesive covered by a removable protective strip.

3. The napkin according to claim 1 wherein each of said side panels comprises a fluid-impervious backing, one surface of which is covered with a thin layer of a flexible adhesive to which a layer of soft, absorbent material is secured thereby, the soft, absorbent material being co-extensive with one surface of the backing, the other surface of said backing having a longitudinal strip of adhesive thereon covered by a removable protective strip.

* * * * *

45

50

55

60

65

Alvarez                                                    Dec. 11, 1979

[54] THERAPEUTIC APPLICATOR AND
CLEANSING DEVICE

[76] Inventor: Marcial Alvarez, 225 E. Jersey St.,
Elizabeth, N.J. 07206

[21] Appl. No.: 833,070

[22] Filed: Sep. 14, 1977

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 744,403, Nov. 23,
1976, abandoned.

[51] Int. Cl.² .................................. A61M 35/00; B08B 1/00
[52] U.S. Cl. .................................. 128/261; 15/104.93
[58] Field of Search ............ 128/254, 261, 265, 255,
128/403, 260, 401, 269, 267, 341, 342, 271, 283;
224/26 J; 225/1, 94; 229/51 C, 87 C;
424/14–18; 401/28, 36, 37, 192, 292; 15/104.94,
104.93

[56]                    References Cited
### U.S. PATENT DOCUMENTS

| 1,610,947 | 12/1926 | Hosmer | 128/254 |
| 2,333,342 | 5/1942 | Slocumb | 128/271 |
| 2,554,177 | 5/1951 | Burton | 229/87 C |
| 2,779,465 | 1/1957 | Anderson | 206/47 |

### FOREIGN PATENT DOCUMENTS

| 379146 | 10/1907 | France | 128/271 |
| 519197 | 3/1940 | United Kingdom | 128/261 |

Primary Examiner—Dalton L. Truluck
Assistant Examiner—Thomas Wallen

Attorney, Agent, or Firm—Weingram & Klauber

[57]                    ABSTRACT

A cleansing and applicator device is disclosed, which is
especially useful in treatment of the perineal area of the
human anatomy. The device comprises a generally con-
ically shaped applicator body, formed preferably of a
good heat conductor, the device being hollow and
closed at the base thereof by a removable cap, whereby
a cooling or heating liquid may be provided to the body
interior. A flexible and compressible covering structure
for effecting cleansing and treatment is fitted about and
thereby encloses at least the portion of the applicator
body including the apex. The covering structure prefer-
ably includes multiple layers, including at least one
moisture-absorbent layer. The applicator body may
include a necked-in portion toward the base thereof, so
that the covering structure can be frictionally secured
to the body, such as with an elastic band or a clamp.
The plural layers comprising the covering structure,
preferably include tear lines, which enables the various
layers to be successively separated from the applicator
device for disposal. The covering structure may include
an outermost liquid-impervious protective layer as for
example, of plastic, cellophane or the like; with an ab-
sorbent layer. Beneath the absorbent layer, a further
liquid-impervious protective layer may be provided,
and beneath this a layer of paper or the like which is
impregnated with a soothing medication such as an oil
or the like.

13 Claims, 3 Drawing Figures



## 285 (A)



# FIG.1

# FIG.3

# FIG.2



# THERAPEUTIC APPLICATOR CLEANSING DEVICE

## BACKGROUND OF INVENTION

This application is a continuation-in-part of my co-pending application; Ser. No. 744,403, filed Nov. 23, 1976, for "Perineal Toilet Cone," abandoned.

This invention relates generally to medical apparatus, and more specifically relates to devices useful in the cleansing and treatment of the perineal portion of the human anatomy, and useful as well in treatment of hemorrhoids.

As one aspect of personal hygiene, individuals are often required to effect cleansing of the perineal area of the anatomy, for example, subsequent to defecation. Particularly, where pathological conditions are present, including irritation of the anal and/or perineal areas and/or the presence of hemorrhoids, it is important that such cleansing be effected thoroughly, under reasonably sanitary, i.e., hygienic conditions; and further, it may be important where irritations or the like are present, to provide soothing medications or the like to the afflicted area.

In the past, individuals faced with the aforementioned problems have found it extremely difficult to effect a suitable solution. It will, for example, be evident that such individuals may require the above-mentioned treatment while away from home or other facilities where medical resources are readily available. Under such circumstances, the individual is often simply unable to provide the appropriate medical treatment, and a resulting aggravation of a condition can ensue.

In accordance with the foregoing, it may be regarded as an object of the present invention, to provide a therapeutic device which is portable and conveniently carried by a user thereof, which device is useful in the cleansing of the perineal portions of the anatomy.

It is a further object of the present invention to provide a device of the aforementioned character, which enables hygienic cleansing and treatment of the perineal portions of the anatomy, without requiring the user to contact the said areas with the fingers, thereby avoiding irritation of the area by the fingers or nails, and also avoiding the possible consequences of unsanitary contact.

It is a further object of the present invention, to provide a device of the aforementioned character, which is useful in the treatment of hemorrhoids, and especially in treatment of hemorrhoids to effect reduction thereof.

It is a further object of the invention, to provide a device as aforementioned, which includes means enabling the device to be readily heated or cooled, to thereby facilitate treatment of hemorrhoids or other pathological conditions.

## SUMMARY OF THE INVENTION

Now in accordance with the present invention, the foregoing objects, and others, as will become apparent in the course of the ensuing specification, are achieved in a cleansing and applicator device, which is especially useful in treatment of the perineal area of the human anatomy.

The device comprises a generally conically shaped applicator body, formed preferably of aluminum or other good heat conductor, the device being hollow and closed at the base thereof by a removable cap. A flexible and compressible covering structure for effectively encloses at least the portion, including the apex. The covering structure preferably includes multiple layers, including at least one moisture-absorbent layer, as for example, of paper, fabric or the like. The applicator body may include a necked-in portion toward the base thereof, so that the covering structure can be frictionally secured to the body by elastic retaining means, such as an elastic band or a C clamp or the like, which passes about the covering structure to compress same against the necked-in portion of the applicator body. The plural layers comprising the covering structure, preferably include tear lines, which reside toward the apex side of the necked-in body portion. This enables the various layers to be successively separated from the applicator device for disposal.

The covering structure may include an outermost liquid-impervious protective layer as for example, of plastic, cellophane or the like; with an absorbent layer, e.g., of paper underlying the protective layer. Beneath the said absorbent layer, a further liquid-impervious protective layer may be provided and beneath this a layer of paper or the like which is impregnated with a soothing medication such as an oil or the like.

The aforementioned structure may be employed by the user detaching and removing the outermost protective cover, and thereupon making use in cleansing of the underlying absorbent layer. Upon detaching the latter (and the successive second protective layer), the oil-impregnated layer becomes accessible, which layer may be utilized for treating the afflicted perineal area, i.e., by applying the soothing oil composition to the said area. The said impregnated layer may, of course, also include various other compositions known to be useful in treatment of the irritated portion of the anatomy.

The covering structure can also comprise other combinations of layers. For example, a series of medication-impregnated layers separated by liquid-impervious layers can be provided; or a series of absorbent layers either separated or not by protective liquid-impervious layers, can be provided.

The said applicator body, with the covering structure removed, is per se useful in the treatment of hemorrhoids or the like. The structure as it is hollow, may thus be provided with a cooling or heating liquid; and the smooth apex portion may be manually inserted into the anal sphincter to effect reduction of hemorrhoids or so forth.

## BRIEF DESCRIPTION OF DRAWINGS

The invention is diagrammatically illustrated, by way of example, in the drawing appended hereto in which:

FIG. 1 is an exploded side elevational view, of an applicator body in accordance with the present invention; and

FIG. 2 is a longitudinal, cross-sectional view, of a covering structure utilizable with the device of FIG. 1;

FIG. 3 is a side elevational view, partially broken away and sectioned, depicting the covering structure and applicator body in associative relationship.

## DESCRIPTION OF PREFERRED EMBODIMENT

In FIG. 1 herein, an exploded, side elevational view appears of an applicator body 10 in accordance with the present invention. Body 10 is shown in FIG. 1 separate from the covering structure with which it may in one aspect thereof be used. Applicator body 10 is seen to

generally tapering body which is open at [...] thereof, to enable access to the interior 16 for [...] with a liquid or the like, as may be desired. A [...] cap 18 is provided, which interfits with and closes the open end 14 of portion 12. The said cap is fitted upon portion 12 by a simple pressure fit, which yet provides a fluid-tight seal. Cap 18 may also be secured to portion 12 by other means known in the art, including threading thereupon. Other materials than the aluminum mentioned may be used for both the portion 12 and cap 18. For reasons as will be discussed below, it is advantageous, however, for the material comprising especially portion 12 to be a relatively good heat conductor; and it is also significant for the outer surface of portion 12, including especially the apex portion 20 to be relatively smooth.

It is thus seen that with cap 18 placed upon portion 12, the resulting applicator body 10 can be regarded as of generally cone-like or (in some instances) paraboloidal shape, i.e., the shape of the said body tapers from a relatively flat base 22 to a smoothly rounded apex 20, with however, a necked-in portion 24 being provided intermediate base 14 and apex 20.

As thus far described, the present device can be used without further structure, particularly in the treatment of hemorrhoids or similar afflictions at the anal tract. Thus, for these purposes, it is quite suitable for the cap 18 to be removed and a cooling or heating composition provided within the interior 16 of body 10. For example, an ice-water mixture may be thus provided, or a heated liquid. Under these circumstances, the individual using body 10 can insert the apex portion 20 into the anus to effect treatment of hemorrhoids, and thereby reduction of same.

It may also be noted in the foregoing connection, that the hollow interior 16 of body 10 can serve an additional purpose, i.e., various medicaments in small packages or the like can be carried within the interior of the device. This enables the said device, which itself is readily portable, to be used as a convenient carrier for the medicaments or treating compositions which may be used in connection with employment of the device, or which may be separately used.

In FIG. 2, a diagrammatic cross-section is set forth of a covering structure 26 utilizable with the applicator body 10. It will be seen that the basic cross-sectional form of structure 26 is geometrically similar to that of body 10. In consequence, it will be evident that covering structure 26 fits directly about portion 12 of body 10, i.e., conversely one can say that portion 12 nests directly within structure 26. When the association is thus made, a clamping means 28 passes about the necked-in portion 30 of structure 26. The said clamping means is preferably elastic, and can, e.g., be a simple elastic band or an elastically expandable U or C clamp, or the like. Fastener 28 maintains the covering structure 26 in its associative relationship with applicator body 10. The user may purchase a plurality of the covering structures 26, i.e., such structures can be commercially sold in packages of nested units, and the user associates one of the said structures (as in FIG. 3) with the body 10 prior to use of the present device.

Referring to FIG. 2 and also to the view of FIG. 3 showing covering structure 26 operatively associated with body 10, it is seen that structure 26 is characterized by a plurality of overlying layers of flexible, compressible material. Each of these layers is preferably pro-

weakened lines, the function of [...] on is to enable the user to tear away, and thereby [...] ove the successive layers upon use of the present d[...]e. Line 32 can [...] comprise a separable "tear strip," i.e., of the type used, e.g., in cigarette packages or the like—this latter type of structure being advantageous in avoiding unnecessary finger contact with the layers of structure 26.

The outer layer 34 of structure 26 preferably comprises a simple protective layer, which is liquid-impervious and non-absorbent. This layer may thus comprise cellophane or a thin plastic, such as polyethylene or polyvinyl chloride, or so forth—all such materials being well-known for protective packaging.

Beneath layer 34, which is torn away by the user prior to employing the present device, is an absorbent layer 36, preferably of soft fibrous paper. The said layer may also comprise other absorbent materials such as fabric or the like. Layer 36 serves in use of the present device, to effect cleansing of the perineal area, i.e., the user having torn away the outer protective layer 34, now proceeds—handling the present device by the base—to pat or dab the portions of the anatomy to be cleansed. Following this procedure, the said absorbent layer is detached as aforementioned, and discarded.

Beneath absorbent layer 36, is a further protective layer 38, again of a liquid-impervious material, such as the aforementioned cellophane, plastic or the like. This layer is now torn away, and in turn, exposes an underlying layer 40, which in this instance is of paper, fabric or the like, and is preferably impregnated with a soothing composition having medicinal properties, as, for example, a mineral oil or the like. In operation, the user of the device having now torn away the second protective layer 38, exposes the impregnated layer 40, which may then be used to apply the soothing medicament to the perineal area.

Once the entire covering structure 26 is so used, the remaining portions of the covering structure, i.e., the upper part 42, can be detached by loosening or expanding the clamping means 28, and a further, replacement structure provided and affixed to the device.

While the present invention has been particularly set forth in terms of specific embodiments thereof, it will be understood in view of the instant disclosure, that numerous variations upon the invention are now enabled to those skilled in the art, which variations yet reside within the scope of the present teaching. Accordingly, the invention is to be broadly construed and limited only by the scope and spirit of the claims now appended hereto.

I claim:

1. A cleansing and applicator device for treatment of the perineal area of the human anatomy, comprising in combination:

a generally conically shaped applicator body, said body generally tapering from the base to the apex thereof;

a flexible and compressible covering structure for effecting said cleansing being fitted about and thereby enclosing at least the portion of the said body including said apex; said structure being a composite of overlying layers of material, at least one said layer being moisture-absorbent and another said layer being liquid impervious, the layers of said composite being readily detachable from said structure and thereby from said applicator



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

*90/004,908*

| CONTROL NUMBER | FILING DATE | PATENT UNDER REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 90/004,908 | 02/03/98 | | |

ALLEGRA D HEMPHILL
6217 CHARNWOOD DRIVE
ROCKVILLE MD 20852

QM41/0415

| EXAMINER |
|---|
| YASK, JR, J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3734 | |

DATE MAILED:   04/15/98

# ORDER GRANTING/DENYING REQUEST FOR REEXAMINATION

The request for reexamination has been considered.   Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s): ☐ PTO-892,  ☐ PTO-1449,  ☐ Other: _____

1. ☐   The request for reexamination is GRANTED.

   RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:

   For Patent Owner's Statement (optional): TWO MONTHS from the mailing date hereof.  37 CFR 1.530(b). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

   For Requester's reply (optional): TWO MONTHS from the date of service of any patent owner's statement. 37 CFR 1.535.  **NO EXTENSION OF TIME IS PERMITTED.**   If patent owner does not file a timely statement under 37 C.F.R. 1.530(b), no reply by requester is permitted.

2. ☒   The request for reexamination is DENIED.

   This decision is not appealable.  35 U.S.C. 303(c).  Requester may seek review by petition to the Commissioner within ONE MONTH from the mailing date hereof.  37 CFR 1.515(c).  **EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183.**

   In due course, a refund under 37 CFR 1.26(c) will be made to requester (listed below if not patent owner) ☒ by Treasury check,  ☐ by credit to Deposit Account No. _____ unless notified otherwise.  35 U.S.C. 303(c).

   **(Third party requester's correspondence address)**

**289 (A)**

said ........ after use thereof; ai
means removably securing said i......ng structure to
said applicator body, whereby said covering struc-
ture may be replaced following use of the layers
thereof.

2. A device in accordance with claim 1, wherein said
applicator body includes a necked-in portion towards
the base thereof; and wherein said covering structure
extends to cover said necked-in portion and is secured
to said body by clamping means passing about said
structure at said necked-in portion and compressing said
structure against said necked-in portion.

3. A device in accordance with claim 2, wherein at
least some of said layers comprising said covering struc-
ture include weakened portions passing circumferen-
tially about the layers toward the apex-facing side of
said necked-in portion, whereby layers of said structure
so provided may be selectively detached for disposal.

4. A device in accordance with claim 3, wherein said
covering structure includes at least an outermost fluid-
impervious protective layer, and an absorbent layer
underlying said protective layer for effecting cleansing
of said perineal area.

5. A device in accordance with claim 4, wherein said
absorbent layer comprises paper.

6. A device in accordance with claim 4, wherein said
covering structure further includes a second liquid-
impervious protective layer underlying said absorbent
layer, and wherein a medication-impregnated layer
underlies said second protective layer for treating said
cleansed perineal area upon detachment of the layer
overlying said impregnated layer.

7. A device in accordance with claim 6, wherein each
of said layers includes said weakened portions to enable
successive exposure thereof.

8. A device in accordance with claim 1, wherein said
applicator body is hollow and includes a removable cap
member closing the base thereof, whereby the interior
of said body is accessible for provision therein of heat-
ing or cooling liquids.

applicator body, comprising ...... said said wafers at least
the apex and adjacent p.......s are provided with a
smooth surface to enable it ..... e of said device with said
covering structure removed for direct insertion at the
anal area of the anatomy for treatment of anal disorders.

10. A cleansing and applictor device for treatment of
the perineal area of the human anatomy, comprising in
combination:

an elongated applicator body, tapering from the base
thereof to a relatively rounded apex portion; and
a flexible and compressible covering structure for
effecting said cleansing and application, said struc-
ture being removably nested about and thereby
enclosing at least the portions of said applicator
body including said apex; said structure being a
composite including a plurality of overlying layers,
at least one said layer being moisture-absorbent and
another said layer being liquid-impervious, said
layers being successively detachable from said
structure and thereby from said body by a user of
said device to effect disposal thereof; and
means removably securing said covering structure to
said applicator body, whereby said structure may
be replaced following use of said layers.

11. A device in accordance with claim 10, wherein at
least some of said layers comprising said covering struc-
ture include structurally weakened lines passing about
the layers toward the base of said applicator body,
whereby said layers may be selectively detached for
disposal by separating at said lines.

12. A device in accordance with claim 11, wherein
said covering structure is frictionally secured to said
applicator body by clamping means passing about said
structure and said body.

13. A device in accordance with claim 12, wherein
said tear lines are situated to the apex-facing side of said
clamping means, whereby said layers may be removed
from said covering structure by separation at said lines
with the remainder of said structure remaining clamped
to said body.

* * * * *

said layer after use thereof; at means removably securing said ... ng structure to said applicator body, whereby said covering structure may be replaced following use of the layers thereof.

2. A device in accordance with claim 1, wherein said applicator body includes a necked-in portion towards the base thereof; and wherein said covering structure extends to cover said necked-in portion and is secured to said body by clamping means passing about said structure at said necked-in portion and compressing said structure against said necked-in portion.

3. A device in accordance with claim 2, wherein at least some of said layers comprising said covering structure include weakened portions passing circumferentially about the layers toward the apex-facing side of said necked-in portion, whereby layers of said structure so provided may be selectively detached for disposal.

4. A device in accordance with claim 3, wherein said covering structure includes at least an outermost fluid-impervious protective layer, and an absorbent layer underlying said protective layer for effecting cleansing of said perineal area.

5. A device in accordance with claim 4, wherein said absorbent layer comprises paper.

6. A device in accordance with claim 4, wherein said covering structure further includes a second liquid-impervious protective layer underlying said absorbent layer, and wherein a medication-impregnated layer underlies said second protective layer for treating said cleansed perineal area upon detachment of the layer overlying said impregnated layer.

7. A device in accordance with claim 6, wherein each of said layers includes said weakened portions to enable successive exposure thereof.

8. A device in accordance with claim 1, wherein said applicator body is hollow and includes a removable cap member closing the base thereof, whereby the interior of said body is accessible for provision therein of heating or cooling liquids.

applicator body comprises ... and wherein at least the apex and adjacent pc... s are provided with a smooth surface to enable th... e of said device with said covering structure removed for direct insertion at the anal area of the anatomy for treatment of anal disorders.

10. A cleansing and applictor device for treatment of the perineal area of the human anatomy, comprising in combination:

an elongated applicator body, tapering from the base thereof to a relatively rounded apex portion; and

a flexible and compressible covering structure for effecting said cleansing and application, said structure being removably nested about and thereby enclosing at least the portions of said applicator body including said apex, said structure being a composite including a plurality of overlying layers, at least one said layer being moisture-absorbent and another said layer being liquid-impervious, said layers being successively detachable from said structure and thereby from said body by a user of said device to effect disposal thereof; and

means removably securing said covering structure to said applicator body, whereby said structure may be replaced following use of said layers.

11. A device in accordance with claim 10, wherein at least some of said layers comprising said covering structure include structurally weakened lines passing about the layers toward the base of said applicator body, whereby said layers may be selectively detached for disposal by separating at said lines.

12. A device in accordance with claim 11, wherein said covering structure is frictionally secured to said applicator body by clamping means passing about said structure and said body.

13. A device in accordance with claim 12, wherein said tear lines are situated to the apex-facing side of said clamping means, whereby said layers may be removed from said covering structure by separation at said lines with the remainder of said structure remaining clamped to said body.

* * * * *

290 (A)



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**

Address:     COMMISSIONER OF PATENTS AND TRADEMARKS
                  Washington, D.C. 20231

90/004,908

| CONTROL NUMBER | FILING DATE | PATENT UNDER REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 90/004,908 | 02/03/98 | | |

QM41/0415

ALLEGRA D HEMPHILL
6217 CHARNWOOD DRIVE
ROCKVILLE MD 20852

| EXAMINER |
|---|
| YASKO JR, J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3734 | |

DATE MAILED:     04/15/98

# ORDER GRANTING/DENYING REQUEST FOR REEXAMINATION

The request for reexamination has been considered.  Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s): ☐ PTO-892,  ☐ PTO-1449,  ☐ Other: _____

1. ☐  The request for reexamination is GRANTED.

   RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:

   For Patent Owner's Statement (optional): TWO MONTHS from the mailing date hereof.  37 CFR 1.530(b).
   **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

   For Requester's reply (optional): TWO MONTHS from the date of service of any patent owner's statement.
   37 CFR 1.535.  **NO EXTENSION OF TIME IS PERMITTED.**  If patent owner does not file a timely
   statement under 37 C.F.R. 1.530(b), no reply by requester is permitted.

2. ☒  The request for reexamination is DENIED.

   This decision is not appealable.  35 U.S.C. 303(c).  Requester may seek review by petition to the
   Commissioner within ONE MONTH from the mailing date hereof. 37 CFR 1.515(c).  **EXTENSIONS OF
   TIME ONLY UNDER 37 CFR 1.183.**

   In due course, a refund under 37 CFR 1.26(c) will be made to requester (listed below if not patent owner)
   ☒ by Treasury check, ☐ by credit to Deposit Account No. _____
   unless notified otherwise. 35 U.S.C. 303(c).

   (Third party requester's correspondence address)

**289 (A)**

ReExamination No: 90/004,908                                           **Page 2**

Art Unit: 3734

<u>Decision</u>

No substantial new question of patentability is raised by the request for reexamination

and prior art cited therein for the reasons set forth below.

The newly cited U.S. patent 4,285,343 issued to McNair does not raise a substantial new

question of patentability as to claims 1 and 2 of the requesters U.S. Patent 4,557,720 issued to

Hemphill.

The claims of the Hemphill patent for which reexamination is requested, require "A

vaginal swab comprised of ... a pair of hinged housing segments defined by a plurality of

frangible seams ... in which an absorbent member is enclosed therein." And in claim 2, "a

vaginal swab ... including a moveable inner and outer case member;" a core member ... including

at least one layer of a porous material secured to a core member, and housing means for

supporting and enclosing said core member, said core member being secured to said housing

means, having at least two portions moveable relative to one another between first and second

positions for enclosing said core member when in said first position and for both exposing said

core member and the said porous material secured thereto and for forming a handle for said swab

when in said second position."

The U.S. patent to McNair discloses <u>none</u> of the structural features recited, supra.

Further, the McNair patent is neither relevant under 35 USC 102 nor 35 USC 103. Accordingly,

**291 (A)**

ReExamination No: 90/004,908                                    Page 3

Art Unit: 3734

since the newly submitted prior art patent to McNair presents no substantial new question of

patentability, the request for reexamination is <u>DENIED</u>.

J. Yasko:lf
703 308-2986
April 3, 1998

**292  (A)**

*Allegra D. Hemphill*
6217 Charnwood Drive
Rockville, Maryland 20852

RECEIVED

MAY 29

OFFICE OF PETITIONS
A/C PATENTS

VIA PRIORITY MAIL

Commissioner of Patents and Trademarks
Washington, D.C. 20231                    May 20, 1998

RE: RE-EXAMINATION PROCESS (35 USC 302): PRIOR ART

| | | vs. | |
|---|---|---|---|
| UNITED STATES PATENT: | #4,557,720 | | #3,973,567 |
| INVENTOR: | Allegra Hemphill | | Subramanaian Sriniva |
| TITLE: | VAGINAL APPLICATOR | | WRAPPED SANITARY NAP |
| | | | Aldrich Medbery |
| PRIMARY EXAMINER: | John D. Yasko | | |
| ASSISTANT EXAMINER: | Christa K. Scott | | |

Dear Madam or Sir:

Under the re-examination process (35 USC 302)
I appeal to the Patents and Trademarks Offices to please
re-examine the Hemphill U.S. Patent # 4,557,720 limited to
the embodiment, figures 8 & 9 patented claim #2
vs.
the Srinivasan U.S. Patent #3,973,567.

The purpose for this request is directly related to the
February 27, 1998 submission regarding McNair prior art
U.S. Patent #4, 785,343 as these prior art patents were
asserted against Hemphill. Srinivasan was brought to my
attention January 1998 and it should be noted that
the Srinivasan prior art patent is irrelevant to Hemphill
as it does not have the structural components or parts
to be a vaginal swab as described and claimed in Hemphill
U. S. Patent #4,557,720 patent claim #2. Therefore,
within this submission, Hemphill will explain
the significant advantages of Hemphill over the prior art,
in truth, that sets one free from the disadvantages, as
Srinivasan is not the structural equivalent of Hemphill.
Hemphill vaginal swabs have a band present to keep sticky
fingers off the fibers and Hemphill vaginal swabs have
a cover that improves absorbing ; or a sheathe.
Very respectfully, Hemphill requests a certificate of
patentability over this prior art.

**293 (A)**

Re-examination, page 2

A vaginal swab must have all the components or parts to be a
vaginal swab.  A vaginal swab IS:
1. outer housing 110, which is the packaging, container wrapper
or box
2. a band, ring or the like 106 which is, or at least a part
thereof, outer housing
3. and core 102
4. and topsheet, layering, gauze 104 that is present to improve
absorbing unlike the absorbing of Alvarez U.S. Patent # 4,177, 811.

There is nothing remarkable about Srininvasan in the way it
is absorbed, as the fibers are absorbed like Alvarez and
working unlike Hemphill.  The patent claim is structural
and Hemphill was found patentable over Alvarez.  At this time,
Hemphill respectfully requests a certificate of patentability
over the Srinivasan prior art as the Srinivasan methods
for both packaging and as for disposal are unclean and
unsanitary in comparison to Hemphill

Enclosed, please find the Re-examinatin Fee in the amount of $2520.00

Respectfully submitted,

*Allegra Hemphill*

Allegra Hemphill
enclosures        Structural Comparison
                  Hemphill U.S. Patent #4,557,720
                  Alvarez U.S. Patent #4,557,720
                  Srinivasan U.S. Patent #3,973,567 (prior art)
Re-examination Fee

**294 (A)**

3

**EXPLANATION FOR RE-EXAMINATION**

The Srinivasan patent is named a "wrapped sanitary napkin".
Srinivasan discusses an adhesive element for attaching a
sanitary napkin to an undergarment.  The flexible sheet 20
on Srinivasan is packaging or an outer housing
to protect a sanitary napkin (cover 16 and absorbent 14
absorbing like Alvarez) before use and after use.

The flexible sheet 20 wraps the napkin
via a sticky substance <u>directly</u> <u>on</u> the bottom major surface of
fiber (cover 16).  This tacky substance is the Srinivasan
adhesive element and it is present on the bottom major surface
of the fiber (cover 16) <u>as Srinivasan has no band 106 present</u>
and made no provisions for a band 106 present like Hemphill.

As for disposal, Srinivasan discusses an outdated method
on a sanitary napkin absorbing like Alvarez, that is impractical.
Hemphill provides a band 106 for handling
the fiber without touching the applicator tip at anytime
which is an improvement undeniably better than Srinivasan
because the consumer should not be handling the fiber too much
before use <u>or</u> after use.  The device should be used once and
properly thrown out <u>immediately</u> after use.

Srinivasan                          Hemphill

3,973,567



*impractical & inappropriate





The consumer and manufacturer should be encouraged to act responsibly
as <u>responsible disposal</u> is safer and more effective.

295 (A)

4

Srinivasan comments on a fluid impermeable sheet described in another patent (McGuire #3,643,662) but Srinivasan does not reference a number to the corresponding figure or drawings for a fluid impermeable sheet in the Srinivasan patent #3,973,567. Nevertheless, the fluid impermeable sheet would not have been the equivalent to band 106 in Hemphill, as band 106 in Hemphill makes the fiber safe while keeping control over the fiber during use.  Band 106 in Hemphill is not completely wrapped to fully enclose band 106 by fiber 104 as Srinivasan was referring to a band that would have been completely enclosed by the cover 16 fiber.

Srininvasan does not have a fluid impermeable sheet present. Therefore, Srininvsan has no band 106 equivalent to Hemphill and Srinivasan would not have a core member 102 and its band 106 like Hemphill; and Srinivasan would not have a housing means. The cover 16 in Srinivasan is attached to itself, with no band 106 in a core member or housing means.

<u>Srinivasan flexible sheet 20 in comparison to band 106 on Hemphill:</u>

Srinivasan flexible sheet 20 is packaging,
that will detach away from the fibers during use.
Band 106 on Hemphill
is, or at least a part thereof, outer housing 110,
which means band 106 is outer housing and comes from outer housing or the packaging 110.
Unlike Srinivasan , band 106 on Hemphill will not detach completely away from the fibers.  Band 106 is always present to help keep the fibers safe, guiding the fiber during use which is greater protection for the fiber;
which is a victory for every consumer;
offering many benefits over existing technologies.



**296 (A)**

Srinivasan recognizes and admits there are problems
associated with subjecting the fibers to soiling before use.
Yet, Srinivasan imposed upon the fiber a tacky substance
<u>directly on the fiber</u> (cover 16) and for this reason,
Srinivasan needs the flexible sheet 20 to wrap around cover 16,
covering over a sticky substance which is the adhesive element
on the bottom major surface of the fiber (cover 16).

The way the consumer makes use of a vaginal swab is entirely
up to them.  Notably, the consumer would be irresponsible to
dispose of a sanitary napkin as disclosed in Srinivasan
figures 10, 11 and 14, which is most inappropriate
as this would press a worn-out or used, fluid-filled fiber
which is absolutely unclean and very unsanitary.
Furthermore, the consumer may think it is ridiculous
for them to dirty their hands in this way.  Hemphill is
bendable yet, Hemphill is unbent and is upright as for disposal,
Hemphill overcomes such problems associated with leakage from undue
pressure in folding-up.

With Hemphill, any additional packaging 121 & 123 may
be used to help properly cover the fibers,
as for disposal on Hemphill.

It should be well understood that Hemphill does not behave,
operate or function like a sanitary napkin.
Srinivasan does not have the components or parts
to be a vaginal swab as it is defined, disclosed and
specified in Hemphill U.S. patent #4,557,720 entitled
VAGINAL APPLICATORS.  The patent claim #2 is structural.

**Srinivasan flexible sheet 20 in comparison to**
**outer housing 110 on Hemphill:**

The Srinivasan flexible sheet 20 is unlike the outer housing 110
on Hemphill, as Hemphill is in a first closed position, that is
decidedly <u>sealed</u> offering better protection until opening;
which is cleaner than Srinivasan.  A worn-out Srinivasan is
handed over for disposal used-up, tacky, lying prostrate;
failing to have a band 106 present like Hemphill.  Srinivasan
failed to have an adsorbency characteristic 104
to improve absorbing like Hemphill that begins absorbing
inside-and not on the outer most surface first while serving
as a barrier to help reduce leaks, reduce odors, reduce
dripping mess etc.  Also, Srinivasan failed to have an
outer housing 110 that is the equivalent of Hemphill as
Hemphill outer housing as defined and specified is better,
more comfortable protection for the consumer.

Although Srinivasan mentions cost-effectiveness regarding
packaging.  **The longitudal edges**
**are not adhered in Srinivasan** because Srinivasan anticipates
the fibers are not handled until use and are handled again
after use when the sanitary napkin is folded-up, as for
disposal.  This flexible sheet 20 in Srininvasan is no equivalent
to Hemphill outer housing 110. Hemphill made safer,
cleaner provisions for the consumer as a vaginal swab
is in a closed, first position until opening for use.
See figures  8 & 9 in Hemphill U.S. Patent #4,557,720

The Hemphill advantages include the actual <u>presence</u> of band 106
as there is no need to touch the fibers with the hands.
Hemphill vaginal swabs have removed and released the
"stickiness" from an adhesive element directly on the fibers
that would otherwise cause friction, irritations and other
complications that Srinivasan discusses regarding soiling the
-fibers.   These improvements of Hemphill outer housing 110
keeps the fibers :
cleaner, safer, effectual, more desirable and more comfortable with
comfortable protection for the consumer, because unlike Srinivasan,
the fiber 104 on Hemphill does not have any "sticky mess" on 104
so no tacky substance is holding the outer housing 110
in direct contact to 104. The consumer need not touch the
fibers as a band 106 is present on Hemphill.  The
outer housing 110 on Hemphill is released from all stickiness
so that the outer housing 110 will not at anytime soil the fiber
in the gross misregistration described in Srinivasan.

7

The flexible sheet 20 on Srinivasan is first attached to the
fibers then detaches completely away from the fibers and
re-unites with the used fibers for both to be disposed of
properly in a trash receptacle. **The improvements Hemphill
made over Alvarez outclassed and overwhelmed the existence
of a sanitary napkin like Srinivasan** and **the outdated manner
in which to dispose of such a napkin.**

Although Srinivasan seems concerned about cost-effectiveness
**Srinivasan is inadequate** about making provisions for a
finished, packaged product for the consumer.
Srinivasan states:

> "That it is a fact that the longitudal edges
> of the flexible sheet 20 are not adhered
> presents no great disadvantage
> when it is considered that the unused napkins
> are packaged closely together and not handled until use.

A statement like this is careless with respect to
the consumer and negligent with respect to safeguarding
to protect "sanitary" fibers. However, it is not for
Hemphill to surmise if Srinivasan made any provisions for an outer
housing in a closed, flawless condition like Hemphill,
that is clean and germ-free or packaged for purity
because Srinivasan focussed on an adhesive element on a
"wrapped sanitary napkin" that Srinivasan left exposed --are the facts.

**Srinivasan is incomplete** because Srinivasn did not represent,
nor discuss in the embodiments with corresponding figures
and drawings such additional packaging to ensure the napkins
are contemplated as being sterile when packaged, as it is stated
and specified in Hemphill U.S. Patent #4,557,720 --it is a fact.

Thus, in conclusion Srinivasan is without the structural
components or parts to be a vaginal swab, as it is lacking:
a 110 outer housing equivalent to Hemphill;
core member 102 and its band 106 like Hemphill
to have a housing means;
topsheet, layering or cover 104 like Hemphill.
Unlike Srinivasan, **Hemphill makes the provisions for an**
outer **housing so that the fiber is not imposed upon, as**
**a vaginal swab is in readiness for the consumer.**

90040086.0522960

## 299 (A)

*Allegra D. Hemphill*
6217 Charnwood Drive
Rockville, Maryland 20852

CRU 4A11
GRP 3735

#7

OIPE
03 JUL 1 1 1998
PAT & TRADEMARK OFF.

VIA EXPRESS MAIL

Commissioner of Patent and Trademarks
Washington, D.C. 20231                                    June 11, 1998

EXAMINING GROUP: 3700
ART UNIT: 3735

REEXAM CONTROL NO. 90/004, 987

FILING DATE : 5/22/98

PATENT NUMBER: 4,557,720                       RECEIVED
                                               JUL 1 6 1998
PAPER NO. 6                                    GROUP 3200

Dear Madam or Sir:

As the applicant, a patent owner and requesting the re-examination
to receive a certificate of patentability over the prior art of
Srinivasan et. al. #3,973,567
Hemphill has focused on structure and safety and effectiveness
which were the reasons for filing for a United States Patent
in 1981.  I firmly believe the benefits of the vaginal swab are
significant to and for the consumer over existing technologies.
Therefore, one must have all the components or parts to be a vaginal swab.
Srinivasan is unfinished and incomplete to be a vaginal swab.

The improvements of Hemphill over the prior art is a winning product for
the consumer.  NEW, packaged for purity which is safer and more effective
improves absorbing for one to see and feel a betterment and there is
no need for dirty hands on the fibers which is safer and more effective.

I believe the consumer will be gladdened by vaginal swabs;
cheering the efforts of each component or part that is essential
to be a vaginal swab, working altogether as a betterment over the prior art
sanitary napkins such as disclosed in Srinivasan.  Again, Hemphill
respectfully requests a certificate of patentability over the
prior art of Srinivasan et.al United States Patent # 3,973,567.

Respectfully submitted,

*Allegra Hemphill*

Allegra Hemphill

attachment: Srinivasan Sanitary Napkin vs. Hemphill Vaginal Swab (3)

**300 (A)**

*Allegra D. Hemphill*
6217 Charnwood Drive
Rockville, Maryland 20852

CA# 4A11
GRP 3735

#7



VIA EXPRESS MAIL

Commissioner of Patent and Trademarks
Washington, D.C. 20231                    June 11, 1998

EXAMINING GROUP: 3700
ART UNIT: 3735

REEXAM CONTROL NO. 90/004, 987

FILING DATE : 5/22/98

PATENT NUMBER: 4,557,720

PAPER NO. 6

RECEIVED
JUL 1 6 1998
GROUP 3200

Dear Madam or Sir:

As the applicant, a patent owner and requesting the re-examination
to receive a certificate of patentability over the prior art of
Srinivasan et. al. #3,973,567
Hemphill has focused on structure and safety and effectiveness
which were the reasons for filing for a United States Patent
in 1981. I firmly believe the benefits of the vaginal swab are
significant to and for the consumer over existing technologies.
Therefore, one must have all the components or parts to be a vaginal swab.
Srinivasan is unfinished and incomplete to be a vaginal swab.

The improvements of Hemphill over the prior art is a winning product for
the consumer. NEW, packaged for purity which is safer and more effective
improves absorbing for one to see and feel a betterment and there is
no need for dirty hands on the fibers which is safer and more effective.


I believe the consumer will be gladdened by vaginal swabs;
cheering the efforts of each component or part that is essential
to be a vaginal swab, working altogether as a betterment over the prior art
sanitary napkins such as disclosed in Srinivasan. Again, Hemphill
respectfully requests a certificate of patentability over the
prior art of Srinivasan et.al United States Patent # 3,973,567.

Respectfully submitted,

*Allegra Hemphill*
Allegra Hemphill

attachment: Srinivasan Sanitary Napkin vs. Hemphill Vaginal Swab (3)

**300 (A)**

7

The flexible sheet 20 on Srinivasan is first attached to the
fibers then detaches completely away from the fibers and
re-unites with the used fibers for both to be disposed of
properly in a trash receptacle. **The improvements Hemphill
made over Alvarez outclassed and overwhelmed the existence
of a sanitary napkin like Srinivasan and the outdated manner
in which to dispose of such a napkin.**

Although Srinivasan seems concerned about cost-effectiveness
**Srinivasan is inadequate** about making provisions for a
finished, packaged product for the consumer.
Srinivasan states:

    "That it is a fact that the longitudal edges
    of the flexible sheet 20 are not adhered
    presents no great disadvantage
    when it is considered that the unused napkins
    are packaged closely together and not handled until use.

A statement like this is careless with respect to
the consumer and negligent with respect to safeguarding
to protect "sanitary" fibers. However, it is not for
Hemphill to surmise **if** Srinivasan made any provisions for an outer
housing in a closed, flawless condition like Hemphill,
that is clean and germ-free or packaged for purity
because Srinivasan focussed on an adhesive element on a
"wrapped sanitary napkin" that Srinivasan left exposed --are the facts.

**Srinivasan is incomplete** because Srinivasn did not represent,
nor discuss in the embodiments with corresponding figures
and drawings such additional packaging to ensure the napkins
are contemplated as being sterile when packaged, **as it is** stated
and specified in Hemphill U.S. Patent #4,557,720 --it is a fact.

Thus, in conclusion Srinivasan is without the structural
components or parts to be a vaginal swab, as it is lacking:
a 110 outer housing equivalent to Hemphill;
core member 102 and its band 106 like Hemphill
to have a housing means;
topsheet, layering or cover 104 like Hemphill.
Unlike Srinivasan, **Hemphill makes the provisions for an**
outer housing so that the fiber is not imposed upon, as
a vaginal swab is in readiness for the consumer.

page 2.

The history of the way a sanitary napkin is absorbing is like that of Alvarez moving slowly and sluggish; absorbent on the outer most surface first whereas, vaginal swabs are a betterment that allows the fluid to flow through, is moisture absorbent inside and not on the outer most surface first which improves absorbing; offering benefits to the consumer over existing technologies. Hemphill was first to distinguish the differences in the way the fibers are absorbing; changing the look and behavior. The consumer can see and feel the difference because of the adsorbency characteristic.

With respect to safety and effectiveness, Srinivasan is as wide-open as McNair U.S. Patent # 4,285,343; which is structurally like a swab on an absorbent bat, cudgel or wooden stick. Both Srinivasan and McNair were absorbing like Alvarez #4,177,811 because the distinction was first recited in Hemphill U.S. Patent #4,57,720. For clarification, it is true Srinivasan has a core member and porous material but whether or not the absorbing is efficacious must be determined by safety and effectiveness conditions first as the core member and porous material are a priority.


1.  core member surrounded by a porous layer of material

The core member is secured to the housing means (intermediary) which is defined as: made safe to guard from danger or risk from loss. Srinivasan does not have a housing means or band 106 to fulfill what the patent claim requires.   The patent claim #2 requires that the core member and porous material secured thereto change locations from a closed to open state: Structurally, Srinivasan is unfinished to accomplish this.
   a.) flexible sheet 20 as an outer housing 110 is incomplete
   b.) there is no band 106 or housing means on Srinivasan

SRINIVASAN
Srinivasan imposes upon the fiber with a gluey substance directly on the bottom major surface of the fibers.  The main purpose and function of Srinivasan outer housing (flexible sheet 20) seems to be protecting to conceal the gluey mess and not for protecting the fibers. The flexible sheet 20 does not participate with any other component or part except with the sticky glue. Srinivasan does not protect the fibers because the longitudal edges are always open, so that the core member and porous material are always exposed.

Srinivasan  will detach and remove the flexible sheet 20 completely away from the core member and porous material but the position of the core member and porous material will remain unchanged.  The fibers were always open, susceptible to contamination, even in what should have been a first sheltered, closed position because the outer housing (flexible sheet 20) on Srinivasan is inadequate.

HEMPHILL
On Hemphill, the core member surrounded by a porous material on a band, ring or the like has upward mobility from a first closed to second exposed position.  Hemphill outer housing effectively protects the core member and porous material and does not impose upon the fibers.
The outer housing 110 on Hemphill protects the core member and porous material in the first position but also maintains a relationship with the fibers as it helps keep up safeguarding to protect the core member and porous material with a band 106 which is, or at least a part thereof outer housing in the second position.  Therefore, the provisions Hemphill made for the core member and porous material on a band, ring or the like, is the priority as opposed to the provisions Srinivasan made for the glutinous or adhesive element.


**301(A)**

page 3.

## 2. outer housing

With candor, Srinivasan is incomplete and inadequate to achieve the goals of an outer housing 110 like Hemphill and Srinivasan is without at least a part thereof outer housing which is band 106 or also the housing means. The housing means is the way, manner, method or mode to accomplish bringing the fibers from the first to second position.

Flexible sheet 20 on Srinivasan must be considered as the outer housing 110; but Srinivasan flexible sheet 20 does not "house" or "shelter" to protect the fibers. Flexible 20 will close in on core member and porous material but Srinivasan can not assume the first position which is closed tight; enclosed firmly and securely to protect the fibers. Srinivasan did not secure the longitual edges (loose-ends). Thus, the core member and porous material are kept in the same opened state at all times which is vulnerable to unclean conditions that are unsanitary.

In truth, Hemphill outer housing 110 is closed tight in the first position which is firmly and securely protecting core member and porous material until opening for use. Unloose to open, begins the second exposed position.

## 3. and housing means with 2 positions (one position that protects the core member and another that exposes the core member for use.)

The patent claim #2 requires the core member and porous material change positions from a closed location to an open state.

### HEMPHILL
Hemphill made provisions for both an outer housing and housing means. The benefits and improvements of Hemphill vaginal swabs provides the consumer with a finished or completed product. The way a consumer will make use of a vaginal swab is entirely up to them, but understandable instructions for usage should be NO unclean or dirty hands on the fibers because provisions have been made for an outer housing, or at least a part thereof (band 106) which is always present, safeguarding to protect the core member and porous material for the consumer to hold on to, while relocating the fiber from one place ( closed tight ) to the other (open) as for use. Band 106 or housing means is secured thereto the core member surrounded by the porous material are made safe with the housing means; are working altogether as a unit with healthy protection for the consumer.

### SRINIVASAN
The core member and porous material would remain unchanged in both the first and second positions as Srinivasan is always in the same predicament which is the exposed, second position (open along the longitudal edges) which is a "loose-end" regarding safety and effectiveness; vulnerable to contagions or contamination as well as possible tampering; before use. A band 106 during use would help reduce contamination that is caused by dirty hands as unclean hands carry germs that could contaminate the fibers causing infection and irritations. Housing means (band 106) is the way, manner method or means to place or situate the fiber for use; and will accomplish this without contaminating the fibers, knowingly. There is no band 106 on Srinivasan to achieve this goal.

Note: Srinivasan should be used once, fold over then properly thrown-away after use, with no regard for the handling instructions as described in Srinivasan as for disposal.

## 302(A)





#3973567

B



#4,557,720

A

C

It is pointless needling vaginal swabs with the safety and effectiveness concerns of a sanitary napkin. The history of a sanitary napkin such as Srinivasan does not achieve the goals of a vaginal swab because all the components or parts must be present to be a vaginal swab. (see right) Vaginal swabs have improvements over existing technologies offering significant benefits to the consumer as more desirable, effectual with healthy protection that is comfortable.

Structurally, each component or part of a vaginal swab is dependable and depends on the other in a cherished relationship. The core member (102) and porous material (104) are secured to the band (106) which is or at least a part thereof (pertaining to) the outer housing (110). The band is the means or intermediary in both positions from the closed location (fig. 8) —to— the open state (fig. 9). Band 106 is always present to help keep up safeguarding to protect so as no to fall away during use.

1. Hemphill is in a closed tight first position (figure 8) until opening for use (figure 9). Hemphill is protecting a swab element (fiber on a band, ring or the like). see A theloose. The core member and porous material (on a band) and porous material in figure 9, which is in the that are forthcoming, as seen in the upward mobility in figure 9, which is in the open, exposed second position.

2. Srinivasan is protecting a glutinous adhesive element (stickiness) only —not the fibers. Although Srinivasan is called: "wrapped sanitary napkin". Srinivasan is a loose-ended "sanitary" napkin that is packed closely together. see B. Srinivasan is always in the in position. The core member and porous material remain unchanged from a close in on—to— exposed position because the fibers were never truly enclosed by the outer housing (flexible sheet 20) to protect the fibers in a first closed tight position (one that is firmly and securely protected).

3. Srinivasan flexible sheet 20 is not the structural equivalent to Hemphill outer housing 110. Srinivasan can not assume the first position of the Hemphill vaginal swab (see A— figure 8) The fibers or layers are already exposed, they are not enclosed at any time i.e., they are always in an exposed, second position. Open along the longitudinal edges, the exposure of fibers are vulnerable to unclean and unsanitary conditions, before use.

4. (Hemphill) made provisions for both an outer housing 110 and a housing means 106). The housing means has four functions or responsibilities to the core member; supporting, enclosing, exposing and for forming a handle. The housing means or band 106 is not present and does not exist in Srinivasan. Srinivasan has no band 106 which is, or at least a part thereof outer housing 110. Srinivasan has no protected or secure first position for the fibers and made no provisions for a housing means for exposing because it is already exposed. Having failed to adequately protect the fibers, the flexible sheet 20 is detached and removed completely away from the fibers, for use.

5. Srinivasan does NOT have all the components or parts to be a vaginal swab. The structural equivalent of Srinivasan to Hemphill is seen in C. —no band 106 and no outer housing 110 like Hemphill.

**303(A)**



*Allegra D. Hemphill*
6217 Charnwood Drive
Rockville, Maryland 20852

REExam

GRP 3735
CP2 4A11

REC
[JUL 22 1998]
GROUP 3...    #6

June 13, 1998

Commissioner of Patent and Trademarks
Washington, D.C. 20231

EXAMINING GROUP: 3700
ART UNIT: 3735
REEXAM CONTROL NO. 90/004, 987
FILING DATE : 5/22/98
PATENT NUMBER: 4,557,720

Dear Madam or Sir:

In the letter mailed to the Commissioner of Patents and Trademarks
on July 11, 1998 paper number 6, page 1 paragraph 1,
please note a typing correction for the filing date (1982).
Thank you most kindly.

Respectfully,

*Allegra Hemphill*

Allegra Hemphill

**304(A)**



**UNITED STATES DEPARTMENT OF COMMER**
Patent and Trademark Office

Address:    COMMISSIONER OF PATENTS AND TRADEMAR
Washington, D.C. 20231

| CONTROL NUMBER | FILING DATE | PATENT UNDER REEXAMINATION | | ATTORNEY DOCKET NO |
|---|---|---|---|---|
| 90/004,987 9875/28/98 /02/98 | | 4,553,720 | | |

ALLEGRA D HEMPHILL
6217 CHARNWOOD DRIVE
ROCKVILLE MD 20852

QM41/0706

| EXAMINER |
|---|
| RUHL Ruh/ |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3735 | 5 |

DATE MAILED:    07/06/98

# ORDER GRANTING/DENYING REQUEST FOR REEXAMINATION

The request for reexamination has been considered.  Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s): ☒ PTO-892,  ☐ PTO-1449,  ☐ Other: _____

1. ☒ The request for reexamination is GRANTED.

RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:

For Patent Owner's Statement (optional): TWO MONTHS from the mailing date hereof. 37 CFR 1.530(b). EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).

For Requester's reply (optional): TWO MONTHS from the date of service of any patent owner's statement. 37 CFR 1.535.  NO EXTENSION OF TIME IS PERMITTED.  If patent owner does not file a timely statement under 37 C.F.R. 1.530(b), no reply by requester is permitted.

2. ☐ The request for reexamination is DENIED..

This decision is not appealable. 35 U.S.C. 303(c).  Requester may seek review by petition to the Commissioner within ONE MONTH from the mailing date hereof. 37 CFR 1.515(c).  EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183.

In due course, a refund under 37 CFR 1.26(c) will be made to requester (listed below if not patent owner) ☐ by Treasury check, ☐ by credit to Deposit Account No. _____ unless notified otherwise. 35 U.S.C. 303(c).

(Third party requester's correspondence address)

**305(A)**

Serial Number: 90/004987                                                                 Page 2

Art Unit: 3735

A substantial new question of patentability affecting claim 2 of United States Patent

Number 4,557,720 is raised by the request for reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings

"will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in reexamination

proceedings are provided for in 37 CFR 1.550(c).

The request for re-examination indicates that the patent to Srinivasan et al. (3973567) may

be relevant to claim 2 and the examiner feels that further consideration of this reference is

warranted as it was not considered during prosecution of patent # 4,557,720.  The request also

presents arguments as to why claim 2 is patentable over the patent to Srinivasan et al. (3973567) .

It is agreed that the reference to Srinivasan et al. raises a substantial new question of

patentability with respect to claim 2. Srinivasan et al. has structure that may read on claim 2 such

as a core member surrounded by a layer of porous material, an outer housing, and housing means

with 2 positions (one position that protects the core member and another position that exposes

the core member for use). For these reasons the examiner considers that there is a substantial new

question of patentability with respect to claim 2 versus the patent to Srinivasan et al..

D.R.

Assistant Examiner, Sector 3700

**306(A)**

John G. Weiss
Supervisory Patent Examiner
Group 3700

*Allegra D. Hemphill*
6217 Charnwood Drive
Rockville, Maryland 20852

GRP 3735
CP2 4A11

#8

OIPE
JUL 2 4 1998

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Commissioner of Patents and Trademarks
Washington, D.C. 20231

July 22, 1998

EXAMINING GROUP: 3700
ART UNIT: 3735
CONTROL NO. 90,004,987
FILING DATE: 5/22/98
PATENT NUMBER: 4,557,720
PAPER NO. 7

REC'G

JUL 2 9 1998

GROUP 3200

Dear Madam or Sir:

Hemphill has been advised that there are real legal issues regarding the
sanitary napkin and the vaginal swab. The improvements of a vaginal swab
are made known through structural components or parts to become a vaginal swab
and the way the consumer makes use of a vaginal swab is entirely up to them.

A manufacturer <u>knows</u> the process and knows there are rules and regulations.
The manufacturer <u>knows</u> they have a responsibility to the consumer and
using embarrassing tactics that are disadvantageous for a consumer such as:
a.) personal hygiene habits b.) medications c.) intimacy, etc.,
as the only contributory factors regarding infections and irritations
without considering <u>if</u> the product is safe, clean <u>with proper directives</u>
<u>to the consumer</u> as for use during its manufacturing process are dishonorable.
It is reasonable sanitary napkins have served as vectors or vehicles
because dirty hands carry germs and napkins lying dormant vulnerable to
contagions can cause the itching and burning sensations.

1.  <u>Additions</u> such as an adhesive element on a vaginal swab would be the
responsibility of the manufacturer <u>to</u> the consumer to make safe and effective
on the band <u>if</u> the glue does not impose upon the fibers as it does on
sanitary napkins. Technically, Srinivasan et.al.  3,973,567 is claiming
an adhesive element; an adhesive element on a sanitary napkin.
Srinivasan is structurally inadequate to be a vaginal swab.
-no band -no outer housing -no two portions movable -already exposed
(Only the bottom major surface is closed in on as the sides are loose
on the sanitary napkin. One must unloose for opening with the vaginal swab.)

Structurally, the presence of a vaginal swab is unlike the stickiness of a
sanitary napkin as vaginal swabs adhered to the rules and regulations.
The consumer has both an outer housing and a band on vaginal swabs which is
optional for the consumer as to what they will hold on to
(fiber or outer housing which is or at least a part thereof; while relocating
from an enclosed to exposing position) and this decision should be determined by
what may help reduce contamination to the fibers that could cause
infections and irritations which is safer and more effective. The consumer
must be told the fibers are a priority and it is important to protect the fibers
because the fiber is in close proximity with the body. The outer housing and
a band are available to help to safeguard and protect the fiber on vaginal swabs.
Alternatively the porous material and especially the band
are in the intermediate position
which is existing or occurring between (in and through to the second position)
so that both may serve like an intermediary. The manufacturer that proposes
"a sanitary napkin is not hand-held" <u>is incorrect</u> because the facts are:
the consumer must hold on to something to place or position as for use.

**307(A)**

Control No. 90,004,987
July 22, 1998
page 2

2. Safety and effective concerns will have to be answered for to overcome previous complications associated with the sanitary napkin (and a gluey mess). The manufacturer should assume responsibility in a first position and be unable to shirk liability or skirt the issues by making excuses that blames, worries or shames the consumer for its own shortcomings. Future disputes between the consumer and manufacturer could be answered for promptly with an intercessor that would reconcile the manufacturer to the consumer.

3. Hemphill is faultless to directives of the manufacturer that would mob, press or have sticky fingering on the fibers with dirty hands. Truthful and accurate information from good advisors (mediators) produces cleaner protection. Wrongful instructions would pervert the relationship the manufacturer has with the consumer. In order to be helpful, the vaginal swab has an honest alternative and the way the consumer makes use of a vaginal swab is entirely up to them.   Sometimes, common sense and common-sense is the better gauge.

Respectfully, submitted,

*Allegra Hemphill*

Allegra Hemphill

**308(A)**



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**

Address:   **COMMISSIONER OF PATENTS AND TRADEMARKS**
**Washington, D.C. 20231**

90/004987  5/22/98                    4557720
90/004,987        05/22/98         4557720

ALLEGRA D HEMPHILL                    GM41/1997
6217 CHARNWOOD DRIVE
ROCKVILLE MD 20852

D. Ruhl

3735                    9

3735

10 07 98

# NOTICE OF INTENT TO ISSUE REEXAMINATION CERTIFICATE

1. ☑ Examination has been terminated in this reexam proceeding and a Certificate will be issued in due course in view of:

   a. ☑ Patent owner's communication filed on: 7/14/98, 7-11-99 and 7-24-98

   b. ☐ Patent owner's late response filed on: _____

   c. ☐ Patent owner's failure to file an appropriate response to the Office action dated: _____

   d. ☐ Patent owner's failure to timely file an Appeal Brief.  37 C.F.R. 1.192.

   e. ☐ Other: _____

   The Reexamination Certificate will indicate the following:

   f. Change in the Specification: ☐ Yes, ☒ No           g. Change in the Drawings: ☐ Yes, ☒ No

   h. Status of the Claims:

      (1) Patent claim(s) confirmed: 1, 2

      (2) Patent claim(s) amended: _____

      (3) Patent claim(s) cancelled: _____

      (4) New claim(s) patentable: _____

2. ☑ Note attached statement of reasons for patentability and/or confirmation.  Any comments considered necessary by patent owner regarding reasons for patentability and/or confirmation must be submitted promptly to avoid processing delays. Such submissions should be labeled: "Comments on Statement of Reasons for Patentability and/or Confirmation."

3. ☐ Note attached NOTICE OF REFERENCES CITED, PTO - 892, which is a part of this communication.  The listed references are considered pertinent to the claimed invention, but the claims are deemed to be patentable thereover.

4. ☐ Note attached LIST OF REFERENCES CITED, PTO - 1449, which is part of this communication and serves as an acknowledgement of receipt of patent owner's prior art statement.  The references which were considered have been initialed on the form by the examiner and the claims are deemed patentable thereover.

5. ☐ The drawing correction request filled on _____ : ☐ is, ☐ is not, approved.

6. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has: ☐ been received, ☐ not been received, ☐ been filed in Serial No. _____ filed on _____

7. ☐ Note Examiner's Amendment (attachment).

8. ☐ Other (attachment).

cc: Requester

PTOL-469 (2-90)

**309(A)**

John G. Weiss
Supervisory Patent Examiner
Group 3700

Re-exam no: 90/004,987
Art Unit: 3735

1.    STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION
    The following is an examiner's statement of reasons for patentability and/or confirmation
of the claims found patentable in this reexamination proceeding:
    Claim 1 of the patent to Hemphill (4557720) is considered patentable over the patent to
Srinivasan et al. (3973567) because Srinivasan simply does not disclose the claimed structure,
such as an open end opposite a closed end, an annular band, and frangible seams.
    Claim 2 of the patent to Hemphill (4557720) is considered patentable over the patent to
Srinivasan et al. (3973567) because Srinivasan does not disclose the housing means of Hemphill
and does not disclose structure that could be considered equivalent to the housing means of
Hemphill. *In re Donaldson Co.*, 16F.3d 1189, 29 USPQ2d 1845 (Fed. Cir. 1994).
    Any comments considered necessary by PATENT OWNER regarding the above statement
must be submitted promptly to avoid processing delays. Such submission by the patent owner
should be labeled: "Comments on Statement of Reasons for Patentability and/or Confirmation"
and will be placed in the reexamination file.

2.    Any inquiry concerning this communication or earlier communications from the examiner
should be directed to Dennis Ruhl whose telephone number is (703) 308-2262.

D.R. *DR*
September 1, 1998

John G. Weiss
Supervisory Patent Examiner
Group 3700

**310 (A)**

*Notice of References Cited*

| Application No. | Applicant(s) |
|---|---|
| 09/004,987 | Allegra Hemphill |

| Examiner | Group Art Unit | |
|---|---|---|
| Dennis Ruhl | 3735 | Page 1 of 1 |

## U.S. PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|
| A | 3,973,567 | 8-1976 | Srinivasan et al. | 604 | 386 |
| B | | | | | |
| C | | | | | |
| D | | | | | |
| E | | | | | |
| F | | | | | |
| G | | | | | |
| H | | | | | |
| I | | | | | |
| J | | | | | |
| K | | | | | |
| L | | | | | |
| M | | | | | |

## FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|---|
| N | | | | | | |
| O | | | | | | |
| P | | | | | | |
| Q | | | | | | |
| R | | | | | | |
| S | | | | | | |
| T | | | | | | |

## NON-PATENT DOCUMENTS

| | DOCUMENT (Including Author, Title, Source, and Pertinent Pages) | DATE |
|---|---|---|
| U | | |
| V | | |
| W | | |
| X | | |

## 311(A)

[11] Patent Number:    4, ,7,720
[45] Date of Patent:    Dec. 10, 1985

| 3,731,682 | 5/1973 | Fielding |
| 4,023,559 | 5/1977 | Gaskell | 604/1 X |
| 4,155,991 | 5/1979 | Schopflin et al. |
| 4,157,709 | 6/1979 | Schuster et al. |
| 4,159,718 | 7/1979 | Bower |
| 4,165,942 | 8/1979 | Johansson |
| 4,175,439 | 11/1979 | Laker |
| 4,177,811 | 12/1979 | Alvarez | 604/1 |

FOREIGN PATENT DOCUMENTS

114419 10/1929 Austria ———————— 604/1

Primary Examiner—John D. Yasko
Assistant Examiner—Christa K. Scott
Attorney, Agent, or Firm—Allegra D. Hemphill; F.
Erich Hemphill; Gardner, Vivian C.

[57]  ————  ABSTRACT

A disposable vaginal refreshener or swab comprised of an outer container for enclosing an inner, fairly rigid core member about which an adsorbent layer is secured. The outer container when removed, exposes the adsorbent covered member or allows that member to be moved out of the container into an operable position. The outer container also forms the handle for the disposable swab element.

2 Claims, 11 Drawing Figures

9000497.052208



9

312(A)

[11]  Patent Number:    4, ,7,720

[45]  Date of Patent:    Dec. 10, 1985

| | | | |
|---|---|---|---|
| 3,731,663 | 5/1973 | Fielding | |
| 4,023,539 | 5/1977 | Gaskell | 604/1 X |
| 4,155,991 | 5/1979 | Schopflin et al. | |
| 4,157,709 | 6/1979 | Schmaar et al. | |
| 4,159,718 | 7/1979 | Bever | |
| 4,165,942 | 8/1979 | Johansson | |
| 4,175,439 | 11/1979 | Laker | |
| 4,177,811 | 12/1979 | Alvares | 604/1 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 114619 | 10/1929 | Austria | 604/1 |

*Primary Examiner*—John D. Yasko
*Assistant Examiner*—Christa K. Scott
*Attorney, Agent or Firm*—Allegra D. Hemphill; F. Erich Hemphill; Gardner, Vivian C.

[57]                ABSTRACT

A disposable vaginal refreshener or swab comprised of an outer container for enclosing an inner, fairly rigid core member about which an absorbent layer is secured. The outer container when removed, exposes the adsorbent covered member or allows that member to be moved out of the container into an operable position. The outer container also forms the handle for the disposable swab element.

2 Claims, 11 Drawing Figures

9062850 · 4864092698



9

312(A)

## Notice of References Cited

| Application No.<br>09/004,987 | Applicant(s)<br>Allegra Hemphill | | |
|---|---|---|---|
| Examiner<br>Dennis Ruhl | Group Art Unit<br>3735 | Page 1 of 1 | |

### U.S. PATENT DOCUMENTS

| | | DOCUMENT NO. | DATE | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|---|
| A | | 3,973,567 | 8-1976 | Srinivasan et al. | 604 | 386 |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |
| F | | | | | | |
| G | | | | | | |
| H | | | | | | |
| I | | | | | | |
| J | | | | | | |
| K | | | | | | |
| L | | | | | | |
| M | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|---|
| N | | | | | | |
| O | | | | | | |
| P | | | | | | |
| Q | | | | | | |
| R | | | | | | |
| S | | | | | | |
| T | | | | | | |

### NON-PATENT DOCUMENTS

| | DOCUMENT (Including Author, Title, Source, and Pertinent Pages) | DATE |
|---|---|---|
| U | | |
| V | | |
| W | | |
| X | | |

## 311(A)

U.S. Patent    Dec. 10, 19



FIGURE 2

18

14

16



9000487.052298

FIGURE 1

10

12

16



FIGURE 3

30

34

36

40

42

32

10

**313(A)**



FIGURE 2a.

24

18

24

22

24

20

26

FIGURE 4

38

32

36

FIGURE 4a.

38

48

32

44

46

50    52

36

//

862250 . 78640006

U.S. Patent    Dec. 10



FIGURE 5





**FIGURE 6**

**FIGURE 7**

316(A)

U.S. Patent     Dec. 10, 1985

FIGURE 8



9006494987.052298

*14*

**317(A)**

Sheet 3 of 3     4,⌐57,720

FIGURE 9



318(A)

1

4,5

## VAGINAL APPLICATOR

This application is a continuation of Ser. No. 434,828 filed Oct. 18, 1982 now abandoned.

### FIELD OF THE PRESENT INVENTION

The present invention relates to vaginal swabs and refreshers.

### BACKGROUND OF THE PRESENT INVENTION

It is well known that the vagina is a relatively long, hollow, tube like structure that extends from the cervix or the outer end of the uterus down to the labia minora. The interior of the vagina is composed of a mucous membrane and an outer, smooth muscle closely attached to it. While glands are present in the vaginal lining itself, vaginal secretions can arise from the glands in the cervical canal of the uterus such as bartholin's and skene's glands. The lining of the vaginal cavity also responds to stimulation from various ovarian hormones either by building up new cell layers or by shedding old ones. Likewise, mucous is developed in the cervical canal of the uterus at other times, such as in the proliferative phase of the menstrual cycle where the endometrium thickens and its glands begin their secretion of mucous. Thus, it is well known that a variety of secretions develop varying amounts of mucous and other material as the result of a variety of factors and conditions.

Normally, such secretions are clean but occassionally debris in the form of blood or from the deposition of seminal fluid can accumulate. Accordingly, it is desirable at times to be able to have a convenient disposable swab or refresher available for purposes of cleansing the vaginal area or for purposes of adding or treating the vaginal area with fragrances, medications, germicides or deodorants.

Many types of vaginal devices have been suggested including plunger type devices as in Rogers, U.S. Pat. No. 1,256,831, swabs as in U.S. Pat. No. 3,228,393, or foam type devices directly formed in their outer container as in Ravel, U.S. Pat. No. 4,260,570.

### SUMMARY OF THE PRESENT INVENTION

I have found that a truly portable, convenient and disposable internal vaginal cleaning device or refreshner is not available, especially one that is small, compact, easily usable and very simply constructed. The devices such as disclosed in the Rogers patent are cumbersome and not easily disposable. I have found that a device such as disclosed by Ravel is not convenient to use as the device does not provide a sufficiently long handle structure in order to manipulate the swab itself to produce appropriate and needed cleaning. Further, the foam or sponge-like exteriors from which some vaginal swabs or applicators are comprised as in Ravel are not sufficiently adsorbent to produce the necessary and appropriate cleaning required. Rather, such devices tend to collect mucous and other vaginal fluids only on their outer surfaces as they do not have the absorbency needed to provide the amount of fluid collection and removal or to hold and apply the proper amount of material that should be used for proper treatment, as is actually desired or necessary.

My device, as set forth herein, is comprised of an outer container, the various embodiments of which allow that container, or at least a part thereof, to form

9000487.250298

16

57,720

2

the handle structure for the swab, with that handle providing both the protection for the swab while packaged and a handle during use to provide better control over swab during such use.

The swab portion is preferably comprised of fairly rigid inner core member, constructed either in segments or as a one piece unit, over which a thick, gauze type adsorbent pad or layer is secured. In one embodiment, the rigid structure on which the pad is secured is retractable into and extendable from an outer container in which it is held by means of twisting a rotatable bottom thereof in a manner similar to raising and lowering a lipstick. In a second embodiment, the outer container is held together by means of a flexible strap or lever-type handle with that strap or handle serving to provide means for extending the swab from its retracted to its raised operative position. In another embodiment, the outer container is essentially peeled away from its enclosing or protecting relationship about the swab itself with at least part of the outer container forming the handle structure at the base of the thus exposed swab.

Other objects, features, and characteristics of the present invention, as well as the methods and operation and functions of the related elements of the structure, and to the combination of parts and economies of manufacture, will become more apparent upon consideration of the following detailed description and the appended claims with reference to the accompanying drawings, all of which form a part of this specification, wherein like reference numerals designate corresponding parts in the various figures.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a view of a first embodiment of the present invention showing the device in its covered, closed and unextended condition;

FIG. 2 is a view of the device as in FIG. 1 in its extended, operating condition;

FIG. 2a is a diagrammatic cross-sectional view of a portion of the device shown in FIG. 2;

FIG. 3 is a side elevational view of a second embodiment of the present invention in its closed condition;

FIG. 4 is a side elevational view of device shown in FIG. 3 with the top having been removed, prior to the swab being raised to its operative position;

FIG. 4a is a diagrammatic cross-sectional view of a portion of the bottom of the device shown in FIG. 4;

FIG. 5 is a side elevational view of the device shown in FIGS. 3 and 4 in its raised operative condition with portions having been cut away or omitted for clarity;

FIG. 6 is a side elevational view of still another embodiment of the present invention showing an additional handle structure that can be located on the exterior case;

FIG. 7 is diagrammatic, cross-sectional view of the female reproductive system showing the area in which the present device is used;

FIG. 8 is a diagrammatic, perspective view of still another embodiment of the present invention in its closed and sealed condition; and

FIG. 9 is diagrammatic, perspective view of the device shown in FIG. 8 in its opened and ready to use condition.

17

3

—4,

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS OF THE PRESENT INVENTION

As explained above, the present invention is designed to dry or absorb material in the internal vaginal area when one observes a discharge or lubrication building up to the point that cleansing is either desired or required. Alternatively, the swab can be used as an applicator for a variety of products or medicants and it can either be pre-impregnated therewith or such material could be applied once the swab was unpackaged. It should be understood that the absorbent gauze material and the swab element is contemplated as being sterile when packaged. Likewise, it is important that the device be extremely compact and easily manufactured so as to be both portable and disposable rendering it easily carriable and usable.

Turning first to FIGS. 1, 2 and 2a, the device is comprised of an outer housing, generally indicated at 10, with that outer housing being comprised of an exterior cover 12, an internal tubular member 14 and rotatable base 16. The swab itself is comprised of an internal and preferably hollow core member 18 which as shown in FIG. 2a preferably has a flange 20 integrally formed therewith and extending about its base. Flange 20 cooperates with a radially inwardly extending flange 22 at the top of tube 14 so that when core member 18 is in its fully extended position, as shown in FIG. 2, flanges 20 and 22 will abut one another and prevent further movement as shown in FIG. 2a.

An outer gauze adsorbent layer 24 is secured to core 18 by any convenient means, preferably by a medically inert adhesive. It is also preferred that gauze 24 extend over or around flange 20 at the base of core member 18. Accordingly, when core 18 is in its fully raised condition, gauze 24 will be effectively clamped between flanges 20 and 22.

The operation of this structure, in order to raise core 18 from the position shown in FIG. 1 to the erected or extended position shown in FIG. 2, is accomplished by a conventional helical cam and guide slot arrangement, generally indicated at 26 in FIG. 2a. Such mechanisms, for example, are shown in Coryel, U.S. Pat. No. 1,504,216, or Davis, U.S. Pat. No. 3,677,654, both of which are exemplary of conventional well known mechanisms for raising and lowering lipsticks. Thus, by rotating base 16 it is possible to raise and lower core 18 and the attached gauze material 24.

With reference to FIG. 7, the average vaginal cavity is approximately 9 cm (3.5 inches) long. Accordingly, I prefer to have the swab, gauze material 24 and likewise core 18 be approximately 4 inches long. Container 14 accordingly must be approximately 4 inches in length in order to effectively receive core 18 and the gauze material 24 therein when core 18 is retracted, as shown in FIG. 1. I have found that a cover having a total length of approximately 4 inches is sufficient to completely encase container 14 above base 16.

The container is preferably made from a moldable plastic material, such as polyethylene or any one of the other polyolefins or from thermoplastics. Core 18 can be made from the same material. I prefer to have the adsorbent material 24 be comprised of a cotton or cotton/polyester gauze. However, it is important to employ a highly absorbent material and, accordingly, any such materials could be used as the absorbent material 24.

*18*

57,720

4

As an alternative method of ... ...g and lowering swab 24, the interior of core 18 ... as provided with suitable threads and a suitably corresponding threaded rod (not shown) could be attached to the rotatable base 16. As base 16 was rotated it would likewise rotate the threaded rod which would in turn, rotate inside core member 18 causing that core member to be raised or lowered depending upon the position of the core member relative to that threaded rod and the direction in which base 16 was rotated.

Turning now to FIGS. 3-5, the second embodiment of the present invention is comprised of an outer container, generally indicated at 30, which is comprised of a hollow base container 32, an exterior upper cover 34, a flexible retaining clamp member 36 and a swab member, generally indicated at 38. A flanged joint 40 is provided between base 32 and cover 34 in order to assure that the joint area is securely formed and to likewise assure their correct and desired relative positioning. If desired, a snap-type interconnection could be employed between cover 34 and base 32 as an added measure to work along with clamp member 36 to hold cover 34 in place. As shown in FIG. 3, the device is in its closed position and retaining clamp 36 is in place extending over cover 34.

Turning next to FIGS. 4a and 5a portion of the internal structure at the bottom of the device is set forth diagrammatically in cross-section in FIG. 4a where as the device in its extended condition ready for use is shown in FIG. 5. As shown in FIG. 5, the outer container 32 is provided along its upper periphery with an inwardly extending annular flange 42. Swab member 38 is respectively comprised of an internal core member 44 which is preferably formed in a one piece manner from a moldable plastic material such as, for example, polyethylene, and is formed with a bottom flange 46 as shown in both FIGS. 4a and 5. Affixed thereto is an outer sheath 48 of absorbable material and as shown, this sheath 48 preferably extends around and is affixed to core 44 adjacent the base thereof. As was true with the first embodiment, I prefer to use a medically inert adhesive for this purpose although other methods could be used to securely attach the gauze sheath 48 to core 44 in a manner that it extends over or around flange. Clamp 36 is preferably integrally formed with core 44 and is integrally hinged at a predetermined point along the bottom peripheral edge of that core member. The location where clamp member 36 is hinged to core 44 is predetermined so that when core 44 is retracted within the hollow container 32, clamp 36 can be pivoted up to its closed position extending about cover 34 as shown in FIG. 3, thereby securing core 44 within container 32 with the upper loop portion of clamp member 36 serving to hold cover 34 in place.

With reference specifically to FIG. 4, retaining member 36 has been rotated to its full pivotal unlocked condition and cover 34 has been removed thereby exposing the upper portion of swab 38. By pushing upward on member 36, the inner core 44 will be moved upwardly within container 32 thereby fully exposing swab member 38 as shown in FIG. 5. In that condition shown in FIG. 5, both the container 32 and the remaining portion of member 36 extending therebelow will act as a handle for the user to grasp onto when using the device.

In order to securely close the container to keep swab 38 sterile is to provide a bottom 50 on the lower container 32 in which a suitable passageway or opening 52

90001987 ' 862250

19

322 (A)

5

4,5

is provided through which member 36 can pass. It may be otherwise desirable to close or seal the opening 52 of container 32. This can be accomplished by a variety of sealing methods once the assembly is connected together. Preferably, a bottom member 50 is separately formed with a suitable cutout forming opening 52 with bottom member 50 snapping into place within the bottom confines of container 32 following insertion of swab 38 and member 36 into container 32.

In FIG. 6, another embodiment of the present invention is shown. The cover 34' extends along the full length of the internal core supporting the gauze or adsorbent pad assembly which can be similar to the structure set forth in FIGS. 3–5 without member 36 attached thereto. In this instance, the cover itself 34' can itself snap in place with respect to the lower container 32' so that a retaining clip or other retaining device would not be required. However, in order to provide sufficient leverage for handling the device when in use and to aid in securing cover 34' to base 32', one or two handles, as indicated at 60 and 62, could be provided on the sides of outer container formed from cover 34' and lower container 32'. These handles can be integrally molded together with lower container 32' and initially held in an upright condition by means of breakable bands indicated at 64.

Turning now to the last embodiment, as shown in FIGS. 8 and 9, the swab is generally indicated at 100 in FIG. 9 and is comprised of a core 102 covered by a gauze layer 104. An outer container is generally indicated at 110. Core 102 is separately formed so as to have a base formed as an annular band or ring 106. Core member 102 can be formed either as a solid structure or preferably with a hollow interior. As in the other embodiments, absorbent gauze material 104 is secured about the exterior surface of core 102 but not about annular band 106. In FIG. 9, the device is shown in its open, ready-to-use position whereas in FIG. 8 the device is shown in its closed and sealed condition. The cover or outer case 110 is comprised of an annular band or ring 112 at the base thereof together with an upper portion generally indicated at 114. It should be understood that the annular band or ring 106 of core member 102 has an outer diameter which is at least equal to the inner diameter of band 112 so that the two can fit thereby allowing core 102 to be secured within band 112 by a suitable adhesive following their formation and the application of gauze 104. Outer container 110 is formed in its closed condition so that following insertion of core 102 therein the swab will be completely formed. However, the bottom of the resulting structure could be closed by a separate member (not shown) that would likewise fit within or over the base of band 112.

In FIG. 8, the outer container 110 is shown in its closed condition and it should be noted that container 110 is comprised of a plurality of segments defined by a plurality of sets of frangible seams. The first set of four frangible seams 116 extend axially along the side walls of the container thereby defining two opposed vertically extending strips 121 and 123 of the side wall therebetween. They also define part of container segments 126 and 128 as will become clear below. A second set of frangible seams 118 extend across the top of container 110 and connect opposing pairs of seams 116 together. An additional seam 124 extends perpendicularly between the center of seams 118 on the very top of the container. Tabs 120 and 122 are provided adjacent each

57,720

6

side of seam 134 and will be used to pull open seam 124 and to thereby open container 110.

Another frangible seam 134 is provided between band 112 and the upper portion 114 with seam 134 defining the upper edge of band 112 and the bottom edge of upper portion 114. Two portions of that seam are thickened and, therefore, are non-frangible so that they respectively form hinges 130 and 132. The remaining portions of seam 134 are frangible and subject to being severed or broken when container 110 is opened. Seams 116, 118, 124 and 134 together serve to define sections 121, 123, 126 and 128 as well as the size of band 112. Sections 121 and 123 will be peeled away and discarded after tabs 120 and 122 are pulled up and away from each other thereby breaking seam 134 which is followed by the severing of seams 118 and 116 and a portion of seam 134 at the juncture between sections 121 and 123 and band 112. Once sections 121 and 123 have been removed, sections 126 and 128 will remain. These sections can then be rotated, respectively, about hinges 130 and 132 thus breaking the remaining portions of frangible seam 134 which had previously joined them to band 112. This open condition of segments 126 and 128 is shown in FIG. 9 with those segments being bent so that they engage one another, as shown in phantom. This opening procedure exposes swab member 100, with segments 126 and 128 serving to provide the handle structure required for using the swab. While segments 126 and 128 have been shown as comprising cylindrical type segments, the actual design of sections 121 and 123 can be modified as desired so that the resulting shape of segments 126 and 128 can be varied. In addition, it would be possible to reinforce segments 126 and 128 in an axial direction or to provide them with another internal shape that would not interfere with the dimensions and sides of swab 100 so that when sections 126 and 128 are folded down as shown in FIG. 9 a variety of handle structures could be formed.

The core member 102 and its band 106 are preferably molded as a one-piece unit. Likewise, the cover section 110, would also be integrally molded as a one-piece unit. Once these two molded portions are obtained, the gauze material 104 can be secured to core 102 with that structure then being placed into cover 110 with band 106 being permanently secured within band 112. It is believed that the resulting structure will maintain the sterile condition of gauze 104 until tabs 120 and 122 are pulled and the opening of the container 110 is initiated.

While the invention has been described in connection with what is presently considered to be the most practical and preferred embodiment, it is to be understood that the invention is not to be limited to the disclosed embodiment, but on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims, which scope is to be accorded the broadest interpretation so as to encompass all such modifications and equivalent structures.

What I claim is:

1. A vaginal swab comprised of an outer housing having a closed and open end on opposing ends thereof, said housing including an annular band defining said open end and a plurality of frangible seams that together define a pair of removable members and a pair of housing segments hingably secured to said annular band following removal of said removable members, a swab core member having a predetermined exterior shape, said core member having an annular base with an outer

21

324 (A)

7                                          4,5

diameter equal to the inner diameter of said annular bead and an adsorbent member secured to said core member, said core member being secured within said housing so that said adsorbent member is enclosed therein.

2. A vaginal swab comprising an outer housing including an inner case member and an outer case member at least part of which is connected to and overlies said inner case member;

a core member, at least one layer of a porous material secured to said core member, and housing means

9000487.052298

222

325(A)

7,720

8

for supporting and enclosing said core member,
said core member being secured to said housing
means, having at least two portions movable rela-
tive to one another between first and second posi-
tions for enclosing said core member when in said
first position and for both exposing said core mem-
ber and the said porous padding secured thereto
and for forming a handle for said swab when in said
second position.

* * * * *

23

# United States Patent [19]

## Srinivasan et al.

[11]  **3,973,567**

[45]  **Aug. 10, 1976**

[54] **WRAPPED SANITARY NAPKINS**

[75] Inventors: **Subramanian Srinivasan; Fred H. Steiger,** both of East Brunswick, N.J.

[73] Assignee: **Personal Products Company,** Milltown, N.J.

[22] Filed: **May 19, 1975**

[21] Appl. No.: **578,978**

[52] U.S. Cl. ............................. 128/290 R; 128/284; 229/48 SB

[51] Int. Cl.² ........................................ A61F 13/16

[58] Field of Search ........ 128/284, 287, 262, 290 R, 128/156; 229/48 SB, 80, 87, 92.5, 92.7

[56] **References Cited**

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 1,720,721 | 7/1929 | Culotta | 229/92.7 X |
| 3,024,788 | 3/1962 | Lane | 128/290 R X |
| 3,035,578 | 5/1962 | Elmore | 128/290 R |
| 3,193,181 | 7/1965 | Konjevich et al. | 229/87 |
| 3,230,956 | 1/1966 | Kargul | 128/290 R |
| 3,274,999 | 9/1966 | Robinson | 128/156 |
| 3,307,773 | 3/1967 | Kratzer et al. | 229/80 |
| 3,367,334 | 2/1968 | Testa | 128/290 R |
| 3,570,491 | 3/1971 | Sneider | 128/290 R |
| 3,604,423 | 9/1971 | Fraser | 128/290 R |
| 3,731,689 | 5/1973 | Schaar | 128/287 |

Primary Examiner—Aldrich F. Medbery

Attorney, Agent, or Firm—J. Lipow

[57]  **ABSTRACT**

A sanitary napkin having an adhesive element thereon for attaching to a undergarment is provided with means for both protecting the napkin and the adhesive element prior to use and for disposing of the napkin after use. The means comprise providing the napkin with a wrapper sheet of flexible material overlying one major surface, and the sides of the napkin and at least partially overlapping on the second major surface of the napkin. The sheet is releasably adhered to and held in place by the adhesive element.

**7 Claims, 14 Drawing Figures**







3,973,567

1

# WRAPPED SANITARY NAPKINS

## BACKGROUND OF THE INVENTION

This invention concerns the handling and disposing of sanitary napkins and, in particular, concerns means for protecting a sanitary napkin having an adhesive attachment system before use and means for disposing of such a napkin after use.

The art is now replete with suggestions for sanitary napkins which can be applied to the crotch portion of an undergarment and held in place there by an adhesive element thus eliminating the need for the more conventional attachment systems such as belts, pins, and the like. Generally, such napkins comprise an adhesive element in the form of a rectangular layer of pressure-sensitive adhesive or a double faced adhesive tape arranged in various patterns on the bottom surface of the napkin (i.e., the surface of the napkin worn away from the body). Because such adhesive elements are necessarily tacky, it is essential that a protective layer be provided to overlie the adhesive element prior to use, the protective layer being capable of releasably peeling from the adhesive element at the time of use. Such protective layers have heretofore comprised a relatively stiff sheet of material essentially co-extensive in size with the adhesive element and being specially treated so as to easily peel from the adhesive element at the time of use. For example, a heavy paper strip having one surface coated with silicone has been used commercially.

Napkins of this type are then typically packaged, without further protection, in cardboard, or flexible film packages of eight, 10, 12 or more napkins.

Several drawbacks are associated with the construction and packaging of adhesively attached napkins in the manner described above. Firstly, a large number of napkins packaged in a single package, necessarily means that the package will remain open, with the unused napkins exposed and subjected to soiling, for a period of days and even for as much as a month or longer. Secondly, a user will frequently remove several napkins from the large package and place them in her handbag for future use. The exposed napkins are once again subject to being soiled when carried in a purse. Thus, it is advantageous to individually wrap each napkin. Unfortunately, the additional materials and processing steps required to so wrap each napkin would appear to greatly increase the cost of the product to the consumer and heretofor, no economical means have thus far been suggested for accomplishing this without such increased cost.

Still another problem which relates to the above described napkins is in the disposal of the used napkin. Ideally a used napkin should be fully wrapped immediately after use and disposed of in a closed trash receptacle. Understandably however, there is a great reluctance toward any extensive handling of the used napkin and so all too frequently, the napkin is disposed of in an unwrapped condition or alternatively is simply flushed in a water closet where it often causes clogging of the associated piping. Several suggestions are found in the prior art for alleviating this problem and are exemplified by U.S. Pat. No. 2,750,033 issued June 12, 1956 to J. B. Pickens or U.S. Pat. No. 2,766,927, issued on Oct. 16, 1956 to J. S. Wallace. Each of these patents describe a closed envelope or receptacle for receiving a soiled napkin, the envelope being reclosable or sealable

2

after receiving the same. While it appears that these suggestions would function quite well with conventional napkins, it is likewise apparent that these complex, specially designed receptacles would represent a substantial portion of the cost of the product to the consumer. Additionally, when attempting to use these receptacles with the newly developed adhesively attached napkins, it is exceedingly difficult to slide such a used napkin into an envelope-like receptacle without extensive handling of the soiled napkin. This is primarily due to the resistance to sliding caused by the now exposed adhesive element which is tacky and adheres to the walls of the envelope.

Accordingly, there is a need for an inexpensive, yet effective means for packaging and disposing of adhesively attached sanitary napkins.

## SUMMARY OF THE INVENTION

In accordance with this instant invention, a sanitary napkin having an adhesive element thereon for attaching to an undergarment is provided with means for both protecting the napkin and the adhesive element prior to use and for disposing of the napkin after use. It has been discovered that such means may be provided without unduly increasing the cost of the napkin to the consumer, while still overcoming the problems associated with prior attempts to meet these desired results.

Specifically, the means of this invention comprise providing an adhesively attached napkin with a sheet of flexible material overlying one major surface and the sides of said napkin and at least partially overlapping on the second major surface of said napkin, said sheet being releasably adhered to and held in place by said adhesive element. Preferably, the sheet overlaps on that surface on which the adhesive element is disposed. Thus, by simply providing the overlapped sheet as described above, the napkin is protected from soiling and because the sheet overlies the adhesive element, the need for a protective, specially treated, release strip found to be necessary in prior art adhesively attached napkins is now completely eliminated. In fact, the adhesive element is utilized as the means for holding the flexible sheet in place, thus eliminating the need for special sealing steps in fabricating an envelope to protect the napkin. The provision of the simple sheet construction in combination with the utilization of the adhesive element to hold it in place represents only a small fraction of the cost of the finished product and this cost is offset by the savings realized in eliminating the release strip heretofore required.

In use, the sheet is simply unwrapped from the napkin and releases easily from the adhesive element leaving the napkin ready for use. The sheet may then be folded and placed in a handbag or another convenient place until the napkin is to be discarded. At this time, the sheet may be unfolded, the napkin laid onto the unfolded sheet and then wrapped in the sheet with the adhesive element again acting to hold the sheet in place. Thus, the now wrapped napkin may safely and sanitarily be disposed of in a trash receptacle.

In a preferred embodiment of the invention, the sheet is in the form of a parallelogram having both short parallel sides and long parallel sides. The short sides are at least twice as long as the width of the napkin and are spaced apart by a distance at least as long as the length of the napkin. The napkin is then placed onto this sheet with the longitudinal sides of the napkin essentially perpendicular to the short sides of the sheet, and pref-

330 (A)

3,973,567

3

erably with the top major surface of the napkin (the surface normally worn against the body and without the adhesive element) facing the sheet. A first part of the sheet is then folded over the napkin about a line essentially coincidental to one longitudinal edge of the napkin so that this folded portion of the sheet forms a right triangular shape on the surface of the napkin. When, as in the preferred embodiment, the adhesive element is on the surface covered by this folded portion, the folded portion is advantageously adhered to and held in place by the adhesive element. Similarly, the remainder of the napkin is covered by folding a second portion of the sheet about a line coincidental with the second longitudinal edge of the napkin and again advantageously using the adhesive to hold this folded portion in place. In this manner, the napkin is fully covered using a minimum of sheet material. The hypotenuse of each of the triangular portions of the sheet each cross the adhesive element on the napkin at least one point and, accordingly, it is assured that the sheet will be held in place by the adhesive element even though the sheet is not in perfect registration with the napkin.

Other closure means may be provided such as a cuff which folds over to seal the open end of the package. In still another embodiment, the sheet is formed integral with an envelope for receiving the wrapped napkin and further insuring that the used napkin is fully enclosed when disposing of the same.

BRIEF DESCRIPTION OF THE DRAWINGS

In the Drawings:
FIG. 1 is a perspective view of the wrapped, adhesively attached sanitary napkin of this invention, with parts broken away to expose internal features;
FIG. 2 is a cross-sectional view of the napkin of FIG. 1 taken through line 2—2;
FIG. 3 is an analogous cross-sectional view of a second embodiment of this invention;
FIG. 4 is a planar view of a napkin placed on a sheet prior to wrapping and illustrating another embodiment of this invention;
FIG. 5 is a planar view of the napkin and sheet of FIG. 4, in a partially folded condition;
FIG. 6 is a planar view of the napkin and sheet of FIGS. 4 and 5 in a completely wrapped condition;
FIG. 7 is a planar view of a wrapped napkin of this invention illustrating still another specific embodiment;
FIG. 8 is a cross-sectional view of the wrapped napkin of FIG. 7 taken along line 8—8;
FIG. 9 is a cross-sectional view of the wrapped napkin of FIG. 8 taken along line 9—9;
FIG. 10 is a perspective view of a used, wrapped and folded napkin prior to sealing and discarding;
FIG. 11 is a perspective view of the napkin of FIG. 10 after sealing;
FIG. 12 is a planar view of a napkin placed in a wrapper with an integral envelope and illustrating still another embodiment of this invention;
FIG. 13 is a cross-sectional view of the napkin and wrapper of FIG. 12 taken through line 13—13; and
FIG. 14 is a perspective view of the napkin of FIG. 14, wrapped and being folded and placed in the envelope for discarding.

DETAILED DESCRIPTION OF THE INVENTION

FIGS. 1 and 2 illustrate an embodiment of the invention and specifically depict a wrapped sanitary napkin 10 with its bottom surface 12 facing upward in the

4

drawing. The wrapped napkin comprises an absorbent core 14 which may be made up of any suitable absorbent material such as, for example, comminuted wood pulp fibers, cotton linters, rayon fibers, cotton staple, bleached sulfite creped wadding and the like. The core 14 is surrounded by a fluid pervious cover 16 which may be such sheet material as gauze or nonwoven fabrics reinforced with adhesive binders or the like. In certain instances, the portion of the cover overlying the bottom major surface of the napkin may comprise a fluid impermeable sheet material such as polyethylene or polypropylene, cellophane and other similar films. Such a napkin construction is described in U.S. Pat. No. 3,643,662, issued on Feb. 22, 1972 to M. McGuire.

Applied to the bottom surface of the napkin is a pressure sensitive adhesive element 18, which, in the configuration shown in FIG. 1, is in the form of a single band of pressure sensitive adhesive extending centrally and parallel to the longitudinal edges of the napkin. In use, the napkin is applied to the crotch portion of an undergarment by pressing the adhesive thereto and this may be worn, without substantial repositioning of the napkin, and without the need for belts, pins and the like as with conventional tabbed napkins. The adhesive element may comprise any of a large number of pressure sensitive adhesives now available on the market, including, for example, the so-called cold pressure sensitive adhesives such as the acrylate adhesives, e.g., vinyl acetate-2 ethyl hexyl acrylate copolymer which is generally combined with tackifiers such as, for example, ethylene amine. Alternatively, the adhesive may comprise the rapid setting thermoplastic (hot melt) adhesives such as block copolymers exemplified by styrene and butadiene styrene copolymers. The adhesive element may also comprise a two-sided adhesive tape such as that described in the aforementioned U.S. Pat. No. 3,643,662.

It will be understood that while a particular geometrical configuration for the adhesive element is illustrated, the advantages of this invention accrue to various patterns of adhesive elements such as squares, triangles or other forms as will occur to one skilled in the art.

In accordance with the teachings of this invention, means are provided for both protecting the adhesive element and the napkin prior to use. These means comprise a sheet 20 of flexible material, covering the top surface 22, the sides 24 and overlapping on the bottom surface 12. The sheet is then held in place by being adhered to the adhesive element and thus, the sheet and the adhesive element cooperate in that the sheet provides a protective covering for the adhesive whereas the adhesive provides a means for holding the sheet about the napkin to protect the napkin from soiling. By this simple expedient, it can be seen that the specially designed release strip heretofore found necessary for protecting the adhesive element in napkins of this type is completely eliminated while obtaining the advantages of a completely wrapped product. When using the napkin, the sheet may be simply pulled away from the adhesive element and folded up and placed in the user's purse. Thereafter, when discarding the used napkin, the sheet may be unfolded, the napkin placed onto the center of the sheet, the sheet refolded and adhered to the adhesive element, all these steps requiring only minimal handling of the used napkin itself. The fully wrapped napkin may now be discarded in a trash receptacle.

3,973,567

5

The embodiment shown in FIGS. 1 and 2 are so constructed as to provide a product which will not unintentionally unwrap even when handled by virtue of the fact that the longitudinal edge portions 26 of the covering sheet both contact and are adhered to the adhesive element. This configuration is relatively easy to achieve when wrapping a used napkin for discarding the same by simply taking care to register the napkin with respect to the unfolded sheet so that when the sheet is folded about the napkin, the edges adhere to the adhesive. A simple manual adjustment can be made should the registration be imperfect. In mass producing such wrapped napkins however, registration may become a problem, particularly when the adhesive element used is a narrow adhesive band. Accordingly, it may be more advantageous to produce a product wrapped as illustrated in FIG. 3. Depicted there is sanitary napkin 10, overwrapped by the flexible sheet 20, but unlike the construction shown in FIGS. 1 and 2, the longitudinal edges 26 of the sheet 20 overlap on the top major surface 22 of the napkin rather than on the bottom surface 12 on which the adhesive element 18 is disposed. As in the prior embodiment, the sheet is held to the napkin by the adhesive element and similarly protects the adhesive element and the product from soiling. However, it will be appreciated that in this embodiment, even gross misregistration of the sheet and napkin will still provide a completely protected adhesive element. The fact that the longitudinal edges of the sheet are not adhered presents no great disadvantage when it is considered that the unused napkins are packaged closely together and not handled until use. When the time comes to dispose of a used napkin however, the same sheet may be applied as is shown in FIG. 1 and 2 by the user so that a safely wrapped napkin can be deposited in a trash receptacle.

Illustrated in FIGS. 4–6 is still another embodiment of this invention which more elegantly solves the aforementioned problem of registration while still maintaining the advantages of this invention in providing a completely wrapped product and eliminating the need for a special protective strip for the adhesive element. Shown in these figures is a sanitary napkin 30 similar in construction to the napkin 10 shown in FIGS. 1–3 in that napkin 30 comprises an absorbent core (not visible) overwrapped in a fluid-pervious cover 32 and, having on the bottom surface of the napkin (facing upward in the drawing) two pressure sensitive adhesive elements 34. For illustrative purposes, the adhesive elements 34 are shown as two rectangles extending transversely across the napkin and located at either end of the napkin. It will be understood that this configuration is one of many possible configurations and, for example, is completely interchangeable with the adhesive configuration shown in FIGS. 1–3 while still obtaining the advantages of this invention.

The napkin 30 is placed on a flexible sheet 36 which is in the shape of a parallelogram having two short parallel sides 38, 39 and two longer parallel sides 40, 41. The dimensions of the sheet are chosen relative to the size of the napkin such that the shorter parallel sides 38, 39 are at least twice as long as the width W of the napkin and are spaced apart by a distance at least as long as the length L of the napkin. The napkin is placed on the sheet preferably with the top major surface of the napkin facing the sheet, and with the longitudinal edges of the napkin essentially perpendicular to the short sides of the sheet.

6

FIG. 5 illustrates the embodiment shown in FIG. 4 with the napkin partially wrapped. The sheet is first folded about a line essentially coincidental to one longitudinal edge 42 of the napkin, with a corner of the sheet c folded over a second corner d, thus forming a right triangle cover 46 on the bottom major surface of the napkin. The right triangle covers approximately half of this surface and is held in place by overlying and adhering to one adhesive element 34. Illustrated in FIG. 6 is the completely wrapped napkin which is obtained by folding the sheet about a line essentially coincidental with the second longitudinal edge 44 of the napkin, with the corner of the sheet a folded over the corner b. Thus, again, a right triangle cover 48 is formed on the bottom major surface of the napkin and covers the remaining half of this surface. Again, this portion of the cover is adhered to second adhesive element 34. It will be appreciated that because the hypotenuse of each of the right triangles lies diagonally across the face of the napkin, of necessity at least a portion of each triangle will contact and adhere to one of the adhesive elements. Accordingly, even gross misregistration of the napkin as placed onto the sheet will not result in the sheet being unadhered to the adhesive and so this particular embodiment may be advantageously used in the rapid mass production of wrapped product. As in the prior embodiment described herein, the sheet may be saved by the user and employed in rewrapping the used product when disposing of the napkin.

The wrapped product illustrated in FIGS. 1–3 and FIG. 6 may be completely enclosed within the sheet by sealing the marginal edges of the sheet which extend beyond the ends of the napkin using such methods known in the art as heat sealing or adhesive sealing. Generally, such sealing is unnecessary in packaging unused napkins in that they are adequately protected from soiling by the unsealed flexible wrapper. When disposing of the napkin, however, it may be desirable to more effectively seal the used napkin for sanitary reasons. This may readily be accomplished by providing resealable adhesive elements on the marginal portions of the wrapped sheet. Another highly effective method is illustrated in FIGS. 7–11. Illustrated in FIGS. 7–9 is the wrapped napkin, in essentially the form of the embodiment shown in FIG. 6 with the exception that, on the uppermost triangle 48 of the folded sheet, a pocket or cuff 50 has been provided. The cuff may consist of a rectangular sheet of the same material as the flexible sheet, overlying the portion of the triangle 48 nearest one end of the napkin. The cuff is formed by sealing the periphery of the rectangular sheet to the triangular portion leaving an open mouth 52 facing the center of the wrapped napkin. The sealing may be accomplished by adhesive or heat seals 53. Alternatively, the rectangular sheet may be integral with the flexible sheet 38 and then folded about line e-a (see FIGS. 4 and 5) and sealed along the longitudinal edges to form the cuff.

In any event, the cuff now provides a convenient and easy-to-use means for sealing a wrapped used napkin. As is illustrated in FIG. 10, a used napkin, first wrapped as described above, is folded in half. Fingers may then be inserted into the mouth of the cuff at one end of the folded napkin and, as is shown in FIG. 11, the cuff may then be turned inside out around the other end of the napkin, thus producing a neatly sealed package which may be safely discarded and which has been formed

FORM PTO-1506 (8-89)
## REEXAMINATION

(3712)

4,557,720

| CONTROL NUMBER | CERTIFICATE DATE | CERTIFICATE NUMBER |
|---|---|---|
| 90/004987 | JAN 26 1999 | B1-4,557,720 |

| CLASS | SUBCLASS | ① O.I.P.E DWD SCANNED BW O.A. ⑪ | ART UNIT | EXAMINER | P2 411 |
|---|---|---|---|---|---|
| 604 | 001 | | 3735 | Ruhl | |

TITLE OF INVENTION (FOR DESIGN APPLICATION ONLY):

| ☐ TERMINAL DISCLAIMER | ☐ The term of this patent subsequent to _____ (date) has been disclaimed. | ☐ The term of this patent shall not extend beyond the expiration date of Pat. No. ____ | ☐ The terminal _____ months of this patent have been disclaimed. |
|---|---|---|---|

### ISSUING CLASSIFICATION

| ORIGINAL | | CROSS REFERENCE(S) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CLASS | SUBCLASS | CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | | |
| 604 | 1 | 401 | 77 | 78 | | | | |

INTERNATIONAL CLASSIFICATION

| A | 6 | 1 | B | 10/00 | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

☐ Continued on Issue Slip Inside File Jacket

Form PTO-3008 (Rev. 4-87)   **WARNING:** The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

| REQUESTER CORRESPONDENCE ADDRESS: | PATENT OWNER ☒ | THIRD PARTY ☐ |
|---|---|---|

Same As Above

| COPENDING OFFICE PROCEEDINGS | | PREPARED FOR CERTIFICATE |
|---|---|---|
| TYPE OF PROCEEDING | NUMBER | Rita Kent   10/7/98 |
| 1. NONE | | (Docket Clerk) |
| 2. | | REEXAMINED AND PASSED FOR CERTIFICATE |
| 3. | | John Wiss   3735 |
| | | (Primary Examiner)   (Group) |

**333(A)**

7

3,973,567

8

around the used napkin with minimal handling of the napkin.

FIGS. 12 through 14 illustrate still a further embodiment of the instant invention. A rectangular sheet 60 having a length $k$ equal to at least the length of the napkin is divided into a central portion 64 and two lateral portions 62 and 63, each of the portions being at least as wide as the width W of a napkin 68. Integral with the sheet 60 and extending from the central portion 64 is a bottom panel 70 also of a width and length at least as large as that of the napkin. Overlying the bottom panel 70 is a top panel 72 generally of the same dimensions as the bottom panel and sealed to the bottom panel along the peripheral edges 75, 75', 75" of the panels but unsealed at the edge facing the sheet 60 so as to form an envelope with a mouth 74 opening from the direction of the sheet 60. As shown in this specific embodiment, a cuff 78 is provided on the outside surface of the top panel 72 near the mouth 74, the cuff having a mouth 80 opening in a direction opposite to mouth 74. In using this sheet and integral envelope, the napkin 68 is laid onto the central portion 64 of sheet 60, preferably with the adhesive element 69 facing upwardly. Portions 62 and 63 are alternately folded or wrapped about the napkin. In this connection, it has been found desirable to provide slits 82 and 83 cut through the sheet 60 at the points where the sheet is integral with the formed envelope to facilitate the folding.

As is best illustrated in FIG. 14, the wrapped napkin may now be folded in half and rolled into the integral envelope. Thereafter, fingers may be inserted into the cuff at mouth 80 and the cuff turned about the open mouth 74 of the envelope to safely seal the napkin therein for discarding.

What is claimed is:

1. In a sanitary napkin having an adhesive element thereon for attaching to an undergarment, the improvement which comprises means for protecting said napkin and said adhesive element prior to use and for discarding said napkin after use, said means comprising a sheet of flexible wrapper material overlying one major surface and the sides of said napkin and at least partially overlapping on the second major surface of said napkin, said sheet being releasably adhered to and held in place by said adhesive element.

2. The improved sanitary napkin of claim 1 wherein said sheet overlaps on the major surface of the napkin on which the adhesive element is disposed.

3. The improvement of claim 2 wherein said sheet is in the form of a parallelogram having short parallel sides and long parallel sides, said short parallel sides being at least twice as long as the width of the napkin, and said short sides being spaced apart a distance at least as long as the length of said napkin.

4. The napkin of claim 1 wherein said flexible sheet is sealed to itself at one end of said napkin.

5. The napkin of claim 1 wherein a cuff is provided on the flexible sheet approximately one end of the napkin whereby said cuff may be turned around said end of the napkin to seal the napkin within the sheet.

6. The napkin of claim 1 wherein said sheet is integral with an envelope for receiving said napkin.

7. The napkin of claim 6 wherein said envelope is provided with a cuff at one end thereof whereby said napkin may be placed in said envelope and said cuff may be turned around said catamenial napkin to seal said napkin in said envelope.

*  *  *  *  *

40

45

50

55

60

65

3,973,567

| 7 | 8 |

around the used napkin with minimal handling of the napkin.

FIGS. 12 through 14 illustrate still a further embodiment of the instant invention. A rectangular sheet 60 having a length $k$ equal to at least the length of the napkin is divided into a central portion 64 and two lateral portions 62 and 63, each of the portions being at least as wide as the width W of a napkin 68. Integral with the sheet 60 and extending from the central portion 64 is a bottom panel 70 also of a width and length at least as large as that of the napkin. Overlying the bottom panel 70 is a top panel 72 generally of the same dimensions as the bottom panel and sealed to the bottom panel along the peripheral edges 75, 75', 75'' of the panels but unsealed at the edge facing the sheet 60 so as to form an envelope with a mouth 74 opening from the direction of the sheet 60. As shown in this specific embodiment, a cuff 78 is provided on the outside surface of the top panel 72 near the mouth 74, the cuff having a mouth 80 opening in a direction opposite to mouth 74. In using this sheet and integral envelope, the napkin 68 is laid onto the central portion 64 of sheet 60, preferably with the adhesive element 69 facing upwardly. Portions 62 and 63 are alternately folded or wrapped about the napkin. In this connection, it has been found desirable to provide slits 82 and 83 cut through the sheet 60 at the points where the sheet is integral with the formed envelope to facilitate the folding.

As is best illustrated in FIG. 14, the wrapped napkin may now be folded in half and rolled into the integral envelope. Thereafter, fingers may be inserted into the cuff at mouth 80 and the cuff turned about the open mouth 74 of the envelope to safely seal the napkin therein for discarding.

What is claimed is:

1. In a sanitary napkin having an adhesive element thereon for attaching to an undergarment, the improvement which comprises means for protecting said napkin and said adhesive element prior to use and for discarding said napkin after use, said means comprising a sheet of flexible wrapper material overlying one major surface and the sides of said napkin and at least partially overlapping on the second major surface of said napkin, said sheet being releasably adhered to and held in place by said adhesive element.

2. The improved sanitary napkin of claim 1 wherein said sheet overlaps on the major surface of the napkin on which the adhesive element is disposed.

3. The improvement of claim 2 wherein said sheet is in the form of a parallelogram having short parallel sides and long parallel sides, said short parallel sides being at least twice as long as the width of the napkin, and said short sides being spaced apart a distance at least as long as the length of said napkin.

4. The napkin of claim 1 wherein said flexible sheet is sealed to itself at one end of said napkin.

5. The napkin of claim 1 wherein a cuff is provided on the flexible sheet approximately one end of the napkin whereby said cuff may be turned around said end of the napkin to seal the napkin within the sheet.

6. The napkin of claim 1 wherein said sheet is integral with an envelope for receiving said napkin.

7. The napkin of claim 6 wherein said envelope is provided with a cuff at one end thereof whereby said napkin may be placed in said envelope and said cuff may be turned around said catamenial napkin to seal said napkin in said envelope.

* * * * *

FORM PTO-1506 (8-89)
## REEXAMINATION

**(3712)**

4,557,720

| CONTROL NUMBER | CERTIFICATE DATE | CERTIFICATE NUMBER |
|---|---|---|
| 90/004987 | JAN 26 1999 | B1- 4,557,720 |

| CLASS | SUBCLASS | O.I.P.E | ART UNIT | EXAMINER | |
|---|---|---|---|---|---|
| 604 | 001 | DWO SCANNED BW Q.A. HH | 3735 | Ruh L | 'P2 'AII |

TITLE OF INVENTION (FOR DESIGN APPLICATION ONLY):

| | | | |
|---|---|---|---|
| ☐ TERMINAL DISCLAIMER | ☐ The term of this patent subsequent to _____ (date) has been disclaimed. | ☐ The term of this patent shall not extend beyond the expiration date of Pat. No. _____ | ☐ The terminal _____ months of this patent have been disclaimed. |

### ISSUING CLASSIFICATION

| ORIGINAL | | CROSS REFERENCE(S) | | | |
|---|---|---|---|---|---|
| CLASS | SUBCLASS | CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | |
| 604 | | 401 | 77 | 78 | |

| INTERNATIONAL CLASSIFICATION | | | | | |
|---|---|---|---|---|---|
| A61B | 10/00 | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | ☐ Continued on Issue Slip Inside File Jacket |

Form PTO-2006 (Rev. 4-87)   WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

REQUESTER  CORRESPONDENCE ADDRESS:     PATENT OWNER ☒     THIRD PARTY ☐

## Same As Above

| COPENDING   OFFICE   PROCEEDINGS | | PREPARED FOR CERTIFICATE |
|---|---|---|
| TYPE OF PROCEEDING | NUMBER | Rita Kent     10/7/98 |
| 1. NONE | | (Docket Clerk) |
| 2. | | REEXAMINED AND PASSED FOR CERTIFICATE |
| 3. | | John Weiss     3735 |
| | | (Primary Examiner)     (Group) |

**333(A)**

EEXAMINATION

00/004987

ATTORNEY DOCKET NO

CONTENTS GROUP 330

GROUP 330

ered

| | | | |
|---|---|---|---|
| | 1. | REQUEST PAPERS FILED | |
| | 2. | Title Report 5/26/98 | ) |
| | 3. | Not of Reex. Req Fil Dt 5/07/98 | ) |
| | 4. | " " Assigned Grp. 5/07/98 | |
| | 5. | REXO | 7-6-98 |
| | 6. | Letter | 7-14-98 |
| | 7. | Letter | 7-11-98 |
| | 8. | Letter | 7-24-98 |
| | 9. | NIRC | 10-7-98 |
| | 10. | | ) |
| | 11. | | ) |
| | 12. | | |
| | 13. | | ( |
| | 14. | | ( |
| | 15. | | |
| | 16. | | |
| | 17. | | |
| | 18. | | |
| | 19. | | |
| | 20. | | |
| | 21. | | |
| | 22. | | |
| | 23. | | |
| | 24. | | |
| | 25. | | |
| | 26. | | |
| | 27. | | |
| | 28. | | |
| | 29. | | |
| | 30. | | |
| | 31. | | |
| | 32. | | |
| | 33. | | |

**335 (A)**

FORM PTO-1506 (8-96)
**REEXAMINATION**

CONTROL NUMBER

90/ 00 4

| CLASS | SUP |
|-------|-----|
| 604   |     |

TITLE C

Consulted with Alan Ostrager concerning whether or not a substantial new question of patentability is present and the condition under which a denial of request for re-examination can be made.

Reviewed references cited in 4,557,720 to Hemphill

| | Date | Ex'r |
|---|------|------|
| | 6-29-98 | OM |
| | 6-29-98 | OM |

---

**CLAIM NO.**

FOR O.G. ___1___

**DRAWING FIG.**
FOR CERTIFICATE AND
FOR O.G. ___9___

**LITIGATION REVIEW** ☒ _OM_ _6-29-98_
(exmr. init.)    (date)

| CASE NAME | DIRECTOR INITIALS |
|-----------|-------------------|
| | |

---

**REEXAMINATION FIELD OF SEARCH**

| Class | Sub | Date | Ex'r |
|-------|-----|------|------|
| NONE  | —   | —    | —    |

**INDEX OF CLAIMS**

| Claim Final | Original | Date 8/31/98 | | | | | Claim Final | Original | Date | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | 26 | | | | |
| 2 | | | | | | | 27 | | | | |
| 3 | | | | | | | 28 | | | | |
| 4 | | | | | | | 29 | | | | |
| 5 | | | | | | | 30 | | | | |
| 6 | | | | | | | 31 | | | | |
| 7 | | | | | | | 32 | | | | |
| 8 | | | | | | | 33 | | | | |
| 9 | | | | | | | 34 | | | | |
| 10 | | | | | | | 35 | | | | |
| 11 | | | | | | | 36 | | | | |
| 12 | | | | | | | 37 | | | | |
| 13 | | | | | | | 38 | | | | |
| 14 | | | | | | | 39 | | | | |
| 15 | | | | | | | 40 | | | | |
| 16 | | | | | | | 41 | | | | |
| 17 | | | | | | | 42 | | | | |
| 18 | | | | | | | 43 | | | | |
| 19 | | | | | | | 44 | | | | |
| 20 | | | | | | | 45 | | | | |
| 21 | | | | | | | 46 | | | | |
| 22 | | | | | | | 47 | | | | |
| 23 | | | | | | | 48 | | | | |
| 24 | | | | | | | 49 | | | | |
| 25 | | | | | | | 50 | | | | |

| SYMBOLS | STATUS |
|---------|--------|
| ✓ | .....................Rejected |
| = | ..................Patentable |
| − | ..(Through numeral) Canceled |
| A | ......................Appeal |
| O | ....................Objected |
| C | .........Disclaimed/Dedicated |

**336(A)**

| *Notice of References Cited* | | | Application No.<br>09/004,987 | | Applicant(s)<br>Allegra Hemphill | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Examiner<br>Dennis Ruhl | | Group Art Unit<br>3736 | | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| | | DOCUMENT NO. | DATE | NAME | CLASS | SUBCLASS |
| --- | --- | --- | --- | --- | --- | --- |
| | A | 3,973,567 | 8-1976 | Srinivasan et al. | 604 | 386 |
| | B | | | | | |
| | C | | | | | |
| | D | | | | | |
| | E | | | | | |
| | F | | | | | |
| | G | | | | | |
| | H | | | | | |
| | I | | | | | |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

**FOREIGN PATENT DOCUMENTS**

| | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUBCLASS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | N | | | | | | |
| | O | | | | | | |
| | P | | | | | | |
| | Q | | | | | | |
| | R | | | | | | |
| | S | | | | | | |
| | T | | | | | | |

**NON-PATENT DOCUMENTS**

| | | DOCUMENT (Including Author, Title, Source, and Pertinent Pages) | DATE |
| --- | --- | --- | --- |
| | U | | |
| | V | | |
| | W | | |
| | X | | |

U. S. Patent and Trademark Office<br>PTO-892 (Rev. 9-95)

Notice of References Cited

Part of Paper No. 5

**337(A)**

FORM PTO-1517
(10-83)

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

**REEXAMINATION CLERK CHECKLIST**

CONTROL NO.
90/ 00 4987

Page 1 of 3

**REEXAMINATION CLERK:**

All of the following items must be completed by the group reexamination clerk.

**A.** After completion, the following items should be forwarded (together), via the appropriate office, to the Office of Publications. Check box when item is present.

☑ 1. This Reexamination Clerk Checklist PTO-1517 (10-83).
☑ 2. Examiner Checklist-Reexamination PTO-1516 (10-83).
☑ 3. Patent file wrapper.
☑ 4. Reexamination file wrapper.
☑ 5. Clean copy of printed patent.

**B.** Mark the following boxes upon ensuring that the item is present, in correct form, complete, and in the proper location at the top portion of the middle section of the reexamination file:

☑ 1. Title Report: Paper No. __2__
☑ 2. PTO-892 and PTO-1449 reference citation sheets.
   Total no. of sheets: __1__
   (Note: include only one copy of duplicate sheets.)

**C.** Mark each of the following boxes upon ensuring that the item has been completed by the examiner.

Blue Issue Slip PTO-270 Items:

☑ 1. Patent Number.
☑ 2. Reexamination Control Number.
☑ 3. International Classification.
☑ 4. Original U.S. Classification.
☑ 5. Cross References. *(Entry present or line through for no entry.)*
☑ 6. Assistant Examiner, if any.
☑ 7. Primary Examiner.

Items Inside Reexamination File Wrapper:

☑ 8. Claim No. for O.G.
☑ 9. Drawing Fig., if any, for O.G.
☑ 10. Reexamination Field of Search.
☑ 11. Litigation Review (box initialed).
☑ 12. Index of Claims.

**D.** In each of the following items mark either the "YES" or "NO" box. If the "YES" box is marked, place the paper referred to which contains the material at the top portion of the middle section of the reexamination file.

YES   NO
☐    ☑   1. Are there any amendments to the description? If yes, indicate Paper No. of paper(s) containing the amendments. Note Item 1 of Examiner Checklist.

Paper No(s)._____

☐    ☑   2. Are there any changes to the patent drawings? If yes, identify the following. Note Item 2 of Examiner Checklist.

Paper No(s)._____
Fig. No(s). containing changes:_____

USCOMM-DC 84-3620

**338(A)**

Page 2 of 3

YES   NO

☐   ☑   3. Was a terminal disclaimer or dedication previously filed or filed during reexamination? Check front of patent and patent file for "previously filed". Note Item 3 of Examiner Checklist for "filed during". If yes, complete paragraph below.

"The portion of the term of this patent subsequent to_____ has been disclaimed or dedicated."    (date)

☐   ☑   4. Has (have) any certificate(s) of correction been issued? If yes, indicate date(s) issued. Note Item 4 of Examiner Checklist.

_____

_____

☐   ☑   5. Has a paper been submitted indicating the names of registered attorneys or agents or a firm to be published on certificate? If yes, indicate Paper No. of paper containing names. Note Item 5 of Examiner Checklist.

Paper No. _____

☐   ☑   6. Was (were) any claim(s) disclaimed prior to or during the reexamination? If yes, complete the following. Note Items 9 and 10 of Examiner Checklist.

a. Paper No.: _____
b. O.G. citation: _____
c. Filing date: _____

☐   ☑   7. Have any claims been amended? A claim is "amended" if there is any change to its text. If yes, indicate Paper No.(s). showing copy of claims as finally amended. Note Item 12 of Examiner Checklist.

Paper No. _____, claims _____
Paper No. _____, claims _____
Paper No. _____, claims _____
(Note: these claims will be printed on reexamination certificate.)

☐   ☑   8. Have new claims been added and allowed during the reexamination? If yes, (1) indicate Paper No. of paper containing copy of allowed claim and (2) list claims by final number. Note Item 14 of Examiner Checklist.

Paper No. _____, claims _____
Paper No. _____, claims _____
Paper No. _____, claims _____
(Note: these claims will be printed on reexamination certificate.)

E. Have any of the following items been changed or added since the patent was issued? If yes, (1) indicate Paper No. of paper containing change, (2) mark indented box(es) upon ensuring statement is correct, and (3) place paper at the top portion of the middle section of the reexamintion file.

YES   NO   INID CODE

☐   ☑   [54]   1. Title of Invention. Note Item 21 of Examiner Checklist.

Paper No. _____.

☐   Update information has been entered on face of reexamination file wrapper.

FORM PTO 1517 (10.83)

**339 (A)**

Page 3 of 3

YES  NO

☐  ☑  [75]  2. Inventor (s). Note Item 22 of Examiner Checklist.
       or
☐  ☑  [76]       Paper No. _____

☐  ☑  [73]  3. Assignee. Compare title report information, printed patent entry, and reexamination file wrapper entry, if any.

            Paper No. _____

            ☐ Update information has been entered on face of reexamination file wrapper.

            4. Continuing Data. Note Item 23 of Examiner Checklist.

☐  ☑  [60]       a. Combination of Division and Continuation and/or C.I.P.

            Paper No. _____

      [62]       b. Division (s).

            Paper No. _____

☐  ☑  [63]       c. Continuation(s) and/or C.I.P.

            Paper No. _____

☐  ☑  [64]       d. Reissue (s).

            Paper No. _____

            ☐ Update information has been entered on face of reexamination file wrapper.

            ☐ Update information has been entered in the first sentence of the specification following the   title. 37 CFR 1.78 (a).

☐  ☑  [30]  5. Foreign Priority. Note Item 24 of Examiner Checklist.

            Paper No. _____

            ☐ Update information has been entered on face of reexamination file wrapper.

☐  ☑  [57]  6. Abstract. Note Item 25 of Examiner Checklist.

            Paper No. _____

CLERK   Rita Kent

FORM PTO 1517 (10-83)

DATE   10-7-98

USCOMM DC 84-3620

**340(A)**

| FORM PTO-1616 (REV. 12-86) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | CONTROL NO. 90/004 987 | Page 1 of 3 |
|---|---|---|---|
| EXAMINER CHECKLIST - REEXAMINATION | | | |

EXAMINER:

All items must be reviewed and completed by the examiner. After completion, this checklist, the reexamination file wrapper, and the patent file wrapper should be forwarded to the group reexamination clerk. Note: If a previous reexamination certificate has been issued, all references below to "the patent" should be replaced by "previous reexamination certificate" and all data entries should be made accordingly.

YES  NO

☐ ☑ 1. Any amendment(s) to the description? If yes, indicate (a) the reexamination paper number(s) containing the amendment(s), and (b) patent column number(s) and beginning and ending lines of the paragraph(s) containing the change(s).

Paper No. _____; _____

_____

_____

Paper No. _____; _____

_____

☐ ☑ 2. Any amendment(s) to the patent drawings? If yes, indicate (a) Fig. No. containing change, (b) reexamination paper number containing NEW sheet of drawing and (c) a brief indentification of change(s) (e.g., "reference numerals 10 and 11 have been added to Fig. 1"):

a. Fig. No(s): _____

b. Paper No(s): _____

c. The drawing figure(s) have been changed as follows:

_____

_____

_____

_____

☐ ☑ 3. Any terminal disclaimer or dedication filed DURING reexamination? If Yes, (a) indicate paper number containing terminal disclaimer or dedication and (b) complete paragraph below:

a. Paper No. _____

b. "The portion of the term of this patent subsequent to _____, has been disclaimed or dedicated."

☐ ☑ 4. Any certificate(s) of correction to the patent? If yes, indicate date(s) issued:

_____

_____

☐ ☑ 5. Any paper submitted indicating the names of registered attorneys or agents or a firm to be printed on the reexamination certificate. *(Must be separate paper addressed solely to this issue.)*

If yes, indicate paper No. _____

☐ ☑ 6. Any entry in "LITIGATION REVIEW BOX"? If yes and court decision has been issued, complete the following entry:

"Attention is directed to the decision of _____

_____

_____

relating to this patent. This reexamination may not have resolved all questions raised by this decision. See 37CFR 1.552." *(Enter the name of case, court, and date of decision.)*

USCOMM-DC 86-3864

**341(A)**

Page 2 of 3

For items 7-16 mark the "YES" box(es) where appropriate and complete the statement. If not applicable, mark the "NO" box(es). ALL the patent claims and ONLY new renumbered ALLOWED claims must be listed in items 7-16. Patent claims retain their original number. All NEW allowed claims should be renumbered, if necessary, to immediately follow the highest numbered patent claim. Note that a claim is "amended" if there is ANY change to its text. A claim number should NOT be repeated in items 7-16.

**YES  NO**

☑ ☐  7. The patentability of claim(s) _____
_____ (and) ___2___ is confirmed.

☐ ☑  8. Claim(s) _____
_____ (and) _____ was (were) previously cancelled.
(Relates to a prior proceeding.)

☐ ☑  9. Claim(s) _____ (and) _____
was (were) previously disclaimed.

☐ ☑  10. Claim(s) _____ (and) _____
is (are) now disclaimed.

☐ ☑  11. Claim(s) _____ (and) _____
is (are) cancelled.

☐ ☑  12. Claim(s) _____ (and) _____
is (are) determined to be patentable as amended.
(Note: these claim(s) to be printed on certificate.)

☐ ☑  13. Claim(s) _____ (and) _____
dependent on an amended claim, is (are) determined to be patentable. (Note: to be used for claims which are not amended. Amended claims must be listed in 12 above).

☐ ☑  14. New claim(s) _____ (and) _____
is (are) added and determined to be patentable.
(Note: these claim(s) to be printed on certificate.)

☐ ☑  15. Claim(s) _____ (and) _____
was (were) not reexamined.

☐ ☑  16. Other (identify claims and status) _____
_____
_____

Mark the following boxes upon ensuring that the following statements relating to the blue issue slip are correct.

☑  17. The international classification (updated to reflect current format of the most recent edition) includes all notations presently listed on patent.

☑  18. The reexamination original U.S. classification is the same as the current original U.S. classification of the patent.

☑  19. All current cross-reference classifications are included.

☑  20. A soft copy of the patent has been ordered using form PTO-14B and will be placed in the examiner's search file for each new cross reference added.

FORM PTO-1516 (REV. 12-86)

USCOMM-DC 86-3664

**342(A)**

Page 3 of 3

For items 21-25 mark the "YES" or "NO" box indicating whether the item has been changed or added during the reexamination. If yes, indicate paper number of paper containing change.

YES  NO  BND CODE

☐  ☑  [54]  21. Title of Invention.
                  Paper No. _____

☐  ☑  [75]  22. Inventor(s).
         or
         [76]        Paper No. _____

             23. Continuing Data.
☐  ☑  [60]       a. Combination of Division and
                     Continuation and/or C.I.P.
                     Paper No. _____

☐  ☑  [62]       b. Division(s).
                     Paper No. _____

☐  ☑  [63]       c. Continuation(s) and/or C.I.P.
                     Paper No. _____

☐  ☑  [64]       d. Reissue(s).
                     Paper No. _____

☐  ☑  [30]  24. Foreign Priority.
                  Paper No. _____

☐  ☑  [57]  25. Abstract.
                  Paper No. _____

EXAMINER _____

DATE
9-1-98

FORM PTO-1516 (12-84)                                    USCOMM-DC 86-3644

**343(A)**

*REEXAM TITLE REPORT*

REEXAM CONTROL NO  90004987          PAPER NUMBER   2

SERIAL NUMBER  06/619684             FILING DATE  06/11/84

PATENT NUMBER 4557720                ISSUE DATE  12/10/85

FIRST INVENTOR'S NAME

ET AL              Y                  ALLEGRA D HEMPHILL

                                      Nx

CONTINUITY DATA: THIS IS A xxx CON  DIV  CIP  OF
SERIAL NUMBER 06/434828 FILED ON 10/18/82 .  STATUS:
PATENTED   PENDING xxx ABANDONED .

OTHER CONTINUITY DATA:
WHICH IS  AND  A CON        DIV   CIP      OF
SERIAL NUMBER    FILED ON . STATUS:
PATENTED        PENDING  ABANDONED  .

WHICH IS  AND  A CON        DIV  CIP      OF
SERIAL NUMBER   FILED ON .  STATUS:
PATENTED        PENDING  ABANDONED

WHICH IS  AND  A CON        DIV     CIP      OF
SERIAL NUMBER   FILED ON . STATUS:
PATENTED        PENDING  ABANDONED

*ASSIGNMENT RECORD DATA*

THE ASSIGNMENT RECORDS REVEAL THAT THE TITLE REPORT
APPEARS TO BE VESTED IN:

xxx INVENTOR(s)  ROCKVILLE, MD

AS ENDORSED

AS THE RECORD NOW STANDS, THE PATENT WHEN GRANTED
WILL ISSUE IN THE NAME OF THE INVENTOR(S)

LEGAL REPRESENTATIVE

SECURITY ASSIGNMENT (PLEASE NOTE THAT THE OWNERSHIP

24

**344(A)**

OF THE PATENT IS STILL REFLECTED IN THE ASSIGNOR.  THE

ASSIGNEE CANNOT OWN THE PATENT.)

WHEN THE ASSIGNMENT IS RECORDED, THE PATENT SHOULD
BELONG TO:

OTHER: REEL NO   FRAME NO   DATE RECORDED  COMPANY NAME: ,

EXAMINED UP TO AND INCLUDING THIS CERTIFICATE DATED  *5-26-98*
AND SIGNED:  *ms*

EXAMINER, OIPE APPLICATIONS DIVISION

2

25

**345(A)**

Mar 27, 1998

REEXAM CONTROL NO: 90/004,987
FILING DATE: 05/22/98
PATENT NUMBER: 4,557,720
PAPER NO: 3

Allegra D Hemphill
6217 Charnwood Drive
Rockville MD  20852

NOTICE OF REEXAMINATION REQUEST FILING DATE<br>(Patent Owner Requester)

Requester is hereby notified that the filing date of the request for reexamination is 05/22/98, the date the required fee of $ 2,520 was received.  (See 37 CFR 1.510 (d)).

A decision on the request for reexamination will be mailed within three months from the filing date of the request for reexamination.  (See 37 CFR 1.515 (a)).

Pursuant to 37 CFR 1.33 (C), future correspondence in this reexamination proceeding will be with the latest attorney or agent of record in the patent file.

The paragraphs checked below are part of this communication:

_____ 1. The party receiving the courtesy copy  is  the latest attorney or agent of record in the patent file.

_____ 2. The person named to receive the correspondence in this proceeding has not been made the latest attorney or agent of record in the patent file because:

       _____ A. Requester's claim of ownership of the patent  is not verified by the record.

       _____ B. The request papers are not signed with a real or apparent binding signature.

       _____ C. The mere naming of a correspondence addressee does not result in that person being appointed as the latest attorney or agent of record in the patent file.

__✓__ 3. Addressee is the latest attorney or agent of record in the patent file.

_____ 4. Other: _____

_Frank S. Leavitt_
Legal Instruments Examiner
Application Processing Division

36

**346(A)**

Mar 27 1998

REEXAM CONTROL NO: 90/004,987

FILING DATE: 05/22/98

PATENT NUMBER: 4,557,720

PAPER NUMBER: 4

Allegra D Hemphill
6217 Charnwood Drive
Rockville MD  20852

### NOTICE OF ASSIGNMENT OF REEXAMINATION REQUEST
### (SHORT VERSION)

The above identified request for reexamination has been assigned to Examining Group 3735. All future correspondence to the proceeding should be identified by the control number listed above and directed to the assigned Examining Group.

A copy of this Notice is being sent to the latest attorney or agent of record in the patent file or to all owners of record. (See 37 CFR 1.33(c)).  If the addressee is not, or does not represent, the current owner, he or she is required to forward all communications regarding this proceeding to the current owner(s). An attorney or agent receiving this communication who does not represent the current owner(s) may wish to seek to withdraw pursuant to 37 CFR 1.36 in order to avoid receiving future communications. If the address of the current owner(s) is unknown, this communication should be returned within the request to withdraw pursuant to Section 1.36.

Legal Instruments Examiner
Application Processing Division

cc:

27

*Lef's search*

PATNO IS 4557720

```
        DATE:   JUNE 25, 1998
     LIBRARY:   PATENT
        FILE:   ALL
```

Your search request is:
 PATNO IS 4557720

Number of PATENTS found with your search request through:
    LEVEL   1...      1

Your search request has found 1 PATENT through Level 1.
To DISPLAY this PATENT press either the KWIC, FULL, CITE or SEGMTS key.
To MODIFY your search request, press the M key (for MODFY) and then the ENTER
key.

For further explanation, press the H key (for HELP) and then the ENTER key.
 Press Alt-H for Help or Alt-Q to Quit.

**348(A)**

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

# SEARCH REQUEST FORM

Requestor's Name: *Dennis Ruhl*

Serial Number: 90/004,987

Date: 6-25-98    Phone: 703-308-2262    Art Unit: 3735
CP2 - 43822

**Search Topic:**

Please write a detailed statement of search topic. Describe specifically as possible the subject matter to be searched. Define any terms that may have a special meaning. Give examples or relevent citations, authors, keywords, etc., if known. For sequences, please attach a copy of the sequence. You may include a copy of the broadest and/or most relevent claim(s).

Please do a litigation search for

Patent # 4,557,720

Thank-you!

No reported litigation

---

## STAFF USE ONLY

| | | |
|---|---|---|
| Date completed: _____ | **Search Site** | **Vendors** |
| Searcher: _____ | _____ STIC | _____ IG |
| Terminal time: _____ | _____ CM-1 | _____ STN |
| Elapsed time: _____ | _____ Pre-S | _____ Dialog |
| CPU time: _____ | **Type of Search** | _____ APS |
| Total time: _____ | _____ N.A. Sequence | _____ Geninfo |
| Number of Searches: _____ | _____ A.A. Sequence | _____ SDC |
| Number of Databases: _____ | _____ Structure | _____ DARC/Questel |
| | _____ Bibliographic | _____ Other |

## 349 (A)

LEVEL 1 - 1 PATENT

1. 4,557,720, Dec. 10, 1985, Vaginal applicator, Hemphill, Allegra D., 6217
Charnwood Dr., Rockville, Maryland 20852

Press Alt-H for Help or Alt-Q to Quit.

**350 (A)**

LEVEL 1 - 1 OF 1 PATENT

4,557,720

<=2>  GET 1st DRAWING SHEET OF 3

Dec. 10, 1985

Vaginal applicator

LIT-REEX: Reexamination requested Feb. 3, 1998 by owner, Reexamination No.
90/004,908 (O.G. Apr. 7, 1998) Ex. Gp.: 3308

Press Alt-H for Help or Alt-Q to Quit.

4,557,720 OR 4557720

Your search request has found no CASES.

To edit the above request, use the arrow keys.  Be sure to move the cursor
to the end of the request before you enter it.

To enter a new search request, type it and press the ENTER key.

What you enter will be Search Level 1.

For further explanation, press the H key (for HELP) and then the ENTER key.
 Press Alt-H for Help or Alt-Q to Quit.

**352 (A)**

```
WELCOME TO ORBIT ONLINE SERVICE.  (06/25/98 4:26 P.M. CENTRAL TIME)

****
YOU ARE NOW CONNECTED TO ORBIT.
FOR A TUTORIAL, ENTER ?  OTHERWISE, ENTER A COMMAND OR SS.

file legstat


ELAPSED TIME ON ORBIT: 0.01 HRS.

YOU ARE NOW CONNECTED TO LEGSTAT.
  CURRENT THRU WEEKLY UPDATE (9825)


  CONNECT HOUR COST AND RECORD PRICE REDUCED - SEE NEWSDOC N283.



SS 1?
nbr us4557720


SELECT LIST DEFAULT:
SELECT# RESULTS   TERM
    1       1    US4557718/PN
    2       1    US4557719/PN
    3       1    US4557720/PN
    4       1    US4557721/PN
    5       1    US4557722/PN
UP N OR DOWN N?

sel 3


SS 1 RESULT (1)

SS 2?
prt full ind



-1-   (LEGSTAT)
PATENT NUMBER               US 4557720  [US4557720]
DOCUMENT TYPE               US-P
ACTION                      84.06.11  US/AE-A
                            APPLICATION DATA (PATENT)
                             {US 619684/84  [84US-619684]  84.06.11}
ACTION                      85.12.10  US/A
                            PATENT
ACTION                      98.04.07  US/RR  [+]
                            REQUEST FOR REEXAMINATION FILED
                            980203
UPDATE                      9820

SS 2?
file litalert
```

353 (A)

ELAPSED TIME ON LEGSTAT: 0.03 HRS.

YOU ARE NOW CONNECTED TO LITALERT.
   CURRENT THRU WEEKLY UPDATE (9825)


SS 1?
nbr us4557720


SELECT LIST DEFAULT:
SELECT# RESULTS     TERM
     6          1   US4557382/PN
     7          2   US4557693/PN          no citations for '720 in LITALERT
     8          1   US4557938/PN
     9          3   US4557958/PN
    10          1   US4558172/PN
UP N OR DOWN N?

file past


ELAPSED TIME ON LITALERT: 0.01 HRS.

YOU ARE NOW CONNECTED TO PAST.
   COVERS 1973 THRU WEEKLY UPDATE (9825)


SS 1?
nbr us4557720


SELECT LIST DEFAULT:
SELECT# RESULTS     TERM
    11          1   US4557715/PN
    12          1   US4557717/PN
    13          1   US4557720/PN
    14          2   US4557724/PN
    15          1   US4557726/PN
UP N OR DOWN N?

sel 13


SS 1 RESULT (1)

SS 2?
prt full ind


-1-    (PAST)
ACCESSION NUMBER          9814-001281
PATENT NUMBER             US4557720
DOCUMENT TYPE             A (UTILITY)
OFFICIAL GAZETTE          98.04.07


**354 (A)**

CODE
ACTION
SUBJECT HEADING

RXA
REQUEST FOR REEXAMINATION FILED
REQUEST FOR REEXAMINATION FILED

**355 (A)**

```
File 345:Inpadoc/Fam.& Legai Stat.  1998/UD=9824
       (c) 1998 European Patent Office
*File 345: The EPO is working to correct some garbled Japanese titles.

     Set  Items  Description
     ---  -----  -----------
?ds

Set     Items   Description

 S2       1     PN="US 4557720"

?t s2/9/1

 2/9/1
DIALOG(R)File 345:Inpadoc/Fam.& Legal Stat.
(c) 1998 European Patent Office. All rts. reserv.

6501898
Basic Patent (No,Kind,Date): US 4557720 A  851210    <No. of Patents: 001>

PATENT  FAMILY:
UNITED STATES OF AMERICA (US)
  Patent (No,Kind,Date): US 4557720  A    851210
    VAGINAL APPLICATOR (English)
    Author (Inventor): HEMPHILL ALLEGRA D  (US)
    Priority (No,Kind,Date):  US 434828  A1  821018
    Applic (No,Kind,Date):  US 619684  A   840611
    Addnl Info:  Abandoned
    National Class: *  604001000; 401077000; 401078000
    IPC: *  A61B-010/00
    Derwent WPI Acc No: ; C  86-006487
    Language of Document:  English

UNITED STATES OF AMERICA (US)
  Legal Status (No,Type,Date,Code,Text):
    US 4557720    P    821018  US AA        PRIORITY
                                US 434828  A1  821018
    US 4557720    P    840611  US AE        APPL. DATA (PATENT)
                                US 619684  A   840611
    US 4557720    P    851210  US A         PATENT
    US 4557720    P    980407  US RR        REQUEST FOR REEXAMINATION FILED

                       980203
```

## 356 (A)

| PATENT NUMBER | ORIGINAL CLASSIFICATION | | |
|---|---|---|---|
| 4.557,720 | CLASS 601 | SUBCLASS 1 | |
| APPLICATION/SERIAL NUMBER | CROSS REFERENCE(S) | | |
| 90/004,987 | CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | |
| APPLICANT'S NAME (PLEASE PRINT) | 401 | 77 | 78 |
| Allegra Hemphill | | | |
| IF REISSUE, ORIGINAL PATENT NUMBER | | | |

| INTERNATIONAL CLASSIFICATION | |
|---|---|
| A 6 1 B | 10/00 |

| GROUP ART UNIT | ASSISTANT EXAMINER (PLEASE STAMP OR PRINT FULL NAME) |
|---|---|
| 3735 | Jennifer R. Li |
| | PRIMARY EXAMINER (PLEASE STAMP OR PRINT FULL NAME) |
| | JOHN J WEISS |

ISSUE CLASSIFICATION SLIP

U S DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

PTO 270
(REV. 9-91)

357 (A)

| SERIAL NUMBER 90/004,987 | FILING DATE 05/22/98 | CLASS 604 | GROUP ART UNIT 3735 | ATTORNEY DOCKET NO. |
|---|---|---|---|---|

APPLICANT

4557720, ALLEGRA D. HEMPHILL, ROCKVILLE, MD.

**CONTINUING DOMESTIC DATA*********************
VERIFIED       THIS APPLN IS A REX OF    06/619,684 06/11/84 PAT    4,557,720
               WHICH IS A CON OF    06/434,828 10/18/82
/W/

**371 (NAT'L STAGE) DATA********************
VERIFIED
/W/

**FOREIGN APPLICATIONS************
VERIFIED
/W/

FOREIGN FILING LICENSE GRANTED 04/17/98

| Foreign Priority claimed ☐yes ☒no | STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|
| 35 USC 119 (a-d) conditions met ☐yes ☒no ☐Met after Allowance | | | | |
| Verified and Acknowledged    EXAMINER'S INITIALS    INDIA | | 0 | 2 | 2 |

ADDRESS

ALLEGRA D HEMPHILL
6217 CHARNWOOD DRIVE
ROCKVILLE MD 20852

TITLE

VAGINAL APPLICATOR

| FILING FEE RECEIVED $2,520 | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT NO. _____ for the following: | ☐ All Fees<br>☐ 1.16 Fees (Filing)<br>☐ 1.17 Fees (Processing Ext. of time)<br>☐ 1.18 Fees (Issue)<br>☐ Other _____<br>☐ Credit |
|---|---|---|

**358(A)**

US004557720B1

# REEXAMINATION CERTIFICATE (3712th)

## United States Patent [19]

### Hemphill

[11] **B1 4,557,720**

[45] Certificate Issued    **Jan. 26, 1999**

[54] **VAGINAL APPLICATOR**

[76] Inventor: **Allegra D. Hemphill**, 6217 Charnwood Dr., Rockville, Md. 20852

**Reexamination Request:**
No. 90/004,987, May 22, 1998

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | 4,557,720 |
| Issued: | Dec. 10, 1985 |
| Appl. No.: | 619,684 |
| Filed: | Jun. 11, 1984 |

**Related U.S. Application Data**

[62] Division of Ser. No. 434,828, Oct. 18, 1982, abandoned.

[51] Int. Cl.⁶ ............................... A61B 10/00

[52] U.S. Cl. ................. 604/1; 401/77; 401/78

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

3,973,567   8/1976   Srinivasan et al. ............... 604/386

*Primary Examiner*—John Weiss

[57] **ABSTRACT**

A disposable vaginal refreshener or swab comprised of an outer container for enclosing an inner, fairly rigid core member about which an adsorbent layer is secured. The outer container when removed, exposes the adsorbent covered member or allows that member to be moved out of the container into an operable position. The outer container also forms the handle for the disposable swab element.



359(A)

B1 4,557,720

1

## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

2

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 1 and 2 is confirmed.

* * * * *

OFFICIAL BUSINESS

Penalty for Private Use, $300

Return to
Office of Patent Publication
Publishing Division

U.S. OFFICIAL MAIL

LETTER MAIL

DO NOT FOLD OR BEND

B1  4,557,720  ***  90/004,987  ***  01/26/99

ALLEGRA D. HEMPHILL
6217 CHARNWOOD DRIVE
ROCKVILLE, MD.  20852

FIRST CLASS

**361 (A)**

# THE
# AMERICAN
# HERITAGE
# COLLEGE
# DICTIONARY

### THIRD EDITION



HOUGHTON MIFFLIN COMPANY

*Boston • New York*

**362 (A)**

# THE
# AMERICAN
# HERITAGE
# COLLEGE
# DICTIONARY

### THIRD EDITION



HOUGHTON MIFFLIN COMPANY

*Boston* • *New York*

362 (A)



OFFICIAL BUSINESS

Penalty for Private Use, $300

Return to
Office of Patent Publication
Publishing Division

U.S. OFFICIAL MAIL

**LETTER MAIL**

DO NOT FOLD OR BEND

B1 4,557,720 *** 90/004,987 *** 01/26/99

ALLEGRA D. HEMPHILL
6217 CHARNWOOD DRIVE
ROCKVILLE, MD. 20852

**FIRST CLASS**

**361 (A)**

Words are included in this Dictionary on the basis of their usage. Words that are known to have current trademark registrations are shown with an initial capital and are also identified as trademarks. No investigation has been made of common-law trademark rights in any word, because such investigation is impracticable. The inclusion of any word in this Dictionary is not, however, an expression of the Publisher's opinion as to whether or not it is subject to proprietary rights. Indeed, no definition in this Dictionary is to be regarded as affecting the validity of any trademark.

American Heritage and the eagle logo are registered trademarks of Forbes Inc. Their use is pursuant to a license agreement with Forbes Inc.

Copyright © 1993 by Houghton Mifflin Company.
All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by any information storage or retrieval system without the prior written permission of Houghton Mifflin Company unless such copying is expressly permitted by federal copyright law. Address inquiries to Reference Permissions, Houghton Mifflin Company, 222 Berkeley Street, Boston MA 02116.

0-395-67161-2 (UPC)


*Library of Congress Cataloging-in-Publication Data*
The American heritage college dictionary. —3rd ed.
    p.    cm.
    ISBN 0-395-66917-0 (plain edge). —ISBN 0-395-44638-4 (thumb edge). —ISBN 0-395-66918-9 (deluxe binding).
    1. English language—Dictionaries.  2  Americanisms.
    PE1628.A6227  1993
    423—dc20                                                92-42124
                                                                CIP

Manufactured in the United States of America

363 (A)

**·nee** (sə-wä′nē). A river, c. 386 km (240 mi), flowing in SE GA across N FL to the Gulf of Mexico.
**·on** (sōō′wän′). A city of NW South Korea S of Seoul. Pop. 374,000.

**·rain** (sōō′zər-ən, -zə-rān′) *n.* **1.** A nation that controls another nation in international affairs but allows it domestic sovereignty. **2.** A feudal lord to whom fealty was due. [Fr. < *suzerain* : prob. *sus*, up [< Lat. *sursum*, *susum*, upward < *subvorsum*, turned upward : *subs-*, *sub-*, from under; see *uper*, to turn; see *versus*) + *souverein*, sovereign; see sovereign.] — **su′ze·rain** *adj.*

**·rain·ty** (sōō′zər-ən-tē, -zə-rān′tē) *n.*, *pl.* **su·ze·rain·ties** The power or domain of a suzerain.

**·hou** (sōō′jō′) *also* **Soo·chow** (sōō′chou′, -jō′). A city of E China WNW of Shanghai. Pop. 695,500.

**·bard** (sväl′bär′). A Norwegian archipelago comprising Spitsbergen and other islands in the Arctic Ocean.

**·abbr.** Service.

**·te** (svĕlt) *adj.* **svelt·er**, **svelt·est.** Slender or graceful in figure or outline; slim. [Fr. < Ital. *svelto* < p.part. of *svellere*, to stretch out < VLat. *\*exvellere* < Lat. *ēvellere* : *ē*, ex-, *ex·vellere*, to pull.] — **svelte′ly** *adv.* — **svelte′ness** *n.*

**·nga·li** (svĕn-gä′lē, sfĕn-) *n.*, *pl.* **-lis.** A person who evilly controls another to do what is desired. [After *Svengali*, the hypnotist villain in the novel *Trilby* by George du Maurier.]

**·lovak** (slō′väk′, svylrd-). Officially (since 1991) **Ye·va·ta·va-burg** (vĭ-kät′ər-ĭn-būrg′). A city of W-central Russia in the E foothills of the Ural Mts. Pop. 1,300,000.

**·drup Islands** (slēt′drəp, svēt′-). A group of islands of N Northwest Terrs., Canada, in the Arctic Ocean W of Ellesmere I.

**·abbr.** Savings.

**·abbr.** Short wave.

**·abbr.** Switch.

**·abbr.** Swedish.

**·also swob** (swŏb) — *n.* **1.a.** A small piece of absorbent material on the end of a stick or wire, used for cleansing or applying medicine. **b.** A specimen of mucus or other material secured with a swab. **2.** A sponge or patch of absorbent material used to clean the bore of a firearm or cannon. **3.** A device used for cleaning floors or decks. **4.a.** One who uses such a mop, esp. on a ship. **b.** *Slang.* A sailor. **5.** A lout. — *tr.v.* **swabbed**, **swab·bing**, **swabs** *also* **swobbed**, **swob·bing**, **swobs. 1.** To use a swab on. **2.** To clean with a swab. — *idiom.* < *swabber*, mop for a ship's deck (< *obsolete* Du. *\*zwabber* < *zwabben*, to mop) or < obsolete Du. *zwabbe*, mop (< MDu.).]
*Also* **swab·by** (swŏb′ē) *n.*, *pl.* **-bies.** *Slang.* See **swab**

**·be** (swä′bē-). A historical region of SW Germany with parts of present-day France and Switzerland; center of the Swabian League from 1488 to 1534. — **Swa′bi·an** *adj.* & *n.*

**·dle** (swŏd′l) *tr.v.* **-dled**, **-dling**, **-dles. 1.** To wrap or bind with bandages; swathe. **2.** To wrap (a baby) in swaddling clothes. **3.** To restrain or restrict. — *n.* A band or cloth used for swaddling. [ME *swadlen*, prob. back-formation < *swadel*, swaddling (cloth), or *swathelbonde*, bind + swathe.] — *prob.* freq. of OE *swathian*, to swathe.]
**·dling clothes** (swŏd′lĭng) *pl.n.* **1.** Strips of cloth wrapped around a newborn infant to hold its legs and arms still. **2.** Restrictions imposed on the immature.

**·g** (swăg) *n.* **1.a.** An ornamental drapery or curtain draped in a curve between two points. **b.** An ornamental festoon of flowers or fruit. **c.** A carving or plaster molding of such an ornament. **2.** *Slang.* Stolen property; loot. **3.** *Australian.* The pack or bundle containing the personal belongings of a traveler. — *intr.v.* **swagged**, **swag·ging**, **swags. 1.** *Chiefly British.* To lurch or sway. **2.** *Australian.* To travel about with a swag. [Prob. of Scand. orig.]

**·ge** (swāj) *n.* **1.** A tool used to bend or shape cold metal. **2.** A stamp or die for marking or shaping metal. **3.** A swage tool. — *tr.v.* **swaged**, **swag·ing**, **swag·es.** To bend or shape by or as if by using a swage. [ME, ornamental border < OFr. *souage*.]

**·ge block** *n.* A metal block with holes or grooves for shaping metal objects.

**·ger** (swăg′ər) *v.* **-gered**, **-ger·ing**, **-gers.** — *intr.* **1.** To walk or conduct oneself insolently or arrogantly; strut. **2.** To boast. — *tr.* To browbeat or bully (someone). — *n.* A swaggering movement or gait. **2.** Boastful or conceited expression. [Prob. freq. of swag.] — **swag′ger·er** *n.*

**·ger stick** *n.* A short metal-tipped cane carried esp. by officers in the armed forces.

**··li** (swä-hē′lē) *n.*, *pl.* **Swahili** *or* **-lis. 1.** A member of a predominantly Muslim people inhabiting much of the coast and islands of eastern Africa. **2.** The Bantu language of the Swahili that is the official language of Tanzania and is widely used as a lingua franca in eastern and east-central Africa.

---

[Swahili < Ar. *sawāḥily*, belonging to the coasts : *sawāḥil*, pl. of *sāḥil*, coast + *-īy*, belonging to.] — **Swa·hil′i·an** *adj.*
**swain** (swān) *n.* **1.** A country lad, esp. a young shepherd. **2.** A beau. [ME, young man, servant < ON *sveinn.* See **s(w)e-**.]
**swaie** (swāl) *n.* A low tract of land, esp. when moist or marshy. [Perh. < ME, shade, perh. of Scand. orig.]
**swal·low¹** (swŏl′ō) *v.* **-lowed**, **-low·ing**, **-lows.** — *tr.* **1.** To cause (food or drink, for example) to pass through the mouth and throat into the stomach. **2.** To put up with (something unpleasant). **3.** To refrain from expressing; suppress. **4.** To consume or destroy as if by ingestion; devour. **5.** *Slang.* To believe without question. **6.** To take back; retract. — *intr.* To perform the act of swallowing. — *n.* **1.** The act of swallowing. **2.** An amount swallowed. [ME *swalowen* < OE *swelgan.* See **swel-*.**] — **swal′low·er** *n.*
**swal·low²** (swŏl′ō) *n.* **1.** Any of various small graceful swift-flying passerine birds of the family Hirundinidae, having long pointed wings, a tail, notched or forked tail, and a large mouth for catching flying insects. **2.** Any of various similar birds, such as a swift. [ME *swalowe* < OE *swealwe.*]
**swal·low·tail** (swŏl′ō-tāl′) *n.* **1.a.** The deeply forked tail of a swallow. **b.** Something similar to the tail of a swallow. **2.** *Informal.* A swallow-tailed coat. **3.** Any of various colorful, widely distributed butterflies of the family Papilionidae, usu. having an extension at the end of each hind wing that resembles the tails of certain swallows. — **swal′low-tailed′** *adj.*
**swallow-tailed coat** *n.* A man's black coat worn for formal daytime occasions and having a long rounded and split tail.
**swal·low·wort** (swŏl′ō-wûrt′, -wôrt′) *n.* **1.** See **celandine 1. 2.** Any of several vines of the genus *Cynanchum*, esp. *C. nigrum* of Europe having small brownish-purple flowers. [From the shape of its pod.]
**swam** (swăm) *v.* P.t. of **swim.**
**swa·mi** (swä′mē) *n.*, *pl.* **swa·mis. 1.a.** *Hinduism.* A religious teacher. **b.** A mystic; a yogi. **2.** Used as a form of address for such a person. [Hindi *svāmī*, master, swami < Skt. *svāminaḥ*, nom. sing. of *svāmin-*, being one's own master, possessing proprietary rights. See **s(w)e-*.**]
**Swam·mer·dam** (svä′mər-däm′), Jan. 1637–80. Dutch naturalist known for his pioneering microscopic research.
**swamp** (swŏmp, swômp) *n.* **1.a.** A seasonally flooded bottomland with more woody plants than a marsh and better drainage than a bog. **b.** A lowland region saturated with water. **2.** A situation or place fraught with difficulties and imponderables. — *v.* **swamped**, **swamp·ing**, **swamps.** — *tr.* **1.** To drench in or cover with or as if in or with water. **2.** To inundate or burden; overwhelm. **3.** *Naut.* To fill (a ship or boat) with water to the point of sinking it. — *intr.* To become full of water or sink. [Perh. of Low German origin.] — **swamp′i·ness** *n.* — **swamp′y** *adj.*
**swamp boat** *n.* *Naut.* A flat-bottomed boat propelled by an airplane propeller projecting above the stern and used in swamps or shallow waters.
**swamp·er** (swŏm′pər, swôm′-) *n.* **1.** One who lives in or close to a swamp. **2.** One who clears a swamp or forest. **3.a.** A helper, as in a restaurant. **b.** A truck driver's assistant.
**swamp fever** *n.* **1.** See **malaria 1. 2.** A viral disease in horses marked by progressive anemia, a staggering gait, and fever. **3.** See **leptospirosis.**
**swamp pink** *n.* An orchid (*Arethusa bulbosa*) of northeast North America having a usu. rose-colored flower.
**swamp potato** *n.* *Bot.* Arrowhead.
**swan** (swŏn) *n.* Any of various large aquatic birds of the family Anatidae chiefly of the genera *Cygnus* and *Olor*, having webbed feet, a long slender neck, and usu. white plumage. — *intr.v.* **swanned**, **swan·ning**, **swans.** *Chiefly British.* To travel around from place to place. [ME < OE. See **swen-*.**]
**Swan** (swŏn) *n.* See **Cygnus.**
**swan dive** *n.* *Sports.* A dive made with the legs straight together, the back arched, and the arms out from the sides.
**swank** (swăngk) *adj.* **swank·er**, **swank·est. 1.** Imposingly fashionable or elegant; grand. **2.** Ostentatious; pretentious. — *n.* **1.** Smartness in style or bearing; elegance. **2.** Swagger. — *intr.v.* **swanked**, **swank·ing**, **swanks.** To act in an ostentatious or pretentious way; swagger. [Perh. akin to MHGer. *swanken*, to swing.]
**swank·y** (swăng′kē) *adj.* **-i·er**, **-i·est.** Swank. — **swank′i·ly** *adv.* — **swank′i·ness** *n.*
**swan·ny** (swŏn′ē) *interj.* Chiefly Southern U.S. Used to express surprise; Well, I swanny! [Prob. alteration of dial. *I'wan ye*, I shall warrant ye.]
**swan's-down** *also* **swans·down** (swŏnz′doun′) *n.* **1.** The soft down of a swan. **2.** A soft woolen fabric used esp. for baby clothes. **3.** Flannelette.
**Swan·sea** (swŏn′zē, -sē). A borough of S Wales on Swansea Bay, an inlet of the Bristol Channel. Pop. 188,500.
**swan·skin** (swŏn′skĭn′) *n.* **1.** The skin of a swan with the feathers attached. **2.** Any of several flannel or cotton fabrics with a soft nap.
**swan song** *n.* **1.** A farewell or final appearance, action, or work. **2.** The beautiful legendary song sung only once by a swan in its lifetime, as it is dying.


Joan Sutherland


swallowtail
Black swallowtail butterfly
*Papilio polyxenes asterius*


swan
Mute swan
*Cygnus olor*

| | |
|---|---|
| ă pat | oi boy |
| ā pay | ou out |
| âr care | ŏŏ took |
| ä father | ōō boot |
| ĕ pet | ŭ cut |
| ē be | ûr urge |
| ĭ pit | th thin |
| ī pie | th this |
| îr pier | hw which |
| ŏ pot | zh vision |
| ō toe | ə about |
| ô paw | item |

Stress marks:
′ (primary);
′ (secondary), as in
dictionary (dĭk′shə-nĕr′ē)

**1405**

**thaumaturgy**

**then and there**

...tourgos : thauma, thaumat-, wonder + ergon, work; ...

**thau·ma·tur·gy** (thô′mə-tûr′jē) n. The working of miracles or magic. — thau′ma·tur′gic, thau′ma·tur′gi·cal adj.

**thaw** (thô) v. thawed, thaw·ing, thaws. — intr. 1. To pass from a frozen solid to a liquid by gradual warming. 2. To lose stiffness, numbness, or impermeability by being warmed: *waited out by the stove.* 3. To become warm enough for snow and ice to melt. 4. To become less formal, aloof, or reserved. — tr. To cause to thaw. — n. 1. The process of thawing. 2. A warm period in the cold season when ice and snow melt. 3. A relaxation of reserve, restraints, or tensions. [ME thawen < OE thawian.]

**Thay·er** (thâ′ər, thâr), Sylvanus. 1785–1872. Amer. soldier and superintendent (1817–33) of the U.S. Military Academy.

**Th.B.** abbr. Lat. Theologiae Baccalaureus (Bachelor of Theology).

**the·at·rics** (thē-ăt′rĭks) n. 1. (used with a sing. v.) The art of the theater. 2. (used with a pl. v.) Theatrical effects or mannerisms; histrionics.

**the·ba·ine** (thē′bə-ēn′, thĭ-bā′ĭn) n. A poisonous alkaloid, $C_{19}H_{21}NO_3$, obtained from opium. [< NLat. (herba) thebaia, (herb of) Thebes, Egyptian opium < Lat. Thebaea, fem. of Thebaeus, Theban < Thebae, Thebes < Gk. Thēbai.]

**the·be** (thē′bē) n. See table at currency.

**The·be** (thē′bē) n. A satellite of Jupiter. [Lat. Thēbē, a nymph, daughter of the river god Asopus < Gk.]

**Thebes** (thēbz). 1. An ancient city of Upper Egypt on the Nile R.; flourished from the mid-22nd to the 18th cent. B.C. 2. An ancient city of Boeotia in E-central Greece NW of Athens. — The′ban (thē′bən) adj. & n.

**the·ca** (thē′kə) n., pl. -cae (-sē′, -kē′). A case, covering, or sheath, such as the pollen sac of an anther. [Lat., case, receptacle < Gk. thēkē. See dhē-*.] — the′cal (-kəl) adj.

**the·cate** (thē′kāt′) adj. Having a theca; encased or sheathed.

**thee** (thē) pron. The objective case of thou[1]. 1.a. Used as the direct object of a verb. b. Used as the indirect object of a verb. 2. Used as the object of a preposition. 3. Used in the nominative as well as the objective case, esp. by members of the Society of Friends.

**the·ism** (thē′ĭz′ən) n. See estrone. [Gk. thēlus, female; see dhē(i)-* + -in-.]

**thee·lol** (thē′lôl′, -lŏl′, -lōl′) n. See estriol. [THE(LIN) + -OL.]

**theft** (thĕft) n. 1. The act or an instance of stealing; larceny. 2. Obsolete. Something stolen. [ME < OE thiefth.]

**their** (thâr) adj. The possessive form of they. 1. Used as a modifier before a noun: their home. 2. Usage Problem. His, her, or its: "It is fatal for anyone who writes to think of their sex" (Virginia Woolf). See Usage Note at he[1]. [ME < ON theirra, theirs. See to-*.]

**theirs** (thârz) pron. (used with a sing. or pl. v.) 1. Used to indicate the one or ones belonging to them: The red house is theirs. 2. Usage Problem. His or hers. See Usage Note at he[1]. [ME < their. See THEM.]

**the·ism** (thē′ĭz′əm) n. Belief in a god or gods, esp. belief in a personal God as creator and ruler of the world. — the′ist n. — the·is′tic, the·is′ti·cal adj. — the·is′ti·cal·ly adv.

**The·lon** (thē′lŏn′). A river, c. 885 km (550 mi), of S-central Northwest Terrs., Canada, E of Great Slave Lake.

**them** (thĕm, thəm) pron. The objective case of they. 1.a. Used as the direct object of a verb: We saw them. b. Used as the indirect object of a verb: We gave them ... Used as the object of a preposition: This is for them ... ormal. Used as a predicate nominative: It's them. See to... ates at be. [1]. [ME < OE them and OE thām; see tho-.]

**the·mat·ic** (thĭ-măt′ĭk) adj. 1. Of, relating to, c... being a theme. 2. Ling. Of, constituting, or relating to the theme of a word: a thematic vowel. [Gk. thematikos < thema, themat-, theme. See THEME.] — the·mat′i·cal·ly adv.

**The·mat·ic Apperception Test** (thĭ-măt′ĭk) n. A projective test in which the subject tells a story suggested by each of a standard set of pictures showing everyday situations.

**theme** (thēm) n. 1. A topic of discourse or discussion. See Syns at subject. 2. A subject of artistic representation. 3. An implicit or recurrent idea; a motif. 4. A short composition assigned to a student as a writing exercise. 5. Mus. A principal melodic phrase in a composition, esp. a melody forming the basis of a set of variations. 6. Ling. A root accompanied by derivational affixes. [ME teme, theme < OFr. tesme < Lat. thema < Gk. See dhē-*.]

**theme park** n. An amusement park in which all the settings and attractions have a central theme, such as the future.

**theme song** n. Mus. 1. An often repeated song in a musical play that is identified with the work or a character. 2. A song identified with a performer or radio or television program.

**The·mis·to·cles** (thə-mĭs′tə-klēz′). 527?–460? B.C. Athenian official who directed the naval victory over Persia (480).

**them·selves** (thĕm-sĕlvz′, thəm-) pron. 1. Those ones identical with them: a. Used reflexively as the direct or indirect object of a verb or as the object of a preposition: They prepared themselves. b. Used for emphasis: The cooks themselves eat later. c. Used in an absolute construction: Newcomers themselves, they knew few people. 2. Their normal or healthy condition: They're fully recovered and quite themselves again.

**then** (thĕn) adv. 1. At that time: I was still in school then. 2. Next in time, space, or order; immediately afterward: watched the movie and then went to bed. 3. In addition; moreover; besides: It costs $20, and then there's the sales tax. 4. Used after but to qualify or balance a preceding statement: The star was nervous, but then who isn't on the first night. 5. In that case; accordingly: If traffic is heavy, then allow extra time. 6. As a consequence; therefore: The case, then, is closed. — n. That time or moment: Those days leave at four; until then let's shop. — adj. Being so at that time: the then president. — Idiom. and then some. Informal. With considerably more in addition. [ME < OE thenne. See to-*.]

**then and there** adv. At that precise time and place; on the spot: resigned then and there.



**Margaret Thatcher**

| | |
|---|---|
| ă pat | oi boy |
| ā pay | ou out |
| âr care | ŏŏ took |
| ä father | ōō boot |
| ĕ pet | ŭ cut |
| ē be | ûr urge |
| ĭ pit | th thin |
| ī tie | th this |
| îr pier | hw which |
| ŏ pot | zh vision |
| ō toe | ə about, |
| ô paw | item |

Stress marks:
′ (primary);
′ (secondary), as in
dictionary (dĭk′shə-nĕr′ē)

# V v

**v** or **V** (vē) *n., pl.* **v's** or **V's. 1.** The 22nd letter of the modern English alphabet. **2.** Any of the speech sounds represented by the letter *v*. **3.** The 22nd in a series. **4.** Something shaped like the letter V.

**V¹ 1.** The symbol for the element **vanadium. 2.** *Elect.* The symbol for **potential** 5. **3.** Also **v.** The symbol for the Roman numeral 5.

**V² abbr. 1.** *Phys.* Velocity. **2.** Victory. **3.** *Elect.* Volt. **4.** Volume (size or capacity).

**V-1** (vē′wŭn′) *n.* A robot bomb deployed by the Germans in World War II. [Ger. *Vergeltungswaffe eins,* retaliation weapon (number) one.]

**V-2** (vē′cōō′) *n.* A long-range liquid-fuel rocket used by the Germans as a ballistic missile in World War II. [Ger. *Vergeltungswaffe zwei,* retaliation weapon (number) two.]

**v. abbr. 1.** Verb. **2.** Verse. **3.** Version. **4.** *Print.* Verso. **5.** Versus. **6.** Or **V.** Very (in titles). **7.** Vide. **8.** Or **V.** Village. **9.** Violin. **10.** Vocative. **11.** Voice. **12.** Volume (book). **13.** Vowel.

**V. abbr. 1.** Venerable (in titles). **2.** Viscount; viscountess.

**VA** or **Va. abbr.** Virginia.

**V.A. abbr. 1.** Also **VA.** Veterans' Administration. **2.** Vicar apostolic.

**Vaal** (väl). A river rising in E South Africa and flowing c. 1,207 km (750 mi) to the Orange R.

**VAB abbr.** Voice answer back.

**va·can·cy** (vā′kən-sē) *n., pl.* **-cies. 1.** The condition of being vacant or unoccupied. **2.** An empty or unoccupied space. **3.** A position, an office, or a place of accommodation that is unfilled or unoccupied. **4.** Emptiness of mind. **5.** A crystal defect caused by the absence of an atom, an ion, or a molecule in a crystal lattice. **6.** *Archaic.* A period of leisure; idleness.

**va·cant** (vā′kənt) *adj.* **1.** Containing nothing; empty. **2.** Without an incumbent or occupant; unfilled. **3.** Not occupied or put to use. **4.a.** Lacking intelligence or knowledge. **b.** Lacking expression; blank. **5.** Not filled with any activity. [ME < OFr. < Lat. *vacāns, vacant-,* pr.part. of *vacāre,* to be empty. See **eu-²**.] — **va′cant·ly** *adv.* — **va′cant·ness** *n.*

**va·cate** (vā′kāt′, vā-kāt′) *v.* **-cat·ed, -cat·ing, -cates.** — *tr.* **1.a.** To cease to occupy or hold; give up. **b.** To empty of occupants or incumbents. **2.** *Law.* To make void or annul; countermand. — *intr.* To leave a job, an office, or a lodging. [Lat. *vacāre, vacāt-,* to be empty. See **eu-²**.]

**va·ca·tion** (vā-kā′shən, və-) *n.* **1.** A period of time devoted to pleasure, rest, or relaxation, esp. one with pay granted to an employee. **2.a.** A holiday. **b.** A fixed period of holidays, esp. one during which a school, court, or business suspends activities. **3.** *Archaic.* The act or an instance of vacating. — *intr.v.* **-tioned, -tion·ing, -tions.** To take or spend a vacation. [Ult. < Lat. *vacātiō, vacātiōn-,* freedom from occupation < *vacātus,* p.part. of *vacāre,* to be empty, at leisure. See **eu-²**.] — **va·ca′tion·er, va·ca′tion·ee′** (-shə-nēr′) *n.*

**va·ca·tion·land** (vā-kā′shə-nlst, və-) *n.* One on vacation.

**va·ca·tion·land** (vā-kā′shən-nlst, və-) *n.* A place with special attractions for those on vacation.

**Vac·a·ville** (văk′ə-vĭl′). A city of central CA WSW of Sacramento. Pop. 71,479.

**vac·ci·nal** (văk′sə-nəl, văk-sē′-) *adj.* **1.** Of or relating to vaccination or a vaccine. **2.** Induced by vaccination.

**vac·ci·nate** (văk′sə-nāt′) *v.* **-nat·ed, -nat·ing, -nates.** — *tr.* To inoculate with a vaccine in order to produce immunity to an infectious disease, such as diphtheria or typhus. — *intr.* To perform vaccinations or a vaccination. — **vac′ci·na′tor** *n.*

**vac·ci·na·tion** (văk′sə-nā′shən) *n.* **1.** Inoculation with a vaccine in order to protect against a particular disease. **2.** A scar left on the skin by vaccinating.

**vac·cine** (văk-sēn′, văk′sēn′) *n.* **1.a.** A preparation of a weakened or killed pathogen, such as a bacterium or virus, or of a portion of the pathogen's structure that upon administration stimulates antibody production against the pathogen but is incapable of causing severe infection. **b.** A vaccine prepared from the cowpox virus and inoculated against smallpox. **2.** *Comp. Sci.* Software designed to detect and stop a computer virus. [< Lat. *vaccīnus,* of cows < *vacca,* cow.]

**vac·ci·nee** (văk′sə-nē′) *n.* One that has been vaccinated.

**vac·cin·i·a** (văk-sĭn′ē-ə) *n.* See **cowpox.** [NLat. *vaccinia* < Lat. *vaccīnus,* of cows. See **VACCINE.**] — **vac·cin′i·al** *adj.*

**vac·il·lant** (văs′ə-lənt) *adj.* Undergoing vacillation; wavering.

**vac·il·late** (văs′ə-lāt′) *intr.v.* **-lat·ed, -lat·ing, -lates. 1.** To sway from one side to the other; oscillate. **2.** To swing indecisively from one course of action or opinion to another. [Lat. *vacillāre, vacillāt-,* to waver.] — **vac′il·lat′ing·ly** *adv.* — **vac′il·la′tion** *n.* — **vac′il·la′tor** *n.*

**vac·il·la·to·ry** (văs′ə-lə-tôr′ē, -tōr′ē) *adj.* Inclined to waver.

**va·cu·i·ty** (vă-kyōō′ĭ-tē, və-) *n., pl.* **-ties. 1.** Total absence of matter; emptiness. **2.** An empty space; a vacuum. **3.** Total lack of ideas; emptiness of mind. **4.** Absence of meaningful occupation; idleness. **5.** The quality or fact of being devoid of something specified: *a vacuity of taste.* **6.** Something empty, a remark, that is pointless or inane. [ME *vacuite* < OFr. < Lat. *vacuitās* < *vacuus,* empty. See **tonoplast.**]

**vac·u·o·lar membrane** *n.* See **tonoplast.**

**vac·u·o·lat·ed** (văk′yōō-ō-lā′tĭd) also **vac·u·o·late** (-lāt′, -lĭt) *adj.* Containing vacuoles or a vacuole.

**vac·u·ole** (văk′yōō-ōl′) *n.* A small cavity in cell cytoplasm, bound by a single membrane and containing water, food, or metabolic waste. [Fr. < Lat. *vacuus,* empty. See **VACUUM.**] — **vac′u·o′lar** (-ō′lər, -lär′) *adj.* — **vac′u·o·la′tion** *n.*

**vac·u·ous** (văk′yōō-əs) *adj.* **1.** Devoid of matter; empty. **2.a.** Lacking intelligence; stupid. **b.** Devoid of substance or meaning; inane: *a vacuous comment.* **c.** Devoid of expression; vacant. **3.** Lacking serious purpose or occupation; idle. [< Lat. *vacuus,* empty. See **VACUUM.**] — **vac′u·ous·ly** *adv.* — **vac′u·ous·ness** *n.*

**vac·u·um** (văk′yōō-əm, -yōōm, -yəm) *n., pl.* **-ums** or **-u·a** (-yōō-ə). **1.a.** Absence of matter. **b.** A space empty of matter. **c.** A space relatively empty of matter. **2.** A space in which the pressure is significantly lower than atmospheric pressure. **3.** A state of emptiness; a void. **3.** A state of being sealed off from external or environmental influences; isolation. **4.** *pl.* **-ums.** A vacuum cleaner. — *adj.* **1.** Of, relating to, or used to create a vacuum. **2.** Containing air or other gas at a reduced pressure. **3.** Operating by means of suction or by maintaining a partial vacuum. — *tr. & intr.v.* **-umed, -um·ing, -ums.** To clean with or use a vacuum cleaner. [Lat., empty space, neut. of *vacuus,* empty < *vacāre,* to be empty. See **eu-²**.]

**vacuum bottle** *n.* A bottle or flask having a vacuum between its inner and outer walls, designed to maintain the desired temperature of the contents.

**vacuum cleaner** *n.* An electrical appliance that cleans surfaces by suction.

**vacuum gauge** *n.* A device for measuring pressures below atmospheric pressure.

**vac·u·um-packed** (văk′yōō-əm-pākt′, -yōōm-, văk′yəm-) *adj.* **1.** Packed in an airtight container. **2.** Sealed under low pressure or a partial vacuum.

**vacuum pump** *n.* **1.** A pump used to evacuate an enclosure. **2.** See **pulsometer.**

**vacuum tube** *n.* An electron tube from which all or most of the gas has been removed, permitting electrons to move with low interaction with any remaining gas molecules.

**va·de me·cum** (vā′dē mē′kəm, vä′dē mā′-) *n., pl.* **va·de me·cums. 1.** A useful thing that one constantly carries about. **2.** A book, such as a guidebook, for ready reference. [Lat. *vāde mēcum,* go with me : *vāde,* sing. imper. of *vādere,* to go + *mē,* ablative sing. of *egō,* I + *cum,* with.]

**V.Adm.** or **VADM abbr.** Vice admiral.

**va·dose** (vā′dōs′) *adj.* Of, relating to, or being water located in the zone of aeration in the earth's crust above the ground water level. [Lat. *vadōsus,* shallow < *vadum,* a shallow, ford.]

**Va·duz** (vä-dōōts′, fä-). The cap. of Liechtenstein, in the W part on the Rhine R. Pop. 4,927.

**vag·a·bond** (văg′ə-bŏnd′) *n.* **1.** A person without a permanent home who moves from place to place. **2.** A vagrant; a tramp. **3.** A wanderer; a rover. — *adj.* **1.** Of, relating to, or characteristic of a wanderer; nomadic. **2.** Aimless; drifting. **3.** Irregular in course or behavior; unpredictable. — *intr.v.* **-bond·ed, -bond·ing, -bonds.** To lead the life of a vagabond; roam about. [ME *vagabonde* < OFr. *vagabond* < LLat. *vagābundus,* wandering < Lat. *vagārī,* to wander < *vagus,* wandering.] — **vag′a·bond′age, vag′a·bond′ism** *n.*

**va·gal** (vā′gəl) *adj.* Of or relating to the vagus nerve.

**va·ga·ry** (vā′gə-rē, və-gâr′ē) *n., pl.* **-ries.** An extravagant or erratic notion or action. [< Lat. *vagārī,* to wander < *vagus,* wandering.]

**va·gi** (vā′gī, -jī) *n.* Pl. of **vagus.**

**va·gile** (văj′əl, -īl) *adj.* Able to move about or disperse in a given environment: *a vagile animal species.* [Lat. *vagus,* wandering + -**ILE**.] — **va·gil′i·ty** (və-jĭl′ĭ-tē, vā-) *n.*

**va·gi·na** (və-jī′nə) *n., pl.* **-nas** or **-nae** (-nē). **1.** *Anat.* **a.** The passage leading from the opening of the vulva to the cervix of the uterus in female mammals. **b.** A similar part in some invertebrates. **2.** *Bot.* A sheathlike structure, such as the leaf of a grass that surrounds a stem. [Lat. *vāgīna,* sheath.]

**vag·i·nal** (văj′ə-nəl) *adj.* **1.** Of or relating to the vagina. **2.** Relating to or resembling a sheath. — **vag′i·nal·ly** *adv.*

**vag·i·nate** (văj′ə-nĭt, -nāt′) also **vag·i·nat·ed** (-nā′tĭd) *adj.* **1.** Forming or enclosed in a sheath. **2.** Resembling a sheath.



WEBSTER'S
New
Collegiate
Dictionary

Copyright © 1979 by G. & C. Merriam Co.

Philippines Copyright 1979 by G. & C. Merriam Co.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's new collegiate dictionary.

    Editions for 1898–1948 have title: Webster's collegiate dictionary.
    Includes index.
    1. English language--Dictionaries.
PE1628.W4M4    1979    423    78-11140
ISBN  0-87779-358-1
ISBN  0-87779-359-X (indexed)
ISBN  0-87779-360-3 (deluxe)

Webster's New Collegiate Dictionary principal copyright 1973

COLLEGIATE trademark Reg. U.S. Pat. Off.


*All rights reserved. No part of this work covered by the copyrights hereon
may be reproduced or copied in any form or by any means—graphic, elec-
tronic, or mechanical, including photocopying, recording, taping, or informa-
tion and retrieval systems—without written permission of the publisher.*


Made in the United States of America


3334RMcN79

**368(A)**

**suspensively ● swallow**

indecisiveness  3 : characterized by suspension — **sus·pen·sive·ly** adv

**sus·pen·soid** \sə-'spen(t)-ˌsȯid\ n [ISV suspension + colloid] 1 : a colloidal system in which the dispersed particles are solid  2 : a lyophobic sol (as a gold sol)

**sus·pen·sor** \sə-'spen(t)-sər\ n [NL, fr. suspensus, pp.] : a suspending part or structure: as  a : a group or chain of cells that is produced from the zygote of a heterosporous plant and serves to push the embryo which arises at its extremity deeper into the embryo sac and into contact with the food supply of the megaspore  b : one of the two hyphae in fungi (order Mucorales) that bear gametangia at their tips and later support the zygospore

**¹sus·pen·so·ry** \sə-'spen(t)s-(ə-)rē\ adj  1 : held in suspension; also : fitted or serving to suspend  2 : temporarily leaving undetermined : SUSPENSIVE 1

**²suspensory** n, pl -ries : something that suspends or holds up; esp : a fabric support for the scrotum

**suspensory ligament** n  1 : an annular fibrous membrane holding the lens of the eye in place — see EYE illustration  2 : the falciform ligament of the liver

**¹sus·pi·cion** \sə-'spish-ən\ n [ME, fr. L suspicion-, suspicio, fr. suspicere to suspect — more at SUSPECT]  1 a : the act or an instance of suspecting something wrong without proof or on slight evidence  b : MISTRUST  b : a state of mental uneasiness and uncertainty : DOUBT  2 : a slight touch or trace (just a ~ of garlic)  syn see UNCERTAINTY

**²suspicion** vt  **sus·pi·cioned; sus·pi·cion·ing** \-'spish-(ə-)niŋ\ chiefly substand : SUSPECT

**sus·pi·cious** \sə-'spish-əs\ adj  1 : tending to arouse suspicion : QUESTIONABLE  2 : disposed to suspect : DISTRUSTFUL (~ of strangers)  3 : expressing or indicative of suspicion (a ~ glance) — **sus·pi·cious·ly** adv — **sus·pi·cious·ness** n

**sus·pi·ra·tion** \ˌsəs-pə-'rā-shən\ n : a long deep breath : SIGH

**sus·pire** \sə-'spī(ə)r\ vi **sus·pired; sus·pir·ing** [ME suspiren, fr. L suspirare, fr. sub- + spirare to breathe — more at SPIRIT] : to draw a long deep breath : SIGH

Susse abbr Sussex

**Sus·sex spaniel** \ˌsəs-ik(s)-, -ˌek(s)-\ n [Sussex, England] : any of a British breed of short-legged short-necked long-bodied spaniels with a flat or slightly wavy golden liver-colored coat

**sus·tain** \sə-'stān\ vt [ME sustenen, fr. OF sustenir, fr. L sustinēre to hold up, sustain, fr. sub-, sus- up + tenēre to hold — more at SUBTHIN]  1 : to give support or relief to  2 : to supply with sustenance : NOURISH  3 : to keep up : PROLONG  4 : to support the weight of : PROP; also : to carry or withstand (a weight or pressure)  5 : to buoy up  6 a : to bear up under  b : SUFFER, UNDERGO (~ed heavy losses) (~ed a concussion of the brain — Allan Nevins)  7 a : to support as true, legal, or just  b : to allow or admit as valid (the court ~ed the motion)  8 : to support by adequate proof : CONFIRM (testimony that ~s our contention) — **sus·tain·able** \-'stā-nə-bəl\ adj — **sus·tain·er** n

**sus·tain·ing** adj  1 : serving to sustain  b : aiding in the support of an organization through a special fee (a ~ member)  2 : of or relating to a sustaining program

**sustaining program** n : a radio or television program that is paid for by a station or network and has no commercial sponsor

**sus·te·nance** \'səs-tə-nən(t)s\ n [ME, fr. OF, fr. sustenir]  1 a : means of support, maintenance, or subsistence : LIVING  b : FOOD, PROVISIONS; also : NOURISHMENT  2 a : the act of sustaining : the state of being sustained  b : a supplying or being supplied with the necessaries of life  3 : something that gives support, endurance, or strength

**sus·ten·tac·u·lar** \ˌsəs-tən-'tak-yə-lər, -ˌten-\ adj [NL sustentaculum supporting part, fr. L prop, fr. sustentare] : serving to support or sustain

**sus·ten·ta·tion** \ˌsəs-tən-'tā-shən\ n [ME, fr. MF, fr. L sustentation-, sustentatio act of holding up, fr. sustentatus, pp. of sustentare to hold up, fr. sustentus, pp. of sustinēre]  1 a : MAINTENANCE, UPKEEP  b : PRESERVATION, CONSERVATION  c : maintenance of life, growth, or morale  2 a : provision with sustenance  2 : something that sustains : SUPPORT — **sus·ten·ta·tive** \'səs-tən-ˌtāt-iv\ adj

**sus·ten·tion** \ˌsəs-'ten-chən\ n [fr. sustain, after such pairs as E retain : retention]: SUSTENTATION

**Su·su** \'sü-(ˌ)sü\ n, pl **Susu** or **Susus**  1 : a member of a West African people of Mali, Guinea, and the area along the northern border of Sierra Leone  2 : the language of the Susu people

**su·sur·ra·tion** \ˌsü-sə-'rā-shən\ n : a whispering sound : MURMUR

**su·sur·rous** \sü-'sər-əs, 'sü-rəs\ adj : full of whispering sounds

**su·sur·rus** \sü-'sər-əs, 'sü-rəs\ n [L, hum, whisper — more at SWARM] : a whispering or rustling sound — **su·sur·rant** \-'sər-ənt, 'sə-rənt\ adj

**Suth** abbr Sutherlandshire

**sut·ler** \'sət-lər\ n [obs. D zoeteler, fr. LG zuteler sloppy worker, camp cook; akin to OE besūtian to dirty, Gk hyein to rain — more at SUCK] : a provisioner to an army post often established in a shop on the post

**su·tra** \'sü-trə\ n [Skt sūtra thread, string of precepts, sutra; akin to L suere to sew — more at SEW]  1 : a precept summarizing Vedic teaching; also : a collection of these precepts  2 : a discourse of the Buddha

**sut·tee** \ˌsə-'tē, 'sə-ˌ\ n [Skt satī wife who performs suttee, lit., good woman, fem. of sat true, good; akin to OE sōth true — more at SOOTH]  1 : the act or custom of a Hindu widow willingly being cremated on the funeral pile of her husband as an indication of her devotion to him; also : a woman cremated in this way

**¹su·ture** \'sü-chər\ n [MF & L: MF, fr. L suture seam, suture, fr. sutus, pp. of suere to sew — more at SEW]  1 a : a strand or fiber used to sew parts of the living body  b : a stitch made with a suture  c : the act or process of sewing with sutures  2 a : a uniting of parts  b : the seam or seamlike line along which two things or parts are sewed or united  3 a : the line of union in an immovable articulation (as between the bones of the skull); also : such an articulation  b : a furrow at the junction of adjacent bodily parts;

*exp* : a line of dehiscence (as on a fruit) — **su·tur·al** \'süch(...)\ adj — **su·tur·al·ly** \-rə-lē, adv

**²suture** vt **su·tured; su·tur·ing** \'süch-(ə-)riŋ\ : to unite, clo... secure with sutures (~ a wound)

**su·ze·rain** \'süz-(ə-)rən, -ˌran\ n [F, fr. (assumed) MF MF sus up (fr. L sursum, fr. sub- up + versum -ward, fr... versus, pp. of vertere to turn) + -erain (as in soverain sovere... more at SUB-, WORTH]  1 : superior feudal lord to whom due : OVERLORD  2 : a dominant state controlling the foreig... tions of a vassal state but allowing it sovereign authority... internal affairs

**su·ze·rain·ty** \-tē\ n [F suzeraineté, fr. MF suseraineté, fr... MF suzerain]: the dominion of a suzerain : OVERLORDSHIP

**sv** abbr  1 sailing vessel  2 saves  3 [L sub verbo or sub voc...] the word

**Sv** or **svce** abbr service

**sved·berg** \'sfed-ˌbȯrg, -ˌber-ē\ n [The Svedberg †1971 Sw...] : a unit of time amounting to $10^{-13}$ second that is used to m... the sedimentation velocity of a colloidal solution (as of a ... in an ultracentrifuge and to determine molecular weight by... tution in an equation — called also svedberg unit

**svelte** \'sfelt\ adj [F, fr. It svelto, fr. pp. of svellere to plu... modif. of L evellere, fr. e- + vellere to pluck — more at VUL... BLE]  1 a : SLENDER, LITHE  b : having clean lines : SLEEK  2...

**Sven·ga·li** \sfen-'gäl-ē\ n [Svengali, malefic hypnotist in ... novel Trilby (1894) by George du Maurier] : one who ma... ness, with evil intentions to persuade or force another to ... bidding

**svgs** abbr savings

**sw** abbr switch

**SW** abbr Sweden; Swedish

**SW** abbr  1 seawater  2 shipper's weight  3 shortwave  4 ...

**SWA** abbr South-West Africa

**¹swab** \'swäb\ n [prob. fr. obs. D swabbe; akin to LG swabbe...]  1 a : MOP; esp : a yarn mop  b (1) : a wad of absorbent mate... usu. wound around one end of a small stick and used for app... medication or for removing material from an area  (2) : ... men taken with a swab  c : a sponge attached to a long ha... and used to clean the bore of a firearm  2 a : a useless or c... temptible person  b : SAILOR, GOB

**²swab** vt **swabbed; swab·bing** [back-formation from ¹...]  : to clean with or as if with a swab  2 : to apply medicati... with a swab (swabbed the wound with iodine)

**swab·ber** \'swäb-ər\ n (akin to LG swabber mop, ME swabbe... sway]  1 : one that swabs  2 : SWAB 2a

**swab·ble** also **swab·by** \-ə, ē\ n swabbies slang : SWAB 2b

**swad·dle** \'swäd-əl\ vt swaddled; swad·dling \'swäd-(ə-)liŋ\... ME swadelen, swethelen, prob. alter. of swethelen, swethe... swethel swaddling band, fr. OE; akin to OE swathian to swathe... a : to wrap (an infant) with swaddling clothes  b : SWATHE... VELOP  2 : RESTRAIN, RESTRICT

**swaddling clothes** n pl  1 : narrow strips of cloth wrap... around an infant to restrict movement  2 : limitations or rest... tions imposed upon the immature or inexperienced

**¹swag** \'swag\ vi **swagged; swag·ging** [prob. of Scand orig... akin to ON sveggja to cause to sway; akin to OHG swingan... swing]  1 : SWAY, LURCH  2 : SAG

**²swag** n  1 : SWAY  2 : something (as a decoration) hang... a curve between two points : FESTOON  b : a suspended cluster... of evergreen branches)  3 a : goods acquired by unlawful me... : LOOT  b : SPOILS, PROFITS  4 : a depression in the earth  5 ch... Austral : a pack of personal belongings

**³swag** \'swäj\ n [ME, ornamental border, fr. MF ...] : a tool used by workers in metals for shaping their work by hol... ing it on the work, or the work on it and striking with a hamm... sledge

**²swage** vt swaged; swag·ing : to shape by or as if by means of a... swage

**swage block** n : a perforated cast-iron or steel block with grooved... sides that is used in heading bolts and swaging bars by hand

**¹swag·ger** \'swag-ər\ vb swaggered; swag·ger·ing \-(ə-)riŋ\ [... prob. fr. ²swag + -er (as in chatter)]  vi  1 : to conduct oneself in... an arrogant or superciliously pompous manner; esp : to walk w... an air of overbearing self-confidence  2 : BOAST, BRAG ~ vt... force by argument or threat : BULLY  syn see STRUT — **swag·ge... er** \-ər-ər\ n — **swag·ger·ing·ly** \-(ə-)riŋ-lē\ adv

**²swagger** n  1 a : an act or instance of swaggering  b : arrogan... or conceitedly self-assured behavior  c : ostentatious display... bravado  2 : self-confident outlook : COCKINESS

**³swagger** adj : marked by elegance or showiness : POSH

**swagger stick** n : a short light stick usu. covered with leather a... tipped with metal at each end and intended for carrying in... hand (as by military officers)

**swag·man** \'swag-mən\ n, chiefly Austral : VAGRANT 2; esp : o... who carries a swag when traveling

**Swa·hi·li** \swä-'hē-lē\ n, pl **Swahili** or **Swahilis** [Ar sawāhil... sāhil coast]  1 : a member of a Bantu-speaking people of Za... and the adjacent coast  2 : a Bantu language that is a trade... governmental language over much of East Africa and in the C... region

**swain** \'swān\ n [ME swein boy, servant, fr. ON sveinn; akin to ... swin swain, L suus one's own — more at SUICIDE]  1 : ... PEASANT; specif : SHEPHERD  2 : a male admirer or suitor... **swain·ish** \'swā-nish\ adj — **swain·ish·ness** n

**¹swale** \'swā(ə)l\ n [ME, prob. of Scand origin; akin to Ic... swalr cool; akin to OE swelan to burn — more at SWELTER] : ... lying or depressed and often wet stretch of land

**swal·low** \'swäl-(ˌ)ō, -ə(-w)\ n [ME swalewe, fr. OE swealwe; ak... to OHG swalawa swallow, Russ solovej nightingale]  1 : any... numerous small long-winged passerine birds (family Hirundi... that are noted for their graceful flight and regular migrations... a short bill with a wide gape, small weak feet, and often a ...

**1199**

word *after* and to indicate emphatic repetition of the idea expressed by a previous word or phrase (he was helpful, and ~ to an unusual degree)   b — used as a function word immediately before or after a word group consisting of a verbal auxiliary or a form of the verb *be* preceded by *there* or a personal pronoun subject to indicate emphatic repetition of the idea expressed by a previous verb or predicate noun or predicate adjective (is he capable? He is ~)   4 : the one : the thing : the kind : SOMETHING, ANYTHING (the truth of ~ which is true) (the senses are ~ whereby we experience the world) (what's ~ you say)   b*a* : some persons (*those* who think the time has come) — all that : everything of the kind indicated (tact, discretion and *all that*) — at that   1 : in spite of what has been said or implied   2 : in addition : BESIDES

**²that** *adj, pl* **those**  1 *a* : being the person, thing, or idea specified, mentioned, or understood   b 1 so great   c : SUCH   2 : the farther away or less immediately under observation or discussion (this *chair* or ~ one)

**³that** \that, (ˌ)that\ *conj*  1 *a* (1) — used as a function word to introduce a noun clause that is usu. the subject or object of a verb or a predicate nominative (said ~ he was afraid)   (2) — used as a function word to introduce a subordinate clause that is anticipated by the expletive *it* occurring as subject of the verb (it is unlikely ~ he'll be in)   (3) — used as a function word to introduce a subordinate clause that is joined as complement to a noun or adjective (we are certain ~ this is true) (the certainty ~ this is true) (the fact ~ you are here)   (4) — used as a function word to introduce a subordinate clause modifying an adverb or adverbial expression (will go anywhere ~ he is invited)   b — used as a function word to introduce an exclamatory clause expressing a strong emotion esp. of surprise, sorrow, or indignation (~ it should come to this!)   2 *a* (1) — used as a function word to introduce a subordinate clause expressing purpose or desired result (cutting down expenses ~ her son might inherit an unencumbered estate —W. B. Yeats)   (2) — used as a function word to introduce a subordinate clause expressing a reason or cause (rejoice ~ you are highly favored —Rob. Browning)   (3) — used as a function word to introduce a subordinate clause expressing consequence, result, or effect (are of sufficient importance ~ they cannot be neglected —Hannah Wormington)   b — used as a function word to introduce an exclamatory clause expressing a wish (oh, ~ he would come)   3 — used as a function word after a subordinating conjunction without modifying its meaning (~ thy bent of love be honorable —Shak.)

**⁴that, (ˌ)that\ *pron*  1 — used as a function word to introduce a restrictive relative clause and to serve as a substitute within that clause for the substantive modified by that clause (the house ~ Jack built)   2 *a* : that which : as in which : on which : by which with which : to which (each year ~ the lectures are given)   b according to what : to the extent of what — used after a negative (has never been here ~ I know of)   3 *a* : *archaic* : that which   b : the person who

**⁵that\ , *adv*  1 : to such an extent (a nail about ~ long)   2 : VERY, EXTREMELY — usu. used with the negative (did not take the festival ~ seriously —Eric Goldman)

**thatch \thach, *vb* [ME *thacchen*, fr. OE *theccan* to cover; akin to OHG *decchen* to cover, L *tegere*, Gk *stegein* to cover, *stegos* roof, *skt shagati* he covers] : to cover with or as if with thatch — **thatch-er** *n*

**²thatch** *n*  1 *a* : a plant material (as straw) used as a sheltering cover esp. of a house   b : a sheltering cover (as a house roof) made of such material   2 : something resembling the thatch of a house; *esp* : the hair of one's head

**thau-ma-turge \'tho-mə-ˌtərj\ *n* [F, fr. NL *thaumaturgus*, fr. Gk *thaumaturgos* working miracles, fr. *thaumat-*, *thauma* miracle + *ergon* work — more at THEATER, WORK] : THAUMATURGIST

**thau-ma-tur-gic \ˌtho-mə-'tər-jik\ *adj*  1 : performing miracles   2 of, relating to, or dependent on thaumaturgy

**thau-ma-tur-gist \'tho-mə-ˌtər-jəst\ *n* : a performer of miracles; *esp* : MAGICIAN

**thau-ma-tur-gy \-jē\ *n* : the performance of miracles; *specif* : MAGIC

**²thaw \'tho\ *vb* [ME *thawen*, fr. OE *thawian*; akin to OHG *douwen* to thaw, Gk *tēkein* to melt, L *tabes* wasting disease] *vi* : to cause to thaw — *vt*  1 : to go from a frozen to a liquid state : MELT   b : to become free of the effect (as stiffness, numbness, or hardness) of cold as a result of exposure to warmth   2 : to be warm enough to melt ice and snow — used with *it* in reference to the weather   3 : to abandon aloofness, reserve, or hostility : UNBEND   4 : to become mobile, active, or susceptible to change

**²thaw** *n*  1 : the action, fact, or process of thawing   2 : a warmth of weather sufficient to thaw ice   3 : the action or process of becoming less aloof, less hostile, or more genial

**the-bor [NL *theologiae baccalaureus*] bachelor of theology

**the-ine \'thē-ˌēn, -ən\ *n* [*tetrahydrocannabinol*] : a physiologically active liquid from hemp plant resin that is the chief intoxicant in marijuana

**the-o-bor [NL *theologiae doctor*] doctor of theology

**¹the \thə (before consonant & esp South sometimes vowel sounds), thē (before vowel sounds); * It is often* \thē, *definite article* [ME, fr. OE *thē*, masc. demonstrative pron. & definite article, alter. (influenced by oblique cases — as *thæs*, gen. — & neut., *thæt*) of *sē*; akin Gk *ho*, masc. demonstrative pron. & definite article — more at THAT]  1 *a* — used as a function word to indicate that a following noun or noun equivalent is definite or has been previously specified by context or by circumstance (put ~ cat out)   b — used as a function word to indicate that a following noun or noun equivalent is unique or a particular member of its class (~ President) (~ Lord)   c — used as a function word before a noun to limit the application of a modifying adjective to the word designated (~ right is cold)   d — used as a function word before a noun denoting time to indicate (the ~ future)   e — used as a function word before names of some parts of the body or of the clothing as an equivalent of a possessive adjective (how's ~ arm today?)   f — used as a function word be-

fore the name of a branch of human endeavor or proficiency (~ law)   g — used as a function word in prepositional phrases to indicate that the noun in the phrase serves as a basis for computation (sold by ~ dozen)   h — used as a function word before a proper name (as of a ship or a well-known building) (~ Mayflower)   i — used as a function word before the plural form of a numeral that is a multiple of ten to denote a particular decade of a century or of a person's life (life in ~ twenties)   j — used as a function word before the name of a commodity or any familiar appurtenance of daily life to indicate reference to the individual thing, part, or supply thought of as at hand (talked on ~ telephone)   k — used as a function word to designate one of a class as the best, most typical, or most worth singling out (this ~ to ~ life)   **2** *a* (1) — used as a function word with a noun modified by an adjective or by an attributive noun to limit the application of the modified noun to that specified by the adjective or by the attributive noun (~ right answer) (Peter ~ Great)   (2) — used as a function word before an absolute adjective (nothing but ~ best)   b — used as a function word before a noun to limit its application to that specified by a succeeding element in the sentence (~ poet Wordsworth) (~ days of our youth) (didn't have ~ time to write)   **3** — used as a function word before a singular noun to indicate that the noun is to be understood generically (~ dog is a domestic animal)   b — used as a function word before a singular abstract substantivized adjective to indicate an abstract idea (an essay on ~ sublime)   **4** — used as a function word before a noun or a substantivized adjective to indicate reference to a group as a whole (~ elite)

**²the** *adv* [ME, fr. OE *thȳ* by that, instrumental of *thæt* that]  1 : than before : than otherwise — used before a comparative (none ~ wiser for attending)   **2** *a* : to what extent (~ sooner the better)   b : to that extent (the sooner ~ better)   **3** : beyond all others (likes this ~ best)

**the** *prep* [the] : PER 2

**the-** *or* **theo-** *comb form* [ME *theo-*, fr. L, fr. Gk *theo-*, fr. *theos*] : god : God (*theism*) (*theocentric*)

**theat** *abbr* theater; theatrical

**the-a-ter** *or* **the-a-tre** \'thē-ət-ər, *oftenest in South* 'thē-ˌāt-\ *n* [ME *theatre*, fr. MF, fr. L *theatrum*, fr. Gk *theatron*, fr. *theasthai* to view, fr. *thea* act of seeing; akin to Gk *thauma* miracle]  1 *a* : an outdoor structure for dramatic performances or spectacles in ancient Greece and Rome   b : a building for dramatic performances   c : a building or area for showing motion pictures   **2** *a* : a place rising by steps or gradations (a woody ~ of stateliest view —John Milton)   b : a room often with rising tiers of seats for assemblies (as for lectures or surgical demonstrations)   **3** *a* : a place of enactment of significant events or action (the ~ of public life)   **4** *a* : dramatic literature : PLAYS   b : dramatic representation as an art or profession : DRAMA (the philosophy that ~ is important to people's lives —Joseph Papp)   **5** : dramatic or theatrical quality or effect esp. as measured by the response of the audience

**the-ater-go-er \'thē-ət-ər-ˌgō(-ə)r\ *n* : one who frequently goes to the theater

**the-ater-go-ing \-ˌgō-iŋ, -ˌgō(-)iŋ\ *n* : attendance at the theater

**theater-in-the-round** *n* : ARENA THEATER

**theater of cruelty** : theater that seeks to heighten the audience's awareness and sensibility by depicting realistically acts of sadism and extreme suffering

**theater of operations** : the part of a theater of war in which active operations are conducted

**theater of the absurd** : theater that seeks to represent the absurdity of man's existence in a meaningless universe by bizarre or fantastic means

**theater of war** : the entire land, sea, and air area that is or may become involved directly in war operations

**The-a-tine \'thē-ə-ˌtin, -ˌtēn\ *n* [NL *Theatinus*, fr. L *Teatinus* inhabitant of Chieti, fr. *Teate* Chieti, Italy] : a priest of the Order of Clerks Regular founded in 1524 in Italy by St. Cajetan and Gian Pietro Caraffa to reform Catholic morality and combat Lutheranism — **Theatine** *adj*

**¹the-at-ri-cal \thē-'a-tri-kəl\ *adj*  1 : of or relating to the theater or the presentation of plays (a ~ costume)   **2** : marked by pretense or artificiality of emotion   **3** *a* : HISTRIONIC (a ~ gesture)   b : marked by extravagant display or exhibitionism — **the-at-ri-cal-ism \-kə-ˌliz-əm\ *n* — **the-at-ri-cal-i-ty \ˌthē-ˌa-trə-'kal-ət-ē\ *n* — **the-at-ri-cal-ly \-k(ə-)lē\ *adv*

**²theatrical** *n*  1 *a* : the performance of plays   b : DRAMATICS   **2** : a professional actor   **3** *pl* : showy or extravagant gestures

**the-at-ri-cal-ize \thē-'a-tri-kə-ˌliz\ *vt* -ized; -iz-ing  1 : to adapt to the theater : DRAMATIZE   **2** : to display in showy fashion — **the-at-ri-cal-i-za-tion \-ˌa-tri-kə-lə-'zā-shən\ *n*

**the-at-rics \thē-'a-triks\ *n, pl*  1 : THEATRICAL   **2** : staged or contrived effects

**the-ca \'thē-kə\ *n, pl* **the-cae \'thē-ˌsē, -ˌkē\ [NL, fr. Gk *thēkē* case — more at TICK]  1 : an urn-shaped spore-containing upper part of a moss capsule   **2** : an enveloping sheath or case of an animal or animal part — **the-cal \'thē-kəl\ *or* **the-cate \-ˌkāt\ *adj*

**-the-ci-um \'thē-s(h)ē-əm\ *n comb form, pl* **-the-cia \-s(h)ē-ə\ [NL, fr. Gk *thēkion*, dim. of *thēkē* case — more at TICK] : small containing structure (*apothecium*)

**¹the-co-dont \'thē-kə-ˌdänt\ *adj* [ISV *theco-* (fr. NL *theca*) + *-odont*] : having the teeth inserted in sockets

**²thecodont** *n* : a thecodont animal; *esp* : any of an order (Thecodontia) of Triassic diapsid thecodont reptiles that were presumably on the common ancestral line of the dinosaurs, birds, and crocodiles

| ə abut | ᵊ kitten | ər further | a back | ā bake | ä cot, cart |
|---|---|---|---|---|---|
| aᵘ out | ch chin | e less | ē easy | g gift | i trip |  ī life |
| j joke | ŋ sing | ō flow | ȯ flaw | ȯi coin | th thin | th̶ this |
| ü loot | u̇ foot | y yet | yü few | yu̇ furious | zh vision |

**370 (A)**

1281



**V**

**¹v** \'vē\ *n, pl* **v's** *or* **vs** \'vēz\ *often cap, often attrib* **1 a** : the 22d letter of the English alphabet **b** : a graphic representation of this letter **c** : a speech counterpart of orthographic *v* **2** : FIVE — see NUMBER table **3 a** : a graphic device for reproducing the letter *v* **b** : one designated *v* esp. as the 22d in order or class **5** : something shaped like the letter V

**²v** *abbr, often cap* **1** vector **2** velocity **3** verb **4** verse **5** versus **6** very **7** vice **8** victory **9** vide **10** voice **11** volt: voltage **12** volume **13** vowel

**V** *symbol* **1** electric potential **2** potential energy **3** vanadium

**VA** *abbr* Virginia

**VA** *abbr* **1** Veterans Administration **2** vicar apostolic **3** vice admiral **4** Virginia **5** visual aid **6** volt-ampere

**vac** *abbr* vacuum

**va·can·cy** \'vā-kən-sē\ *n, pl* **-cies 1** *archaic* : an interval of leisure **2 :** physical or mental inactivity or relaxation : IDLENESS **3 a :** vacating of an office, post, or piece of property **b :** the time such office or property is vacant **4 :** a vacant office, post, or tenancy **5 :** empty space : VOID **6 :** the state of being vacant : VACUITY

**va·cant** \'vā-kənt\ *adj* [ME, fr. OF, fr. L *vacant-, vacans,* prp. of *vacare* to be empty, be free — more at VACUUM] **1 :** not occupied by an incumbent, possessor, or officer ⟨a ~ office⟩ ⟨~ thrones⟩ **2 :** being without content or occupant ⟨a ~ seat in a bus⟩ ⟨a ~ room⟩ **3 :** free from activity or work : DISENGAGED ⟨~ hours⟩ **4 a :** STUPID, FOOLISH ⟨a ~ mind⟩ **b :** EXPRESSIONLESS ⟨a ~ face⟩ **c :** STUPID, FOOLISH ⟨a ~ mind⟩ — **va·cant·ly** *adv* — **va·cant·ness** *n*

**va·cate** \'vā-,kāt, vā-'\ *vb* **va·cat·ed; va·cat·ing 1 :** to make legally void : ANNUL **2 a :** to deprive of incumbent or occupant **b :** to give up the incumbency or occupancy of ~ *vt* : to vacate an office, post, or tenancy

**va·ca·tion** \vā-'kā-shən, və-\ *n, often attrib* [ME *vacacioun,* fr. MF *vacation,* fr. L *vacation-, vacatio* freedom, exemption, fr. *vacare*] **1 :** a respite or a time of respite from something : INTERMISSION **2 a :** a scheduled period during which activity (as of a court or school) is suspended **b :** a period of exemption from work granted to an employee for rest and relaxation **3 :** a period spent away from home or business in travel or recreation ⟨had a restful ~ at the beach⟩ **4 :** an act or an instance of vacating — *vi* — **va·ca·tion·er** *n* — **va·ca·tion·ist** \-nist\ *n*

**va·ca·tion·land** \-,land\ *n :* an area with recreational attractions and facilities for vacationists

**vac·ci·nal** \'vak-sə-n°l, vak-'sēn-\ *adj :* of or relating to vaccine or vaccination

**vac·ci·nate** \'vak-sə-,nāt\ *vb* **-nat·ed; -nat·ing 1 :** to inoculate (a person) with cowpox virus in order to produce immunity to smallpox **2 :** to administer a vaccine to usu. by injection ~ *vi* **:** to perform or practice vaccination — **vac·ci·na·tor** \-,nāt-ər\ *n*

**vac·ci·na·tion** \,vak-sə-'nā-shən\ *n :* a vaccinated individual **2 :** the scar left by vaccinating

**vac·cine** \vak-'sēn, 'vak-,\ *adj* [L *vaccinus* of or from cows, fr. *vacca* cow; akin to Skt *vaśā* cow] **1 :** derived from cows infected with cowpox or inoculated with its virus ⟨~ lymph⟩ **2** [NL, sec. *vaccinia*] *n* **1 :** of or relating to vaccinia or vaccination ⟨a ~ pustule⟩

**vac·cine** *n* **1 :** a matter or a preparation containing the virus of cowpox in a form used for vaccination **2 :** a preparation of killed microorganisms, living attenuated organisms, or living fully virulent organisms that is administered to produce or artificially increase immunity to a particular disease

**vac·cin·ia** \vak-'sin-ē-ə\ *n* [NL, fr. *vaccinus*] **:** COWPOX — **vac·cin·i·al** \-ē-əl\ *adj*

**vac·il·late** \'vas-ə-,lāt\ *vi* **-lat·ed; -lat·ing** [L *vacillatus,* pp. of *vacillare* to sway, waver — more at PREVARICATE] **1 :** to sway through lack of equilibrium **2 :** to FLUCTUATE, OSCILLATE **3 :** to waver in mind, will, or feeling : hesitate in choice of opinions or courses *syn* see HESITATE — **vac·il·lat·ing·ly** \-,lāt-iŋ-lē\ *adv* — **vac·il·la·tor** \-,lāt-ər\ *n*

**vac·il·la·tion** \,vas-ə-'lā-shən\ *n* **1 :** an act or instance of vacillating **2 :** inability to take a stand

**va·cu·ity** \va-'kyü-ət-ē, və-\ *n, pl* **-ties** [L *vacuitas,* fr. *vacuus* empty] **1 :** an empty space **2 :** the state, fact, or quality of being vacuous **3 :** something (as an idea) that is vacuous or inane

**vac·u·ole** \'vak-yə-,wōl\ *n* [F, lit., small vacuum, fr. L *vacuum*] **:** a small cavity or space in the tissues of an organism containing air or fluid **2 :** a cavity or vesicle in the protoplasm of a cell containing fluid — *see* AMOEBA illustration — **vac·u·o·lar** \,vak-yə-'wō-lər, '---,\ *adj* — **vac·u·o·la·tion** \,vak-yə-(,)wō-'lā-shən\ *n* **:** the development or formation of vacuoles

**vac·u·ous** \'vak-yə-wəs\ *adj* [L *vacuus*] **1 :** emptied of or lacking content **2 :** marked by lack of ideas or intelligence : STUPID, INANE ⟨~ mind⟩ ⟨~ expression⟩ **3 :** devoid of serious occupation *syn* see EMPTY — **vac·u·ous·ly** *adv* — **vac·u·ous·ness** *n*

**vac·u·um** \'vak-yü-əm, -(,)yüm, -yəm\ *n, pl* **vac·u·ums** *or* **vac·ua** \-yə-wə\ [L, fr. neut. of *vacuus* empty; akin to L *vacare* to be empty] **1 :** emptiness of space **2 :** a space absolutely devoid of matter **b :** a space partially exhausted (as to the highest degree possible) by artificial means **c :** a degree of rarefaction below atmospheric pressure : negative pressure **3 :** a state of isolation from outside influences ⟨people who live in a ~ ... so that the world outside them is of no moment —W. S. Maugham⟩ **4 :** a device creating or utilizing a partial vacuum

**²vacuum** *adj* **1 :** of, containing, producing, or utilizing a partial vacuum (separated by means of ~ distillation) **2 :** of or relating to a vacuum device or system (expert at ~ repair)

**³vacuum** *vt* **1 :** to use a vacuum device (as a cleaner) on ~ *vi* : to operate a vacuum device

**vacuum bottle** *n* **:** a cylindrical container with a vacuum between an inner and an outer wall used to keep material and esp. liquids either hot or cold for considerable periods

**vacuum cleaner** *n* **:** an electrical appliance for cleaning (as floors, carpets, tapestry, or upholstered work) by suction — called also **vacuum sweeper**

**vacuum gauge** *n* **:** a gauge indicating degree of negative pressure

**vacuum-tube** \,vak-yü-əm-\ *n, attrib* **:** an electron tube

**vacuum bomb** *n* **1 :** a bomb designed to produce a vacuum in **2 a :** to clean or dry by a vacuum mechanism **b :** to pack in a vacuum container

**vacuum-packed** \,vak-yüm-'pakt, -(,)yüm-, -yəm-\ *adj* **:** having much of the air removed before being hermetically sealed

**vacuum pan** *n* **:** a tank with a vacuum pump for rapid evaporation and condensation (as of sugar syrup) by boiling at a low temperature

**vacuum pump** *n* **:** a pump for exhausting gas from an enclosed space

**vacuum tube** *n* **:** an electron tube evacuated to a high degree of vacuum

**va·de me·cum** \,vād-ē-'mē-kəm, ,väd-ē-'mā-\, *n, pl* **vade mecums** [L, go with me] **1 :** a book for ready reference : MANUAL **2 :** something regularly carried about by a person

**VADM** *abbr* vice admiral

**va·dose** \'vā-,dōs\ *adj* [L *vadosus* shallow, fr. *vadum, n.* shallow, ford; akin to L *vadere* to go — more at WADE] **:** of, relating to, or being water or solutions in the earth's crust above the permanent groundwater level

**vag-** *or* **vago-** *comb form* [ISV, fr. NL *vagus*] **:** vagus nerve ⟨*vago*pressor⟩

**va·gus** \'vā-gəs\ *n, pl* **va·gi** \'vā-,jī, -,gī\ [NL, fr. L *vagus* wandering, fr. L *vagus* wandering] **:** vagus nerve — **va·gal** \'vā-gəl\ *adj*

**va·ga·ry** \'vā-gə-rē, və-'ge(ə)r-ē, -'ga(ə)r-\ *n, pl* **-ries** [prob. fr. L *vagari* to wander; akin to L *vagus* wandering] **1 :** an erratic, unpredictable, or extravagant manifestation, action, or notion *syn* see CAPRICE

**va·gi·na** \və-'jī-nə\ *n, pl* **-nae** \-(,)nē\ *or* **-nas** [L, lit., sheath] **1 a :** a canal in a female mammal that leads from the uterus to the external orifice of the genital canal **b :** a canal that is similar in function or location to the vagina and occurs in various animals other than mammals **2 :** SHEATH; *specif* : the expanded or enveloping sheathing part of the base of a leaf

**vag·i·nal** \'vaj-ən-°l\ *adj* **:** of or relating to a sheath **2** : of, relating to, or affecting the genital vagina — **vag·i·nal·ly** \-°l-ē\ *adv*

**vag·i·nis·mus** \,vaj-ə-'niz-məs\ *n* [NL, fr. L *vagina*] **:** a painful spasmodic contraction of the vagina

**vag·i·ni·tis** \,vaj-ə-'nīt-əs\ *n* [NL] **:** inflammation of the vagina or of a sheath (as a tendon sheath)

**va·got·o·my** \vā-'gät-ə-mē\ *n, pl* **-mies** [ISV] **:** surgical division of the vagus nerve

**va·go·to·nia** \,vā-gə-'tō-nē-ə\ *n* [NL] **:** excessive excitability of the vagus nerve resulting typically in vasomotor instability, constipation, and sweating — **va·go·ton·ic** \-'tän-ik\ *adj*

**va·go·tro·pic** \-'trō-pik\ *adj* **:** acting selectively upon the vagus nerve (~ drugs)

**va·gran·cy** \'vā-grən-sē\ *n, pl* **-cies 1 :** VAGARY **2 :** the state or action of being vagrant **3 :** the offense of being a vagrant

**¹va·grant** \'vā-grənt\ *n* [ME *vagraunt,* prob. modif. of MF *wacrant, wacrant* wandering, fr. OF, fr. prp. of *waucrer, wacrer* to roll, wander, of Gmc origin; akin to OE *wealcan* to roll — more at WALK] **1 a :** one who has no established residence and wanders idly from place to place without lawful or visible means of support **b :** one (as a common prostitute or drunkard) whose conduct constitutes statutory vagrancy **2 :** ROVER, WANDERER

**²vagrant** *adj* **1 :** wandering about from place to place with no means of support **2 :** having a floating, wayward, or inconstant quality **3 :** having no fixed course : RANDOM — **va·grant·ly** *adv*

**va·grom** \'vā-grəm\ *adj* **:** VAGRANT

**vague** \'vāg\ *adj* **vagu·er; vagu·est** [MF, fr. L *vagus,* lit., wandering] **1 :** not clearly expressed : stated in indefinite terms ⟨~ accusation⟩ **b :** not having a precise meaning ⟨~ term of abuse⟩ **2 :** not clearly defined, grasped, or understood : INDISTINCT ⟨~ idea⟩ **b :** not clearly felt or sensed : somewhat subconscious ⟨~ longing⟩ **3 :** not thinking or expressing one's thoughts clearly or precisely ⟨~ about dates and places⟩ **4 :** lacking expression : VA-

| ə abut | ᵊ kitten | ər further | a back | ā bake | ä cot, cart |
|---|---|---|---|---|---|
| aᵘ out | ch chin | e less | ē easy | g gift | i trip | ī life |
| j joke | ŋ sing | ō flow | ò flaw | òi coin | th thin | ᵗʰ this |
| ü loot | u̇ foot | y yet | yü few | yu̇ furious | zh vision |



**372 (A)**

